## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. PAUL PIETSCHNER<br><br>    Plaintiff-Relator,<br><br>v.<br><br>KABBAGE, INC.; KATHRYN PETRALIA;<br>ROBERT FROHWEIN and SPENCER ROBINSON,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  _4:21cv110-SD_J<br>**JURY TRIAL DEMANDED**<br>**FILED UNDER SEAL** |

## COMPLAINT

1.      Relator Paul Pietschner brings this action on behalf of himself and the

United States of America against defendants Kabbage, Inc.; Kathryn Petralia;

Robert Frohwein; and Spencer Robinson, for violations of the federal False Claims

Act ("federal FCA"), 31 U.S.C. §§ 3729 *et seq*. (the "False Claims Act").

## INTRODUCTION

2.      Kabbage, Inc. is a fintech company that applied its "fund now, verify later"

model of lending to the federal Paycheck Protection Plan loan program,

recklessly spreading more than six billion dollars around the country in a matter

of weeks. In doing so, Kabbage failed to apply even the lax standards that it had

been applying for its own loan portfolio, ignored even the most basic origination

criteria, and then bragged about how fast it could originate PPP loans and how

few people it needed to do so.

3.    Kabbage's boastful press releases were a supposed homage to its data analytics platform, which supposedly looked at myriad data points to make quick credit decisions. But in fact, more than a year before the PPP program Kabbage had already begun lowering its own lending standards, disregarding most of these data points.

4.    By the time it was qualified as a PPP lender, Kabbage was in a state of negative amortization and violating even its own most basic tenets, such as requiring a business to exist for a year before receiving Kabbage credit.

5.    The "Kabbage Heads," as Kabbage management styles itself, saw the PPP program as a way to salvage their own struggling business through loan processing fees. They did this so successfully that after closing out the second round of the PPP program, the Kabbage Heads sold the data analytics platform to American Express, Inc. in what was called the "Deal of the Year."

6.    Unfortunately, this "deal of the year" was at the expense of the PPP program, the CARES Act funds, and ultimately the American taxpayer.

7.    As explained below, Relator Paul Pietschner, a legal analyst in Kabbage's Atlanta collections department, saw the decreasing internal controls on lending and brought it to the attention of the Kabbage Heads, but to no avail.

8.    As the data from PPP loans becomes available, it is easy to see that even

obviously fraudulent loan requests were granted, all because Kabbage failed to abide by its duties as a PPP Lender and engage in even basic verification procedures.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1331, 1345.

10.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as one or more of the defendants resides or transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## PARTIES

11.    Defendant Kabbage, Inc. is a Delaware fintech corporation originally founded to provide working capital advances for online merchants. Kabbage offered financial services data and financial technology for small and medium sized online sellers from its principal place of business at 730 Peachtree Street Suite 350 Atlanta, GA 30308.

12.    Between April and August of 2020, Kabbage distributed more than six billion dollars in SBA PPP loan funds, earning more than three hundred million dollars in loan fees. These loans went to applicants all U.S. states, including Texas.

13.     In late 2020, substantially all of Kabbage's assets were purchased by American Express, Inc. ("Amex"). However, Kabbage's existing loan portfolio (including both Kabbage Funding loans and Paycheck Protection Program loans) were not part of the Amex acquisition. Such loans taken out prior to October 16, 2020 continue to be serviced by Defendant Kabbage, Inc. through the new K Servicing site.

14.     Defendant Kathryn Petralia is a co-founder of Kabbage and currently serves as its President. Defendant Petralia lives in Atlanta, Georgia. She received a cash retention award of $13,320,000 as part of the sale of Kabbage to Amex.

15.     Defendant Robert Frohwein is the second co-founder of Kabbage, who still serves as its CEO. Defendant Frohwein lives in Atlanta, Georgia. Like Petralia, he received a cash retention award of $13,320,000 as part of the sale of Kabbage to Amex.

16.     Defendant Spencer Robinson was the Kabbage Head of strategy and as such was responsible for the PPP Loan implementation. Defendant Robinson lives in Atlanta, Georgia. He received a $2,400,000 cash Retention Award as part of the sale of Kabbage to Amex.

17.     Relator Paul Pietschner is a former Kabbage legal analyst in the credit operations department. Prior to the PPP loan roll out, Relator's job duties included training customer service representatives on legal terms and conditions

of the loan program and how to explain those concepts to customers, and how to assess/forward calls requiring escalation.

18.     Relator, along with a significant portion of the Kabbage work force, was furloughed in March 2020 at the start of the pandemic. After Kabbage was qualified as a PPP Lender, Relator was called back to work in June 2020, where his job duties put him squarely in the path of the fraud described herein.

## BACKGROUND

### A.     Regulatory Framework and the Fraudulent Conduct

*Overview of the PPP Loan Program Framework*

19.     Under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act, Pub. L. 116–136), the SBA received funding and authority to modify its existing loan programs and establish a new loan program to assist small businesses nationwide that had been or were expected to be adversely impacted by the pandemic. Section 1102 of the CARES Act authorized the SBA to guarantee 100 percent of certain 7(a) loans under a new program titled the ''Paycheck Protection Plan.''

20.      At a high level, the PPP Loan Program is designed to work as follows: small businesses apply for a loan through an SBA-approved lender, which reviews the application and makes eligibility determinations based on

requirements that, in the main, were already well established for issuing loans under the SBA 7(a) loan program.

21.    One important difference in the PPP loan program, however, is that lenders were permitted to rely on borrower certifications to determine eligibility and to rely on borrower's documentation in determining loan amount and forgiveness eligibility.

22.    Nevertheless, as explained below, eligibility determinations still required the lender to undertake basic underwriting procedures and to comply with the Bank Secrecy Act (BSA), anti-money laundering (AML) controls, and fraud controls. For example, lenders were required to verify the identity of the applicant and, in the case of certain businesses, its ultimate beneficial owners. Lenders were also required to report fraudulent and suspicious transactions.

23.    If the loan is approved, it is funded by the lender. Prior to the end of the loan's term, the business may apply to have the loan forgiven based on having spent the money in specific, approved ways such as payroll or mortgage/rent payments.

24.    If the forgiveness conditions are satisfied, the lender is repaid by the SBA through CARES Act funds. If the business's use of the funds does not qualify it for forgiveness, the business pays the loan back to the lender itself. However, if

the business fails to make payments, the Lender can turn to the SBA, who will pay the loan back 100%, protecting the Lender.

*SBA Interim Final Rules*

25.    To manage the PPP Program, the SBA and Treasury have published twenty-six Interim Final Rules in the Federal Register as follows:

| IFR | Title |
|---|---|
| 1 | Letter from the Administrator |
| 2 | Paycheck Protection Program |
| 3 | Affiliation Rules |
| 4 | Additional Eligibility Criteria and Requirements for Certain Pledges of Loans for the Paycheck Protection Program |
| 5 | Promissory Notes, Authorizations, Affiliation, and Eligibility |
| 6 | Seasonal Employers |
| 7 | Disbursements |
| 8 | Requirements – Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders |
| 9 | Nondiscrimination and Additional Eligibility Criteria |
| 10 | Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan Request |
| 11 | Requirements for Loan Increases for Partnerships or Seasonal Employers |
| 12 | Eligibility of Certain Electric Cooperatives |
| 13 | Treatment of Entities with Foreign Affiliates |
| 14 | Second Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan and Lender Reporting |
| 15 | Requirements – Loan Forgiveness |
| 16 | SBA Loan Review Procedures and Related Borrower and Lender Responsibilities |

| IFR | Title |
|-----|-------|
| 17 | Eligibility of Certain Telephone Cooperatives |
| 18 | Interim Final Rule on Revisions to the First PPP Interim Final Rule |
| 19 | Additional Revisions to First PPP Interim Final Rule |
| 20 | Interim Final Rule on Revisions to the Third and Sixth Interim Final Rules |
| 21 | Revisions to Loan Forgiveness Interim Final Rule and SBA Loan Review Procedures Interim Final Rule |
| 22 | Additional Eligibility Revisions to First PPP Interim Final Rule |
| 23 | Certain Eligible Payroll Costs (Fishing Boat Owners) |
| 24 | Appeals of SBA Loan Review Decisions Under the PPP |
| 25 | Treatment of Owners and Forgiveness of Certain Nonpayroll Costs |
| 26 | Additional Revisions to Loan Forgiveness and Loan Review Procedures |

***Lender Certifications***

26.     To qualify as a lender, Kabbage submitted SBA Form 3507, which states in

Paragraph 3 ("Approval of Guaranty") that:

> For purposes of making covered loans to an eligible recipient under
> the Paycheck Protection Program, Lender is responsible, to the
> extent set forth in the PPP Loan Program Requirements, for all
> decisions concerning the eligibility (including size) of a borrower for
> a covered loan. Lender may issue a covered loan approved under
> PPP procedures without prior SBA review and approval of the
> processing and underwriting of the loan by executing a PPP
> Authorization.

27.     The Lender Agreement further requires, in Paragraph 4 ("Closing and

Disbursement of Covered Loans") that Kabbage:

> must ensure that a note and all other Loan Documents (as defined in
> this paragraph) and additional documents are properly executed

and take such other actions necessary to fulfill the requirements of the Paycheck Protection Program. SBA is entitled, at any time, to examine and obtain copies of all notes, certifications and documentation (herein, collectively, called "Loan Documents"), and all other records held by Lender which relate to covered loans made pursuant to the Paycheck Protection Program.

28.    Finally, in Paragraph 10 ("Interpretation of this Agreement"), Kabbage certified compliance: "[t]o the best of its knowledge, Lender certifies that it is in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program and PPP Loan Program Requirements." (¶10(B)); *see also* signature block, stating "[b]y signing below, I hereby certify that I have the authority to execute this Agreement for the Lender on whose behalf I am signing, and that all representations made are true and correct to the best of my knowledge."

29.    The "Paycheck Protection Program Lender Application Form – Paycheck Protection Program Loan Guaranty" was also submitted electronically and required Kabbage to certify as follows:

On behalf of the Lender, I certify that:

• The Lender has complied with the applicable lender obligations set forth in paragraphs 3.b(i)-(iii) of the Paycheck Protection Program Rule.

• The Lender has obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts) of the Applicant and will retain copies of such documents in the Applicant's loan file.

30.    IFR No. 1, referenced in the first bullet above and published at 85 F R

20811, provides in Paragraph 3 ("What do lenders need to know and do?) (B)

("What do lenders have to do in terms of loan underwriting?") as follows:

Each lender shall:

> i. Confirm receipt of borrower certifications contained in Paycheck
> Protection Program Application form issued by the Administration;
>
> ii. Confirm receipt of information demonstrating that a borrower
> had employees for whom the borrower paid salaries and payroll
> taxes on or around February 15, 2020;
>
> iii. Confirm the dollar amount of average monthly payroll costs for
> the preceding calendar year by reviewing the payroll documentation
> submitted with the borrower's application; and
>
> iv. Follow applicable BSA requirements:
>
> ….
>
> II. Entities that are not presently subject to the requirements of the
> BSA, should, prior to engaging in PPP lending activities, including
> making PPP loans to either new or existing customers who are
> eligible borrowers under the PPP, establish an anti-money
> laundering (AML) compliance program equivalent to that of a
> comparable federally regulated institution. Depending upon the
> comparable federally regulated institution, such a program may
> include a customer identification program (CIP), which includes
> identifying and verifying their PPP borrowers' identities (including
> e.g., date of birth, address, and taxpayer identification number), and,
> if that PPP borrower is a company, following any applicable
> beneficial ownership information collection requirements.
> Alternatively, if available, entities may rely on the CIP of a federally
> insured depository institution or federally insured credit union with
> an established CIP as part of its AML program. In either instance,
> entities should also understand the nature and purpose of their PPP
> customer relationships to develop customer risk profiles. Such
> entities will also generally have to identify and report certain

suspicious activity to the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). ….

Each lender's underwriting obligation under the PPP is limited to the items above and reviewing the "Paycheck Protection Application Form." Borrowers must submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099-MISC, or income and expenses from a sole proprietorship. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount.

31.     Thus, in sum, the IFR require lenders to confirm (1) receipt of the required borrower certifications; (2) receipt of information sufficient to establish that a borrower had employees for whom the borrower paid salaries and payroll taxes on or before February 15, 2020; (3) the dollar amount of the average monthly payroll costs, based on review of the payroll documentation submitted by the borrower.

32.     Then, in addition to these certifications, the lender must follow all BSA requirements, which may include having a "Customer Identification Program" for both individual and entity clients. Existing clients were not required to be re-verified "unless otherwise indicated by the institution's risk-based approach to BSA compliance," suggesting that first time customers did, in fact, need to go through appropriate verification procedures.

33.     Identity verification for partnerships includes establishing information on Ultimate Beneficial Ownership (UBO). Specific information on UBO

requirements is found in Final PPP FAQs 25, which provides that for new customers, the lender's collection "of the following information from all natural persons with a 20% or greater ownership stake in the applicant business will be deemed to satisfy applicable BSA requirements and FinCEN regulations governing the collection of beneficial ownership information: owner name, title, ownership %, TIN, address, and date of birth. If any ownership interest of 20% or greater in the applicant business belongs to a business or other legal entity, lenders will need to collect appropriate beneficial ownership information for that entity."

34.    Finally, it is important to note that the SBA specifically required that all of these obligations must be fulfilled by the lender *before* the lender submitted the loan application to SBA. Final PPP FAQ No. 28, provides as follows:

> Question: Is a lender permitted to submit a PPP loan application to SBA through E-Tran before the lender has fulfilled its responsibility to review the required borrower documentation and calculation of payroll costs?

> Answer: No. Before a lender submits a PPP loan through E-Tran, the lender must have collected the information and certifications contained in the Borrower Application Form and the lender must have fulfilled its obligations set forth in paragraphs 3.b.(i)-(iii) of the PPP Interim Final Rule.

35.    However, as discussed below and consistent with its own loan practices, Kabbage performed only minimal verification until *after* loans were submitted.

Then, after submission, a secondary review was performed, but only on some files, and was conducted by largely-untrained third parties.

36.     The PPP program required Kabbage to verify customer information at this basic level, consistent with its obligations under the BSA/AML procedures, before submitting the loan, and Kabbage did not do so.

37.     Importantly, both the 100% guarantee of the PPP loans and the payment of SBA Lender Fees (discussed further below) are conditioned on the Lender meeting each of the foregoing requirements.

*SBA Lender Fees*

38.     Before the passage of the CARES Act, Lenders were not compensated by the SBA for originating SBA 7(a) loans. Under the PPP loan program, however, Lenders are compensated for processing PPP loans based on the amount of the funded PPP loan.

39.     Lender fees for PPP loans were calculated as follows: five percent for loans of not more than $350,000; three percent for loans between $350,000 and $2,000,000; and one percent for loans of $2,000,000 or greater.

40.     These SBA Lender Fees were the incentive for Kabbage Heads to reimagine themselves as a PPP Lender.

41.     As explained below, in addition to the SBA Lender Fees it generated for its own loans, Kabbage also entered into servicing agreements with Cross River

Bank and Customers Bank. These two banks were also paid SBA Lender Fees, a portion of which they remitted to Kabbage in exchange for servicing obligations.

42.    IFR No. 15 states that a Lender is not eligible for an SBA Lender Fee if the borrower himself is determined to be ineligible for the loan. "If SBA conducts a loan review and determines that the borrower was ineligible for a PPP loan, the lender is not eligible for a processing fee" and previously paid processing fees are subject to clawback: '[f]or any SBA-reviewed PPP loan, if within one year after the loan was disbursed SBA determines that a borrower was ineligible for a PPP loan based on the provisions of the CARES Act or applicable rules or guidance available at the time of the borrower's loan application, or the terms of the loan application, SBA will seek repayment of the lender processing fee from the lender."

43.    Similarly, SBA Lender Fees are subject to clawback if a lender has not fulfilled its obligations under PPP regulations. "If a lender fails to satisfy the requirements applicable to lenders that are set forth in section III.3.b of the First Interim Final Rule or the document collection and retention requirements described in the lender application form (SBA Form 2484), SBA will seek repayment of the lender processing fee from the lender and may determine that the loan is not eligible for a guaranty.

44.    To request payment for SBA Lender Fees, the lender reports to SBA that the loan has been fully disbursed, using Form 1502.

45.    Upon receipt of Form 1502, SBA confirms that no previous request has been made for fees on the same loan, confirms that the disbursed amount on the 1502 matches the approval amount in E-Tran; calculates the processing fee owed based on the finally fully disbursed amount; and submits the fee to the Lender using the ACH credit information provided by the Lender.

*Loan Amounts*

46.    As discussed above, lenders like Kabbage were required to certify that, "[t]he Lender has obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts) of the Applicant and will retain copies of such documents in the Applicant's loan file."

47.    The amount for which a business was eligible was based on the payroll of that business, paying out two-and-a-half months of a company's payroll. This is calculated is based on annual compensation, with a cap for annualized compensation of $100,000.

48.    Self-employed individuals were eligible for a PPP Loan if (1) they were in operation as of February 15, 2020; (2) they were individuals with self-employment income, such as an independent contractor or a sole proprietorship; (3) their principal place of residence was in the United States; and (4) they filed

Form 1040 Schedule C. IFR "Additional Paycheck Protection Program Eligibility Criteria and Requirements for Certain Pledges of Loans."

49.     As a result of these calculations, the most that a single employee/sole proprietor could receive under the program was $20,833.00, which is an annual compensation of $100,000, divided into twelve months, times two and a half months. This number reoccurred over and over in the Kabbage loans—many times for industries in which the annual compensation more typically was $30,000 to $40,000, and where the taxpayer was only able to show that much compensation for previous years.

### B.  Background and Corporate History of Kabbage, Inc.

50.     Kabbage was founded in 2009 by Defendants Petralia and Frohwein, to make fast credit decisions for small, online businesses using automated processes.

51.     Named after a slang term for money, the company set out to build "Kabbage culture," which included offering daily yoga, bootcamp, and lunch, along with snacks, a keg, massage chairs, a pool table, and pinball machines. Employees were permitted to bring both pets and children to the office and, announcing a commitment to transparency, Kabbage Heads set up weekly "Town Halls" in which the entire company gathered.

52.    Kabbage's "Core Values," as per its website are to "Unconditional Commitment, Stay Connected, Care Deeply, Inspire Innovation, Win, and Create Holy Shit Moments."

53.    Kabbage's first and primary product was known as "Kabbage Funding," which uses automated processes to make fast loan decisions for small online businesses. The process relies on data points such as business volume, time in business, transaction volume, social media activity, and the seller's credit score to authorize a total available balance for small online businesses for up to $250,000 per customer.

54.    Each draw by the customer against the available balance was considered a separate loan, with either 6-, 12- or 18-month terms.

55.    Kabbage loans were not funded by Kabbage, but by Celtic Bank, a privately owned industrial bank chartered by the State of Utah, which allowed Kabbage to take advantage of Utah's favorable lender rules. For example, Utah banks are not subject to an interest rate ceiling, This made the functional APR for Kabbage loans 100% in some cases.

56.    However, immediately after each loan was made, Kabbage paid Celtic the face value of the note plus a fee for the participation interest in the receivable, which Kabbage then securitized to use as collateral for credit facilities.

57.    Kabbage purchased the participation interest from Celtic with funds from various credit facilities, then repaid those facilities with the funds received from customers. The remainder was Kabbage's profit.

58.    Kabbage began servicing online merchants with Kabbage Funding in 2011 and from the outside, the company appeared to be a roaring success. It extended its automated lending platform to brick and mortar small businesses in February 2014 and within six years, Kabbage Funding reportedly offered access to over $1 billion each year in working capital for small businesses.

59.    In addition to Kabbage Funding, Kabbage began to diversify as early as 2015, working to license its loan platform to other organizations such as ING in Spain. The same year, it introduced the "Kabbage Card," a point-of-sale purchasing card that was linked to the customer's Kabbage Funding account balance.

60.    In August 2015, Kabbage was named the 36th fastest-growing private company in America and in October of the same year, completed a Series E funding round of $135 million led by Reverence Capital Partners, with Holland's ING, Spain's Santander, and Canada's Scotiabank also participating.

61.    In 2017, the company raised $250 million from Softbank Group Corp., raising its total equity funding to $500 million. It also secured the largest asset-backed securitizations of small business loans in the online lending industry at

$525 million, and further diversified its debt-funding sources with a $200 million revolving credit facility with Credit Suisse.

62.    Despite this seeming success, insiders like Relator knew that by late 2017, Kabbage faced mounting difficulties.

63.    As explained below, even at its best, Kabbage Funding's business model rewarded the underreporting of fraudulent loans. By 2018, Kabbage began lowering its own loan standards, allowing even more opportunities for fraudsters to obtain funds. The company then began rolling out more "disrupter" products under the aegis of "Cash Flow as a Service," known internally as "CFAS." These CFAS products brought Kabbage under legal and regulatory schemes that came with obligations that Kabbage was not merely unprepared for, it was actually ignorant of. By early 2020, these issues contributed to a crisis.

64.    As further evidence that things were not as rosy as Kabbage's press releases suggest, there were no merit-based pay increases, very limited bonuses, and a general hiring freeze for most departments going into 2020.

### i. Underreporting of Fraud

65.    As a fintech company—called a "non-bank" by the banking community— the Kabbage Funding product took full advantage of the fact that it operates outside the bounds of many banking and financial regulations. For example, Kabbage was only subject to the strict requirements to discover, report, or

mitigate fraud such as are found in the BSA/AML guidelines as a program manager for Celtic Bank.

66.     Moreover, Kabbage had an incentive to keep fraud metrics low, because they were reported both internally and as part of the contractual terms with lending facilities and other partner accounts.

67.     To keep these fraud metrics low, in Relator's personal experience, loans that should have been classified as fraud were systemically categorized as uncollected or uncollectible, and thus considered delinquent but rightly issued.

68.     In part due to Kabbage customers' ability to kite loans, these accounts did not substantially impact the apparent delinquency rate, and thus the benefit of the increased originations due to reduced controls did not create substantial risk.

69.     As used here, kiting refers to paying off credit with credit. Specifically, Kabbage customers were able to take out another loan from their Kabbage available balance in order to pay the amount that was due. This allowed the customers to appear current while sliding towards a point of no return, where there would not be sufficient funds available to make the next payment. At that point funding would be cut off, and the customer would spiral into delinquency.

70.     Kiting was easy to do with Kabbage Funding because the amounts were relatively small and the credit was revolving. As discussed above, each draw on the available balance was treated as an individual loan, each of which would be

paid back in sequence. Under this system, each time a payment was made, the available balance opened up for the amount of that payment. Thus, a customer could have sixteen to twenty Kabbage loans, which enabled the customer to take out a loan to pay back the loan that was coming due that month. In Relator's experience in collections, this practice was common.

71.    In addition, from its founding until around October 2019, Kabbage allowed loans to be paid back with credit cards. In fact, Kabbage only stopped this practice when it launched Kabbage Payments, which was a merchant terminal product that required the company to sign agreements with Visa and Mastercard that forbade accepting debt to pay debt.

72.    Thus, from the beginning, Kabbage Funding's lack of regulatory oversight enabled and encouraged it to underreport fraud, while its business model incentivized it to do so.

### ii.    Kabbage Reduces Quality Controls

73.    As noted above, in 2017, Kabbage raised $250 million from Softbank Group Corp., raising its total equity funding to $500 million; secured the largest asset-backed securitizations of small business loans in the online lending industry at $525 million; and took out a $200 million revolving credit facility with Credit Suisse. All of this created heightened expectations for management, the Board, and the founders to outperform previous years.

74.     Unfortunately, based on market saturation and other factors, Kabbage was seeing a lessening of originations. To try and "juice originations," the company brought in a new Vice President of Underwriting and Fraud Strategy as well as a new Chief Risk Officer. Both men came into Kabbage's risk department from Amex.

75.     As part of revamping the department, the pair contracted with third-party URS Tech Solutions to perform "secondary account reviews." These reviews occurred *after* the loan had been approved and issued.

76.     Bringing in URS was an unpopular decision. The company was slow to respond to inquiries from Kabbage employees and had no clear processes. Worst of all, URS's typical turn around was about 72-hours. Given that Kabbage loans were often issued within hours, this review was not helpful—72 hours after disbursement was more than enough time for a fraudster to claim the funds and vanish.

77.     In early 2019, another person was brought in to assist the risk department, but departed in only about eight months. Then the new VP left in October 2019, and the new CRO left shortly thereafter in December 2019.

78.     Also in 2019, Kabbage's senior fraud analyst who had been handling all of the fraud analytics, left the firm and was not replaced with anyone capable of doing the types of analysis he had been performing. In addition to bringing

fraud analytics to a standstill, Gibson's absence also meant that banks calling in

to report suspected fraudulent activity had no clear point of contact.

79.     With the risk department in tatters and increasingly understaffed—

Kabbage had not had a Head of fraud with a tenure longer than three months

since late 2018—the quality of Kabbage loans continued to plummet in 2019 and

early 2020.

80.     Over the course of that time, the hundreds of datapoints that had

originally been used to vet applicants (and which were still described as being

part of the process) devolved into essentially a two-part inquiry of "what's in

your bank account?" and "what is your FICO score?"

81.     There were two reasons that Relator personally witnessed this lessening of

internal controls. First, he worked in collections with defaulted loans. This

allowed him to see firsthand that the sensitivity of the underwriting and risk

controls had been drastically reduced. When the files reached his desk in

collections, none of the underlying financial data made available to him would

demonstrate the types of controls that had previously been in place.

82.     For example, Relator recalls an account opened by a start-up company that

had raised $90,000 through a Kickstarter campaign. This alone was a red flag to

Relator, because Kabbage was not supposed to service start-up companies; the

company's own internal controls required an entity to have been in business for

at least a year before it was eligible for Kabbage Funding. Nevertheless, the start-up deposited its Kickstarter money into a bank account, and on that basis alone was approved for a $45,000 Kabbage loan—half the amount of its Kickstarter funds. The company took the loan money and defaulted. In fact, it never made a single payment. When the file arrived on Relator's desk in collections, he discovered that no analysis had ever been done for ability to repay.

83.     The second way Relator witnessed this reduction in controls was through his interactions with sales reps. When unfavorable decisions were made (such as a loan being declined or an available funding amount being adjusted downward), sales reps relied on Relator to help them explain the reasoning to disappointed applicants. To communicate with the unhappy would-be customers, Relator had to review the decision process that had gone into the denial.

84.     In late 2019 and early 2020, based on reviewing both the internal documentation and the derived customer data, Relator could tell that all decisions were based on substantially simpler metrics than what the company was reporting that it used.

85.     Finally, Relator also specifically recalls that the Kabbage "Returning Customer Model," which was supposed to re-evaluate borrowers based on new data, was entirely disabled at some point in 2019. Thus, by 2019, Kabbage was

not reviewing applicants beyond first time qualification, and not particularly well at that point, either.

### iii.   Kabbage's Ignorance of Regulatory Compliance

86.    Kabbage's forays into other markets than Kabbage Funding demonstrate the "leap first, learn later" approach that was to be the hallmark of its PPP loan program.

87.    For example, in September 2014, Kabbage launched Karrot Personal Loans. Relator observed that the company had to jettison the program because it came with regulatory and reporting obligations that Kabbage was unaware of prior to launch and was completely unprepared to handle. By approximately early 2016, collection was also discontinued.

88.    In 2019, Kabbage rolled out several new disruptors under the "Cash Flow as a Service" (CFAS) banner, including Kabbage Insights, Kabbage Checking, and Kabbage Card 2. Unfortunately, none of the new CFAS "products" were raising much revenue because they were just attachments to other online lenders. For example, Green Dot provided checking, Marquetta provided Kabbage Card 1, and Kabbage Card 2 was through Metabank.com.

89.    Besides not being very profitable, Kabbage entered these markets completely unaware of the additional obligations that these new products would entail.

90.    For example, until it rolled out checking and payments, Kabbage Funding was a loan servicer and thus was not subject to demands to hold or restrain funds. Indeed, part of Relator's job included dealing with requests and orders to restrain funds, such as garnishments, which he could dispense with quickly by stating that Kabbage was just a loan servicer and thus not subject to such demands. However, with the addition of Kabbage Checking and Kabbage Payments, this was going to change.

91.    Since these requests were normally passed to Relator, and he knew that Kabbage would now be subject to these demands, he was concerned about his ability to respond. Accordingly, he approached the Kabbage Checking and Kabbage Payment teams to ask what the new process would be when Kabbage received an order to hold or restrain funds.

92.    To his dismay, Relator discovered that the product teams not only had not developed such a plan, they had no idea that their new products would incur such obligations.

93.    Thus, with a hidden fraud rate, coupled with the decimation of the risk department and a host of new obligations, Kabbage was already in trouble when the pandemic struck.

94.    At that time, small businesses—Kabbage's customer base—were in serious trouble, and Kabbage began to shut down. On March 16, 2020, Kabbage

tightened its lending restrictions. By the next day, March 17, call volumes had tripled. On March 23, lending was terminated in full internally, with the official close of lending on March 29, 2020.

95.    This suspension of all lending services for active and new customers came without warning, to the dismay of Kabbage customers, who had been counting on the lines of credit to see them through the global economic downturn. With no more available balance to draw from, Kabbage customers who had been kiting their loans were unable to make payment and they began stopping payment or reversing payment on automatic payments, which in turn caused problems with Kabbage's issuing bank, Wells Fargo.

96.    On March 31, 2020, Kabbage furloughed approximately three-quarters of its employees, including Relator, and laid off the entire Bangalore office, which among other tasks performed data analytics.

97.    On April 30, 2020, those who were still furloughed were laid off as well.

98.    During this same period of March and April:

- Kabbage's then most recent Head of fraud, Nicole Hill, was either dismissed or resigned. Her position was not backfilled.

- The Kabbage Funding Portfolio hit 40% delinquency and stuck above 30% until roughly September—nearly triple the normal rate of default.

- As a result, Kabbage went into negative amortization. In essence, Kabbage's obligations to repay the credit facilities (whose funds it used to purchase the receivables for Kabbage

Funding loans from Celtic Bank) were based on specific contractual terms regarding the performance of the securitized loans. As Kabbage's delinquency rates climbed, repayment terms accelerated. Most of the funds that Kabbage was able to collect were directed to these facilities, as Kabbage's inability to generate new loans, combined with the inability of current customers to repay existing loans, created an extremely dire situation.

### C. Kabbage Reinvented as a PPP Lender.

99.    The PPP loan program offered Kabbage a way out of its crisis. Instead of offering its own loans, it determined to use its existing platform to rapidly make loan decisions for PPP program.

100.    However, Kabbage had no experience with existing SBA 7(a) loan program upon which PPP was based, and made no effort to educate itself.

101.    Nor did Kabbage use the data points that it had used at the start of the company to issue the PPP loans—in other words, Kabbage was not treating the PPP loan applications with even the same degree of care it had given its own loans, which (as explained above) had become steadily more inadequate.

102.    Kabbage opened up to PPP applications and, with at least reckless disregard for whether any of the provided information was true, began issuing PPP loans like candy.

103.    To make that happen, Kabbage employed contract workers and third parties like URS who had no prior experience as fintech originators, let alone with SBA loans.

104.    So rapidly were the loans processed that between April 7, 2020, when the program began, and Kabbage's first statements on May 18, Kabbage claimed to have paid out about $3.5 billion in PPP loan funds.

105.    On June 1, 2020, Relator was called back to work (from home).

106.    By July, Kabbage was reporting that it was the country's third-largest PPP Lender, approving more than 209,000 small business loans totaling $5.8 billion.

107.    According to its own press release, "[o]ver the three-month period of the program, Kabbage approved over 209,000 small businesses for $5.8 billion, making it the third-largest PPP lender in the country by application volume. The result is the single-largest PPP lending accomplishment by a FinTech company, outperforming some of America's largest banks to ensure the country's smallest businesses received relief."

108.    Kabbage boasted of its swift conversion to the SBA system, noting that "[p]rior to the PPP, Kabbage had never processed a loan for the SBA. In less than two weeks, Kabbage entirely restructured its lending platform and developed new automated systems to ingest, analyze, verify, and approve PPP applications." The Kabbage report went on to state that:

- 97% of all SBA-approved applicants were new customers to Kabbage.

- 93% of all applicants had 10 or fewer employees; 62% had one employee, and 58% were self-employed.

- Kabbage's total average loan size was $28,100 and 50% of all loans were under $13,500.

- Over 75% of all applications were processed without human intervention or manual review.

- The median time from applying to approval was 4 hours.

109.    Kabbage issued the loans in partnership with Customers Bancorp (Pa.) and Cross River Bank (N.J.) to serve small businesses in all 50 U.S. states and territories.

110.    Of the loans processed, 55 percent were directly funded through Kabbage, with 23 percent funded through Customers Bancorp, and 22 percent funded through Cross River Bank.

111.    A complete report of Kabbage's PPP results was made available in August 2020[1] and stated, *inter alia*, that 67% of its PPP customers were self-employed; approximately 69% of its PPP customers had only one employee; and 90% had ten or fewer employees. In all, the company bragged that it had posted over seven billion dollars in loans but **"on average, for every 790 employees at major U.S. banks, Kabbage has one"** (emphasis supplied).

112.    Kabbage has declined to say how much it earned in SBA Lender Fees from these transactions, but outside estimates based on its reporting suggest that

---

[1] https://newsroom.kabbage.com/wp-content/uploads/2020/08/Kabbage-Paycheck-Protection-Program-PPP-Report.pdf (last visited Dec. 26, 2020).

Kabbage earned between $330 million and $340 million in fees on the $7 billion in approved loans the company said it processed.

113.    So successful was Kabbage with this "pivot" to the SBA space that on August 17, 2020, in what was later named "The Deal of the Year" by Banking Dive, Amex announced it had entered into an agreement to "acquire substantially all of Kabbage."

114.    Under the terms of the agreement, Amex acquired Kabbage's team and its full suite of financial technology products, data platform and IP.

115.    However, Kabbage's existing loans, including PPP loans, remained with Kabbage and are being serviced through an online platform known as K Servicing.

## FACTUAL ALLEGATIONS

**A.    Relator's Discovery of and Efforts to Stop the Fraud**

116.    Relator resumed working for Kabbage on or about June 1, 2020.

117.    Like the rest of the company, Relator worked from home, with most intraoffice communication happening via Slack. Weekly team meetings and Town Halls still occurred but were conducted over Webex, using a Slack channel for questions.

118.    Even as Kabbage began to roll out reports extolling its own performance as a PPP Lender, Relator and other Kabbage employees became increasingly uncomfortable with the way the PPP money was being distributed.

119.    With his role in collections, Relator was attuned to typical Kabbage loan processing verifications, as well as the way safeguards had been steadily lowered over the past year. But upon returning to work, he found that even the remaining verification rules had been largely suspended when it came to PPP Loans.

120.    In addition, verifications were being performed by contractors and URS, who received only the barest training.

121.    During the first week Relator was back, he was inundated with requests to assist in complying with OIG subpoenas, which sought information on PPP borrowers. These requests were going to the also-understaffed legal department, which had lost several positions in the furlough and lay off that had not been backfilled.

122.    By June 8, a week after his return, Relator was swamped with concerns from the customer reps about the PPP loan process.

123.    Relator had a variety of Slack conversations with managers on customer-facing parts of the credit operations team, including sales, customer service, collections, and billing, trying to help the customer reps learn what documents would be appropriate verifications, who they could talk to for verification

purposes, how to address issues with applicants, and so on. Notably, this was months into the program.

124.    Reports of suspicious activities continued to pile up. Customer service reps reported to Relator that there were many instances in which people stated that they had been misled into applying for PPP loans by "accountants" (sometimes actual accountants, but more often "business consultants," or in the Spanish-speaking communities, "notarios"). These borrowers told customer service reps that they did not have a business and had not intended to apply for a loan; the form had been filled out for them and they had merely been advised that they were entitled to "COVID relief money."

125.    Others called in to report neighbors and relatives who had been paid to apply for loans that had been funded, and in one instance, a woman called in to beg the Kabbage rep to tell her friend "not to do this fraud."

126.    To Relator's frustration, there was no process for following up on these calls or reporting them to any regulatory body such as FinCEN. Moreover, with only three people assigned to fraud reporting, there was nowhere near adequate staff to review the volume of reports.

127.    Another issue was that when deposited into the accounts provided by borrowers, loans were being returned by banks under the NACHA Rules because they appeared fraudulent on their face.

128.    Some of these surface-level fraud indicators included PPP loans sent to a person who did not own a business and who had opened the account the week before; PPP loans sent to a bank that did not service business accounts; and attempts to "deposit" PPP loan funds onto a prepaid debit card.

129.    On one memorable Thursday morning, the company opened to find that thousands of loans had been returned overnight in what became known internally as the "Wednesday Night Massacre." These thousands of loans had been flagged by the SBA as "duplicates."

130.    As part of the collections department, Relator had a growing concern that he and his colleagues would eventually be tasked with collecting loans that had been issued without even basic questions being asked, let alone properly verified.

131.    The loans seemed destined to go to collections, because, as he and his coworkers explicitly discussed, "bogus accounts don't apply for forgiveness." When the bogus loans defaulted, Relator worried that lack of proper verification procedures would mean Kabbage would be unable to invoke the SBA guarantee, unable to service the loans, and unable to even identify the borrowers to make collection efforts. He was also concerned that ultimately the losses from these fraudulent loans would fall on collections' books, and that his department would be required to handle reconciliation with the SBA.

132.    Trying to suss out whether the concerns he was hearing were isolated or systemic, Relator spoke with an employee in "fraud operations" who was charged with investigating—manually—if a loan was reported as suspicious. He also spoke with the associate in financial operations, who was the point of contact when loans were returned by banks as fraudulent on their face.

133.    Hearing nothing that reassured him—to the contrary, both employees were dealing with daily and escalating problems—by the end of the second week in June, Relator had decided to escalate the issue by approaching the Head of policy, a lobbyist who had been part of the team that had worked to have Kabbage approved as a PPP lender.

134.    Relator asked the Policy Head to clarify what the policies and procedures for PPP fraud reporting were. He was told that in addition to the usual method of sending an email to "legal@kabbage" (which created a ticket in the work flow system), he should add a copy to a specific attorney.

135.    He was further told that, because the system was backlogged, he should also instruct reps to drop issues into a new, special Slack channel created for the fraud operations rep.

136.    Within hours, the fraud operations rep was objecting to the new system in most strenuous terms, stating that "just dropping [sic] cases in slack is not helpful! I have a backlog of 500 cases! Im [sic] sure a lot of those are ALSO

FRAUD THAT I NEED TO LOOK AT[.] I CANNOT DO ALL OF IT [.] i [sic] am also the ONLY PERSON on this team reviewing Payments which by the way, ZERO FRAUD RULES [.] ITS [sic] ALL MANUAL."

137.    Based on this response, Relator reported back to the Policy Head that the new system was not working. With apparent frustration, the Policy Head stated that the situation was not what he and Spencer Robinson had agreed to, and that he would come back with something to address it. However, to Relator's knowledge there was never any programmatic response.

138.    By the third week in June, with no adequate response, Relator encouraged the reps to ask about the practices at the upcoming weekly Town Hall, which was held via Webex on June 25, 2020.

139.    During that meeting, a sales rep asked something to the effect of, "we seem to be having a lot of fraud, what is happening? What are we doing? We don't have a lot of guidance. Please speak on that."

140.    The question was echoed by several other employees, who shared "reactions" on Slack with emojis.

141.    As usual, Petralia and Frohwein tossed the question to the department Heads. The Policy Head reiterated the maxim, "if you see something, say something," but provided no direction on where to actually "say something" or how to report. Spencer Robinson, Strategy Head, followed that with a statement

about "how our numbers are looking," and suggested that the fraud rate was "between 2 and 12 percent," a number that no one thought was remotely accurate.

142.    There was no other follow up and no other related questions were answered.

**B. Kabbage's Reckless Failure to Perform Its Duties**

143.    The following issues in the PPP program at Kabbage were observed by Relator directly or brought to his attention by others in the company and verified by Relator.

144.    **Identity Verification**: Kabbage qualified applications and issued loans that had the wrong Social Security Number on the loan documents that the customer themselves had provided. On three occasions, this was brought to the attention of customer service by the affected parties themselves. These applications should never have been able to reach that stage without the SSNs at least matching one another.

145.    On a limited and short review, Relator identified at least three instances where an SSN check was either not performed, or the error was not corrected prior to submission and approval by the SBA. At least two of these instances, the reps were directed by a lead sales rep to just have the customers sign documents

with known incorrect SSN so that Kabbage could go ahead and send out the money.

146. **Business Organization Type Verification**: There were often mismatches between Business Organization Type and the name of businesses taking out loans. For example, customers who included "LLC" or "Inc." in their business names often listed their Business Organization Type as a sole proprietorship rather than S-Corp or Single LLC.

147. Kabbage did not require articles of incorporation or other documents to validate the existence of a statutory entity like a corporation or LLC.

148. Any account that claimed to be a sole proprietorship was evaluated solely on the alignment of personal information provided by the applicant. Accordingly, applications were approved that did not meet even basic business organization type verification.

149. The reason for this is clear when reviewing the URS PPP Loan Document Review Guide for reviewing "Organizational docs," which states:

> This is easy! If there is anything uploaded under the Request Type: Organizational Document [...] or Request Type: Articles of Organization, enter y in Column O and move on! There is no need to open this document.

150. **Business Eligibility Verification**: Kabbage determined if businesses were in an ineligible industry based solely on the NAICS code selected by the applicant in the application.

151.    However, NAICS code was not treated as a mandatory field for the Kabbage application.

152.    There was no routine substantive investigation into either business activity or revenue.

153.    On a number of accounts personally reviewed by Relator, Kabbage accepted customer-generated invoices with no identifying information and bank statements that showed only Social Security Payments and Retirement Annuity deposits as proof of operation.

154.    **Payroll Data Verification**: Kabbage accepted revenue information that was entirely unverified, relying solely on *unfiled* tax documents, i.e., the "form fill" versions of tax documents available on the IRS website.

155.    This was accepted even when the information placed applicants in the top 10% of earners nationwide, despite their businesses having no advertising, no documentation of revenue aside from the unsigned, unfiled tax form, and being in industries that traditionally carry an average annual salary of $20,000-40,000.

156.    **W-3 Issue**: For a time, Kabbage also ignored the requirement that if customers provided a W-3, and the gross wages paid averaged out to more than $100,000 per employee, the Lender was obliged to request a W-2 for each employee that is paid more than $100,000.

157.    Several accounts were processed without this W-2 request, and a number of those were found to be fraud after a sales rep's manual review identified the issue. In that instance, the accounts were revealed to be part of a fraud ring that had been presenting identical W-3s.

158.    Some of these loans were funded and were not caught by Kabbage's automatic processes for either identify verification and fraud prevention, not to mention the general revenue calculation issue presented by the W-3.

159.    This specific W-3 issue was eventually addressed after several fraud rings were identified, but it remained unclear whether Kabbage prioritized customer input versus supplied documentation, nor was there any guidance on how to address a discrepancy.

160.    Directions for reviewing W3s are likewise indicative of the lack of care afforded to the review, as shown in the URS PPP Document Review Guide:

> What if I get a .jpeg or handwritten version of the W3?
>
> Both are good as long as it is in official IRS format.
>
> What should I do if the company I'm reviewing has multiple W3s?
>
> Check the companies names of the W3s because it's most likely the case that they are applying through multiple companies. If the W3s have different names, highlight the column yellow (no need to complete), and list in the comments that there were multiple filings in one application. If the W3s have the same company name, add the W-3 amounts together.
>
> What if my W3 has two states with multiple values stacked on top of each other in Box 17?

> Sum the cumulative total of both boxes and record in the Box 17 column of your GExcel sheet

161. **Bank verification**: Lenders deposit PPP funds into the account designated by the borrower. Kabbage implemented no controls to stop customers from linking to banks that could not receive deposits, such as Chime, Greendot, MetaBank, and prepaid cards. This generated loan returns under the NACHA Rules, as explained below.

162. The National Automated Clearing House Association (NACHA) has established rules that govern the transfer of funds via electronic checks in the United States. The NACHA rules require that Originating Depository Financial Institutions (ODFI) and Receiving Depository Financial Institutions (RDFI) follow guidelines regarding suspicious transactions in order to remain inside safe harbor provisions that shield them from liability for profiting from financial crimes. These rules set limits on various aspects of electronic instruments and provide financial and other penalties for violations.

163. One obligation of an RDFI is to have procedures in place that automatically return funds that are appear fraudulent on their face. With respect to PPP loans, some of these surface-level fraud indicators include PPP loans sent to a person who does not own a business and who opened the account the week before; PPP loans sent to a bank that does not service business accounts; and attempts to "deposit" PPP loan funds onto a prepaid debit card.

164.    It would be difficult to meet the Lender requirements for PPP Loans and still fail to notice the very basic discrepancies that would trigger an automated loan return from an RDFI.

165.    As with these other matters, this bank verification should have been done *before* submission.

166.    For instance, Relator observed specifically that Chime, Greendot, and Metabank accounts did not trigger a check request, but they did trigger a return when Kabbage attempted to transmit PPP funds into them, as happened on many occasions,

167.    When this return happened, the primary remedy was to link a new account rather than perform a more thorough review.

168.    When Relator and others objected, risk team management would argue that "we can't prove that it is fraud" and so said that the company was *obliged* to re-issue the loan.

169.    This was a shocking position to Relator, as it turns the normal course of underwriting on its head. Normally, customers must establish who they are so that they can receive funds. But for PPP loans, Kabbage was requiring reps to issue funds unless there was some concrete *proof* of fraud.

170.    Relator had several arguments on Slack about issue management in the risk department but was unable to change the practice.

171.    The instruction to pay even when bank accounts were not verifiable led to manually adding new bank channels by adding in routing and account number and using hastily acquired and sometimes forged documents, such as Direct Deposit forms and bank letters. These are not an acceptable verification for lending purposes and Kabbage would never have previously accepted them.

172.    If a channel was unable to be verified by Yodlee, many were verified solely by Kabbage Deposit Verification via a micro deposit, with no indication of ownership or contents of the channel, and no requirement for secondary review of the transaction data.

173.    In relying on Kabbage Deposit Verification to link substantially more bank channels than it normally would, Kabbage faced substantial issues with bank ownership and revenue verification.

174.    Kabbage faced similarly unprecedented numbers of accounts without the data it would ordinarily use to validate business and account ownership.

175.    While some disbursals were returned by the bank or recalled successfully by Kabbage and other PPP partners, it was clear that Kabbage did deposit funds into accounts that were not owned or controlled by an eligible business owner.

176.    This situation became so extreme that on or about July 1, 2020, Kabbage customer support was contacted directly by the head of fraud of Lower Michigan Credit Union and U.S. Bank regarding the extremely high volume of suspected

fraudulent or otherwise suspicious transactions originating from Kabbage that were being stopped by their BSA/AML/CIP rules.

177.    Because there was no one in the risk department to deal with these issues after the senior fraud analyst's departure, this call and others like it came to customer service, where it was forwarded to Relator personally.

178.    The URS PPP Document Review Guide provided this instruction with respect to bank account verification:

> What if the ID doesn't match the name of the account owner?
>
> Put a Y in the Govt ID column and note ID doesn't match account owner in comments

179.    **Customer Identification Program:** Given that by its own estimates, ninety percent or more of Kabbage's PPP volume was made up of new customers, Kabbage was required to have applied a risk-based review, compliant with BSA/AML guidelines, of the information they provided. Per FAQ 28, this background check should have been completed *prior to submission* to the SBA.

180.    Instead, as noted above, loans were submitted to the SBA and only then did Kabbage perform a secondary review on some of the loan files.

181.    As part of that secondary review, the Kabbage system often would throw out a "Manual Identity Verification Flag" or other flag, which indicated that the account was suspicious. Only then would Kabbage request a standard package

of Know Your Customer (KYC)/Know Your Business (KYB)/Customer

Identification Program (CIP) documents as a *follow up* to SBA approval.

182.   This is a document package that is held by other institutions for every

applicant either as part of their existing relationship or as a due diligence process

*before* opening a new account.

183.   A supervisory rep on the PPP side was asked on Slack how to clear a

Manual Identity Verification Flag. His response is illuminating, since it shows

steps that should have been done prior to submission, not post hoc, and not only

if a Manual Identity Verification Flag was thrown.

184.   Specifically, his response indicated that Kabbage was accepting "null" in

an account holder name; that reps were only asking for a voided check if there

was an actual mismatch between account information and application

information; that skip tracing had not yet been done by this point to identify the

customer via social security number or some other identification beyond what

was originally received; that EIN letters were being treated equally with filed tax

documents; and that outbound voice checks on telephone numbers were being

done with applicant provided numbers.

185.   **Know Your Customer/Know Your Business**: As with the Customer

Identification Program, this is another instance of overall verification that was

too little, too late.

186.    During the PPP loan program, if something triggered a check for KYC/KYB, Kabbage used Lexis and Clear to verify the business and the authorized representative, and to perform Ultimate Beneficial Owner checks.

187.    However, unless applicants volunteered the information, there was nothing to trigger a review of who, in fact, owned a business or whether the owner was, in fact, involved with the PPP application.

188.    Any business identified as a General Partnership ought to have been subject to UBO review automatically, as a General Partnership requires an equal division of ownership among two or more individuals.

189.    Relator found no indication that these reviews were required or undertaken. Instead, Kabbage relied on the applicant to tell it who owned the company.

190.    No effort was made to go beyond the name, and there was no requirement that representatives seek documentation (such as from tax forms) to determine whether there were multiple owners.

191.    Relator did not see any account for which a UBO Verification was performed without either customer input or manual review identifying a problem.

192.    **Checks for inaccurate, insufficient, or fictitious documentation**: Internal reports indicate that 75% of applications were fully automated, with no clear

information on what particular criteria were being applied to verify documents or to ensure that they logically connect with applicants in meaningful ways.

193.    Relator does know that Kabbage was accepting unfiled taxes and other documents that are available to anyone via the IRS website. Such documents would appear genuine as they are indeed IRS forms, but they are not reflected in bank statements, nor are they helpful in creating a realistic look at a customer's financial state.

194.    There was no system in place to validate an applicant's income aside from reviewing their tax forms through Inscribe, which did not catch most issues since the form is downloaded from the IRS website that has not been "altered" but instead filled in with patently false or otherwise extremely suspicious information, such as identical W3 or other wage and earnings statements.

195.    **Internal documentation issues**: At the most basic level, internal guidance and documentation were extremely sparse.

196.    There was no central repository of policies and procedures, and no way of indicating which prior procedures were outdated, nor was there any notification when updates were made.

197.    Given that the PPP loan program rules were constantly evolving, this created a great deal of confusion and contributed to the difficulty that sales reps

were having in identifying and reporting suspicious activity, as well as identifying dubious documents or requests.

198.    What documentation did exist was simply not being followed.

199.    Kabbage did create a document known as the "Overview of Paycheck Protection Loan Program BSA/AML Procedures," but as to Items 2 (use of a different geolocation for the business and signing into Kabbage), 3 (requesting changes to profile or bank account after qualification), 7 (triangulation of data indicates suspicious behavior), 8 (applicant questions need for documentation), 9 (applicant withdraws application after documents are requested), and 10 (account review team indicates suspicious facts), Kabbage not only did not have meaningful controls or guidance, Relator observed that the company was actively doing the opposite in many cases and simply issuing the loan, even if it required changing the initial information provided by the borrower.

200.    Similarly, Kabbage's documentation stated that:

> On a weekly basis, the Account Review team Manager pulls 3 tickets from each Account Review team member's queue for a quality control check. The tickets are reviewed against the documented process for each ticket type. Sales Force notes are reviewed to confirm ticket disposition.

201.    However, for much of the time of the PPP loan process, there simply was no "Account Review team Manager."

202.    Even had this review been conducted, on its face it only included the Account Review team, and not the three fraud review team members. And even if implemented, it would have resulted in a review of only 36 to 42 accounts per rep over the course of the PPP program.

203.    **Suspicious Activity Monitoring and Reporting**: Kabbage did not provide even estimated fraud rates for the PPP program. To the extent these metrics are obscured, it was impossible to say that fraudulent activity was being tracked and monitored.

204.    More specifically, as of June 26, 2020, there had not been uniform guidance on reporting suspicious activity aside from escalating a ticket to the account review team.

205.    As Kabbage began asking customers with dead-ended applications to resubmit, it did not identify accounts that share a device unless one of the accounts sharing the device had already been identified as fraud by manual review.

206.    To the extent accounts were not identified as suspicious, they were not flagged for having matching devices to other applications in their own name or in any other name.

207.    **Staffing**: Finally, Relator believed that lack of staffing was an important reason why Kabbage was unable to respond to suspicious activity reports.

208.    Even though the account volumes being processed dwarfed any other three-month period in Kabbage's history, there were many gaps in the organizational structure that had gone unfilled for years, and even more after the layoffs at the start of the pandemic.

209.    Although URS continued to perform post hoc reviews, it had no direct line of communication to the Kabbage customer-facing teams, nor did it perform reviews pre-submission.

## C.    Specific Loan Examples

210.    Relator discovered these specific loans with issues, which are identified herein by their internal identifier, the Kabbage User ID (KUID).

211.    KUID 2311046 – Customer's allegedly unfiled but prepared tax return provides a Routing Number of Liberty Bank situated in Middletown, Connecticut. If customer had not filed this form (it says that it is not final and not to file it in big letters), then why did the deposit account for the sole proprietor business differ so wildly from the place a direct deposit refund should go for a sole proprietor? Risk and Sales managers overrode the decision of the agent to not accept the documents the customer had submitted as not conforming to BSA guidelines.

212.    KUID 2341369 – Customer kept getting fraud flags, and Kabbage kept clearing them. Business and personal information were an exact duplicate.

Outbound verification done via phone number on file; phone numbers Accurint associates with the customer are different. First filed August 2019. File name "1099-misc-efile-2019-edited(19).pdf," which obviously would be the default name for a file that was duplicated eighteen prior times and not renamed.

213.    KUID 2398765 – Kabbage accepted an expired driver's license to verify identity.

214.    KUID 2234620 – The applicant offered a New Jersey corporate certificate for a California place of business. LLC had not been filed for foreign registration in California, the email was from a dead website domain, and the applicant provided the business address of which he did not appear to be an owner or even an employee. Yet the primary reason this account did not fund was because the customer took too long to sign loan documents.

215.    KUID 780155 – The customer was an LLC, which claimed to be a Single LLC, then changed to Sole Proprietor when asked for tax documents (even though name indicated two owners). The corporation is housed in Alaska, all addresses were in Colorado, the customer provided a receipt from the Alaskan government for Corporation Franchise Taxes. This loan was disbursed.

216.    KUIDs 2334451 and 2216841 – had exactly the same W-3, for two different businesses, $1.5 million in loans were approved between the two of them.

217.    KUID 2298451 – Customer has 2018 tax return for $35,000 with W-2s, but then purportedly made over $100k cutting hair in 2019.

218.    KUID 2321678 – Customer provided information that did not match: Accurint showed a different primary address, the secondary address was on the list but with an apartment number that was not included in the application. The customer's bank statement matched the tertiary address in Accurint. Kabbage performed an outbound verification to what seemed to be the wife's phone, whose primary address in Accurint is also different from the applicant's.

219.    KUID 2322529, 2320438, 2322745, 2322674, 2345778, 2321982, 2318397, 2320902 – These KUIDS were sent to Relator from a rep: someone called in and was trying to get all of these applications pushed through. They were very similar loan amounts, and they were all sole proprietorships with the same income amounts on their 1040-Cs, yet they were spread out through the country.

220.    KUID 2313656 – Customer listed as an LLC, provided Partnership Tax documents, UBO at 100%. Website is closed. Address was not a retail store, but a home.

221.    KUID 1871628 –Articles list two owners and an authorized party. Business listed as a Sole Proprietorship. Name includes LLC. Primary place of business was not listed on the application.

222.    KUID 1857607 – Customer was approved for an amount as a sole proprietor. Email leads to a financial group and to an LLC.  Customer's offer expired, was resubmitted, upon an issue with the resubmitted loan amount, customer's account was identified as a prohibited industry and an LLC, not a sole proprietorship.

223.    KUID 1978610 – Customer had an "SBA Duplicate Tax ID in E-Tran" flag. They claimed not yet to have a loan for this Tax ID, although they were approved for another business as a sole proprietor with Kabbage already (KUID 1976436) The Tax ID numbers were not the same and they claim they haven't gone anywhere else for a loan. Email address led to a hedge fund.

224.    KUID 1978854 – Customer attempted to change bank account by having email address send in a voided check for a new account that needs to be linked. This account was specifically cleared by URS Tech Solutions on May 6, 2020.

225.    KUIDS 2310626, 2212457, 2288398, 2224967, 2212040, and 2187966 – accounts are linked by device ID to confirmed fraud KUID 2355279, which was flagged for device velocity. Risk says "Customers Docs Check out" but does not clear fraud flags, indicating that the customers' documents would have been accepted if not for the matching device ID for the other fraudulent accounts.

226.    The following KUIDs represent accounts for which the SSN on the application and loan documents did not match the actual SSN for the applicants.

In these instances, the discrepancy was pointed out by the applicants themselves, which shows that there was no systemic review happening. The first three of these applications signed SBA loan documents. KUID 2249152 –transposed digits; KUID 2413009 – showing husband's SSN; KUID 2357798 and 2415315 -- customer requested all accounts be removed so they could add to 2143750. For this last example, the names did not match but the SSN and the DOB did match, and the business name included "Inc" but reported business structure was LLC.

*Threatmatrix Device Rules*

227.   Numerous fraud rings were discovered on the basis of a single suspicious account being reviewed by fraud ops for matching device ID. However, Kabbage did not choose to review for device rules unless there was first an outside, independent verification of a fraudulent application that originated from that device. There are several rings of these with numerous qualified applications, as they are voluminous and repetitive, as the connected GUIDs number into the hundreds.

228.   For example, these accounts all came from the same device and submitted the **exact same W-3**: E0EEC563-F637-4674-B7E1-E6AFA85B1C3B; F9B48C41-994C-4C7C-9998-9534349AFC0B; 83EB9C41-E3DB-44D1-8FB3-97250F8A7E56; 5867D687-030C-4C0F-AD12-31AD1C818C07; 5B764677-B388-4229-B6F4-674B3D81742D; 66D89702-4663-46E0-BF76-8DE5B6723596; 83F6AC34-D21F-

4AA9-9167-78948E150770; AE1EC42E-E434-45C6-A797-037726254A9C;

4F2CFE0D-8718-4CC0-98C6-CB25792E12CB; 62A21B6E-C993-422D-A675-

87FE5344A00C; 74EBD668-D119-45F0-90E6-EDA69ABB4F23; D0D1AFC6-C95B-

47DE-A978-D82555517457; 80BC1925-7DF9-45F9-BBE9-FE4AB4090624.

229.    After seeing no changes from his efforts to stop the fraud, Relator became

increasingly disillusioned.

230.    He spent his final few months at Kabbage trying to "stop the bleeding"

and assisting with efforts to prepare the Kabbage loans for K Servicing as part of

the Amex deal, because, by September, almost all of the Kabbage loans had been

charged off and would be handled entirely by third party collections agencies.

231.    On or about October 15, 2021, Relator was notified that he was terminated

as part of the Amex transition.

232.    As part of that transaction, Frohwein and Petralia both received a

$13,320,000 "Retention Award." Spencer Robinson received a $2,400,000

Retention Award.

**COUNT I**
**VIOLATIONS OF 31 U.S.C. § 3729 – FEDERAL FCA**

233.    Relator hereby incorporates and realleges all other paragraphs as if fully set

forth herein.

234.   As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

235.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

236.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. 31 U.S.C. § 3729.

237.   Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Relator prays for judgment against Defendants:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a maximum civil penalty for each of the false claims and statements;

(c) awarding Relator the maximum share of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(d) awarding Relator litigation costs and reasonable attorneys' fees; and

(e) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

Respectfully submitted,

Sarah Frazier
Texas Bar No. 24027320
**Law Office of Sarah Frazier, PLLC**
1919 Decatur Street
Houston, TX 77007
Telephone: (346) 283-9158
sarah@sarahfrazierlaw.com

Julie Bracker
Georgia Bar No. 073803
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com