# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* PAUL PIETSCHNER, | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No.: 4:21-cv-110-SDJ |
| v. | § § | |
| KATHRYN PETRALIA; ROBERT<br>FROHWEIN; and SPENCER ROBINSON, | § § § | |
| Defendants. | § § | |

## THE UNITED STATES' COMPLAINT IN INTERVENTION

The United States of America brings this action to recover damages for false claims, unjust enrichment, and payment by mistake as a result of the conduct of Defendants Kathryn Petralia, Robert Frohwein, and Spencer Robinson (collectively referred to as "Defendants"), former executives of Kabbage, Inc. ("Kabbage"), a lender and lender service provider that participated in the Paycheck Protection Program ("PPP"). Since April 2020, Defendants knowingly submitted claims and caused the submission of claims to the Small Business Administration ("SBA") related to PPP loans originated and facilitated by Kabbage that were false. In doing so, Defendants violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, and Defendants were unjustly enriched and paid by mistake.

## NATURE OF ACTION

1. The United States brings this action to recover treble damages and civil penalties under the FCA, and to recover damages under common law or equitable theories of unjust enrichment and payment by mistake.

2. As detailed below, under the direction and control of Defendants, who were Kabbage executives up until October 2020, Kabbage knowingly inflated loan amounts of tens of

thousands of PPP loans by systematically double-counting employees' state and local taxes ("SALT") and by including annual per-employee compensation in excess of $100,000 in calculating borrowers' average monthly payroll, contrary to statute and SBA regulations.

3.      Furthermore, under the direction and control of Defendants, Kabbage knowingly failed to comply with its obligations as a PPP lender to "[c]onfirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes," as required by PPP regulations.  Under Defendants' direction and control, Kabbage did not implement adequate fraud controls and other procedures sufficient to comply with PPP requirements, resulting in the knowing submission and approval of fraudulent and ineligible PPP loan applications to the SBA.

4.      As a result, since April 2020, Defendants knowingly submitted and caused to be submitted thousands of false or fraudulent claims and statements to the United States, which resulted in the SBA's payment of millions of dollars for processing fees and loan forgiveness and guaranty purchase payments, which were ineligible for payment because of Defendants' unlawful conduct.

## JURISDICTION AND VENUE

5.      This action arises under the FCA, as amended, 31 U.S.C. §§ 3729–3733.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367(a).

6.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and Federal Rule of Civil Procedure 4 because Defendants, through Kabbage, transacted business in this district.  Specifically, in 2020, Kabbage, under the direction and control of Defendants, approved and disbursed hundreds of PPP loans in this district, including to borrowers in Tyler, Plano, and Beaumont, Texas.

7.      Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because Defendants transacted business in this district.

## THE PARTIES

8.      Plaintiff United States, acting through the SBA, administers the PPP, 15 U.S.C. § 636(a)(36).

9.      Relator Paul Pietschner ("Relator") is a resident of the State of Georgia.  Relator began his employment with Kabbage in 2015 in the credit operations department and eventually became a legal analyst in Kabbage's collections department until he was furloughed in March 2020.  In or around May or June 2020, Relator returned to work for Kabbage and assisted with Kabbage's PPP lending activities.   In that position, Relator was involved in and aware of Defendants' participation in the PPP.  In February 2021, Relator filed this action under the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1), alleging violations of the FCA on behalf of the United States.

10.      Defendant Kathryn Petralia ("Petralia") is an individual who resides in the State of Georgia.  Petralia, with Defendant Robert Frohwein, co-founded Kabbage in 2008 and served as President of Kabbage until her departure in October 2020.

11.      Defendant Robert Frohwein ("Frohwein") is an individual who resides in the State of California.  Frohwein co-founded Kabbage, Inc. in 2008 and served as the CEO of Kabbage until his departure in October 2020.

12.      Defendant Spencer Robinson ("Robinson") is an individual who resides in the State of Florida.  Robinson was hired by Kabbage in 2010 and was Head of Strategy during the PPP until his departure in October 2020.

## THE FALSE CLAIMS ACT

13.    The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

14.    For purposes of the FCA:

the terms "knowing" and "knowingly" mean (A) that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

15.    The FCA defines the term "claim," in pertinent part, as

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2)(A).

16.    For purposes of the FCA, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

## THE PAYCHECK PROTECTION PROGRAM

**I.    Overview of the PPP.**

17.    Congress created the PPP under section 7(a) of the Small Business Act as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286 (Mar. 27, 2020).  The PPP, which is administered through the SBA, provided emergency relief to small businesses affected by the COVID-19 pandemic and was designed to cover businesses' actual gross payroll expenses to keep people employed during the COVID-19 pandemic.  *See* 15 U.S.C. § 636(a)(36).

18.    The SBA did not make PPP loans directly.  Rather, the CARES Act delegated authority to private lenders, such as Kabbage, to make PPP loans pursuant to PPP requirements. *See* 15 U.S.C. § 636(a)(36)(F)(ii)–(iii).

19.    The CARES Act provided for borrower loan forgiveness for PPP funds used for certain expenses. *See* CARES Act, Pub. L. No. 116-136, § 1106, 134 Stat. 281, 297 (Mar. 27, 2020). To apply for PPP loan forgiveness, borrowers submitted loan forgiveness applications to their lenders, and lenders then issued a forgiveness decision to the SBA.  *See* 85 Fed. Reg. 33004, 33005 (June 1, 2020); 85 Fed. Reg. 38304, 38306 (June 26, 2020).  If a borrower received loan forgiveness, the SBA issued forgiveness payments to lenders.  *See* 85 Fed. Reg. 33010, 33013 (June 1, 2020); 85 Fed. Reg. 38304, 38306 (June 26, 2020).  If a borrower's forgiveness application was denied (in whole or in part) or the borrower otherwise defaulted on the PPP loan, the lender could request that the SBA purchase the guaranty of the PPP loan.  *See* SBA Procedural Notice, No. 5000-812316 (July 15, 2021).  So long as lenders adhered to the program requirements, the SBA would guarantee the unforgiven or defaulted loan amounts.  *See* 15 U.S.C. § 626(a)(2)(F); 85 Fed. Reg. 20811, 20816 (Apr. 15, 2020); 86 Fed. Reg. 8283, 8294 (Feb. 5, 2021).  To receive forgiveness or guaranty payments, lenders submitted claims and certifications to the SBA.  *See*

SBA Form 3507, at ¶ 6; SBA Procedural Notice, No. 5000-20038, at 5 (July 23, 2020).  The SBA then disbursed payments to lenders, which included the 1% interest due on the loan.  *See* 85 Fed. Reg. 33004, 33005 (June 1, 2020); 85 Fed. Reg. 38304, 38306 (June 26, 2020); 86 Fed. Reg. 8283, 8288 (Feb. 5, 2021).

## II.    Applicable Lender Requirements.

20.    Because the PPP was established under section 7(a) of the Small Business Act, PPP lenders were required to adhere to requirements of the Small Business Act to the extent they did not conflict with PPP requirements.  85 Fed. Reg. 20811, 20815.

21.    For PPP, the SBA relaxed certain lender obligations ordinarily applicable to the SBA's 7(a) loan program.  Recognizing the time sensitive nature of businesses' financial needs, the SBA permitted PPP lenders to rely on borrower certifications for certain components of the loan application and to rely on documents borrowers provided to determine qualifying loan amounts.  *See* 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020) ("SBA will allow lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness."); *see also* 86 Fed. Reg. 8283, 8294 (Feb. 5, 2021) (providing that a lender that "acts in good faith relating to loan origination or forgiveness of the PPP loan" and satisfies "all other relevant Federal, State, local, and other statutory and regulatory requirements applicable to the lender . . . with respect to the PPP loan" will not be subject to "penalties relating to loan origination or forgiveness of the PPP loan").

22.    However, the SBA did not hold PPP lenders harmless for failing to comply with the lender obligations set out in the PPP regulations.  85 Fed. Reg. 20811, 20812 (Apr. 15, 2020) ("Lenders must comply with the applicable lender obligations set forth in this interim final rule,

but will be held harmless for *borrowers'* failure to comply with program criteria; remedies for *borrower* violations or fraud are separately addressed in this interim final rule." (emphasis added)).

23.     To participate in PPP, non-bank lenders not already approved as an 7(a) Lender were required to submit SBA Form 3507 to the SBA and receive approval from the SBA and the Department of Treasury.  In this submission of SBA Form 3507, the lender attested that (1) it would "assume all obligations, responsibilities, and requirements associated with delegated processing of covered loans made under the Paycheck Protection Program;" (2) it was "responsible, to the extent set forth in the PPP Loan Program Requirements, for all decisions concerning the eligibility (including size) of a borrower for a covered loan;" and (3) it would "certif[y] that it is in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program and PPP Loan Program Requirements."

24.     In this submission of SBA Form 3507, the signatory for the lender also certified that the person had authority to execute this Agreement for the lender, "that all representations made are true and correct," and further acknowledged that any false statements made to the SBA and Department of Treasury could result in prosecution and imposition of civil money penalties under 31 U.S.C. § 3729, the FCA.

25.     The CARES Act required that:

In evaluating the eligibility of a borrower for a covered loan with the terms described in this paragraph, a lender shall consider whether the borrower--

(aa) was in operation on February 15, 2020; and

(bb)(AA) had employees for whom the borrower paid salaries and payroll taxes; or

(BB) paid independent contractors, as reported on a Form 1099-MISC.

15 U.S.C. §636(a)(36)(F)(ii)(II).

26.    PPP lenders were also required to: (a) "confirm receipt of borrower certifications," (b) "confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020," and (c) confirm, by performing a good faith review, "the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application."  85 Fed. Reg. 20811, 20815 (Apr. 15, 2020).  SBA guidance referred to these requirements as "paragraphs 3.b(i)-(iii) of the April 15 Interim Final Rule."

27.    After the lender processed and approved a borrower's PPP loan application, but prior to the closing of the PPP loan, lenders were required to execute SBA Form 2484 to apply for a guaranty on the loan. SBA Form 2484 required lenders to certify that they had complied with paragraphs 3.b(i)-(iii) of the April 15 Interim Final Rule and that "[t]he Lender has obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts) of the Applicant and will retain copies of such documents in the Applicant's loan file."

28.    After the lender applied to the SBA for the guaranty, the SBA provided proof of the SBA guaranty by issuing an SBA loan number.  The lender then disbursed the proceeds to the borrower.  Because the CARES Act provided lenders with delegated authority to process PPP loans, the SBA did not review the borrower's application.  *See* SBA Form 3507, at ¶ 3 ("Lender may issue a covered loan approved under PPP procedures without prior SBA review and approval of the processing and underwriting of the loan by executing a PPP Authorization.").  Rather, the SBA relied on the lenders' review of the borrower's application.

29.    PPP lenders were paid processing fees by the SBA as reimbursement for processing PPP loans.  15 U.S.C. § 636(a)(36)(P).  In 2020, lenders received fees for each eligible PPP loan ranging from one to five percent of the loan value depending on the loan amount.  *Id.*

8

§ 636(a)(36)(P)(i); 85 Fed. Reg. 20811, 20816.  Agents who processed loans were also entitled to receive fees that ranged from 0.25% to 1% of the loan value depending on the loan amount.  85 Fed. Reg. 20811, 20816.

30.     To receive processing fees, the PPP required lenders to submit SBA Form 1502. 85 Fed. Reg. 26321 (May 4, 2020).  Lenders were required to make a one-time confirmation in the lender's fiscal transfer agent lender portal agreeing that for, each Form 1502 report submitted by the lender to request payment of PPP processing fees, "all the information" in each Form 1502 was "true and correct." SBA Procedural Notice, No. 5000-20028 (May 21, 2020).  Once lenders disbursed the PPP funds to the borrower and submitted SBA Form 1502, the SBA remitted payment of the processing fees to the lender.

31.     When issuing a decision to the SBA approving or denying a borrower's forgiveness application, a lender was further required to confirm for each submission that "the information provided by the Lender to the SBA with this submission accurately reflects the Lender's records for the PPP loan," and that "the Lender has made its decision in accordance with the requirements set forth in Part III.2.a" of the SBA's June 1, 2020 regulation relating to forgiveness and review of PPP loans, as amended. 85 Fed. Reg. 33010, 331013 (June 1, 2020); *see also* 85 Fed. Reg. 38304, 38310 (June 26, 2020); 86 Fed. Reg. 8283, 8296–97 (Feb. 5, 2021).  This required lenders to confirm that borrowers submitted certifications and documentation in support of their loan forgiveness application, "[c]onfirm the borrower's calculations on the borrower's Loan Forgiveness Application . . . by reviewing the documentation submitted with the Loan Forgiveness Application," and "[c]onfirm that the borrower made the calculation on Line 10 of the Loan Forgiveness Calculation Form correctly."  85 Fed. Reg. 33010, 331013 (June 1, 2020); *see also* 85 Fed. Reg. 38304, 38310 (June 26, 2020); 86 Fed. Reg. 8283, 8295 (Feb. 5, 2021).

32.     To request guaranty purchase of a PPP loan by the SBA, the lender was required to certify for each guaranty purchase request that it "made, closed, and serviced the loan in accordance with the PPP Loan Program Requirements."  SBA Procedural Notice No. 5000-812319, SBA Guaranty Purchases and Lender Servicing Responsibilities for PPP Loans, at 6 (July 15, 2021).  "SBA will honor its guaranty and purchase 100 percent of the outstanding balance of the loan provided that the Lender has complied with all PPP Loan Program Requirements, including the Lenders' underwriting requirements . . . ."  *Id.*  Under Paragraph 6 of SBA Form 3507, "[b]y making any written demand that SBA purchase the guaranteed portion of a loan, [the] Lender [was] deemed thereby to certify that the covered loan has been made, closed, serviced, and liquidated in compliance with the Paycheck Protection Program and PPP Loan Program Requirements."

A.     <u>The PPP Required Lenders to Confirm the Borrower's Loan Amount.</u>

33.     Under PPP regulations, borrowers calculated their own loan amounts in their application and were required to submit documentation to support their loan eligibility along with their application.  *See* 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020) ("You must also submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099–MISC, or income and expenses from a sole proprietorship.").  Loan amounts that exceeded actual payroll expenses are inconsistent with PPP regulations and purpose.

34.     Under the CARES Act, the maximum loan amount for PPP loans made in 2020 were typically 2.5 times the borrowers' gross average monthly "payroll costs."  *See* 15 U.S.C. § 636(a)(36)(E).

35.     The CARES Act defined "payroll costs" to include, in relevant part:

(aa) the sum of payments of any compensation with respect to employees that is a—

    (AA) salary, wage, commission, or similar compensation;

(BB) payment of cash tip or equivalent;
(CC) payment for vacation, parental, family, medical, or sick leave;
(DD) allowance for dismissal or separation;
(EE) payment required for the provisions of group health care benefits, including insurance premiums;
(FF) payment of any retirement benefit; or
(GG) payment of State or local tax assessed on the compensation of employees . . . .

15 U.S.C. § 636(a)(36)(A)(viii)(I); *see also* 85 Fed. Reg. 20811, 20813.

36.    Excluded from the definition of "payroll costs" was, in relevant part, "the compensation of an individual employee in excess of an annual salary of $100,000, as prorated for the covered period." 15 U.S.C. § 636(a)(36)(A)(viii)(II)(aa).

37.    The SBA provided the following methodology to calculate a borrower's maximum loan amount:

> Step 1: Aggregate payroll costs . . . from the last twelve months for employees whose principal place of residence is the United States.
>
> Step 2: Subtract any compensation paid to an employee in excess of an annual salary of $100,000 and/or any amounts paid to an independent contractor or sole proprietor in excess of $100,000 per year.
>
> Step 3: Calculate average monthly payroll costs (divide the amount from Step 2 by 12).
>
> Step 4: Multiply the average monthly payroll costs from Step 3 by 2.5.
>
> Step 5: Add the outstanding amount of an Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID–19 loan (because it does not have to be repaid).

85 Fed. Reg. 20811, 20812.

38.    SBA guidance further specified that "payroll costs are calculated on a gross basis" and "are not reduced by taxes imposed on an employee and required to be withheld by the

employer," with specific reference to federal taxes imposed and withheld, including federal income tax.  SBA PPP FAQ # 16 (Apr. 6, 2020).

39.    The term "payment of state and local taxes assessed on compensation of employees" in the definition of "payroll costs" in both the statute and the SBA's implementing regulations, published on April 2, 2020, refers to taxes incurred by employers as a result of payroll, such as, state unemployment and city taxes incurred by employers.  This was clear from the statute, the SBA's initial regulations, and the SBA's interim final rule, published on April 14, 2020, which stated that "state and local taxes assessed on compensation" referred "primarily" to "State Unemployment Tax[es] . . . from state quarterly wage reporting forms."  85 Fed. Reg. 21747, 21749 (Apr. 20, 2020).

40.    The PPP required lenders to confirm the borrowers' loan calculations by reviewing borrowers' payroll documentation. Specifically, SBA's regulations required—in paragraph 3.b(iii)—that lenders: "Confirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application[.]" 85 Fed. Reg. 20811, 20815 (Apr. 15, 2020); *see also* SBA PPP FAQ #1 (Apr. 3, 2020) ("Providing an accurate calculation of payroll costs is the responsibility of the borrower . . . . Lenders are expected to perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll cost.").

41.    PPP lenders were further required to certify compliance with this requirement in executing SBA Form 2484 in connection with each loan.

42.    PPP lenders were also required to confirm, through their submission of SBA Form 1502, that "all the information," including the loan size, in each Form 1502 was "true and correct."

43.    In submitting forgiveness decisions to the SBA, lenders certified to the SBA that they had confirmed that the borrower had correctly calculated their eligible forgiveness amount and that the borrower had submitted documentation that showed they were entitled for forgiveness pursuant to SBA's regulations.  *See* 85 Fed. Reg. 33010, 331013 (June 1, 2020); *see also* 85 Fed. Reg. 38304, 38310 (June 26, 2020); 86 Fed. Reg. 8283, 8295 (Feb. 5, 2021).

B.    <u>The PPP Required Lenders to Comply with Applicable BSA/AML Requirements to Detect Fraud, Consistent with Lenders' Obligations to Review Loan Applications in Good Faith.</u>

44.    PPP lenders were also required to follow applicable Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") requirements.  85 Fed. Reg. 20811, 20815 (Apr. 15, 2020).  BSA/AML regulations require certain financial institutions to take steps to detect and deter those who seek to use the U.S. financial system for illicit purposes to combat money laundering and financing terrorism through fraud and other unlawful activities.

45.    Non-bank PPP lenders, like Kabbage, were required to establish an "AML compliance program equivalent to that of a comparable federally regulated institution" before making PPP loans.  85 Fed. Reg. 20811, 20815.  AML regulations require institutions to have (and utilize) a written Customer Identification Program ("CIP"), as part of an anti-money laundering compliance program, which includes procedures for: (1) specifying what identifying information will be obtained from the customer and verifying the identity of the customer using that information; (2) making and maintaining a record of customer identification information; (3) determining whether the customer appears on government lists of known or suspected terrorists or terrorist organizations; and (4) providing customers with notice that information to verify customer identity is requested. *See* 31 C.F.R. § 1020.220(a)(1)–(5). These are often called "Know Your Business/Know Your Customer" ("KYB/KYC" or "KYC/KYB") requirements.  AML regulations also require institutions to (1) have and apply a due diligence program "designed to

enable" the detection and reporting of "known or suspected money laundering activity" connected to both correspondent accounts and private banking accounts; and (2) maintain procedures for risk assessment of accounts. *See* 31 C.F.R. §§ 1010.610(a), 1010.620(a); *see also* 31 C.F.R. § 1020.210(a)(1). Federally regulated institutions must also report suspicious activity for transactions involving or aggregating at least $5,000 in funds where the institution knows, suspects, or has reason to suspect that the transaction involves funds derived from illegal activities or is designed to evade BSA regulations or other federal law. *See* 31 C.F.R. § 1020.320.

46.    PPP lenders certified compliance with these requirements when submitting claims for payment of processing fees, forgiveness, and guaranty purchase from the SBA.

## DEFENDANTS' FRAUDULENT SCHEME

47.    Defendants knowingly used the PPP to defraud the SBA out of millions of dollars so they could line Kabbage's pockets, and in turn their own, in a time of a national crisis caused by the COVID-19 pandemic. Under Defendants' control and direction, Kabbage knowingly miscalculated PPP loan amounts for borrowers in two ways: by double-counting employee-paid state and local taxes and including employees' annual wages over $100,000, in direct contradiction of the plain language of the CARES Act and SBA regulations. In doing so, Defendants caused Kabbage to artificially inflate the loan amounts for thousands of PPP borrowers and to submit and cause the submission of those loans to the SBA for guaranty.

48.    Defendants caused Kabbage to knowingly submit and cause the submission of PPP loan applications to the SBA for payment and guaranty despite knowing that Kabbage had not implemented a due diligence program sufficient to comply with BSA/AML regulations or to detect fraud and had not performed a good faith review of the borrowers' PPP loan applications and supporting documentation to assess borrower eligibility for PPP loans and loan forgiveness.

49.    Defendants caused Kabbage thereafter to knowingly submit and cause the submission of false certifications to the SBA that the lender had complied with the laws governing PPP, by confirming eligible PPP loan amounts, performing a good faith review of documentation to support borrowers' applications, complying with BSA/AML regulations, and confirming that all information contained in the PPP loan and loan forgiveness applications were true and correct.

50.    As a results of Defendants' conduct, the SBA paid millions of dollars to Kabbage and its partner banks in processing fees for thousands of patently fraudulent and ineligible borrowers that Kabbage and its partner banks were not entitled to receive.  Further, as a result of Defendants' conduct, the SBA paid millions of dollars to Kabbage and its partner banks in inflated forgiveness and guaranty purchase payments due to Kabbage's loan calculation errors and submission of obviously fraudulent and ineligible PPP loan applications.

**I.    Kabbage.**

A.    <u>Overview of Kabbage's Involvement in the PPP.</u>

51.    Defendants caused Kabbage to participate in the PPP as an agent or Lender Service Provider (LSP) for PPP lenders and as a direct PPP lender.  On April 9, 2020, Kabbage submitted SBA Form 3507, the CARES Act Section 1102 Lender Agreement for Non-Bank and Non-Insured Depository Institution Lenders, to the SBA in order to be authorized as a PPP lender because Kabbage was not an existing, approved SBA Lender with an SBA Form 750.  With the SBA Form 3507, Kabbage certified to the SBA that it was in compliance with, and would maintain compliance with, all applicable requirements of the Paycheck Protection Program and PPP Loan Program Requirements.

52.    On or about April 13, 2020, Kabbage entered into an agreement with Lender Partner 1 to serve as an LSP for Lender Partner 1 to accept PPP loan applications through Kabbage's website and process PPP loans to be originated and funded by Lender Partner 1.  In the agreement,

Kabbage agreed to comply with all PPP requirements, review all completed PPP loan applications, and take steps to prevent fraud in connection with the PPP. Lender Partner 1 agreed to pay Kabbage a fee for each loan it processed. Frohwein signed this agreement on behalf of Kabbage. On or about April 14, 2020, Kabbage began approving PPP loans as an LSP for Lender Partner 1. Lenders are required to submit LSP agreements to SBA for review. Small Bus. Admin., SOP 50 10 5(K), Lender and Development Company Loan Programs, Subpart B, Chapter 3, para. IX.A.1.b, at 171 (Apr. 1, 2019). SBA reviewed the agreement between Lender Partner 1 and Kabbage in approving Kabbage's participation in PPP as an LSP for Lender Partner 1.

53.     On or about April 27, 2020, Kabbage entered into an agreement with Lender Partner 2 to serve as an agent for Lender Partner 2 with respect to PPP loans originated by Lender Partner 2. In the agreement, Kabbage agreed to comply with all PPP requirements, review all completed PPP loan applications for compliance with PPP requirements, and take steps to prevent fraud in connection with the PPP. Lender Partner 2 agreed to pay Kabbage a fee for each loan it processed. Frohwein signed this agreement on Kabbage's behalf. On or about April 24, 2020, Kabbage also began approving PPP loans as an agent for Lender Partner 2. SBA reviewed the agreement between Lender Partner 2 and Kabbage in approving Kabbage's participation in PPP as an LSP for Lender Partner 2.

54.     On April 13, 2020, upon Kabbage's application, the SBA approved Kabbage as a direct lender. In late April 2020, Kabbage began originating PPP loans to borrowers.

55.     Between April and August 2020, Kabbage facilitated, as a direct lender and LSP for its partner banks, an aggregate principal loan balance of over $7 billion.

56.     Between April and August 2020, Kabbage received an aggregate of over $217 million in PPP loan processing fees from the SBA for processing PPP loans as a direct lender and

16

LSP for its partner banks.

B.   Defendants Sought to "Pump Up the Volume" of PPP Loans to Remedy Kabbage's Financial Struggles.

57.   Petralia and Frohwein founded Kabbage in 2008 as an Atlanta-based non-bank, financial technology company.  Kabbage facilitated loans to small businesses and consumers through its online lending platform in partnership with other financial institutions.  It used data from its customers and other sources to underwrite and approve loans to small businesses.

58.   Since its founding and through 2019, Kabbage was never profitable.  In 2017 and 2018, Kabbage incurred losses from its operations.

59.   At all relevant times until their departure in October 2020, Defendants directed and controlled Kabbage and its participation in PPP.  Frohwein and Petralia, as co-founders and CEO and President respectively, oversaw and closely managed all aspects of Kabbage's operations. Robinson joined Kabbage in 2010, and during Kabbage's participation in PPP, Robinson served as Head of Strategy and worked closely with Frohwein and Petralia.

60.   In February 2020, Defendants and Kabbage's Board of Directors were eyeing tough times ahead for Kabbage financially.  They contemplated a hiring freeze, reducing marketing costs, and renegotiating Kabbage's covenant with its warehouse lender.  They also considered another round of equity fundraising and bridge financing to solve Kabbage's looming liquidity problem.

61.   By the end of March 2020, as the COVID-19 pandemic began impacting the U.S. economy and small businesses in particular, Kabbage's financial position became even more precarious.  It laid off a significant number of employees and suspended its lending services in anticipation of widespread defaults by its customers who were heavily impacted by the COVID-19 pandemic.  Because of its declining liquidity, Kabbage was forced to renegotiate and pay down its corporate debt early.

62.     In early April 2020, Defendants knew that Kabbage was projected to run out of cash by September or October 2020, and trimmed down costs by reducing executive compensation by twenty percent, Defendants included.

63.     Defendants saw the PPP as a lifeline for Kabbage's financial troubles and the key to Kabbage's survival.  On or about March 30, 2020, Kabbage employee S.A. estimated that Kabbage could make over $100 million in processing fees in just the first three months and described the PPP as a "money making machine! . . . Plus no risk of loss."[1]

64.     On or about April 5, 2020, Robinson wrote to another Kabbage employee about PPP: "its a shit ton of revenue that we're going to take as much of as we can."  He added: "we're looking at a legitimate opportunity of hundreds of millions of dollars of revenue," commenting that "you've seen the liquidity...we could definitely use a few hundred million."

65.     On or about April 9, 2020, Defendants participated in a company-wide "Town Hall" meeting with Kabbage employees where another senior executive explained that "this [the PPP] is a great business to be in" because "Kabbage can raise the equivalent of an equity [financing] round in the next 3 months."

66.     Defendants also saw PPP as an opportunity to increase the value of Kabbage as a whole, in the event of the future sale of the company or its technology.  On or about April 4, 2020, a day after reporting to its Board that Kabbage was entering merger and acquisition discussions with American Express, Petralia texted senior Kabbage management, including Robinson and Frohwein, that Kabbage should maximize the number of PPP loans approved because "There is

---

[1]  Kabbage employees used email, Slack, an internal instant messaging service, and text message to communicate with one another regarding PPP.  To the extent feasible, the United States quotes Defendants' communications verbatim, without correcting typos or misspellings.

value . . . from an enterprise perspective to simply being the fintech that deployed more $ faster to more businesses."

67.     Despite having laid off a significant number of employees in the end of March 2020, Kabbage used what remained of its workforce to capture as many PPP loans as it could through its newly created PPP platform.

68.     Defendants were closely involved with every step of Kabbage's development and deployment of its PPP platform and all aspects of Kabbage's PPP lending process.

69.     Robinson directly oversaw and approved the processes for three departments with respect to PPP: data science, data strategy, and credit and fraud risk. These departments developed the process for scanning documents submitted by PPP borrowers and extracting data from them, formulated Kabbage's methodology for calculating applicants' PPP loan amounts, and executed Kabbage's approach for evaluating loans for fraud risk. Robinson was also the Authorized Lender Official with the SBA for all PPP loans that Kabbage directly issued to borrowers.

70.     Robinson reported directly to Petralia, who, in turn, reported directly to Frohwein. Petralia and Frohwein were jointly responsible for overseeing all Kabbage employees and Kabbage's day-to-day operations, including the development and implementation of Kabbage's PPP loan calculation methodology and its PPP KYC/KYB, BSA/AML, and fraud procedures. Despite Defendants' respective titles at Kabbage, they were directly involved with Kabbage's participation in PPP lending and closely monitored SBA program updates and kept abreast of requirements for lenders.

71.     Defendants also attended and participated in daily or twice-daily senior management meetings during PPP, during which issues regarding Kabbage's PPP lending were discussed, such as regulatory updates, financing for PPP loans, interactions with the SBA and

Kabbage's partner banks, contractor and employee staffing, and progress on PPP loan processing and loan platform development.

72.     From the start of the PPP, Frohwein pressured employees to process and submit as many PPP loan applications as possible before the funds allocated by the CARES Act were exhausted.  On or about April 12, 2020, Frohwein texted senior Kabbage employees, including Robinson and Petralia, that Kabbage "obviously need[s] to get to over $1B in volume [submitted to the SBA] daily."  In a message from on or about April 16, 2020, Kabbage employee N.G. wrote "pressure like crazy for addl apps to submit . . . [from] rob [Frohwein] lolz."  Notes from an April 18, 2020 meeting among senior Kabbage leaders attributed the following statement to Frohwein: "Rob: Wanted to be primed to go, but can't stop as money will likely go quickly!  Need to accelerate the curve.  Maximize the number of our apps."  Frohwein closely monitored the number and dollar value of the PPP applications Kabbage submitted, and throughout the program, he pressed employees to "pump up the volume" of PPP applications submitted to the SBA.  Petralia and Robinson were well aware of the pressure placed on Kabbage's employees.  And Frohwein's message trickled down to Kabbage employees: On or about April 27, 2020, one Kabbage employee wrote to a large Slack channel for customer service representatives that Kabbage needed to "submit as many applications as possible before the SBA shuts its window again."

73.     Defendants defrauded the government to profit from the "money making machine" in two ways: by knowingly inflating the loan amounts of tens of thousands of loans and by knowingly failing to comply with its obligations as a PPP lender to "[c]onfirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes."  First, contrary to SBA regulations, Kabbage systematically double counted employees' state and local taxes ("SALT") in determining borrowers' average monthly payroll

("SALT Error").  The SALT Error improperly increased more than 53,000 borrowers' loans, collectively, by over $111 million dollars.  Additionally, Kabbage failed to exclude annual employee wages over $100,000 in calculating borrowers' eligible loan amounts, contrary to SBA regulations ("$100k Error").  The $100k Error improperly increased thousands of borrowers' loans, collectively, by approximately $110 million.  Second, contrary to SBA regulations, Kabbage did not conduct good faith reviews of PPP loan applications to determine their eligibility and did not implement adequate fraud controls sufficient to comply with the PPP requirements, including compliance with BSA/AML requirements.  As a result, Kabbage approved PPP loans to thousands of patently fraudulent and ineligible borrowers.

74.     These were not mistakes; rather, Defendants deliberately ignored numerous red flags about Kabbage's loan calculations and procedures for processing loans in a scramble to profit from the PPP.  Both insiders and outsiders warned Defendants early on that Kabbage was miscalculating, approving, and funding loans for fraudulent and ineligible borrowers.  For example, shortly after Kabbage launched its PPP platform, a Twitter user flagged Kabbage's SALT calculations as nonsensical and called Kabbage out publicly for "doubling up" employees' state and local tax withholding.  Kabbage employees, including Robinson, discussed this criticism internally and admitted they might be wrongly calculating loans using SALT, but Kabbage continued to double count state and local taxes anyway.  Further, Kabbage employees realized— and informed Defendants—that their own programming errors caused Kabbage to calculate loans without excluding annual employee compensation over $100,000, as required by the PPP.  Even after this episode, Kabbage continued to approve loans with the $100k Error.  Yet another Kabbage employee was fired by Petralia after the employee raised concerns to Robinson that Kabbage's

data showed that 25% of PPP applicants were fraudulent and suggested that Kabbage automatically decline certain applicants.

75.    Despite these red flags, Defendants pushed ahead because they did not want to lose out on the opportunity to profit off the PPP. On or about April 3, 2020, Frohwein set a company goal to process more than $5 billion in PPP lending before the program's end. In mid-April 2020, Petralia shared a meme of a person making a snow angel on a floor covered in money while Kabbage's senior management celebrated the first $1 million in PPP loans approved by the SBA.



76.    Rather than exercise care and comply with the PPP requirements expected of a PPP lender, Defendants pushed through inflated and fraudulent loans, reaped unjustified processing fees based on those loans, blamed the SBA, and left SBA to clean up the mess they caused.

77.    For each of the thousands of inflated, fraudulent, and ineligible PPP loans Kabbage submitted to the SBA, both ones it originated and those it processed for its partner banks, Defendants submitted and knowingly caused the submission of false certifications to the SBA when Kabbage certified that it had "[c]onfirm[ed] the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application" and "[c]onfirm[ed] receipt of information demonstrating that a borrower

had employees for whom the borrower paid salaries and payroll taxes." These certifications were materially false in several respects. First, in the case of the miscalculated loans, Kabbage did not confirm the borrower's calculation; instead, Kabbage substituted its own wrong, inflated calculation. Second, Kabbage did not confirm the "average monthly payroll costs," per the PPP program requirements. Third, Kabbage did not confirm that the documentation from the borrower demonstrated that the borrower was in operation or paid employees as of February 15, 2020.

78.    For each of the thousands of inflated, fraudulent, and ineligible loans, Defendants knowingly caused the submission of false claims for processing fees, guaranty purchase payments, and forgiveness payments that were larger than Kabbage or its partner bank were otherwise entitled to receive due to Kabbage's calculation errors and failure to comply with PPP lender requirements.

79.    Defendants' fraud paid off: Due to Kabbage's participation in PPP and receipt of illicit PPP processing fees, Kabbage's financial position rebounded. It was able to pay off its corporate debt by July 2020, only three months after defaulting. Kabbage also reinstated executive compensation that it had previously reduced for Frohwein, Petralia, and Robinson, and even paid bonuses to Defendants. Due to Kabbage's apparent success in PPP, Defendants successfully leveraged Kabbage's participation in PPP to sell all of Kabbage's assets (excluding its PPP portfolio) to American Express ("AmEx") for more than $650 million on or about October 16, 2020.

80.    Defendants, who oversaw Kabbage's participation in the PPP as it systematically defrauded the government over many months, received lucrative payouts. In addition to their compensation while at Kabbage during and after the PPP, Frohwein earned at least $17 million, Petralia earned at least $10 million, and Robinson earned at least $1 million for their Kabbage stock and options as a result of the AmEx transaction. Kabbage would not have made these

payments but for Kabbage's participation in PPP and receipt of illicit PPP processing fees to which they were not entitled because Kabbage was, and had been since at least March of 2020, struggling financially to keep afloat.

81.    After the sale, Kabbage—doing business as KServicing—continued to service the inflated and fraudulent loans that it made or facilitated.  Frohwein, Petralia, and Robinson left Kabbage and went to work at AmEx, receiving significant retention bonuses.  Defendants, other Kabbage executives, and its investors, however, left this new entity so strapped for cash that it filed for bankruptcy in October 2022 and liquidated in June 2023.

C.    Kabbage's Online PPP Lending Platform.

82.    In order to process as many PPP loans as quickly as possible, Kabbage created an online PPP lending platform for applicants to access through Kabbage's website.  Kabbage designed the platform to automate the application and underwriting process to reduce or eliminate the need for human review of the application, the supporting documentation, and loan calculations.

83.    In general terms, Kabbage's PPP lending platform worked as follows:  Applicants, through Kabbage's website, completed a series of questions regarding their business information, owner information, and specific payroll costs and then were prompted to upload as supporting documentation tax documents, government-issued identification, documents to establish the existence of the business, and other materials.

84.    Frohwein, Petralia, and Robinson had decision-making authority regarding the final design of the portal used to facilitate Kabbage's PPP lending platform. As PPP began, Defendants knew that, as a PPP lender, Kabbage was required to verify the dollar amount of the borrower's average monthly payroll costs.

85.    Robinson directly oversaw the development of this platform.  When Robinson testified under oath and was asked whether he "approved the automated process for evaluating and

approving PPP loans" and "approved the procedures that Kabbage used to submit loans to the Small Business Administration through E-Tran," he asserted his right against self-incrimination under the Fifth Amendment to the United States Constitution.[2]  When Frohwein testified under oath and was asked whether "anyone at Kabbage, including Spencer Robinson, need[ed] to come to [him] for approval on Kabbage's automated processes for evaluating and approving PPP loans" and whether he had "signed off on Kabbage's automated process for evaluating and approving PPP loans," Frohwein asserted his right against self-incrimination under the Fifth Amendment.[3]

86.    One way that Kabbage automated the lending process was to standardize the loan calculation across borrowers by requiring borrowers to submit information from certain fields on IRS tax forms.  Kabbage did not need to be prescriptive: PPP regulations expected the borrower to calculate the loan.  So, requiring specific information from specific tax forms for all borrowers was Kabbage's idea to streamline its PPP loan processing.

87.    To implement this standardized loan calculation, Kabbage employees, supervised by Robinson, developed a methodology for calculating PPP loan amounts by identifying certain fields from IRS tax forms with certain eligible payroll costs from the CARES Act and PPP regulations.

---

[2]  On April 25, 2024, Robinson testified under oath pursuant to a Civil Investigative Demand served upon him in the course of the Government's investigation.  While Robinson, who was represented by counsel at the examination, answered some questions about his work history, he asserted his right against self-incrimination under the Fifth Amendment with respect to all questions about his work at Kabbage and the PPP.  Robinson signed the transcript after being granted the opportunity to review it.

[3]  On June 3, 2024, Frohwein testified under oath pursuant to a Civil Investigative Demand served upon him in the course of the Government's investigation.  While Frohwein, who was represented by counsel at the examination, answered some questions about his work history, he asserted his right against self-incrimination under the Fifth Amendment with respect to all questions about his work at Kabbage and the PPP.  Frohwein signed the transcript after being granted the opportunity to review it.

88.     Robinson approved the loan calculation methodology.

89.     Petralia and Frohwein had oversight of Robinson and the PPP loan calculation methodology.  When Petralia testified under oath and was asked whether she "approve[d] the PPP loan calculation methodology that the data strategy team developed," she asserted her right against self-incrimination under the Fifth Amendment.[4]  When Frohwein testified under oath and was asked whether "[y]ou were responsible for overseeing all Kabbage employees and business operations, and that would include oversight of individuals responsible for development and implementation of Kabbage's PPP loan calculation methodology," he asserted his right against self-incrimination under the Fifth Amendment.

90.     Kabbage's lending platform calculated the borrowers' eligible PPP loan amount using the formula that Kabbage devised.  Kabbage then used an automated program to scan the tax documents, extract data, and compare them against the borrowers' entries.  At times, Kabbage employees manually reviewed the supporting documentation.

91.     When Robinson testified under oath and was asked whether he "approved the process that Kabbage used to extract data from Paycheck Protection Program loan applications and to confirm that data," he asserted his right against self-incrimination under the Fifth Amendment.

92.     When Petralia testified under oath and was asked whether she "approved the process for scanning submitted application documents and extracting data that was developed by

---

[4]  On May 16, 2024, Petralia testified under oath pursuant to a Civil Investigative Demand served upon her in the course of the Government's investigation.  While Petralia, who was represented by counsel at the examination, answered some questions about her work history, she asserted her right against self-incrimination under the Fifth Amendment with respect to all questions about her work at Kabbage and the PPP.  Petralia signed the transcript after being granted the opportunity to review it.

the data science team for PPP," she asserted her right against self-incrimination under the Fifth Amendment.

93.    When Frohwein testified under oath and was asked whether he "approved the data science strategy for scanning submitted applications and extracting data for Kabbage" and whether "Robinson need[ed] to come to [him] for approval of this process for Kabbage," he asserted his right against self-incrimination under the Fifth Amendment.

94.    Kabbage also used a primarily automated process to "review" PPP loan applications to confirm the borrower's eligibility and in an attempt to comply with KYB/KYC requirements, as required under PPP regulations.  At a high level, Kabbage processed the information submitted by the borrower through several software programs designed to verify borrowers' identities and business information and evaluate their documents for fraud concerns.  If a borrower's information was flagged in Kabbage's automated process, the application was sent for manual review by a Kabbage employee or contractor, who then reviewed the submitted materials, requested additional documentation, and decided whether to decline or approve the application.

95.    Robinson was responsible for providing instruction, guidance, and training to Kabbage employees and staff on how to process PPP loan applications received, which included direction in manual reviews of supporting documents submitted by borrowers.

96.    When Robinson testified under oath and was asked whether he "approved Kabbage's process for reviewing loans for Know Your Customer/Know Your Business compliance," whether he "approved Kabbage's processes for conducting fraud reviews of PPP loan applications," and whether he "approved the Bank Secrecy Act/Anti-Money Laundering procedures and any changes to those procedures," he asserted his right against self-incrimination under the Fifth Amendment.

27

97.    When Petralia testified under oath and was asked whether she "approve[d] Kabbage's fraud controls for PPP" and any changes thereto, and whether she "approve[d] Kabbage's BSA/AML procedures for PPP" and any changes thereto, she asserted her right against self-incrimination under the Fifth Amendment.

98.    When Frohwein testified under oath and was asked whether he approved Kabbage's fraud controls, BSA/AML process, and whether he was the person who approved any changes to those controls and procedures, Frohwein asserted his right against self-incrimination under the Fifth Amendment.

99.    In their haste to cash in on the PPP, Defendants and Kabbage recklessly designed and implemented Kabbage's PPP lending platform and its processes for reviewing PPP loans.

100.    First, in their rush to approve as many PPP loans as possible, Defendants failed to address problems with the loan application process and the process for reviewing them after concerns regarding miscalculated loans or the volume of fraudulent loans approved by Kabbage arose.  Rather, Defendants ignored concerns that Kabbage was approving miscalculated and fraudulent loans and chose to continue accepting and approving PPP applications, rather than pausing application processing to address and remediate these concerns.

101.    Second, Robinson, reporting to Frohwein and Petralia, tasked employees who did not have relevant experience or expertise with designing its PPP loan calculation methodology and with overseeing Kabbage's fraud and BSA/AML review.

102.    The Kabbage employees who designed and implemented the payroll calculation had no experience with basic payroll, accounting, or IRS tax documents.  As a result, these employees, under Defendants' direction and control, misapprehended these tax documents and caused systematic inflation of Kabbage's loan calculations.

103.    Furthermore, in mid-April 2020, Robinson reassigned and Petralia fired Kabbage's Head of Fraud.  She was hired at the beginning of 2020 to develop and execute a fraud strategy for Kabbage, but she pivoted to developing Kabbage's BSA/AML, and fraud risk processes for PPP loans because Defendants knew that Kabbage needed to comply with those requirements and mitigate fraud risk to be a PPP lender.  Rather than fill this position with someone with relevant expertise, Robinson replaced this employee with a credit risk analyst who had no prior fraud risk experience.

104.    Finally, Defendants failed to put in place adequate resources to handle the volume of loan applications yet continued to place pressure on Kabbage employees to process and approve PPP loans.  The pressure to capitalize on the PPP quickly became overwhelming for Kabbage employees.  Employees were routinely working sixteen hours per day, seven days a week.  As Robinson commented on or about April 4, 2020, "Everyday is basically Monday at the moment." Employees assigned to review PPP applications for potential fraud routinely complained that they were drowning in work.  When loan calculation errors arose and employees raised concerns about the large volume of fraudulent loans being approved by Kabbage, Defendants ignored these warnings and did not heed to employee suggestions to pause accepting or processing PPP loans to correct course.  Instead, Defendants instructed their employees to move full speed ahead.

## II.    The SALT Error Fraud.

### A.    Overview of the SALT Error.

105.    Kabbage's automated PPP loan calculation methodology relied on documents that could be easily scanned, which required them to be uniform.  One of the documents that Kabbage relied on for borrowers with employees was the IRS Form W-3, which summarizes the aggregate compensation that employers have paid their employees during the calendar year and that is reported on employees' Forms W-2.  Kabbage focused on the amounts in Box 1 ("Wage, tips,

29

other compensation"), Box 5 (Medicare wages and tips"), Box 17 ("State income tax"), and Box 19 ("Local income tax") of applicants' W-3s, as represented in this example:



106.    Box 1 and Box 5 report gross wages, tips, and other compensation paid to employees before certain individual deductions.

107.    Box 17 and Box 19 report the aggregate state and local taxes withheld by employers on employees' behalf and paid to state or local governments.    Importantly, Box 17 and Box 19 represent amounts paid by employees to state and local governments from employees' wages, tips, and other compensation reported in Box 1 and Box 5.  They are not amounts paid by employees.

108.    Kabbage required applicants using its online platform to identify Box 1, Box 5, and the total of Box 17 and Box 19:



109.    Kabbage's online application described Box 17 and Box 19 amounts as "state and local income tax paid," but failed to advise applicants that those amounts were included in the amounts from Box 1 and Box 5 and were not supplemental payroll costs incurred by the employer.

110.    Kabbage incorrectly calculated PPP loan amounts for borrowers with employees by adding the total of Box 17 and Box 19 to gross wages in Box 1.

111.    Robinson approved this methodology.  When Robinson testified under oath and was asked about this document and whether he had approved this methodology, he asserted his right against self-incrimination under the Fifth Amendment.

112.    When Petralia testified under oath and was asked whether she had approved this methodology, she asserted her right against self-incrimination under the Fifth Amendment.

113.    Kabbage's methodology conflicted with the PPP rules and SBA guidance.  Further, this methodology was illogical because Box 17 and Box 19 are included in the Box 1 and Box 5 amounts for total compensation.  In other words, Box 17 and Box 19 reflect amounts withheld for SALT payments from employees' gross wages reported in Box 1 and Box 5.  While the PPP regulations allowed Kabbage to include in applicants' loan calculations the taxes that were assessed on employee compensation and that *employers incurred* concerning their employees,

such as unemployment insurance, neither Box 17 nor Box 19 reflect such employer-paid taxes.

114.    Because Kabbage hard-wired this error into its calculations for all loans, it systematically inflated over 53,000 loans between April and August 2020.  In total, Kabbage's SALT Error resulted in the lending of more than $111 million in excess principal, on which Kabbage and its partner banks claimed and received processing fees.

B.    Defendants Ignored Warnings That Kabbage Was "Doubling Up" SALT.

115.    Robinson was responsible for managing the implementation of Kabbage's PPP program, which included the process for processing applications from prospective borrowers and the development of the formula for applicants' loan calculations.

116.    At first, Robinson tried to develop a methodology around April 5, 2020, but soon delegated the work to Kabbage employees N.G. and S.A.  Before PPP, N.G. reported to Robinson and was responsible for developing Kabbage's U.S. portfolio, conducting market research, and managing risk operations.  N.G. supervised S.A. for purposes of the PPP and delegated to S.A. the task of developing the methodology.  Prior to PPP, S.A. was a member of the new products team, responsible for developing new lending products for Kabbage.

117.    Neither S.A. nor N.G. had any experience in payroll, accounting, or tax issues.  And neither S.A. nor N.G. consulted a tax or payroll expert regarding their formulation of the loan calculation methodology.

118.    On or about April 6, 2020, S.A. suggested a PPP loan calculation method that added together inputs from W-3 Box 1, Box 17, and Box 19.  He circulated this proposal to a group of Kabbage employees, including Robinson.  Kabbage used this calculation for PPP lending in 2020.

119.    Also on or about April 6, 2020, Robinson, N.G., and others were sent a news update from an outside law firm advising that for PPP loans, "Payroll costs should use gross wages, not net wages."  W-3 Box 1 and Box 5 represent gross wages.  By adding Box 1 of Form W-3 to Box

17 and Box 19, Kabbage did the opposite of what was recommended.

120.    Within days of Kabbage accepting PPP applications, Defendants began to receive feedback from the public about the SALT Error.  On or about April 11, 2020, Kabbage employees discussed by Slack "Feedback from a CPA [certified public accountant]" that Kabbage's application "asked for state W/H from w3 but that shouldnt be included.    Only state unemployment."  Robinson and Petralia were members of the Slack channel where this concern was shared, received this message, and knew or should have known of Kabbage's error.

121.    The next day, on or about April 12, 2020, a Kabbage employee shared an accountant's Twitter comment that Kabbage was "doubling up" the "EE's [Employees'] SIT [state income tax] & LIT [local income tax] w/h [withholding] in gross wages" including Boxes 17 and 19:



122.    S.A. responded that he was not a CPA and "[The message poster] might be right." Robinson also replied and acknowledged that Boxes 17 and 19 "wouldn't be employer-paid taxes" but that he was "not a CPA . . . maybe we should talk to one."

123.    When Robinson testified under oath and was asked and was asked about this Slack exchange, he asserted his right against self-incrimination under the Fifth Amendment.

124.    Despite suggesting that Kabbage contact a CPA, Robinson did not consult a CPA to confirm Kabbage's methodology was correct, despite having the authority to do so.  When he testified under oath and was asked whether he discussed this concern with a CPA, Robinson asserted his right against self-incrimination under the Fifth Amendment.

125.    Petralia was aware of this concern, as she was a member of the Slack channel where this concern was discussed. When she testified under oath and was asked whether she "kn[ew] that in April 2020 customers were informing Kabbage that it was double counting borrower paid state and local income taxes in its loan calculation," Petralia asserted her right against self-incrimination under the Fifth Amendment.

126.    When Frohwein testified under oath and was asked whether he "knew as of April 12, 2020, that Kabbage was double-counting state and local income taxes paid by employees in its loan calculations," he asserted his right against self-incrimination under the Fifth Amendment.

127.    After receiving the Twitter comment that Kabbage was "doubling up" SALT, S.A. realized his error and that W-3 Box 1 was duplicative of W-3 Box 17 and Box 19 and informed his supervisor, N.G.

128.    When Robinson testified under oath and was asked whether he "knew that [S.A.] determined that the Twitter user was correct and that Kabbage was double-counting employee-paid state and local income taxes when calculating PPP loan amounts," he asserted his right against self-incrimination under the Fifth Amendment.

129.    After this realization, S.A. and N.G. consulted with D.E., Kabbage's Head of Tax, who was a CPA, regarding Box 17 and Box 19 and the loan calculation.  D.E. told them that Box 17 and Box 19 were included within W-3 Box 1 and Box 5.

130.    When Robinson testified under oath and was asked whether he "discuss[ed] this

issue with [D.E.]," he asserted his right against self-incrimination under the Fifth Amendment.

131.    Moreover, despite numerous internal discussions among Kabbage employees that they should consult with an accountant about its PPP loan calculation methodology, no one at Kabbage consulted with an accountant other than D.E., who advised the methodology was incorrect.  Despite D.E.'s advice, Defendants did not change their loan calculation.

132.    Even after Kabbage employees recognized this error, Defendants did not change Kabbage's loan calculation methodology, pause accepting PPP applications, or instruct Kabbage employees to evaluate these concerns.  Instead, Defendants allowed Kabbage to continue referring to Box 17 and Box 19.

133.    On or about April 20, 2020, yet another outsider questioned Kabbage's SALT Error for a PPP loan Kabbage processed for Lender Partner 1.  Lender Partner 1 received notice of this concern about Kabbage's loan calculation from a client and forwarded it to Frohwein and others at Kabbage:

> 2- It seems you use the numbers from the W3 form - Box #1 for Gross salary, Box #17 for State income Tax Withheld, Box #19 for Local tax withheld. Client:  "I am quite sure that they are wrong because all three - it makes no sense. You do not add Tax Withheld to the Gross wages – its in there already. Monthly Salary Cost is calculated from Gross before it is adjusted to taxable gross which then goes to Box 1. They said I could log in again with another email address and open a new account. I am not sure what to do."

134.    When Frohwein testified under oath and was asked about this exchange, he asserted his right against self-incrimination under the Fifth Amendment.

135.    When Petralia testified under oath and was asked whether she "kn[ew] that in April 2020 that [Lender Partner 1] sent Kabbage borrower feedback that Kabbage was double counting borrower paid state and local income taxes in its loan calculation," she asserted her right against self-incrimination under the Fifth Amendment.

136.    Despite Lender Partner 1's inquiry, Petralia and Frohwein did not change Kabbage's loan calculation, pause accepting PPP applications, or instruct Kabbage employees to evaluate these concerns.  Rather, Kabbage continued to refer to Box 17 and Box 19.

137.    On or about April 24, 2020, Frohwein and Petralia received a voice message and an e-mail from a person representing himself to be a CPA that Kabbage's PPP application had a "huge, glaring error" and a "HUGE mistake in how it figures the loan amount" that he warned would "get you in serious trouble."  Frohwein sent, by text message, the voice message to senior Kabbage management, including Robinson and N.G.

138.    Robinson responded to Petralia, Frohwein, and others: "We've heard it all before…."  He added: "What we were tasked to do by SBA is not possible and our calc gets as close as possible.  It's not perfect but its what we can do at a semblance of scale."

139.    Even though Defendants discussed contacting the CPA, no one at Kabbage ever contacted the person.  The CPA intended to warn Kabbage employees about the SALT Error.

140.    When Petralia testified under oath and was asked about this warning of a "huge, glaring error" that would "get you in serious trouble," she asserted her right against self-incrimination under the Fifth Amendment.

141.    When Frohwein testified under oath and was asked about this warning of a "huge, glaring error" and whether he did "anything to follow up to make a determination on whether or not there was an error on Kabbage's part in terms of calculating a loan amount," Frohwein asserted his right against self-incrimination under the Fifth Amendment.

142.    Defendants were on notice of the SALT Error and that Kabbage's loan calculation method did not comply with the PPP, yet they did nothing to investigate or correct it. Rather, Defendants forged ahead with processing PPP loans using the loan calculation developed by S.A.

36

to "pump up the volume" of PPP loans and the lucrative processing fees.

        C.     <u>Kabbage Admitted to the SALT Error and Settled with the Government.</u>

       143.    In January 2021, the Department of Justice ("DOJ") issued a Civil Investigative Demand ("CID") to Kabbage concerning the SALT Error. Only then did Kabbage change its loan calculation methodology with respect to W-3 Box 17 and Box 19.

       144.    When informed that Kabbage had double-counted SALT, resulting in the SALT Error, SBA stopped processing forgiveness and guaranty purchase requests for affected loans.

       145.    In November 2021, Kabbage entered into a settlement agreement with the SBA to resolve administrative claims relating to the SALT Error for $30 million, an amount less than the total SALT Error due to an offset created by other loan calculation errors. The agreement with the SBA resolved only single damages for the approximately 53,000 loans affected by the SALT Error and did not resolve or address problems with other PPP loans that Kabbage made or facilitated. In the agreement, the SBA and Kabbage acknowledged that the SBA had made inflated forgiveness payments to Kabbage of approximately $12,500,000 due to the SALT Error.

       146.    On May 7, 2024, KServicing Wind Down Corp., the successor entity to Kabbage following its liquidation, executed a settlement agreement with the DOJ to resolve its False Claims Act liability related to the SALT Error in light of the proof of claim DOJ filed in Kabbage's bankruptcy proceeding. In that agreement, KServicing Wind Down Corp. admitted that "In processing PPP loan applications, on some loans, Kabbage double counted employees' state and local tax ('SALT') withholdings in determining borrowers' average monthly payroll. This 'SALT Inflation' increased the loan amount of tens of thousands of borrowers, collectively, by at least one hundred million dollars. Between April 1, 2020 and August 31, 2020, Kabbage received excess processing fees as a result of the SALT Inflation." Due to Kabbage's liquidation, Kabbage has not yet made a cash payment to the United States to resolve its liability as of the date of this filing.

What payment will be received, if any, has not been ascertained.

**III.    The $100k Error Fraud.**

147.    The SALT Error was not Kabbage's only PPP loan calculation error.  Kabbage also systematically included amounts of per-employee annual compensation exceeding $100,000. Defendants knew about this error, yet did nothing to correct it, resulting in the miscalculation of thousands of PPP loans and the submission to SBA by Kabbage and its partner banks of amounts of inflated loan amounts upon which Defendants and Kabbage profited.

A.    Overview of the $100k Error.

148.    The CARES Act and SBA's regulations required PPP loan applicants to exclude any employee's annual salary in excess of $100,000 from the calculation of the borrower's maximum loan amount and required that PPP lenders such as Kabbage confirm the borrower's loan amounts.

149.    In the loan calculation methodology designed by S.A. and N.G., which Robinson approved, Kabbage asked borrowers whether they had any employees who made more than $100,000 annually.  If the borrower answered yes, they were required to upload IRS Forms W-2 of those employees to Kabbage's website.  Manual reviewers then reviewed any such self-reported applications.

150.    If applicants responded that they did not have any employees with compensation exceeding $100,000 (whether that was true or not), Kabbage took no further steps to verify applicants' representations and the borrower's loan calculation.

151.    Throughout April 2020, Kabbage employees expressed confusion and concern regarding Kabbage's implementation of this requirement.  One employee suggested that Kabbage should request W-2s of all employees, because "Even if the applicant says no employee is earning [>]100K, we would need W2 to validate that.  So, if we don't have a w2, doing loan amount

calculation will not be the final and we need to do it again once the doc is submitted." Another questioned whether Kabbage's process for scanning the W-2s would correctly identify the documents for high-earning employees. Robinson knew about these concerns, yet he did not change Kabbage's loan calculation methodology or otherwise address the concerns.

152.    Kabbage employees and Robinson knew that borrowers might provide false or incorrect information on their applications. On April 8, 2020, N.G. joked to Robinson about a loan application he was reviewing: "hawt damn foot doctors making fucking bank. lolz such egregious lies - 150K vs. 400K over 100K."

153.    Even in instances where applicants inaccurately reported that they did not have employees with annual compensation greater than $100,000, Kabbage was on notice, as a matter of arithmetic, that applicants likely were misreporting annual per-employee compensation over $100,000. Under the regulations applicable to the 2020 round of PPP, the most a business could receive per employee, excluding non-wage payroll costs, was $20,833.33: that is, $100,000 annual compensation divided by 12 months, multiplied by 2.5, per the instructions in the first PPP regulation. Kabbage required applicants to state the number of employees and to submit documents that supported that number. Thus, if an applicant's loan amount totaled more than $20,833.33 per employee, this was a red flag that the applicant potentially was including, in calculating payroll costs, employee wages greater than $100,000. While non-wage payroll costs could cause an applicant's loan amount to exceed $20,833.33 per employee, Kabbage still should have been able to confirm in several ways, whether, but for those non-wage payroll costs, the applicant included per-employee wages over $100,000. First, Kabbage's application prompted borrowers to itemize the various components of the payroll calculation. Second, the applicant was required to provide documentation supporting the loan amount. Third, Kabbage's application

generally did not allow borrowers to include some eligible non-wage payroll costs, such as healthcare and retirement payments.  Not only did Kabbage have the information it needed to assess whether an applicant was including annual per-employee wages over $100,000 in the loan calculation, but it also had an obligation under the statute and regulations to confirm the borrower's payroll calculation.

154.    Several Kabbage employees suggested implementing an automated mathematical or logical validation for loans that were too large based on the stated number of employees.

155.    Nevertheless, Kabbage never implemented such a safeguard to identify and review loans with a loan amount that was larger than allowed based on the stated number of employees under PPP rules.

156.    When Petralia and Frohwein testified under oath and were asked whether Kabbage implemented any logical or a mathematical check in its PPP loan application process to ensure that borrowers were not approved for a loan amount that was larger than they were eligible for based on their stated number of employees, they each asserted their right against self-incrimination under the Fifth Amendment.

B.    <u>Defendants Ignored Warnings That Kabbage Was Approving Loans with "Significantly Outsized Loan Amounts."</u>

157.    Indeed, by late April 2020, Defendants were informed, based on data collected from applicants, that Kabbage had failed to implement a cap on applicants' per-employee annual compensation at $100,000.

158.    On or about April 27, 2020, N.G. e-mailed Robinson and other Kabbage employees about calls Kabbage received from borrowers wishing to reduce their loan amounts because they were concerned about being ineligible for forgiveness.  N.G. explained that Kabbage was "not capping sole props / single LLCs to the appropriate $100K."  The loan inflation was systematic

and affected numerous loans that Kabbage had made.  When Robinson testified under oath and was asked about this e-mail, he asserted his right against self-incrimination under the Fifth Amendment.

159.    On or about April 28, 2020, N.G. sent a Slack message to senior Kabbage leadership, including Robinson, warning that approximately 1,200 loans approved by Kabbage were affected by this error.  N.G. stated that Kabbage would attempt to correct in E-Tran, SBA's electronic loan processing system, the 1,200 loan amounts that were inflated due to the "whole removing the SR [self-reported] cap in certain segments."  He also informed Robinson by e-mail that he had taken steps to ensure that the error did not recur going forward.

160.    On or about April 29, 2020, in an effort to identify other loans affected by the $100k Error, N.G. sent Robinson an analysis of Kabbage's calculations of the PPP loan amount compared to applicants' self-reported calculations.  The analysis showed that, for more than 3,000 loans, Kabbage had calculated the borrower's loan amount as higher than the amount the borrower had self-reported to Kabbage that they were eligible for.

161.    After N.G. sent this analysis to Robinson, N.G. and H.G., another Kabbage employee, discussed the scope of the problem and how Robinson and others at Kabbage were not taking any action:



162.     On or about April 29, 2020, N.G. sent Robinson a presentation that summarized several problems with the loans that he had identified.  This included the fact that Kabbage had told customers that Kabbage would fix incorrect borrower-inputted information, when in fact, it had not; that Kabbage was aware that "incorrect inputs" from their systems could generate incorrect payroll calculations; and that for some borrowers, Kabbage's calculation "resulted in *significantly* outsized loan amounts (i.e., correct loan amount is $20K, SBA submission for $2mm)."

42

163.    Like Robinson, Petralia and Frohwein knew that N.G. had identified loans that Kabbage had approved that were inflated by $100k Error issue.

164.    On or about April 30, 2020, N.G. confided in Petralia by text message that he was "just frustrated with all this blowback on loan amounts and stuff...very disappointed."  When Petralia testified under oath and was asked about this document and whether N.G. "was referring to his discovery that Kabbage had approved loans that were larger than the borrower was eligible for" and that one reason "was because Kabbage had failed to cap per-employee annual compensation to $100,000 for certain types of borrowers," Petralia asserted her right against self-incrimination under the Fifth Amendment.

165.    In a text exchange among senior management just a few days later, on or about May 2, 2020, Defendants were informed that some loans were rejected due to calculation errors, and that N.G. "knows some [loans] we overstated."

166.    When Frohwein testified under oath and was asked whether he knew that N.G. had identified Kabbage loans that had been inflated by the $100K Issue, he asserted his right against self-incrimination under the Fifth Amendment.

167.    But even after Kabbage identified loans affected by the $100k Error in late April 2020, Kabbage continued to process and approve PPP loans affected by the $100k Error. Defendants knew that Kabbage continued to approve loans inflated by the $100k Error through August 2020.  Further, Defendants knew that Kabbage was repeatedly warned and informed that Kabbage was approving loans that did not exclude per-employee annual compensation over $100,000.  Defendants did not take action to confirm that Kabbage was correctly calculating PPP loan amounts.

168.    For example, on or about June 16, 2020, Kabbage's outside consultant, Consultant

43

1 recommended that Kabbage update the language in its loan calculation procedures regarding compensation of an individual employee in excess of $100,000 per year.  Both Robinson and Frohwein reviewed Consultant 1's draft report.

169.    On or about June 22, 2020, Kabbage's Head of Product Initiatives, K.A., sent Robinson information relating to a loan approved and disbursed by Kabbage where the loan amount was "too high" based on the stated number of employees.  K.A. determined this even though the borrower had represented that none of its employees earned more than $100,000 annually because "math would tell you that 40 employees at $4.4M payroll means that is not possible."  Even though "math" contradicted the borrower, Kabbage did not request any documentation from the borrower to substantiate the loan amount.

170.    Still, Defendants failed to implement any mathematical or logical validation for such loans, nor did they attempt to determine whether any other loans were affected by the $100k Error.

171.    On or about June 25, 2020, Defendants led a company-wide town hall meeting where a Kabbage employee asked whether Kabbage would be liable for loans where Kabbage miscalculated the loan amount based on the borrower's IRS Form 1040 Schedule C.  Petralia asked Robinson to respond. In responding, Robinson said that it would "depend[]" on the borrower's circumstances, but that if there were an egregious error on Kabbage's part, "at some point, we do bear that responsibility."

172.    On or about July 1, 2020, a Kabbage customer service representative, T.S., sent Petralia recommendations for improving Kabbage's loan processing and fraud controls.  Among those recommendations, T.S. suggested that Kabbage's "automated system [be] taught to check the number of employees against reported payroll . . . . If a person's self-reported payroll would

be in excess of $100k per employee, the system should automatically flag it for manual review and require W2s." T.S. also provided an example of a loan that "even if it wasnt fraud" should have prompted further review. Petralia forwarded this message to Robinson with a comment, "Fascinating."

173. The next day, on or about July 2, 2020, Kabbage's Head of Sales Operations, Sc.A., separately sent T.S.'s recommendations to Robinson, commenting that the ideas seemed "specific and actionable." Despite this proposed fix, Robinson and Petralia did nothing further to address the $100k Error.

174. On or about July 9, 2020, a journalist e-mailed Petralia asking how a PPP borrower with one employee could receive a loan from Kabbage between $1 and $2 million. Petralia forwarded the e-mail to Robinson, with the comment: "Um." Robinson responded: "Automation rules…yep this looks bad…also looks like fraud."

175. When Petralia testified under oath and was asked about this email and whether "As of July 2020, more than two months after [N.G.] had informed [her] that Kabbage had approved loans that were larger than the borrower was eligible for, [she] knew that Kabbage had approved additional [loans] that were too large based on the borrower's stated number of employees," Petralia asserted her right against self-incrimination under the Fifth Amendment.

176. On or about July 10, 2020, Kabbage's Head of Communications, P.B., proposed to Petralia and Robinson that Kabbage respond to journalist inquiries by blaming the Federal government for not giving PPP lenders direct access to tax data from the IRS.

177. On or about July 13, 2020, P.B. informed Defendants that a reporter had reached out to him about potentially fraudulent PPP loans that Kabbage approved and that Kabbage had disbursed a loan between $150,000 and $350,000 to a borrower with one employee, even though

the maximum loan amount per employee was approximately $20,833.  Upon inquiry, Kabbage employee A.K. reported to Defendants that the loan had been "auto-approved without any manual intervention."

178.    On or about July 16, 2020, another journalist contacted P.B. inquiring about publicly reported SBA data that showed that Kabbage had approved loans "of between $1-$2 million" for borrowers with one or two employees "who would not qualify for such a large amount."  P.B. forwarded this question to Petralia and Frohwein and again proposed blaming the SBA.

179.    After the PPP program authority expired in August 2020, Defendants took no action to rectify all loans with the $100k Error despite being warned that such loans existed.

180.    On or about September 25, 2020, Lender Partner 2 flagged for Kabbage a loan funded in August 2020 where the annual maximum payroll for a borrower with two employees far exceeded the maximum amount allowed and asked, "what was Kabbage's process/control that was in place to prevent/detect any similar loan applications to comply with the SBA guidelines."  On or about October 6, 2020, Kabbage employee K.A. responded to Lender Partner 2 that the borrower "attested that they did not have anyone with >$100K salary, which is what then flowed through our system."  K.A. omitted from her response that Kabbage had been repeatedly warned about loans with this kind of calculation error and that it did in fact have information sufficient to identify loans affected by the $100k Error.

181.    K.A. forwarded this exchange to Robinson.  When Robinson testified under oath and was asked about the email exchange between Lender Partner 2 and K.A. and whether, "As of October 2020, [Robinson] knew that additional borrowers had been identified whose loan amount was larger than permitted under the regulations given their stated number of employees," Robinson

asserted his right against self-incrimination under the Fifth Amendment.

182.    After Lender Partner 2 flagged this particular loan, Kabbage employees identified other loans that it had made with $100k Error. On October 7, 2020, K.A. followed up internally with a small group of Kabbage employees, including Robinson, who had "touched this issue today, i.e., the dude who got too much money because he did not flag that he had employees earning >$100K." She noted that Kabbage employee R.B., had run a "quick check on our portfolio to see if we have any other customers" whose loan amounts appeared to exceed the maximum allowed. Later, K.A. told another Kabbage employee that they had identified approximately 2,500–3,900 additional borrowers with loan amounts that potentially exceeded the amount permissible under the program, and she also discussed the issue with Robinson. When Robinson testified under oath and was asked whether he "kn[ew] that [R.B.'s] analysis found multiple additional loans where Kabbage had approved loans where the loan amount was too large per the stated number of employees," Robinson asserted his Fifth Amendment privilege against self-incrimination.

183.    What actions were taken is unclear, but subsequent reviews of Kabbage's loan data revealed numerous loans affected by the $100k Error, which Kabbage had not fixed.

C.    Kabbage Admitted the $100k Error and Settled with DOJ.

184.    When informed that Kabbage had failed to exclude per-employee annual compensation exceeding $100,000, resulting in the $100k Error, SBA stopped processing forgiveness and guaranty purchase requests for affected loans.

185.    On May 7, 2024, KServicing Wind Down Corp. executed a settlement agreement with the DOJ to resolve its FCA liability related to the DOJ's proof of claim filed in the bankruptcy proceeding as it relates to Kabbage's $100k Error. In that agreement, KServicing Wind Down Corp. admitted that "Contrary to PPP regulations, Kabbage included employee annual compensation over $100,000 in calculating borrowers' eligible loan amounts on some applications

for PPP loans processed by Kabbage. This $100k Inflation increased the loan amounts of, at a minimum, 1,900 loans, collectively, by at least one hundred million dollars. Between April 1, 2020 and May 31, 2021, Kabbage received excess processing fees as a result of the $100k Inflation. . . . Prior to August 11, 2022, on some loans, Kabbage (or the lender for whom Kabbage was servicing such Kabbage PPP loans) received from SBA excess forgiveness or guaranty purchase payments as a result of the $100k Inflation." Due to its liquidation, Kabbage has not yet made a cash payment to the United States to resolve its liability as of the date of this filing. What payment will be received, if any, has not been ascertained.

## IV. Failure to Comply with Lender Loan Review Requirements.

186.    In addition to the loan calculation errors, Defendants designed and implemented a system that failed to meet their PPP lender obligation to conduct a good faith review of the PPP loans.

### A. Defendants Knew Kabbage's Pre-Pandemic Processes Were Deficient.

187.    The CARES Act and PPP regulations required Kabbage to confirm that borrowers submitted materials to establish that the borrower was in operation and had employees as of February 15, 2020, and to review documentation submitted with the loan applications to verify borrowers' payroll costs. 85 Fed. Reg. 20811, 20815. Kabbage was also required to comply with applicable BSA/AML requirements. *See* 85 Fed. Reg. 20811, 20815. In all, these provisions required Kabbage to have and implement fraud controls and to conduct a good-faith review of borrower materials for fraud and to confirm their eligibility, notwithstanding a provision that held lenders harmless for borrower errors.

188.    Before the enactment of the CARES Act and the PPP, Defendants knew that several external auditors had opined that Kabbage's processes did not comply with BSA/AML requirements. And Defendants knew that Kabbage's own Head of Fraud, N.H., raised concerns

that Kabbage did not evaluate loans for fraud risk and did not properly verify customer identity, in addition to raising concerns that Kabbage did not comply with BSA/AML.

189.    Prior to its participation in the PPP, Kabbage had written BSA/AML procedures. But even as written, three separate audits had found that the procedures were deficient. In February 2019, Auditor 1 provided Kabbage with a report of its June 2018 audit of Kabbage's commercial lending, including its BSA/AML program and opined that the effectiveness of Kabbage's AML program required improvements. In particular, Auditor 1 found that Kabbage lacked any written policies and procedures regarding suspicious activity monitoring and referral to Kabbage's bank partner for its pre-PPP lending product and that Auditor 1 was unable to determine what information Kabbage had used to verify customer identity for a sample of customers. In December 2019, Auditor 2 was unable to opine on the adequacy of Kabbage's BSA/AML risk assessment because it noted that Kabbage did not have a current BSA/AML risk assessment. In November 2019, Auditor 3 gave Kabbage's BSA/AML program a rating of "limited assurance" and noted "limited evidence of enhancement since the prior review." It also opined that the lack of remediation was an "important weakness that requires prioritization by the Company." When Kabbage began participating in PPP, it had not remediated the BSA/AML weaknesses identified in Auditor 3's report.

190.    As senior executives at Kabbage, Defendants knew of these audits and their findings.

191.    When they testified under oath and were asked whether they "knew that [Auditor 3] provided an overall rating for the BSA/AML control environment of limited assurance for Kabbage," Robinson, Petralia, and Frohwein each asserted their Fifth Amendment privilege against self-incrimination.

192.    Furthermore, in February 2020, Kabbage's Head of Fraud, N.H., presented to Defendants and others regarding the company's fraud risks and BSA/AML compliance. In that meeting, N.H. informed Defendants and others that Kabbage was not in compliance with BSA/AML requirements and required increased fraud controls. Her presentation warned: "Organizational fraud risk management practices are not formalized and fraud risk is managed in an ad-hoc and sometimes reactive manner. There is a limited awareness of fraud risk at the organizational level and an organization-wide approach to managing fraud risk has not been established." During this presentation, she made certain recommendations for Kabbage to come into compliance with BSA/AML requirements and to implement fraud controls to reduce economic loss and fraud risk for the company.

193.    After this meeting, Robinson and Kabbage employee A.K. told N.H. that her suggestions to improve BSA/AML compliance and fraud controls would not be implemented because they were "stupid" and would interfere with Kabbage's ability to make a profit. Robinson also told her that Kabbage did not have fraud. Robinson instructed N.H. not to classify accounts as fraudulent because it would impair Kabbage's investors.

194.    When Robinson testified under oath and was asked whether he "inform[ed] [N.H.] that Kabbage would not implement those recommendations, because if they did Kabbage would not be able to make a profit," he asserted his right against self-incrimination under the Fifth Amendment.

195.    When Petralia testified under oath and was asked whether she "direct[ed] Spencer Robinson to inform [N.H.] that Kabbage would not implement her recommendations regarding BSA/AML requirements and fraud controls, because Kabbage would not be able to make a profit," she asserted her right against self-incrimination under the Fifth Amendment.

196.    Defendants knew at the outset when the CARES Act was enacted that to participate as a PPP lender, Kabbage would be required to comply with BSA/AML regulations and evaluate loans for fraud risk.  Based on Kabbage's prior audits and N.H.'s warnings, Defendants also knew that before PPP, Kabbage's BSA/AML processes required improvement and that the weaknesses posed risks due to the lack of effective fraud controls.

197.    For example, on or about July 10, 2020, in response to questions from AmEx during the due diligence process related to its potential acquisition of Kabbage's technology, Frohwein expressed frustration about AmEx's repeated requests for information about Kabbage's fraud controls in an e-mail to Petralia, Robinson, and others: "From my perspective, they're going to see our process as insufficient as compared to their ridiculous risk approach and it's one of the reasons they need to buy us to fix this shit."

B.    Kabbage Failed to Comply with PPP Loan Review Requirements.

198.    To participate in PPP, Defendants and Kabbage created a PPP loan platform to process applications.  As it relates to fraud review and identity verification, it contained certain improvements to Kabbage's pre-PPP processes.  But, as with Kabbage's error-laden loan calculation, its overall loan review process was riddled with errors and material deficiencies, because, rather than implement the PPP with the requisite regulatory safeguards, Defendants chose to "change the tires while we're running" to take advantage of PPP's guaranteed revenue.

199.    Rather than developing a loan platform that could perform the necessary verification, Defendants, and Robinson in particular, prioritized deficient automated processes so the company could "pump up the volume" and approve as many loans as possible, both to bolster its revenue and statistics, and to claim PPP funds before they ran out.  But Kabbage's review process paired different software programs with manual review by Kabbage employees and contractors: if a software program identified a potential issue—whether that be criminal history, a

low identity verification score, a match on a sanctions list, or risk of identity theft—a person must review the account to determine whether to clear the flag.  Manual review slowed down the "money-making machine."  Rather than slow down the loan approvals that generated substantial revenue, Defendants delayed most manual reviews until after the loan was submitted to the SBA and conducted these reviews before disbursing funds to the PPP borrower.   Kabbage and Defendants were then incentivized to disburse the funds as soon as possible, because, as Frohwein acknowledged in a company-wide Town Hall, Kabbage was not paid processing fees until after the borrower received the PPP loan.  So, Kabbage rushed through the reviews to avoid delaying receipt of processing fees.

200.    Petralia and Robinson approved these procedures.  When Frohwein testified under oath and was asked whether he knew that Kabbage's process for approving loans placed fraud checks after Kabbage submitted PPP loan applications to SBA through E-Tran but before disbursement, he asserted his right against self-incrimination under the Fifth Amendment.

201.    Robinson, in particular, prioritized reducing costs to Kabbage when fashioning their PPP loan review procedures.  For example, on or about April 6, 2020, Robinson told Kabbage employee K.A. his goal was to keep per-loan processing costs to less than $50 per loan.  He asked for assistance in modeling "how much we can afford to pay per application to process them" so he could "figure out how much of this I can afford to automate."  She replied: "if we are successful in this we make a whole lot of money or a little bit more than a whole lot of money."

202.    In August 2020, after the 2020 round of PPP had ended, Kabbage trumpeted that most Kabbage loans never went to manual review.  In Kabbage's own press release, it proclaimed, "over 75% of all approved applications, and more than 90% of self-employed applications, were processed without human intervention or manual review."  The press release also quoted Frohwein

as attributing Kabbage's success to "automation."

203.    In practice, Kabbage systematically failed to identify fraudulent borrowers and prevent disbursement of fraudulent loans.  Defendants cut costs and cut corners so that Kabbage could approve as many loans as possible, as quickly as possible.  Following are examples of Kabbage's loan review procedures that prioritized hasty approval and disbursement of PPP loans at the expense of a good faith review.

204.    For many borrowers, Kabbage never confirmed that the borrower was in operation as of February 15, 2020.  Kabbage did not require most corporation, professional corporation, general partnership, or limited liability company borrowers to provide payroll or other statements establishing that they were in operation as of February 15, 2020.  For all borrowers, Kabbage instructed its manual reviewers that they did not need to do more than confirm that a file had been uploaded, regardless of whether the documents actually showed that the borrower was in operation. Robinson was aware of these procedures.  As a result, Kabbage approved many ineligible and fraudulent borrowers who did not have businesses in operation as of February 15, 2020 and submitted these loans to SBA.

205.    Kabbage also jettisoned its primary pre-pandemic fraud prevention and identity verification tool, a product called Yodlee, during its participation in PPP.  Yodlee allowed Kabbage to connect to customers' bank accounts to see a customer's transaction history and account ownership.  Kabbage's Chief Revenue Officer, L.G., acknowledged in an email to Defendants and others that there were "fraud and other reasons not to" remove Yodlee, but that removing Yodlee from the approval process would result in cheaper and quicker processing of applications. Thereafter, on or about April 3, 2020, with Frohwein and Petralia's knowledge, Robinson approved removing use of Yodlee from Kabbage's PPP approval process to reduce the number of

applicants that would require manual review by a Kabbage employee.

206.    Kabbage employees warned that there could be increased, undetected fraud if Kabbage did not verify bank accounts with Yodlee.  Defendants knew of these concerns and pressed on nonetheless.  One employee stressed in a Slack exchange to a group including Robinson, "we can't go with unverified bank there will be Soooo much fraud."  Another Kabbage employee, K.A., shared a pervasive sentiment in an e-mail to Defendants and others, that the borrower would be liable if they committed fraud, not Kabbage, as if Kabbage had no part to play in preventing fraud as a lender participating in PPP.  Defendants knew that PPP requirements obligated it, as a lender, to act in good faith in processing PPP loan applications, contrary to what was being said by its team, yet they stood by and allowed it to be the prevailing ethos.  Even if borrowers connected their bank accounts via Yodlee, they did so after approval and submission to SBA, and Kabbage did not use any of the bank account data—even if it was available to them— to confirm the borrower's operations or to assist in determining their PPP loan amount.

207.    In another example, on or about April 22, 2020, Robinson approved submitting thousands of PPP loan guaranty applications to the SBA even though the applicants had failed an automated background check and before Kabbage had reviewed the applications to determine whether the borrowers were eligible.  He approved this so that Kabbage could approve loans more quickly and without having to go through the process of manual review.

208.    Kabbage faced repeated issues verifying customer identity as required by PPP regulations and to comply with KYB/KYC requirements.  Kabbage's written PPP procedures called for use of a LexisNexis product to conduct KYB/KYC.  If an applicant's score fell below a certain threshold, the loan was manually reviewed.  If the score was above that threshold, it would be passed automatically to the SBA for approval, without any review by a Kabbage employee.

Kabbage also collected government identification and used another vendor service at the time of loan disbursement to verify borrower identity.  Robinson approved loan guaranty application submissions to the SBA without any review of drivers' licenses, and in some instances, before applicants had even submitted drivers' licenses to Kabbage.  Throughout the PPP, Kabbage employees raised concerns about the identity verification process.  In April 2020, Kabbage employees informed Robinson that Kabbage's automated system was submitting applications to the SBA even for borrowers with ineligible KYB/KYC scores.  In May 2020, Kabbage employees noticed that Kabbage had approved PPP loans and submitted them to the SBA despite not having verified their government identification or where no government-issued identification had been provided at all.

209.    Even with these challenges, in June 2020, Kabbage further lowered its identity verification score thresholds in its automated KYB/KYC procedures to allow for even more borrowers to pass through the automated system without manual review.  Robinson approved these changes to Kabbage's automated logic for processing loans, even though Kabbage's in-house attorney, A.H., had questioned use of such low scores in April 2020.

210.    Kabbage's Head of Fraud, N.H., recommended that Kabbage use a software program to automatically evaluate all borrower-submitted documentation for signs that it had been fabricated, altered, or was otherwise fraudulent.  However, Robinson did not heed this recommendation and instead, utilized a product called Inscribe only during manual reviews of borrowers whose applications were otherwise flagged by the identity verification or fraud processes.  Robinson approved this procedure because, as he said to another Kabbage employee, that would be "easiest path for us i don't want to be reviewing payroll docs."  By June 2020, Kabbage used Inscribe on only approximately 2% of loan applications it had processed.  Moreover,

Inscribe was ill-equipped to evaluate the tax documents that Kabbage required borrowers to upload in support of their loan amounts, and Kabbage employees raised this issue with Robinson as early as April 2020.  On April 12, 2020, N.H.—who was subsequently terminated—informed Robinson that this product would not be effective on the documents submitted to support payroll costs. Additional employees opined to Robinson on or about June 10, July 2, and July 7, 2020, that Inscribe was not identifying falsified or forged tax documents that borrowers submitted.  Even so, Robinson instructed Kabbage fraud analysts to continue using Inscribe and that they could not reject PPP applications unless they had "definitive proof" of fraud through Inscribe.

211.   Kabbage devoted insufficient personnel and provided insufficient training to  its employees and contractors who did loan reviews.  Despite processing more than $7 billion in PPP loans, Kabbage employed only six to seven fraud analysts during PPP. By the end of May 2020, A.K., who oversaw the fraud analysts at that time, reported to Robinson that the fraud analysts were "overwhelmed" by the volume of fraud referrals the team received.  Within a few weeks, Consultant 1 also flagged, in its draft report, "[in]appropriate staffing levels" as a "risk" facing Kabbage's implementation of PPP.  Although Kabbage hired contractors during June and July 2020 to help with reviewing PPP loans, Kabbage fraud analysts continued to be overwhelmed by the work.  Defendants did not hire additional fraud analysts to assist.  Instead, fraud analysts were offered incentives based on the number of fraud reviews they completed over weekends.

212.   When Frohwein testified under oath and was asked whether he was aware that Kabbage fraud reviewers complained that they were overwhelmed with the quantity of work and whether he took any action in response to such complaints, Frohwein asserted his right against self-incrimination under the Fifth Amendment.

213.   When Robinson and Petralia testified under oath and were asked whether they

"knew that Kabbage fraud reviewers complained that they were overwhelmed by the quantity of work," that "additional resources were not allocated to the fraud team," and that "Kabbage fraud reviewers complained that they had insufficient direction on how to process loans flagged as suspicious for fraud," they each asserted their right against self-incrimination under the Fifth Amendment.

214.    Kabbage employees also identified myriad instances where the automated review process approved loans that they later determined, on manual review, to be fraudulent.  After PPP ended, Kabbage employees commented that Kabbage had approved PPP loan applications and disbursed PPP funds to borrowers who were deceased.  Kabbage approved loans without conducting OFAC checks, even though such a check was explicitly required by their BSA/AML procedures and to comply with BSA/AML requirements.  External banks and journalists identified fraudulent PPP loans that were never reviewed by a Kabbage employee and brought these loans to Kabbage's attention during the PPP.  The refrain was, as Kabbage employee A.K. put it in one email to Robinson and others, "automated . . . ."  Even Robinson commented to Petralia, "automation rules . . . looks like fraud."

215.    Based solely on a desire to minimize costs, Kabbage chose to develop its own optical character recognition (OCR) tool to scan and extract data from borrower-submitted tax forms, rather than using a third-party product:  On or about April 5, 2020, Robinson told Kabbage employee H.G. that the decision "comes down to cost," with an emphasis on speed: "because its a shit ton of revenue that we're going to take as much of as we can."  On or about April 8, 2020, Robinson told Kabbage employee K.A. that "it was going to be way too expensive" to use a third-party OCR product.  By late April 2020, Robinson decided that Kabbage's OCR tool would be not only cheaper but also speedier.  He expected Kabbage's internally developed processes to allow

for the approval of enough PPP applications so that Kabbage could pay off its lender with the profits earned from the loans.  Frohwein and Petralia knew about Robinson's decision.

216.    Despite having identified dozens of loans as suspicious and likely fraudulent as early as May 2020, Robinson neglected to ensure that Kabbage employees promptly file Suspicious Activity Reports (SARs) or report suspicious PPP loans to its partner banks, contrary to its regulatory and contractual obligations, despite knowing they were required to do so. Kabbage's in-house attorney, A.H., raised concerns to Robinson and others on or about May 11, 2020 that Kabbage had not submitted any SARs, made any referrals to bank partners, or created a formalized process for doing so.  On or about May 26, 2020, A.H. recommended to Kabbage employee A.K. who reported to Robinson, and others that Kabbage file SARs related to any suspicious loans.  Consultant 1 found in a risk assessment provided to Kabbage on June 16, 2020, that Kabbage's process "to identify and report unusual activity" needed improvement, and recommended "creating SAR procedures that include escalation of suspicious activity and how to complete a SAR."  Robinson and Frohwein were aware of this report and its recommendations. By the end of July 2020, Kabbage had filed only 28 SARs, as Frohwein well knew.  Under Robinson's direction, Kabbage did not begin filing SARs until early September 2020.

217.    By design, Kabbage did not collect enough documentation from PPP applicants to confirm borrower loan eligibility or identify fraudulent borrowers.  For example, on or about August 14, 2020, through Slack, A.K. shared with Robinson and another Kabbage employee. data regarding the number of PPP loans which had been identified or reviewed for fraud or suspicious activity.  Robinson replied, "am I correct in reading that we've reviewed ~70K cases with no disposition (i.e., they remained suspicious)?"  When A.K. replied, "Yes, we reviewed them but couldn't confirm as fraud," Robinson asked: "How many did we 'clear' then? I'm questioning our

process with that many ending up in 'I don't know.'"

218.    Defendants never paused their PPP processing to ensure that their automated and manual procedures resulted in a good faith review of PPP loan applications. Rather, they pressured their employees to process as many loans as possible to increase their statistics. In fact, Defendants resisted calls by their employees to stop processing PPP loans or improve their procedures. To the extent they did make improvements, those improvements were implemented late in the program and were still ineffective.

219.    Defendants knew of the concerns Kabbage employees raised regarding Kabbage's procedures for reviewing PPP loans and regarding the sheer volume of fraudulent and ineligible PPP applicants that Kabbage had approved. They were in close contact with Kabbage employees and discussed these concerns at company-wide Town Hall meetings.

C.    Defendants Ignored Warnings About Kabbage's Failure to Validate Loans Because They Couldn't "Afford" Any Delay in Loan Submission.

220.    Defendants knew, before PPP began, that the SBA was concerned about borrower fraud and that failing to comply with PPP lender requirements would put Kabbage at risk.

221.    On or about March 31, 2020, Kabbage's Head of Policy, S.T., sent an e-mail to Robinson and others which commented: "We expect fraud to be a major concern of the SBA."

222.    On or about March 31, 2020, Defendants discussed by text message that as a PPP lender, Kabbage would be required to "validate[]" the loan. Robinson told Frohwein that, "it's a question of if you want to take the risk that the documents provided have the justification in them...I believe you just run the risk of the guarantee not being honored."

223.    On or about April 2, 2020, N.H. emailed Robinson and others an SBA Notice regarding "Detecting Fraud in Small Business Administration Lending Programs." This Notice was directed to the SBA and its lenders and gave recommendations regarding lenders'

responsibilities in identifying borrower fraud in SBA business loan programs. N.H. sent this message to Robinson to ensure he and others at Kabbage were on notice of the requirements expected of a 7(a) lender before Kabbage participated in the PPP lending program.

224.    Defendants also knew they needed to comply with BSA/AML requirements and authenticate the borrower's identity and verify that a borrower was in operation on February 15, 2020.

225.    Robinson knew that in April 2020, both in-house and external attorneys had advised that Kabbage would need to comply with BSA/AML regulations and implement a CIP to satisfy regulatory obligations and contractual requirements with the partner banks.

226.    Defendants also knew that PPP lenders were expected to do a good faith review of loans. In April 2020, Frohwein personally reviewed regulatory guidance published by the SBA and Defendants discussed this guidance and the requirements for lenders with S.T., Kabbage's Head of Policy. S.T. warned them that Kabbage faced additional risk of investigation or loss of the SBA guaranty because Kabbage was a "novel lender."

227.    On or about April 28, 2020, Robinson advised Petralia that Kabbage should not approve a PPP loan application for a borrower that had submitted documents with "strong signals of fraud," despite Petralia's insistence that "he's a regular dude I've spent a lot of time on the phone with him," because, as Robinson advised Petralia, "fraud on one document seems bad for all docs and submissions. this is where we'd get into FinCEN territory…this would be a we know there's a problem."

228.    As described further below, throughout Kabbage's participation in PPP, Defendants knew that Kabbage was systematically approving fraudulent PPP loans and disbursing funds to fraudulent PPP borrowers.

229.    Defendants knew as soon as Kabbage began accepting applications that the fraud rate could be substantial and that declining borrowers for fraud concerns or pausing submission of PPP loan applications to improve fraud and identity verification controls could cut into Kabbage's bottom line.  On or about April 3, 2020, Robinson and Kabbage employee N.G. reviewed two early PPP applications.  Robinson texted their findings to other Kabbage leaders, including Frohwein and Petralia: "one looked great...the other looks like fraud ... so let's hope that rate goes down."

### 1.    Petralia and Robinson Fired Kabbage's Head of Fraud When She Raised Concerns About Fraud in PPP.

230.    Leading into PPP, Kabbage's Head of Fraud, N.H., warned Robinson repeatedly that Kabbage needed to improve its identity verification and implement appropriate fraud mitigation in order to be an SBA lender.  On or about March 31, 2020, she told him by e-mail that Kabbage "ha[s] the tools [for identity verification] and are not properly using them. Hence, letting the easy criminals through the door."  When Robinson testified under oath and was asked questions about this e-mail, he asserted his right against self-incrimination under the Fifth Amendment.

231.    Later that same day, N.H. informed Robinson via e-mail that in Kabbage's existing products, Kabbage had a 20% fraud rate using its current fraud control tools, while industry average was 5%.  She told him that Kabbage's "KYC/KYB, AML/BSA programs need added authentication/velocity controls with a digital app to avoid identity theft and account takeover-third party fraud. . . . I just need your help to stop the bleeding."  When Robinson testified under oath and was asked questions about this e-mail, he asserted his right against self-incrimination under the Fifth Amendment.

232.    The next day, on or about April 1, 2020, N.H. proposed to Robinson and Kabbage employee A.K. that Kabbage automatically decline PPP applicants with low identity verification

scores to prioritize resources dedicated to manual review to less risky customers.  But, another Kabbage employee told N.H. and Robinson that implementing such a rule would stop 45-50% of applications at the time of submission, and queried whether Kabbage would be comfortable with that from "a business perspective."  Thereafter, Robinson did not act on N.H.'s suggestion.

233.    On or about April 4, 2020, Robinson told N.H. in a Slack message "so you'll find this scary/justifying what you've been saying…[N.G.] and I reviewed 2 accounts together this afternoon…both existing customers. 1 looked great the other was clearly fraud." He added, "hopefully that fraud rate decreases with volume."  N.H. responded by saying, "…..Only two shit … had to get that out. . . . We need the controls but we can stop as much as we can with everything over 40 if the rules we are putting in place knockout the bad." When Robinson testified under oath and was asked about this Slack exchange, he asserted his right against self-incrimination under the Fifth Amendment.

234.    When Robinson testified under oath and was asked, "Were the controls that [N.H.] is referring to put in place," he asserted his right against self-incrimination under the Fifth Amendment.

235.    On or about April 11, 2020, N.H. asked Robinson for approval to hire a fraud manager as PPP ramped up to oversee the fraud team operations.  He told her that she would not be able to hire a manager: "we need to just get funds flowing…"  The same day, N.H. told Robinson that she was worried about BSA/AML with respect to PPP, and recommended, again, that Kabbage decline risky borrowers.  Robinson did not act on this suggestion at this time.

236.    On or about April 12, 2020, N.H. identified data showing that approximately 25% of incoming PPP applications were fraudulent.  This data was sent to Robinson.  When Robinson told N.H. he "simply [did] not believe" those results, she reminded him that Kabbage previously

"ha[s] not had real time or full utilization of quality fraud controls" and that it was not uncommon when a company added fraud controls to experience "learning pains." She also told him that Inscribe would not be effective in identifying fraud in the tax forms Kabbage required borrowers to submit.

237.    Within days, Robinson reassigned N.H., telling her that she was no longer Head of Fraud. Shortly thereafter, Petralia fired N.H.

238.    Petralia called N.H. to inform her that she had been terminated. On that call, N.H. told Petralia that Kabbage did not comply with BSA/AML requirements and did not have effective fraud controls. In response, Petralia offered N.H. a severance payment and equity in Kabbage.

239.    When Petralia testified under oath and was asked whether "[N.H.] told you that she was fired because she had raised these concerns about fraud at Kabbage," she asserted her right against self-incrimination under the Fifth Amendment.

240.    N.H. was replaced by A.K., who had no prior experience in fraud risk mitigation or prevention. Robinson promoted A.K. to overseeing Kabbage's fraud review procedure and analysts, despite knowing that he had no previous experience in fraud risk mitigation or prevention.

### 2.    Defendants Continued to Ignore Kabbage Employees' Concerns About Fraud and Fraud Mitigation Throughout PPP.

241.    After Petralia fired N.H., other Kabbage employees came to Robinson and Petralia with concerns about fraud and suggestions for improvement, but these concerns fell on deaf ears. Instead, Robinson and Petralia instructed their employees to take no action because, in their view, it was the SBA's fault that borrowers attempted to take advantage of Kabbage's PPP application process.

242.    On or about April 30, 2020, Kabbage employee P.A. contacted Petralia, A.K., and others through Slack and proposed running "a fraud test" because he was concerned that a person

with a stolen driver's license could pass through Kabbage's identity verification and obtain a PPP loan even though they did not have a valid business.

243.    Petralia informed Robinson of this concern by text message and by Slack. She acknowledged to Robinson that P.A.'s concern "may be an issue."

244.    Neither Petralia nor Robinson acted on P.A.'s suggestion to conduct "a fraud test" of Kabbage's PPP application. When Robinson and Petralia testified under oath and were asked "Did anyone at Kabbage do the fraud test that [P.A.] suggested," they each asserted their right against self-incrimination under the Fifth Amendment.

245.    Robinson then joined the conversation with P.A. in Slack and told the Kabbage employees: "we should try to do what we can...but to the extent someone falsifies real things that's on them and we rely on the guarantee at that point. they created this system with massive loop holes," blaming the SBA and telling Kabbage employees that they did not need to evaluate loans for fictitious information and could ignore indicia of fraud in PPP loans because Kabbage would rely on the SBA's guaranty of the loan. Later he added: "we should do the checks we can and do a good faith effort to assure compliance...outside of that it's the customer committing a crime."

246.    Petralia confided in a separate text to N.G., who was also copied on this exchange, that she was "avoiding that fraud thread."

247.    On or about May 7, 2020, during a company-wide Town Hall meeting attended by Defendants, a Kabbage employee asked what kind of risk liability Kabbage had from its participation in PPP. Robinson responded that SBA may refuse to honor the guaranty "if we don't do something correctly so if we verified the loan incorrectly and the customer should have not gotten that loan, we would be responsible and we would take that risk."

248.    On or about May 10, 2020, Kabbage employee S.S. e-mailed Robinson and A.K.

that he had identified several instances of numerous applications that were connected to the same electronic devices, indicating that there may be coordinated attempts to obtain illicit PPP funds through Kabbage. S.S. told them that Kabbage had already disbursed hundreds of thousands of PPP funds to risky accounts and suggested implementing rules to stop disbursement of funds for loans that had already been approved but where Kabbage had not yet sent money to the borrower. S.S. also suggested increasing review of applications with similar fraud indicators. Robinson did not act on the suggestion to increase review at this time.

249.    On or about May 14, 2020, A.K. emailed Robinson and other Kabbage employees that S.S. had identified possible organized fraud attacks relating to $22 million in PPP loans approved by Kabbage, where Kabbage had already disbursed approximately $1 million in funds.

250.    On or about May 21, 2020, A.K. emailed Robinson and others a proposal for "streamlin[ing] the review process for the various identity verification and fraud-related queues" because "[t]he team is overwhelmed" by the number of cases that they were expected to review.

251.    On or about May 29, 2020, S.S. asked Robinson whether SBA's "guarantee would apply" "if there is someone who we know may have uploaded a W3 with inaccurate/made-up numbers." Robinson told S.S., "You're in grey territory now I honestly don't know."

252.    On or about June 4, 2020, A.K. recommended to Robinson implementing an additional review step for PPP loan applications requesting loans larger than $250,000 because Kabbage employees had begun seeing suspicious applications in that category.

253.    On or about June 10, 2020, A.K. commented to several Kabbage employees, including Robinson, that Inscribe was not effective at identifying falsified or forged tax documentation.

254.    In late May 2020, Kabbage's consultant, Consultant 1, conducted a risk assessment

of Kabbage's PPP program.  Consultant 1 provided a draft report to Kabbage on or about June 16, 2020.  That assessment flagged several areas of risk to Kabbage relating to its fraud controls and BSA/AML compliance, including that "Kabbage does not maintain the appropriate staffing levels to support the high volume and time constraints related to PPP"; that Kabbage would knowingly transmit fraudulent information to the SBA; and that Kabbage did not adequately identity, track, and monitor suspicious activity.  Robinson and Frohwein received the draft assessment but did nothing to address these flagged areas.

255.  Consultant 1 advised that one loan out of its ten-loan sample lacked documentation establishing that the borrower was in operation as of February 15, 2020.  Kabbage did not change any procedures in response to this report.

256.  When Frohwein received the draft of Consultant 1's report, he messaged Robinson: "that fucking report is going to kill our amex deal And it's self inflicted and way out of scope." He instructed Robinson: "it's not final so you have to kill the out of scope crap in it.  Fucking consulting firms."  When Robinson asked: "What's the actual problem?" Frohwein responded, "If you read the report, you'll see the problems. They're all in red - literally. We're sending fraudulent data to the SBA.  We aren't performing calculations correctly and on and on and on."  Frohwein told Robinson: "Anyway, get with [S.] - keep it attorney client privileged and punch them in the fucking face to update that report and pull it back."

257.  Following this, Robinson and other Kabbage employees urged Consultant 1 to make the draft report look more favorable to Kabbage.

258.  On or about June 25, 2020, during a company-wide Town Hall meeting attended by Defendants, a Kabbage employee asked if Kabbage was liable for fraudulent loans where Kabbage's automated system "accepted" fraudulent documents.  Robinson told the company:

"There is a line there that yes," Kabbage would be responsible for the fraudulent loan.  He added that Kabbage could trust the borrower's documentation but acknowledged: "yes, if we can catch it, we would be better off and we would be doing the job we are supposed to be doing to stop them."

259.    Despite escalating concerns from Kabbage employees, Defendants chose not to pause accepting applications to address them.   On July 1, 2020, Kabbage's Head of Capital Markets, D.J., texted others in Kabbage's senior management, including Defendants, and asked if Kabbage would hold off on funding loans the next day due to fraud concerns.  Robinson replied that if they did, it would not be because of fraud.   Petralia and Frohwein knew of Robinson's response.

260.    On or about July 1, 2020, Kabbage customer service representative T.S. e-mailed Petralia with suggestions for additional controls that Kabbage could implement to reduce the number of fraudulent PPP loans that Kabbage approved.  T.S. flagged several issues that had been raised by other Kabbage employees to Robinson and Petralia previously.  Like P.A., he pointed out that Kabbage's fraud controls would not identify certain categories of fraudulent users.  Like A.K., he suggests manually reviewing loan applications that requested loans larger than $200,000.

261.    Petralia forwarded T.S.'s suggestions to Robinson.

262.    Frohwein was also aware of T.S.'s concerns.

263.    In a separate text exchange, Petralia and Robinson mocked T.S. and his suggestions.   Robinson said, "That fraud email pisses me off. Sending that to you completely ignores that we have a process for this shit." He added: "we just haven't had the time to look for the patterns" among fraudulent borrowers, ignoring the repeated attempts by Kabbage employees to implement improvements to Kabbage's processes to identify fraudulent applicants.  Kabbage

had already been participating in the PPP for three months.

264.    The next day, on or about July 2, 2020, T.S. sent a second e-mail to A.K., Robinson, and Petralia opining that Inscribe would not be effective at identifying borrowers with fictitious payroll information because Inscribe looks for the wrong issue: it checks for "altered documents, not fake payroll numbers."

265.    When Robinson testified under oath and was asked, "At this point in early July 2020, did you consider pausing accepting PPP loan applications to assess [T.S.]'s concerns and suggestions?" he asserted his right against self-incrimination under the Fifth Amendment.  When Petralia testified under oath and was asked "Did you consider pausing PPP loan application processing to address fraud concerns raised by [T.S.]," she asserted her right against self-incrimination under the Fifth Amendment.

266.    On or about July 2, 2020, a Kabbage employee suggested at a company-wide Town Hall that Kabbage pause accepting PPP applications so that Kabbage could "update security/fraud measures along with App errors/bugs."  Before the meeting, Petralia texted privately with Kabbage employee C.H. about this question and said, "I don't think we can afford a few weeks. Or a week." C.H. agreed: "You're right. I don't have time to wait we have to change the tires while we're running."

267.    At the company-wide Town Hall, Petralia asked C.H. to answer this question, and C.H. told the company, "We're going to open up the program as soon as it is available. It is our priority to get funding to these customers as quickly as possible.  The rate this program stays open is really uncertain."  He also said that improvements to the system would proceed on "parallel paths" with application acceptance.  Later in the meeting, another Kabbage employee asked, "who is liable for the fraud that does get through."  Petralia responded: "As long as we are following all

68

of the requirements that SBA has for this program we are not liable for that fraud. If we were negligent in our duties, failed to do the checks we were supposed to do on the identity side, then it would be us.  But because we are doing everything and more than SBA requests, then that is frankly on the SBA."  Frohwein was also present at this meeting.

268.    On or about July 7, 2020, Kabbage fraud analyst B.S. raised concerns to Robinson about Kabbage's fraud review procedures.  She explained, "it just seems like there is money going out the door to bogus businesses that is preventable," but that A.K. and S.S. told her to "let [suspicious applications] through because we don't really have a way to validate that these taxes have been filed with the IRS/are legitimate and that it will ultimately fall back on the SBA." Robinson told B.S. that Kabbage's fraud reviewers must approve applicants they believed to be suspicious: "Essentially if there is no definitive proof of fraud (I'm sure there are exceptions to what I'm going to say) then we have to let them through. . . . if we have nothing to prove wrong-doing then we would have to rely on the government to find those."

269.    When Robinson testified under oath and was asked, "You knew that in July 2020, fraud reviewers were being instructed to approve accounts they viewed as suspicious," he asserted his right against self-incrimination under the Fifth Amendment.

270.    As these concerns began mounting, Petralia and Frohwein began demonstrating awareness of their part in Kabbage's approval of fraudulent PPP loans.

271.    On or about July 9, 2020, just days after employees raised concerns at a company-wide Town Hall, Frohwein texted Petralia and another Kabbage employee and proposed that Kabbage could try to escape scrutiny for its PPP participation: "I'm wondering if we donate $10 million of our PPP fees to some cause, that might be helpful if we're ever under the microscope on the PPP program?"  Petralia responded, "The best thing we can do right now is actively and

aggressively provide fraudulent applicants and recipients to the authorities," as opposed to actively screening for fraudulent PPP loans before submitting PPP loans to SBA.

272.    In the weeks following, Petralia instructed Kabbage employees to report specific fraudulent borrowers to law enforcement.  However, Petralia did not support pausing acceptance of PPP submissions so that Kabbage could improve its fraud prevention procedures.

273.    On or about July 18, 2020, Kabbage's Head of Capital Markets, D.J., informed Robinson and others that Kabbage's correspondent bank, through whom Kabbage issued PPP funds to approved borrowers, had told Kabbage, "we are concerned about the significant increase in the fraudulent transactions confirmed by Kabbage over the past few days, including $18MM of new transactions that were flagged yesterday."  The correspondent bank asked Kabbage to explain "Kabbage's customer due diligence/KYC process prior to funding PPP loans" and "any additional controls in place to identify fraudulent transactions."  Around the time they made these requests, the correspondent bank terminated its relationship with Kabbage.

274.    At company-wide Town Hall meetings on or about July 16 and July 30, 2020, Kabbage employees asked Defendants more questions about the volume of fraudulent applications Kabbage was seeing.

275.    On or about August 6, 2020, Relator, Kabbage's legal analyst, raised concerns to Robinson and others that Kabbage had approved PPP loans even though the automated KYB/KYC check indicated that the borrower's Social Security Number or Tax Identification Number could not be verified. He also warned that doing so could affect Kabbage's ability to obtain forgiveness or guaranty purchase payments.

276.    Kabbage did make certain improvements to its loan processing to identify fraudulent borrowers and prevent disbursement of PPP funds.  However, because Defendants and

Kabbage were so focused on approving and disbursing as many PPP loans as possible, these improvements were often implemented weeks or months after they were first suggested, and many of them were not implemented until the end of July 2020, when the 2020 round of lending concluded on August 8, 2020.

277.     For example, on or about July 7, 2020, A.K. informed Robinson and T.S., in response to T.S.'s suggestions, that Kabbage was in the process of implementing a policy where all loans with a requested loan amount of more than $150,000 would be flagged for manual review. But, A.K. himself had suggested to Robinson such an additional control more than a month earlier, in early June. Despite being informed of these issues as early as May, Robinson did not implement changes to address them for more than a month.

278.     For example, on or about July 31, 2020, A.K. informed Robinson that Kabbage had implemented a solution to identify and review applicants who were submitting similar tax forms in support of their PPP loans. But, on or about May 10, 2020, S.S. had alerted A.K. and Robinson to this type of issue, where groups of applicants were submitting tax forms with the same amounts. T.S. suggested to Petralia on or about July 1, 2020 that Kabbage's automated system compare applications and tax documents for duplicates across borrowers. B.S. had also raised this concern to Robinson, on or about July 7, 2020. Despite being informed of these issues as early as May, Robinson and Petralia did not implement changes to address them for more than two months, and only implemented them mere days before the 2020 round of PPP ended.

279.     During the PPP and after the 2020 round of PPP ended, the press began to take note of Kabbage's systematic approval of fraudulent and ineligible PPP borrowers. In July 2020, Robinson, Frohwein, and A.K. discussed two loans flagged by a journalist as "potentially fraudulent" and concluded that one loan, which was not identified as suspicious by Kabbage's

71

automated system and did not undergo manual review, was likely fraudulent upon further examination.  In September 2020, both Journalist 1 and Journalist 2 reported on PPP loans that Kabbage issued to apparently ineligible borrowers that had not been in business as of February 15, 2020, as required by PPP rules.  Defendants and other Kabbage employees discussed how to respond to these articles.  Frohwein instructed employees who were involved in these discussions, including Petralia, to copy attorneys to "keep this attorney client privileged," even though no legal advice was sought.

280.    The concerns raised by Kabbage employees did not end when the 2020 round of PPP ended in August 2020.  On or about October 21, 2020, Petralia discussed with Robinson and Frohwein that some Kabbage employees wished to build a new tool for identifying fraudulent loans during the forgiveness process so that Kabbage could report those fraudulent PPP loans to the SBA.  Petralia told Frohwein that her and Robinson's opinion was that Kabbage should neither identify suspected fraudulent loans nor report the borrowers to the SBA, because "we followed the damn rules and if there is fraud the SBA can find it or not. There is no value in doing their jobs for them."

281.    As the issues with Kabbage's processing and approving PPP loans percolated to their attention and as Kabbage approached announcing the sale of its assets to AmEx, Defendants became fixated on the prospect that PPP loans may be automatically forgiven without any additional review by either Kabbage or the SBA.

282.    On or about May 20, 2020, N.G. and Robinson discussed approximately 1,300 PPP applicants where Kabbage miscalculated the loan amount and approved $12,000,000 in excess PPP funds that they were not eligible for.  Robinson told N.G., "Not necessarily a problem either...we just did a poor job verifying...only becomes an issue in an audit or guarantee scenario."

He then added that he hoped the error would not be a problem for Kabbage because the loans were small:

> Spencer Robinson <srobinson@kabbage.com>
> That's ~10k average...maybe they'll be auto forgiven 🤞

283.    On or about June 10, 2020, Kabbage's Head of Policy, S.T., sent a group of senior Kabbage employees, including Frohwein and Robinson, programmatic updates relating to PPP, and told them that it was possible that the SBA may use excess program funds "for blanket forgiveness of loans below a certain threshold."

284.    On or about June 25, 2020, in response to the question at the company-wide Town Hall regarding whether Kabbage would be liable for a loan that it had miscalculated, Robinson replied: "What you'd want to happen there is likely that customer to just sail through the forgiveness process and quite frankly not have to worry about it."  Frohwein and Petralia were in attendance at this Town Hall.  Blanket forgiveness of PPP loans was also discussed at Town Halls on June 11, July 16, August 6, and August 20, 2020, all of which were attended by Frohwein and Petralia.

285.    In July and August 2020, in preparing for the AmEx transaction, Kabbage employees, including Robinson, put together financial projections relating to Kabbage's servicing obligations related to PPP loans.  These projections included scenarios that assumed that all PPP loans less than $150,000 would be automatically forgiven without further review, requiring no work on Kabbage's part.  This represented the lion's share of Kabbage's PPP loans: a projected 229,500 out of 235,000 accounts.  In October 2020, just weeks before the transaction with AmEx was finalized, Robinson and others excitedly discussed by e-mail the prospect that all loans under $50,000 would be auto-forgiven, a move which would result in "236,383 accounts would be

forgiven with 22,323 accounts remaining." Robinson replied: "…potentially would land us as the highest number of forgiven loans in the program too…not a bad talking point."

## V.    Defendants Knowingly Submitted and Caused the Submission of False Claims for Payment to the SBA Related to Miscalculated and Fraudulent PPP Loans.

286.    On SBA Form 3507, Kabbage certified that it was "responsible, to the extent set forth in the PPP Loan Program Requirements, for all decisions concerning the eligibility (including size) of a borrower for a covered loan." It also certified that "it is in compliance and will maintain compliance with all applicable requirements of the Paycheck Protection Program and PPP Loan Program Requirements." This certification was false.

287.    On SBA Form 2484, Kabbage or its partner bank certified that the lender had "complied with the applicable lender obligations," including that it had "[c]onfirm[ed] the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application;" and "[c]onfirm[ed] receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020." This certification was false for each loan approved or facilitated by Kabbage that was fraudulently inflated by the SALT Error or by the $100k Error or for which Kabbage failed to conduct a good faith review.

288.    By submitting an SBA Form 1502, Kabbage or its partner bank certified through the one-time confirmation that "all the information," including the loan size, was "true and correct" to obtain payment from the SBA of processing fees. For each loan fraudulently inflated by the SALT Error and by the $100k Error, and for each loan where Kabbage failed to conduct a good faith review, this certification was false. Defendants caused the submission of these false statements and false claims for payment on Forms 1502 by and through their conduct.

289.    As a result of these false statements and certifications on Form 3507, Forms 2484,

and Forms 1502, the SBA paid Kabbage and its partner banks millions in processing fees that were inflated by the SALT Error, the $100k Error, and for patently ineligible PPP loans.

290.    In addition, before the SBA was informed of the SALT Error and the $100k Error, Kabbage submitted and caused the submission of false claims to the SBA for forgiveness for thousands of loans affected by the SALT Error and the $100k Error. The SBA unwittingly forgave thousands of them. Kabbage also submitted and caused the submission of false claims to the SBA for guaranty purchase of loans affected by the $100k Error. Again, the SBA unwittingly purchased hundreds of guaranties on these loans. In all, as a result of the false certifications that Defendants submitted and caused to be submitted, the SBA issued millions of dollars in inflated forgiveness and guaranty purchase payments to Kabbage and its partner banks.

291.    As the Authorized Lender Official for Kabbage for PPP, Robinson personally submitted Forms 2484 and Form 1502 to the SBA. For loans where Kabbage was the LSP to Lender Partner 1 and Lender Partner 2, Robinson caused the submission of these false statements and certifications. And Robinson knew that he would be personally liable for Kabbage's conduct as a result. On May 1, 2020, he said to N.G. in a Slack message: "treasury, sba, private industry, and now the Fed…all of them are going to be able to pull me in to answer for all the crap we're doing. . . . totally hoping for a zoom trial." When Robinson testified under oath and was asked, when he sent this message, whether he "knew about the double-counting of the state and local income taxes and Kabbage's PPP loan calculation methodology," whether he "knew that Kabbage had approved loans where it had failed to cap per employee annual compensation to a hundred thousand dollars," and whether he "knew that there were concerns about Kabbage's fraud rate and BSA and AML controls," he asserted his right against self-incrimination under the Fifth Amendment.

292.    By and through their conduct, Frohwein and Petralia caused the submission of these false statements and certifications.

293.    Some of these forgiveness applications were approved and guaranty purchase applications issued after the AmEx transaction and after Defendants had left Kabbage. However, the PPP was structured such that the SBA would provide either forgiveness or guaranty purchase payments for each PPP loan. Defendants knew that the SBA would render payment for all PPP loans through forgiveness or guaranty, and that Kabbage would be made whole, even for the loans for which forgiveness was approved or guaranty purchase sought after their departure.

A. <u>False Claims to the SBA Due to the SALT Error.</u>

294.    Between April 1 and August 8, 2020, Kabbage inflated more than 53,000 PPP loans by an aggregate principal amount of $111 million due to the SALT Error, based on data and analysis done by Kabbage. Kabbage and its partner banks received millions of dollars in inflated processing fees related to these loans.

295.    For each of these loans, Kabbage falsely certified to the SBA that it had confirmed the borrower's payroll calculations, and Defendants caused the submission of those false certifications. Defendants, and Kabbage, however, did not confirm the borrower's calculation as being consistent with the PPP where Kabbage had erroneously double-counted SALT.

296.    Borrowers whose loan amounts were affected by the SALT Error were not eligible for forgiveness of those amounts. As these loans were miscalculated due to Kabbage's error, Defendants knew that these inflated loan amounts were not eligible for forgiveness. In connection with each claim for forgiveness, the lender certified that it had confirmed that the borrower was eligible for loan forgiveness and in the amount requested by the borrower.

297.    For the reasons stated above, Kabbage failed to comply with lender requirements in connection with loans affected by the SALT Error. Accordingly, these certifications were

materially false.

298.    Based on Kabbage's data and analysis, Defendants caused the submission of false claims for forgiveness payments for at least 8,900 loans affected by the SALT Error.  Because of these false claims and certifications, the SBA made inflated forgiveness payments totaling at least $12,500,000.

299.    Defendants caused the submission of these false certifications related to applications for forgiveness related to loans affected by the SALT Error even after their departure from Kabbage as they knew and that Kabbage and its partner banks would submit forgiveness decisions relating to these loans.

300.    Defendants submitted and caused the submission to the SBA of false statements and false certifications related to these loans.  They also submitted and caused the submission of false claims for inflated processing fees and inflated forgiveness payments.

301.    The following are examples of loans affected by the SALT Error.

302.    On April 30, 2020, Kabbage approved PPP loan number XXXXXX7305 in the amount of $1,728,386 to Borrower 1 located in New Jersey.  Lender Partner 1 was the lender of record.  In support of the PPP loan, the borrower submitted an IRS Form 940, a W-3 showing state and local income taxes withheld from gross wages in Box 17 and Box 19, and eleven Forms W-2 of employees that earned more than $100,000.  In calculating the borrower's average monthly payroll, Kabbage included the values in Box 17 and Box 19 of the W-3.  As a result, this loan exceeded the maximum amount permissible under the PPP regulations, assuming this borrower was otherwise eligible for this loan.  Excluding the SALT double-counting, this borrower's maximum eligible loan amount was $1,660,426. Due to Kabbage's error, the loan was inflated by

$67,960, and the processing fee was inflated by approximately $2,038.[5]  Defendants caused the submission by Lender Partner 1 of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees.

303.    On May 1, 2020, Kabbage approved PPP loan number XXXXXX7302 in the amount of $668,934.00 to Borrower 2 located in California.  Lender Partner 2 was the lender of record.  In support of the PPP loan, the borrower submitted Forms 941 and 940, Forms W-2 for employees that earned more than $100,000 annually, and a W-3 showing state and local income taxes withheld from gross wages in Box 17.  In calculating the borrower's average monthly payroll, Kabbage included the values in Box 17 of the W-3. As a result, this loan exceeded the maximum amount permissible under the PPP regulations, assuming this borrower was otherwise eligible for this loan.  Excluding the SALT double-counting, this borrower's maximum eligible loan amount was $437,260.24.  Due to Kabbage's error, the loan was inflated by $231,673.76, and the processing fee was inflated by $6,950.21.  This loan was forgiven by the SBA before the SBA was informed of the SALT Error, and the SBA issued a forgiveness payment to Lender Partner 2 of $668,934.  Defendants caused the submission by Lender Partner 2 of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees and inflated forgiveness payments.

304.    On June 29, 2020, Kabbage approved PPP loan number XXXXXX8005 in the amount of $1,354,184 to Borrower 3 located in Georgia.  Kabbage was the lender of record. Robinson submitted the loan to the SBA on behalf of Kabbage.  In support of the PPP loan, the borrower submitted a W-3 showing state and local income taxes withheld from gross wages in

---

[5]  Lenders received a 3% processing fee for loans that were greater than $350,000 and less than $2,000,000.

Box 17.   In calculating the borrower's average monthly payroll, Kabbage included the values in Box 17 of the W-3.   Kabbage also made an apparent math error when processing this loan: Kabbage divided the annual gross wages reported on the W-3 by 2—rather than 12—when calculating average monthly payroll.   As a result, this loan exceeded the maximum amount permissible under the PPP regulations, assuming this borrower was otherwise eligible for this loan. Excluding these errors, this borrower's maximum eligible loan amount was $205,721.   Due to Kabbage's errors, the loan was inflated by $1,148,462, and the processing fee was inflated by approximately $30,339.[6] Defendants submitted and caused the submission of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees.

305.    On July 9, 2020, Kabbage approved PPP loan number XXXXXX8101 in the amount of $510,439.00 to Borrower 4, located in Texas.   Kabbage was the lender of record. Robinson submitted the loan to the SBA on Kabbage's behalf.   In support of the PPP loan, the borrower submitted a Form 1040 Schedule C and a Form W-3 showing state and local income taxes withheld from gross wages in Box 17 and in Box 19.   In calculating the borrower's average monthly payroll, Kabbage included the values in Box 17 and Box 19.   As a result, this loan exceeded the maximum amount permissible under the PPP regulations, assuming this borrower was otherwise eligible for the loan.   Excluding the SALT double-counting, the borrower's maximum eligible loan amount was $475,104.   Due to Kabbage's error, the loan was inflated by $35,355, and the processing fee was inflated by $1,060.05.   Defendants submitted and caused the submission of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees.

---

[6]  Lenders received a 3% processing fee for loans that were greater than $350,000 and less than $2,000,000, and in 2020, a 5% processing fee for loans that were less than $350,000.

B.    False Claims to the SBA Due to the $100k Error.

306.    Between April 1, and August 8, 2020, Kabbage inflated more than 1,900 PPP loans by an aggregate principal amount of $110 million due to the $100k Error, based on Kabbage's own data and analysis.  Kabbage and its partner banks received millions of dollars in inflated processing fees related to these loans.

307.    For each of these loans, Kabbage falsely certified to the SBA that it had confirmed the borrower's payroll calculations, and Defendants caused the submission of those false certifications.  Defendants, and Kabbage, however, did not confirm the borrower's calculation as being consistent with the PPP where the loan amount exceeded $20,833.33 per employee.

308.    Borrowers whose loan amounts were affected by the $100k Error were not eligible for forgiveness of those amounts.  As these loans were miscalculated due to Kabbage's error, Defendants knew that these loan amounts were not eligible for forgiveness.  In connection with each claim for forgiveness, the lender certified that it had confirmed that the borrower was eligible for loan forgiveness and in the amount requested by the borrower.

309.    In connection with each claim for guaranty purchase, the lender certified that it had complied with all program requirements in connection with the loan for which it was requesting guaranty purchase.

310.    For the reasons stated above, Kabbage failed to comply with lender requirements in connection with loans affected by the $100k Error.  Accordingly, these certifications were materially false.

311.    Defendants also caused the submission of false claims for guaranty purchase and forgiveness payments relating to loans with the $100k Error.

312.    Based on Kabbage's own data and analysis, Defendants caused the submission of false claims for forgiveness and guaranty purchase payments for at least 850 loans affected by the

$100k Error and approved in 2020. Because of these false claims and certifications, the SBA made inflated forgiveness and guaranty purchase payments totaling at least $12,000,000.

313.    Defendants caused the submission of these false certifications related to applications for forgiveness and guaranty purchase related to loans affected by the $100k Error as they knew that Kabbage and its partner banks would submit applications for forgiveness or guaranty relating to these loans and that the lenders would do so even after their departure from Kabbage.

314.    The following are some examples of loans approved by Kabbage where the loan calculation was clearly erroneous based on the number of reported employees.

315.    On April 30, 2020, Kabbage approved PPP loan number XXXXXX7309 in the amount of $717,733 to Borrower 5 located in California.    Lender Partner 1 was the lender of record.  The borrower represented that it had 18 employees.  Accordingly, the borrower received more than $39,000 in PPP funds per employee.  Kabbage knew based only on the loan amount and stated number of employees that the borrower likely was not eligible for the loan in the amount approved by Kabbage.  The borrower's supporting documentation also did not support this loan amount.  The borrower submitted a W-3 that reported $2,156,211 in annual payroll, 33 Forms W-2, and state income tax withholdings in Box 17.  The borrower also uploaded five W-2s for employees earning more than $100,000 annually.  Kabbage's calculation failed to exclude the reported excess compensation for this borrower and erroneously double-counted SALT, and the loan exceeded the maximum amount permissible under the PPP regulations due to the $100k Error and SALT Error.  When excluding the annual compensation over $100,000 for the five employees whose W-2s were provided in the loan application and the SALT double-counting, this borrower's maximum eligible loan amount was $385,579.  Due to Kabbage's errors, the loan was inflated by

81

$332,154: $24,892.50 due to the SALT Error, and $307,261.50 due to the $100k Error.  Further, Lender Partner 1's processing fee was inflated by $11,567.37.  Accordingly, Defendants caused the submission by Lender Partner 1 of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees.

316.    On May 1, 2020, Kabbage approved PPP loan number XXXXXX7708 in the amount of $100,000 to Borrower 6, located in California.  Lender Partner 2 was the lender of record.  The borrower represented that it had two employees.  The borrower received $50,000 in PPP funds per employee.  Kabbage knew based only on the loan amount and stated number of employees that the borrower likely was not eligible for the loan in the amount approved by Kabbage.  The borrower's supporting documentation also did not support this loan amount.  The borrower submitted a Form W-3 that reported $395,000 in annual payroll, 2 W-2s issued, and state income tax withholdings in Box 17.  The borrower also uploaded two W-2s for employees earning more than $100,000 annually.  Kabbage's calculation failed to exclude the reported excess compensation for these borrowers and erroneously double-counted SALT, and the loan exceeded the maximum amount permissible under the PPP regulations due to the $100k Error and SALT Error.   When excluding the annual compensation over $100,000 and the state income taxes reported in Box 17, this borrower's maximum eligible loan amount was $41,666.67.  Due to Kabbage's errors, the loan was inflated by $58,333.33: $17,708.33 due to the SALT Error, and $40,625 due to the $100k Error.  Lender Partner 2's processing fee was inflated by $2,916.67.  Finally, this loan was forgiven by the SBA before the SBA was informed of the $100k Error, and the SBA issued a forgiveness payment to Lender Partner 2 of $100,000.  Accordingly, Defendants caused the submission by Lender Partner 2 of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees and inflated forgiveness payments.

317.    On May 20, 2020, Kabbage approved PPP loan number XXXXXX7410 in the amount of $1,500,450.00 to Borrower 7, located in the Eastern District of Texas.  Kabbage was the lender of record. Robinson submitted the loan to the SBA on Kabbage's behalf.  The borrower represented that it had fifteen employees.  Accordingly, the borrower received more than $100,000 in PPP funds per employee.  Kabbage knew based only on the loan amount and stated number of employees that the borrower was likely not eligible for the loan in the amount received.  The borrower's documentation did not support the loan amount.  The borrower submitted a W-3 that showed $600,180 in annual payroll and reported that zero Forms W-2 issued.  The borrower should have received a loan in the amount of $125,037 based on this reported gross payroll, assuming the borrower was otherwise eligible for the loan.  For these reasons, this loan exceeded the maximum amount permissible under the PPP regulations due to the inclusion of per-employee annual compensation in excess of $100,000.  Due to Kabbage's error, the loan was inflated by $1,375,413, and Kabbage's processing fee was inflated by $38,761.65.  Accordingly, Defendants submitted and caused the submission of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees.

318.    On June 17, 2020, Kabbage approved PPP loan number XXXXXX7903 in the amount of $1,647,121.00 to Borrower 8, located in the Eastern District of Texas.  Kabbage was the lender of record at the time of loan origination.  Robinson submitted the loan to the SBA on Kabbage's behalf.  The borrower represented that it had 38 employees.  Accordingly, the borrower received more than $43,000 in PPP funds per employee.  Kabbage knew based only on the loan amount and stated number of employees that the borrower likely was not eligible for the loan in the amount sought.  In support of the loan, the borrower submitted a W-3 that showed $7,906,184.26 in annual payroll and reported that 38 W-2s issued, or an average annual salary of

more than $208,000 per employee. The borrower did not submit any W-2s to substantiate employee compensation greater than $100,000 annually. Even if the borrower was otherwise eligible for a PPP loan, the loan exceeded the maximum amount permissible under the PPP regulations due to the inclusion of per-employee annual compensation in excess of $100,000. At most, this borrower's maximum eligible loan amount was $791,654, or $20,833 for each of its 38 employees. Due to Kabbage's error, the loan was inflated by $855,467, and Kabbage's processing fee was inflated by $25,664.01. Kabbage also did not obtain or retain documentation that demonstrated the borrower's eligibility for the loan. Accordingly, Defendants submitted and caused the submission of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees.

319. On June 18, 2020, Kabbage approved PPP loan number XXXXXX7902 in the amount of $1,852,157 to Borrower 9, located in Florida. Kabbage was the lender of record. Robinson submitted the loan to the SBA on Kabbage's behalf. The borrower represented that it had 110 employees. In support of the loan, the borrower submitted a W-3 that reported $8,890,356 in annual payroll and eleven W-2s issued. Furthermore, the borrower did not submit W-2s to substantiate employee compensation greater than $100,000 annually. Accordingly, Kabbage knew based only on the borrower's documentation that it did not support that the borrower had paid payroll to 110 employees and, therefore, that the borrower likely was not eligible for the loan in the amount sought. Even if borrower was otherwise eligible for a PPP loan, the loan exceeded the maximum amount permissible under the PPP regulations due to the inclusion of per-employee annual compensation in excess of $100,000. At most, the borrower's maximum eligible loan amount was $229,163, or $20,833 for each of its 11 employees. Due to Kabbage's error, the loan was inflated by at least $1,622,994, and Kabbage's processing fee was inflated by $44,106.56.

84

Accordingly, Defendants submitted and caused the submission of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees.

320.    On June 25, 2020, Kabbage approved PPP loan number XXXXXX8006 in the amount of $1,436,727 to Borrower 10, located in Florida.  Kabbage was the lender of record. Robinson submitted the loan to the SBA on Kabbage's behalf.  The borrower represented that it had 17 employees.  Accordingly, the borrower received more than $84,500 in PPP funds per employee.  Kabbage knew based only on the loan amount and stated number of employees that the borrower likely was not eligible for the loan in the amount sought.  In support of the loan, the borrower submitted a W-3 that showed $6,896,920 in annual payroll; however, the W-3 was incomplete and did not report the total number of W-2s issued.  Furthermore, the borrower did not submit W-2s to substantiate employee compensation greater than $100,000 annually.  Even if the borrower was otherwise eligible for a PPP loan, the loan exceeded the maximum amount permissible under the PPP regulations due to the inclusion of per-employee annual compensation in excess of $100,000.  At most, the borrower's maximum eligible loan amount was $354,161, or $20,833 for each of its 17 employees.  Due to Kabbage's error, the loan was inflated by $1,082,566, and Kabbage's processing fee was inflated by $32,476.98.  Kabbage also did not obtain or retain documentation that demonstrates the borrower's eligibility for the loan.  Accordingly, Defendants submitted and caused the submission of false statements and certifications relating to this loan and of false claims to the SBA for inflated processing fees.

C.    False Claims to the SBA Due to Failure to Comply with Lender Loan Review Requirements.

321.    On information and belief, between April 1, and August 8, 2020, Kabbage approved thousands of PPP loans to ineligible and fraudulent PPP borrowers where Kabbage had failed to comply with the PPP lender requirements to conduct a good faith review of the loan file to confirm

that the borrower was eligible for the loan.  For the reasons stated above, Kabbage failed to comply with lender requirements in connection with loans that were approved and disbursed to patently ineligible and fraudulent borrowers.

322.    For each of these and other loans, Kabbage falsely certified to the SBA that it had complied with lender obligations.  Defendants, and Kabbage, however, falsely certified that the company had complied with PPP requirements because a good faith review of the loan file would have revealed that the borrower did not have employees for which it paid payroll expenses and was not eligible for the loan. Accordingly, these certifications were materially false.

323.    Defendants caused the submission of those false certifications, and of false claims for processing fees for PPP loans issued to ineligible and fraudulent borrowers.  Because of these false statements and certifications, the SBA paid to Kabbage and its partner banks processing fees.

324.    The following are some examples of loans that Kabbage submitted to the SBA where a good faith review of the documents would have identified that the borrowers were clearly ineligible for the PPP loans.

325.    On April 29, 2020, Kabbage approved PPP loan number XXXXXX7307 in the amount of $18,770 to Borrower 11, located in Florida.  Lender Partner 2 was the lender of record. Based on the information submitted to Kabbage and contained within the loan file, Kabbage's automated product for verifying the business's existence was run on this loan on April 27, 2020. This product noted that the business TIN (tax identification number) for the borrower was not found.  It also indicated that the business was inactive with the relevant Secretary of State office. Nevertheless, the business received a score that "passed" Kabbage's thresholds and Kabbage approved the PPP loan despite these indications.  Based on this information, Kabbage knew that the information provided by the borrower was inaccurate, that the borrower was not in operation

as of February 15, 2020, and accordingly was not eligible for PPP funds.  Nonetheless, Kabbage approved the loan and Lender Partner 2 received $985.80 in processing fees.  Defendants caused the submission of false claims to the SBA for processing fees.

326.    Between July 15, 2020, and August 5, 2020, Kabbage approved eleven PPP loans to eleven purported businesses that, based on the information submitted to Kabbage and contained within the loan file, all shared the same address in Park Forest, IL, and were all purportedly owned by the same person.  All eleven loans were in the exact same amount, $53,229, for the exact same 10 employees.  These borrowers submitted W-3s that reported identical amounts of wages paid and taxes withheld.  Each W-3 was signed on the same day.  Furthermore, each borrower submitted a certificate of good standing from the relevant state that stated that the business was organized in July or August 2020.  On July 8, 2020, Kabbage approved and disbursed another PPP loan to a twelfth company that shared the same address, was owned by the same person, and submitted a W-3 identical to the other eleven applicants.  It submitted to Kabbage a certificate of good standing from the relevant state that said that the business was organized on July 7, 2020.  That borrower received a PPP loan of $53,125.  Kabbage was the lender of record for these loans at the time of loan origination.  Robinson submitted them to the SBA on Kabbage's behalf.  Therefore, Kabbage knew that these businesses were not in operation as of February 15, 2020, were not eligible for PPP funds, and that fraud was likely.  Nonetheless, Kabbage approved the loans and received $31,932.20 in processing fees relating to these twelve loans.  Because Kabbage had not complied with PPP lender requirements in processing the loan, Kabbage was not entitled to processing fees.  Defendants submitted and caused the submission of false claims to the SBA for processing fees.

327.    On July 16, 2020, Kabbage approved two PPP loans to two purported businesses that, based on the information submitted to Kabbage and contained within the loan file, and shared

87

the same address in Plano, TX in the Eastern District of Texas. Kabbage was the lender of record. Robinson submitted them to SBA on Kabbage's behalf. The loans were in the exact same amount, $20,833. The borrowers submitted Forms 1040, Schedule C, that reported that they had earned more than $100,000 in net income in 2019 in Business Consulting. A visual review of these documents indicates that these forms are not legitimate because computer text had been superimposed over a blurry photograph of a Form 1040 Schedule C:



Furthermore, to establish proof of business operations as of February 15, 2020, the borrowers submitted bank account statements. However, the statement submitted by one purported business showed only $200 in deposits and $210 in withdrawals. The statement submitted by the other purported business showed that there were no funds or any other activity in the account prior to February 20, 2020, and only $700 in net deposits over the month. These bank accounts therefore supported neither that the applicants were in operation as of February 15, 2020, nor that they earned more than $100,000 in net income in a year. Finally, Kabbage approved the PPP loan despite an obvious misspelling in one borrower's first name, as shown by the loan documents and supporting documentation. Kabbage knew or should have known based only on a good faith review of the documents submitted by the applicants that they were not in business as of February 15, 2020, and were ineligible for PPP funds. Nonetheless, Kabbage approved the loans and received $2,083.30 in processing fees relating to these two loans. Because Kabbage had not complied with PPP lender requirements in processing the loan, Kabbage was not entitled to processing fees. Defendants submitted and caused the submission of false claims to the SBA for processing fees.

328.    On August 1, 2020, Kabbage approved two PPP loans to two borrowers that, based on the information submitted to Kabbage and contained within the loan file, shared the same address in Manvel, TX.   Kabbage was the lender of record for these loans at the time of loan origination.   Robinson submitted them to the SBA on Kabbage's behalf.   The loans were in the exact same amount, $20,833.   The borrowers submitted Forms 1040, Schedule C, that reported that they had earned more than $100,000 in net income in 2019.   To establish proof of business operations as of February 15, 2020, the borrowers submitted bank account statements.   However, the statements for both borrowers showed zero activity:  there were no deposits to or withdrawals from the accounts.   These bank accounts therefore supported neither that the applicants were in business as of February 15, 2020, nor that they earned more than $100,000 in net income in a year. Kabbage knew that they were not in operation as of February 15, 2020, and were not eligible for PPP funds.   Nonetheless, Kabbage approved the loan and received $2,083.30 in processing fees relating to these two loans.   Because Kabbage had not complied with PPP lender requirements in processing the loan, Kabbage was not entitled to processing fees.   Defendants submitted and caused the submission of false claims to the SBA for processing fees.

329.    On June 1, 2020, Kabbage approved a PPP loan for Borrower 12, located in California, totaling $1,471,771.   Lender Partner 1 was the lender of record.   Based on the information submitted to Kabbage and contained within the loan file, the managing member of the borrower was purportedly "D.S."   In support of the loan, the borrower submitted four IRS Forms 941, an IRS Form W-3, and an IRS Form 940 for 2019.   The borrower's employer identification number, or EIN, on the Form W-3 did not match the EIN on the application or the other supporting documents.   Additionally, the quarterly IRS Forms 941 reported identical wages and tax information for each quarter of 2019 and were all undated and unsigned, even though those forms

were required to be filed with the IRS by the last day of the month that follows the end of the quarter. The Forms 941 and Form 940 for 2019 and the LLC operating agreement submitted to Kabbage reported that the managing member of Borrower 12 was someone other than "D.S." And the different documents submitted showed various business addresses, not matching the address reported by the borrower. Kabbage knew that fraud was likely. In fact, this borrower was later indicted in 2020 for defrauding the PPP. Nonetheless, Kabbage approved the loan and Lender Partner 1 received $44,153 in processing fees relating to this loan. Because Kabbage had not complied with PPP lender requirements in processing the loan, Lender Partner 1 was not entitled to processing fees. Defendants submitted and caused the submission of false claims to the SBA for processing fees.

### COUNT I
**(Against All Defendants)**
**False Claims Act: 31 U.S.C. § 3729(a)(1)(A) (2009)**
**Presenting False Claims for Payment**

330. The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

331. During the period of April 1, 2020, to April 12, 2023, all Defendants knowingly submitted and/or caused Kabbage, Lender Partner 1, and Lender Partner 2 to submit the following four categories of claims for payment to SBA that were false or fraudulent, and not payable.

332. First, all Defendants knowingly submitted and/or caused Kabbage, Lender Partner 1, and Lender Partner 2 to submit to SBA claims for PPP processing fees and PPP forgiveness payments that were false, or fraudulent, and not payable, because they were inflated due to Kabbage's SALT Error. Examples of these claims are described in Paragraphs 309 through 312.

333. Second, all Defendants knowingly submitted and/or caused Kabbage, Lender Partner 1, and Lender Partner 2 to submit to SBA claims for PPP processing fees, PPP forgiveness

payments, and guaranty purchase payments that were false, or fraudulent, and not payable, because they were inflated due to Kabbage's $100k Error. Examples of these claims are described in Paragraphs 322 through 327.

334.    Third, all Defendants knowingly submitted and/or caused Kabbage, Lender Partner 1, and Lender Partner 2 to submit to SBA claims for PPP processing fees that were false, or fraudulent, and not payable, because the fees were in reference to PPP loans to fraudulent and ineligible borrowers where Kabbage had not complied with applicable lender requirements. Examples of these claims are described in Paragraphs 332 through 336.

335.    Had the SBA known these facts, the United States would not have paid these claims.

336.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

337.    By virtue of these false or fraudulent claims, the United States suffered damages, and therefore, is entitled to recover treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $13,946 and up to $27,894 for each violation, with the number of violations to be determined at trial.

### COUNT II
**(Against All Defendants)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Making or Using False Records or Statements**

338.    The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

339.    During the period of April 1, 2020, to April 12, 2023, all Defendants knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false and fraudulent claims

by the United States was a reasonable and foreseeable consequence of Defendants' statements and actions.

340.    These false records and statements, which Defendants submitted or caused to be submitted to SBA, included false certifications on SBA Forms 2484 and SBA Form 3507, and false and misleading representations in the one-time confirmation relating to SBA Form 1502 and submissions to SBA for forgiveness and guaranty purchase payments that Kabbage, Lender Partner 1, and Lender Partner 2 complied with the PPP requirements.

341.    These false records and statements included: (1) on SBA Form 3507, Kabbage would comply with PPP lender requirements, when in fact it did not, and Kabbage attested that it applied the BSA requirements of an equivalent federally regulated institution, when in fact it did not; (2) on SBA Forms 2484, Kabbage, Lender Partner 1, and Lender Partner 2 complied with applicable lender obligations as set forth in paragraphs 3.b(i)-(iii) of the Paycheck Protection Program Rule and obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts) with respect to loans that were inflated by the SALT Error, the $100k Error, or that were approved and issued to fraudulent and ineligible borrowers, when in fact, it had not; (3) all information submitted to SBA by Kabbage, Lender Partner 1, and Lender Partner 2 in Forms 1502 was complete and accurate with respect to loans that were inflated by the SALT Error, the $100k Error, or that were approved and issued to fraudulent and ineligible borrowers, when in fact, it was not; (4) certifications by Kabbage, Lender Partner 1, and Lender Partner 2 that it was entitled to payment of processing fees, forgiveness payments, and guaranty purchase payments, with respect to loans that were inflated by the SALT Error, the $100k Error, or that were approved and issued to fraudulent and ineligible borrowers, when in fact, they were not.

342.    All defendants made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

343.    Had the SBA known of these facts, the United States would not have paid these claims.

344.    By virtue of these false or fraudulent claims, the United States was damaged by Defendants in the full amount of the false claims paid by the SBA, in an amount to be determined at trial, subject to trebling under the FCA.   Furthermore, Defendants are liable for civil penalties of not less than $13,946 and up to $27,894 for each violation, with the number of violations to be determined at trial.

**COUNT III**
**(Against All Defendants)**
**False Claims Act, 31 U.S.C. § 3729(a)(3)**
**Conspiracy to Defraud the Government**

345.    The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

346.    Beginning in or around March 1, 2020, and continuing until the AmEx transaction, completed on October 16, 2020, Defendants Frohwein, Petralia, and Robinson knowingly entered into an unlawful agreement among themselves, and others, to present and cause the presentment of false or fraudulent claims to the United States for payment to enrich themselves based on the SBA's payment on these false claims, and Defendants performed acts in furtherance of this conspiracy.

347.    Specifically, Defendants and others agreed to submit false PPP loan applications to the SBA and false claims for payment of processing fees relating to those loans. Defendants agreed to do so to obtain processing fees to which Kabbage was not entitled.

348.    Defendants performed at least one act in furtherance of the conspiracy including, but not limited to: (1) directing agents of Kabbage to submit SBA Form 3507 to be an approved non-bank lender for the PPP; (2) directing Kabbage employees to approve PPP loans inflated through the SALT Error and/or the $100k Error and to submit these loans to SBA for guaranty through Kabbage or its partner banks; (3) directing Kabbage employees to submit obviously ineligible PPP loan applications to SBA for guaranty through Kabbage or its partner banks; (4) directing Kabbage employees to submit obviously fraudulent PPP loan applications to SBA for guaranty through Kabbage or its partner banks; (5) directing Kabbage employees to submit claims to SBA for inflated processing fees relating to the inflated loans and processing fees for ineligible and fraudulent PPP loans through Kabbage or its partner banks; (6) receiving cash bonuses from Kabbage based on profits Kabbage made from SBA's payment of processing fees related to the obviously fraudulent and ineligible PPP loans and the inflated loan amounts; (7) receiving and retaining payment of inflated forgiveness and guarantee purchase payments relating to the inflated PPP loans from the SBA.

349.    Defendant Frohwein also performed acts in furtherance of this conspiracy by, among other things: signing LSP agreements between Kabbage and Lender Partner 1 and Lender Partner 2; overseeing all operational aspects of Kabbage's PPP lending program, including its loan calculation methodology and loan review procedures, fraud controls, and BSA/AML compliance; placing pressure on Kabbage employees to process PPP loans; directing Kabbage employees to conceal an audit regarding Kabbage's failures regarding loan calculations and fraud; and directing Kabbage employees to mark internal communications regarding external inquiries about potentially fraudulent PPP loans processed or originated by Kabbage as attorney-client privileged.

350.    Defendant Petralia also performed acts in furtherance of this conspiracy by, among

other things, overseeing all operational aspects of Kabbage's PPP lending program, including its loan calculation methodology and loan review procedures, fraud controls, and BSA/AML compliance; and firing Kabbage's Head of Fraud after she raised concerns regarding Kabbage's fraud controls.

351.    Defendant Robinson also performed acts in furtherance of this conspiracy by, among other things, approving Kabbage's methodology for calculating PPP loan amounts; approving Kabbage's procedures for reviewing PPP loans for fraud concerns; approving Kabbage's PPP loan review procedures; approving Kabbage's procedures for BSA/AML compliance; submitting information to Kabbage's partner banks relating to Kabbage's approved PPP loans;  executing SBA Forms 2484 on behalf of Kabbage; and reassigning Kabbage's Head of Fraud after she raised concerns regarding Kabbage's fraud controls.

352.    Had the SBA known of these facts, the United States would not have paid these claims.

353.    As a result of the Defendants' conspiracy to present or cause the presentment of false claims to the United States to obtain payment of processing fees and forgiveness and guarantee purchase payments from the SBA, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $13,946 and up to $27,894 for each violation.

## COUNT IV
### (Against All Defendants)
### Unjust Enrichment

354.    This is a claim by the United States for unjust enrichment under the common law arising from Defendants' unjust receipt of SBA funds while engaged in the unlawful conduct described herein.  This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

355.    The United States re-alleges and incorporates by reference all paragraphs of this

complaint set out above as if fully set forth herein.

356.     By virtue of the wrongful acts described herein, from April 1, 2020, through October 16, 2020, Defendants obtained SBA funds to which they were not entitled and thereafter further profited from these wrongful acts upon the sale of substantially all of Kabbage's assets to AmEx.

357.     The false representations Kabbage made on the forms it submitted to SBA, which Defendants submitted and caused to be submitted for payment, on the inflated and fraudulent or ineligible PPP loans regarding Kabbage's compliance with applicable lender obligations were material to SBA's decision to provide payment to Defendants. Had SBA known the facts described above, the United States would not have paid, forgiven, or provided guaranties on such claims.

358.     Based on the above, Defendants have been unjustly enriched, and the circumstances dictate that, in equity and good conscience, the money should be returned to the United States.

359.     By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Defendants on PPP loans, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

### COUNT V
**(Against All Defendants)**
**Payment by Mistake of Fact**

360.     This is a common law claim by the United States for payment by SBA to Defendants based on a mistake of fact. This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

361.     The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

362.     By virtue of the wrongful acts described herein, from April 1, 2020, through October 16, 2020, Defendants obtained by submitting false claims to SBA for payment and kept

SBA funds they received, to which they were not entitled, by not reimbursing SBA for such claims.

363. The false representations Kabbage made on the forms it submitted to the SBA, which Defendants submitted or caused to be submitted for payment, for inflated and fraudulent or ineligible PPP loans that Kabbage had complied with applicable lender obligations, were material to SBA's decision to provide payment to Defendants. Had SBA known the facts described above, the United States would not have provided the payments.

364. Based on the foregoing, SBA mistakenly overpaid Kabbage and Defendants, and the circumstances dictate that, in equity and good conscience, the amount of these overpayments should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the United States respectfully requests that judgment be entered in its favor against the Defendants identified above as follows:

I. On Counts I, II, and III under the False Claims Act, for treble the United States' damages, together with the maximum civil penalties allowed by law;

II. On Count IV for unjust enrichment, for the amounts by which the Defendants were unjustly enriched plus interest, costs, and expenses, and for all such other relief as the Court deems equitable;

III. On Count V for payment by mistake, for the amount by which Defendants were overpaid by SBA plus interest, costs, and expenses, and for all such other relief as the Court deems equitable; and

IV. Pre- and post-judgment interest, costs, and such other relief as the Court may deem appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States requests a

trial by jury.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DAMIEN M. DIGGS
   United States Attorney
Eastern District of Texas

*/s/ James G. Gillingham*
JAMES G. GILLINGHAM, Texas Bar #24065295
BETTY S. YOUNG, Texas Bar #24102498
Assistant U.S. Attorneys
Eastern District of Texas
110 N. College Street, Suite 700
Tyler, Texas 75702
E-mail: James.Gillingham@usdoj.gov
E-mail: Betty.Young@usdoj.gov
(903) 590-1400
(903) 590-1436 (facsimile)

JAMIE A. YAVELBERG
COLIN M. HUNTLEY
SARAH E. LOUCKS
KELLY E. PHIPPS
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
E-mail:  Sarah.E.Loucks@usdoj.gov
E-mail: Kelly.E.Phipps@usdoj.gov
(202) 616-4203
(202) 514-0280 (facsimile)

**ATTORNEYS FOR THE**
**UNITED STATES OF AMERICA**