**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PAUL PIETSCHNER, <br><br> Plaintiff, <br><br> v. <br><br> KATHRYN PETRALIA; ROBERT FROHWEIN; and SPENCER ROBINSON, <br><br> Defendants. | Civil Action No.: 4:21-cv-110-SDJ |

**DEFENDANTS' JOINT MOTION TO DISMISS
<u>THE UNITED STATES' COMPLAINT IN INTERVENTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

STATEMENT OF ISSUES ................................................................................................3

BACKGROUND ................................................................................................................4

    A.    THE PAYCHECK PROTECTION PROGRAM.............................................................. 4

    B.    THE SBA'S MINIMAL LENDING REQUIREMENTS FOR THE PPP ............................. 6

    C.    THE SBA'S SHIFTING GUIDANCE REGARDING THE PPP.......................................... 7

    D.    THE GOVERNMENT'S KNOWLEDGE AND EXPECTATION OF FRAUD WITHIN THE SBA'S COVID LENDING PROGRAMS ...................................................... 9

    E.    KABBAGE'S SUPPORT OF THE SBA'S IMPLEMENTATION OF THE PPP ................. 11

    F.    PROCEDURAL HISTORY ..................................................................................... 12

LEGAL STANDARDS ....................................................................................................13

    A.    RULE 12(B)(6) ................................................................................................. 13

    B.    RULE 9(B) ......................................................................................................... 13

ARGUMENT ...................................................................................................................13

I.    THE COMPLAINT FAILS TO STATE AN FCA CLAIM AGAINST ANY DEFENDANT ................13

    A.    THE COMPLAINT FAILS TO ALLEGE ANY INDIVIDUAL DEFENDANT KNEW OF ANY FALSITY RELATED TO ALLEGED CALCULATION ERRORS OR NONCOMPLIANT BSA/AML PROCEDURES ..................................................... 14

    B.    THE COMPLAINT FAILS TO ALLEGE MATERIALITY ................................................. 18

II.    THE GOVERNMENT CANNOT CARRY ITS PLEADING BURDEN UNDER RULE 9(B) BY RELYING ON DEFENDANTS' EXERCISING THEIR CONSTITUTIONAL RIGHTS IN INVESTIGATIVE DEPOSITIONS....................................................................................................21

III.    THE COMPLAINT FAILS TO ALLEGE A CONSPIRACY UNDER THE FCA ..............................24

CONCLUSION.................................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abbott v. BP Expl. & Prod., Inc.,*
   851 F.3d 384 (5th Cir. 2017) ............................................................................19

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..........................................................................................13

*Baxter v. Palmigiano,*
   425 U.S. 308 (1976) ..................................................................................... 21-22

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...................................................................... 4, 13, 20, 25

*Deakle v. Westbank Fishing,* LLC,
   559 F. Supp. 3d 522 (E.D. La. 2021) ................................................................4

*Dickerson v. Alachua Cnty. Comm'n.,*
   200 F.3d 761 (11th Cir. 2000) ........................................................................25

*Funk v. Stryker Corp.,*
   631 F.3d 777 (5th Cir. 2011) .............................................................................4

*Gonzalez v. Fresenius Med. Care N. Am.,*
   689 F.3d 470 (5th Cir. 2012) ..........................................................................14

*Grunewald v. U.S.,*
   353 U.S. 391 (1957) ..........................................................................................23

*Hart v. Bayer Corp.,*
   199 F.3d 239 (5th Cir. 2000) ..........................................................................13

*Hilliard v. Ferguson,*
   30 F.3d 649 (5th Cir. 1994) ............................................................................25

*In re Cross,* 653 B.R.
   362 (Bankr. E.D. Tex. 2023)...........................................................................22

*In re Curtis,*
   177 B.R. 717 (Bankr. S.D. Ala. 1995).......................................................22, 23

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.,*
   490 F. Supp. 2d 784 (S.D. Tex. 2007) ............................................................22

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.,*
   762 F. Supp. 2d 942 (S.D. Tex. 2010) ............................................................23

*Lefkowitz v. Cunningham,*
  431 U.S. 801 (1977).............................................................22

*Lucius v. Fort Taco, LLC,*
  2022 WL 335491 (S.D. Fla. Jan. 5, 2022) ..........................17

*Marceaux v. Lafayette City-Par. Consol. Gov't,*
  921 F. Supp. 2d 605 (W.D. La. 2013)...................................25

*Norris v. Hearst Trust,*
  500 F.3d 454 (5th Cir. 2007) ...................................................4

*Ohio v. Reiner,*
  532 U.S. 17 (2001) .................................................................23

*Owens v. Jastrow,*
  789 F.3d 529 (5th Cir. 2015) .................................................13

*SEC v. Colello,*
  139 F.3d 674 (9th Cir. 1998) .................................................22

*State Farm Life Ins. Co. v. Gutterman,*
  896 F.2d 116 (5th Cir. 1990) .................................................22

*Sullivan v. Leor Energy*, LLC,
  600 F.3d 542 (5th Cir. 2010) ...................................................4

*U.S. ex rel. Abrams v. Procarent, Inc.,*
  499 F. Supp. 3d 605 (S.D. Ind. 2020) ...................................25

*U.S. ex rel. Berteletti v. Kabbage Inc.,*
  1:20-cv-12114-GAO (D. Mass. Nov. 25, 2020) ....................21

*U.S. ex rel. Farmer v. City of Houston,*
  523 F.3d 333 (5th Cir. 2008) ...........................................15, 24

*U.S. ex rel. Grubbs v. Kanneganti,*
  565 F.3d 180 (5th Cir. 2009) ...................................... 13, 24-26

*U.S. ex rel. Gudur v. Deloitte Consulting LLP,*
  512 F. Supp. 2d 920 (S.D. Tex. 2007), *aff'd sub nom., U.S. ex rel. Gudur
  v. Deloitte & Touche*, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) ...................16

*U.S. ex rel. Harman v. Trinity Indus. Inc.,*
  872 F.3d 645 (5th Cir. 2017) .................................................19

*U.S. ex rel. Head v. Kane Co.,*
  798 F. Supp. 2d 186 (D.D.C. 2011)........................................25

*U.S. ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*,
2019 WL 5970283 (W.D. Tex. Nov. 13, 2019) ....................................................24

*U.S. ex rel. Jameson v. WBI Energy Transmission, Inc.*,
2024 WL 3512126 (S.D. Tex. July 22, 2024) ....................................................14

*U.S. ex rel. Lamers v. City of Green Bay*,
168 F.3d 1013 (7th Cir. 1999) ....................................................17

*U.S. ex rel. Patel v. Cath. Health Initiatives*,
792 F. App'x 296 (5th Cir. 2019) ....................................................19

*U.S. ex. rel. Porter v. Magnolia Health Plan, Inc.*,
810 F. App'x 237 (5th Cir. 2020) ....................................................19

*U.S. ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023)....................................................14, 15

*U.S. v. Sanford-Brown, Ltd.*,
840 F.3d 445 (7th Cir. 2016) ....................................................19

*U.S. v. Southland Mgmt. Corp.*,
326 F.3d 669 (5th Cir. 2003) ....................................................15

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
579 U.S. 176 (2016)....................................................18-21

## STATUTES, RULES, AND REGULATIONS

85 Fed. Reg. 20,811 (Apr. 15, 2020) ....................................................*passim*

85 Fed. Reg. 20,812 (Apr. 15, 2020) ....................................................6, 10, 20

85 Fed. Reg. 20,815 (Apr. 15, 2020) ....................................................1, 16

15 U.S.C. §636(a)(36)....................................................1, 5

18 U.S.C. §1001....................................................24

31 U.S.C. §3729....................................................14, 18, 24

Fed. R. Evid. 201(b)(2)....................................................4

## OTHER AUTHORITIES

166 Cong. Rec. H1907, H1911 (Apr. 23, 2020) ....................................................9

B. Seigel, *Experts Warn About Big Dollar Fraud In $2.2 Trillion Coronavirus
Relief Package*, ABC NEWS (Apr. 4, 2020) ....................................................9

Coronavirus Crisis, *Resounding Success: A Review of the Paycheck Protection Program* (Sept. 1, 2020), https://oversight.house.gov/wp-content/uploads/2020/09/FINAL-PPP-Report-8.28.20.pdf ................................................8

Coronavirus Pandemic, *After Action Review of the COVID-19 Pandemic: The Lessons Learned and a Path Forward* (Dec. 4, 2024), https://www.congress.gov/118/meeting/house/117748/documents/HRPT-118-SSCPReport.pdf...................................................................................2, 4, 9

*COVID-19: Opportunities to Improve Federal Response and Recovery Efforts* (June 2020), https://www.gao.gov/assets/gao-20-625.pdf..................................10

*COVID Relief: Fraud Schemes and Indicators in SBA Pandemic Programs* (May 18, 2023), https://www.gao.gov/products/gao-23-105331 ......................... 1-2, 7

*Emergency Relief Funds: Significant Improvements Are Needed to Address Fraud and Improper Payments* (Feb. 1, 2023), https://www.gao.gov/assets/gao-23-106556.pdf ........................................................................................10

Hearing Before the Committee on Small Business, 117th Congress (May 18, 2022) (Testimony of Patrick Kelley) ..................................................9

M. Faulkender et al., *The Job-Preservation Effects of Paycheck Protection Program Loans* (July 2024), https://home.treasury.gov/system/files/226/Treasury-EP-Working-Paper-2020-01B.pdf ........................................................................... 8-9

*Message from SBA Administrator Jovita Carranza* (June 15, 2020), https://www.sba.gov/document/policy-guidance-sba-administrator-message-lenders-re-underserved-communities ...............................................12

SBA OIG, *Flash Report Small Business Administration's Implementation of the Paycheck Protection Program Requirements*, Report No. 20-14 (May 8, 2020), https://www.sba.gov/sites/default/files/2020-05/SBA_OIG_Report_20-14_508.pdf............................................................ 5-7

SBA Inspector General, *SBA's Handling of Potentially Fraudulent Paycheck Protection Program Loans*, Report No. 22-13 (May 26, 2022), https://www.sba.gov/document/report-22-13-sbas-handling-potentially-fraudulent-paycheck-protection-program-loans ........................................2, 6, 9

Small Business Administration Office of the Inspector General, *Inspection Of SBA's Implementation Of The Paycheck Protection Program*, Report No. 21-07 (Jan. 14, 2021), https://www.sba.gov/sites/default/files/2021-01/SBA%20OIG%20Report-21-07.pdf..............................................2, 7, 8, 21

*Paycheck Protection Program Loans Frequently Asked Questions* (Apr. 6, 2020),
https://www.sba.gov/sites/default/files/2023-
03/Final%20PPP%20FAQs.pdf ............................................................................... 16-17

*Paycheck Protection Program Loans Frequently Asked Questions* (Apr. 23,
2020), https://www.sba.gov/sites/default/files/2023-03/Paycheck-
Protection-Program-Frequently-Asked-Questions_04%2023%2020.pdf ................... 16-17

Small Business, *A Miscalculated Risk: Fraud Within the SBA's COVID Lending
Programs* (2024),
https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small
_business_-_covid-19_pandemic_loan_fraud_staff_report.pdf....................................7, 10

*Statement from Secretary Steven T. Mnuchin and Administrator Jovita Carranza on the Success
of the Paycheck Protection Program* (Apr. 17, 2020),
https://home.treasury.gov/news/press-
releases/sm983...................................................................................................................6

Defendants Robert Frohwein, Kathryn Petralia, and Spencer Robinson (collectively, "Defendants") by and through their undersigned counsel respectfully submit this Motion to Dismiss ("Joint Motion") the Complaint in Intervention ("Complaint") (ECF No. 40) filed by the United States of America pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## INTRODUCTION

In early 2020, when the COVID-19 pandemic threatened to bring down the global economy, Congress authorized the Small Business Administration ("SBA") to quickly implement a massive lending program reliant on borrower self-attestations to infuse billions of dollars into the U.S. economy in order to save small businesses and their employees from financial ruin. *See* Compl. ¶17; *see also* 15 U.S.C. §636(a)(36); 85 Fed. Reg. 20,811, 20,815 (Apr. 15, 2020). That program—known as the Paycheck Protection Program ("PPP")—succeeded in its primary mission: It distributed over 11.8 million guaranteed PPP loans totaling more than $800 billion to small businesses throughout the country, thereby averting economic calamity.

The infusion of so much capital so quickly was unprecedented, and the effort was too much for the SBA to accomplish on its own or with the institutional lenders that had traditionally participated in the SBA's loan programs. To implement the program, the SBA therefore turned to non-traditional lenders to assist in the effort—including Kabbage, a fintech company with a history of helping small businesses access capital. Compl. ¶57. But the SBA failed to provide clear or consistent guidance about how to prevent fraudulent borrowers from exploiting the program and instead directed lenders to conduct a minimal "good faith" review in a reasonable time and to rely on borrower attestations in order to get money out the door quickly. Compl. ¶21; *see* U.S. Government Accountability Office ("GAO"), GAO-23-105331, *COVID Relief: Fraud Schemes and Indicators in SBA Pandemic Programs* at 77 (May 18, 2023),

1

https://www.gao.gov/products/gao-23-105331 ("GAO-23-105331").  Kabbage did just that—using automated processes to collect and review PPP loan applications and supporting documentation for over 250,000 customers and facilitate the distribution of $7 billion in PPP loan proceeds to American businesses between April and August 2020.  Compl. ¶¶55, 94, 285.

But the SBA's emphasis on speed led to widespread fraud by PPP loan applicants.  As the SBA's own Inspector General ("OIG") put it in one of a series of withering assessments: "SBA's efforts to hurry capital to businesses were at the expense of controls that could have reduced the likelihood of ineligible or fraudulent business[es] obtaining a PPP loan."  Small Business Administration Office of the Inspector General ("SBA OIG"), *Inspection Of SBA's Implementation Of The Paycheck Protection Program*, Report No. 21-07 at 18 (Jan. 14, 2021), https://www.sba.gov/sites/default/files/2021-01/SBA%20OIG%20Report-21-07.pdf ("SBA OIG Report No. 21-07").  In particular, "SBA did not provide lenders sufficient specific guidance to effectively identify, track, address, and resolve, potentially fraudulent PPP loans."  SBA Inspector General, *SBA's Handling of Potentially Fraudulent Paycheck Protection Program Loans*, Report No. 22-13 at 3 (May 26, 2022), https://www.sba.gov/document/report-22-13-sbas-handling-potentially-fraudulent-paycheck-protection-program-loans ("SBA OIG Report No. 22-13").  Indeed, "lenders continually stressed the necessity of specific guidance from SBA to ensure they were meeting the agency's requirements," but "none was provided."  Select Subcommittee on the Coronavirus Pandemic, *After Action Review of the COVID-19 Pandemic: The Lessons Learned and a Path Forward* at 150 (Dec. 4, 2024), https://www.congress.gov/118/meeting/house/117748/documents/HRPT-118-SSCPReport.pdf ("*After Action Review of the COVID-19 Pandemic*"); *see also* SBA OIG Report No. 22-13 at 3.

Now, nearly five years later and with the benefit of hindsight, the government seeks to shift

the blame from borrowers to lenders—not just at the institutional level, but to individual employees of the lenders the SBA enlisted for help.  Specifically, it has alleged that Defendants violated the False Claims Act ("FCA") and were otherwise unjustly enriched and paid by mistake.  But the government's effort to shift the blame fails many times over—both for reasons that are common to all Defendants (as set forth below) and for reasons specific to each Defendant (as set forth in their individual motions).

*First*, the Complaint fails to allege facts sufficient to sustain an FCA claim.  Specifically, in addition to the reasons stated in each Defendant's individual brief, the Complaint fails to allege falsity because the SBA required no more than a minimal, good faith review that could rely on borrower certifications.  Allegations in the Complaint admit Kabbage did just that.  The Complaint also fails to meet the demanding materiality standard for the alleged false claims, especially considering the government's knowledge of the widespread fraud in the PPP and its continued payments in spite of it.  *Second*, many of the Complaint's allegations rest on Defendants' invocations of their Fifth Amendment rights in investigative depositions, but such refusals to answer questions are not affirmative evidence that could be used here to satisfy the heightened pleading standard of Rule 9(b).  *Third*, the Complaint fails under the intra-corporate conspiracy doctrine and also fails to allege facts sufficient to plead a conspiracy with respect to any of the alleged false claims or statements, relying instead on conclusory statements that are insufficient under Rule 9(b).

For these reasons, the Court should dismiss the FCA claims in their entirety.

## STATEMENT OF ISSUES

Defendants move to dismiss the Complaint with prejudice pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  The grounds for relief are set forth below:

3

1.    The Complaint violates Rule 9(b) and fails to state a claim for a violation of the FCA as to all Defendants because it fails to allege materiality, falsity, and scienter.

2.    Defendants' preliminary invocations of their Fifth Amendment rights—that is, a lawful refusal to answer questions—does not constitute an admission of wrongdoing sufficient to meet the heightened pleading standard of Rule 9(b).

3.    The Complaint fails to state a claim for conspiracy to violate the FCA because it fails to allege any agreement and, under the intra-corporate conspiracy doctrine, corporate employees cannot conspire among themselves.

## BACKGROUND[1]

### A.    The Paycheck Protection Program[2]

In the early weeks of the COVID-19 pandemic, much of the country shut down to limit the spread of the deadly virus.  *See generally After Action Review of the COVID-19 Pandemic.* Businesses across the country faced severe economic hardship, and in March 2020, Congress

---

[1] Defendants assume, for purposes of this Motion only, that all factual references in the Complaint are true, as they must at this stage.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (the Court "must accept as true" all factual allegations contained in the Complaint).  Defendants reserve the right to later challenge any of the factual representations in the Complaint.

[2] In deciding this motion, the Court may consider publicly available SBA Interim Final Rules, guidance, and other policies and reports issued by the federal government implementing or evaluating the PPP program without converting this motion into one for summary judgment for two reasons.  *First*, the government cites many of these documents in its Complaint, and Defendants may affix to a motion to dismiss documents that "are referred to in the plaintiff's complaint and are central to the plaintiff's claim."  *Sullivan v. Leor Energy*, LLC, 600 F.3d 542, 546 (5th Cir. 2010).  *Second*, the Court may take judicial notice of the agency documents cited herein.  Under Federal Rule of Evidence 201, a court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."  Fed. R. Evid. 201(b)(2).  Courts routinely accept facts in the public record if there is no reason to question their accuracy or reliability.  *See, e.g.*, *Deakle v. Westbank Fishing*, LLC, 559 F. Supp. 3d 522, 527 (E.D. La. 2021); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.").

quickly passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in response

to provide emergency assistance and health care response for individuals, families, and businesses

affected by the pandemic.  *See* Compl. ¶17.  Section 1102 of the Act provided $349 billion in

initial funding to create the PPP, pursuant to Section 7(a) of the Small Business Act, providing

fully guaranteed SBA loans for certain eligible small businesses, individuals, and nonprofit

organizations that would be forgiven if loan proceeds were used as required by the law.  *See id*.

¶19.

The PPP prioritized the rapid distribution of funds to small businesses to cover their payroll

expenses and keep people employed, while full-scale and partial shutdown orders were in effect

and until the economy was fully restored.  *See* 15 U.S.C. §636(a)(36).  In carrying out this goal,

the CARES Act authorized the SBA to use lenders that were already approved to participate in the

SBA's 7(a) guaranteed loan program, providing small businesses access to capital that they would

not be able to access in the competitive market.  In addition, the Act permitted the SBA and the

Department of the Treasury to approve new lenders—such as Kabbage—to issue PPP loans,

provided they met certain requirements.  *See id.* §636(a)(36)(F)(iii).  Borrowers submitted

applications supported by certifications of information in the application; and all lenders were

delegated authority to oversee and approve those PPP loan requests by the CARES Act.  *See id.*

§636(a)(36)(F)(ii).

The SBA launched the PPP on April 3, 2020, just one week after the CARES Act was

enacted.  Demand for the program immediately exploded.  In the first 14 days of the PPP, the SBA

distributed more than $342.3 billion in loans through thousands of financial institutions across the

country.  *See* SBA OIG, *Flash Report Small Business Administration's Implementation of the*

*Paycheck Protection Program Requirements*, Report No. 20-14 at 2-3 (May 8, 2020),

https://www.sba.gov/sites/default/files/2020-05/SBA_OIG_Report_20-14_508.pdf ("SBA OIG Report No. 20-14"). As then U.S. Treasury Secretary Steven T. Mnuchin and SBA Administrator Jovita Carranza explained in a statement on April 17, 2020, the SBA had processed "more than 14 years' worth of loans in less than 14 days." *Statement from Secretary Steven T. Mnuchin and Administrator Jovita Carranza on the Success of the Paycheck Protection Program* (Apr. 17, 2020), https://home.treasury.gov/news/press-releases/sm983. And by May 31, 2021, SBA had processed 11.8 million guaranteed PPP loans totaling $799.8 billion, through about 5,460 private lenders. SBA OIG Report No. 22-13 at 2. Without a doubt, the SBA achieved the original intent of the CARES Act—to "provide relief to America's small businesses expeditiously." 85 Fed. Reg. 20,811.

**B.    The SBA's Minimal Lending Requirements For The PPP**

The PPP was specifically designed to have minimal lending requirements and a streamlined application process to encourage participation and to enable the government to distribute capital to as many borrowers as quickly as possible. *See* SBA OIG Report No. 22-13 at 5, 12. The SBA's streamlined loan application and review process rested largely on borrower certifications that allowed borrowers to attest that the information provided in their application was true and accurate without requiring additional scrutiny. In particular, the SBA's Interim Final Rule ("IFR") from April 15, 2020 (less than two weeks after the PPP legislation was enacted), provided: "SBA will allow lenders to *rely on certifications of the borrower* in order to determine eligibility of the borrower and use of loan proceeds and to *rely on specified documents provided by the borrower* to determine qualifying loan amount and eligibility for loan forgiveness." 85 Fed. Reg. 20,811, 20,812 (emphasis added).

Consistent with the CARES Act, the SBA required minimal loan underwriting from lenders, requiring only that lenders: (1) confirm receipt of borrower certifications, (2) confirm

receipt of information demonstrating that the borrower had certain employees required for eligibility, (3) review supporting payroll documentation, and (4) follow applicable Bank Secrecy Act requirements, including a customer identification program.  *See* GAO-23-105331 at 111.  The SBA also lacked adequate controls for duplicative loan applications, validating employee counts on borrower applications, or even preventing loans from being issued to individuals on the Treasury's "Do Not Pay" List.  House Committee on Small Business, *A Miscalculated Risk: Fraud Within the SBA's COVID Lending Programs* at 30 (2024), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_covid-19_pandemic_loan_fraud_staff_report.pdf ("*A Miscalculated Risk*").

### C.    The SBA's Shifting Guidance Regarding The PPP

The SBA had never administered a program of this scale in such a short period of time.  To do so, the SBA created guidance for the PPP within a matter of days, quickly rolling out PPP rules in the form of Frequently Asked Questions ("FAQs") to address lenders' uncertainty and concerns with the program details.  *See* SBA OIG Report No. 20-14 at 3-4.

Five days after the passage of the CARES Act, on April 2, 2020, the SBA posted the first IFR implementing the PPP; and the following day, the SBA launched the program and released the affiliation rules that enabled small businesses and lenders to determine whether they qualified for the program.  SBA OIG Report No. 20-14 at 7.  But the evolution of PPP rules and guidance was only just beginning: Over the next three months, the SBA published 22 IFRs and issued 49 FAQs—a total of 71 guidance documents in 89 days—to address various aspects of the PPP's implementation and developments in real time.  *See* Appendix A, *PPP IFRs as of June 30, 2020*; Appendix B, *PPP FAQs as of June 30, 2020*; *see also* Report No. 21-07 at 2.  Those IFRs and FAQs covered crucial topics like borrower requirements, including program eligibility and allowable uses of loan proceeds; loan terms, forgiveness, and compliance; eligibility for lender

participation; underwriting standards including statements the lender could rely on for loan decisions; and other topics including affiliation, borrower certifications, and payroll costs.

Approximately half of the SBA's PPP IFRs were published as revisions, clarifications, or supplements to previously-issued guidance on topics related to borrowers.  *See* Appendix A, *PPP IFRs as of June 30, 2020*.  Not surprisingly, the "evolving nature of the program's guidelines predictably caused confusion."   House Select Subcommittee on the Coronavirus Crisis, *Resounding Success: A Review of the Paycheck Protection Program* at 3 (Sept. 1, 2020), https://oversight.house.gov/wp-content/uploads/2020/09/FINAL-PPP-Report-8.28.20.pdf. Former Treasury Assistant Secretary for Economic Policy Michael Faulkender explained: "Because the program launched so quickly, the rules and list of frequently asked questions (FAQs) were incomplete" and "[a]s borrowers, lenders, and the media started interacting with the program, additional issues arose requiring SBA and Treasury to regularly publish updates and additional rules as well as answer questions regarding situations lenders or borrowers may find themselves confronting."  M. Faulkender et al., *The Job-Preservation Effects of Paycheck Protection Program Loans* at 5 (July 2024), https://home.treasury.gov/system/files/226/Treasury-EP-Working-Paper-2020-01B.pdf ("Faulkender").

But these delayed and inconsistent guidance materials were too little, too late.  In a survey of PPP lenders conducted by the SBA OIG, approximately 75% of respondents said that the SBA had not provided clear or timely guidance for PPP requirements.  SBA OIG Report No. 21-07 at 15.  And, it was not because lenders did not ask for it.  In fact, "lenders continually stressed the necessity of specific guidance from SBA to ensure they were meeting the agency's requirements," but still, "none was provided."  *After Action Review of the COVID-19 Pandemic* at 150; *see also* SBA OIG Report No. 22-13 at 3.

### D.    The Government's Knowledge And Expectation Of Fraud Within The SBA's COVID Lending Programs

The rapid rollout of pandemic relief funds, paired with the SBA's lack of adequate systems to determine eligibility, "paved the way for large amounts of improper payments and fraud." *After Action Review of the COVID-19 Pandemic* at 147.  Mr. Faulkender acknowledged that "[g]iven the pace with which the public health crisis was building, Congress and the Administration prioritized speed over precision in their economic support programs." Faulkender at 4.  According to former Associate Administrator for the Office of Capital Access at the SBA, Patrick Kelley, "there were choices made in 2020 in [the PPP] which created the opportunity for an increased likelihood of fraud" and "[t]hat was the direct result of the decision by the Secretary of the Treasury at the time."  Hearing Before the Committee on Small Business, 117th Congress at 8 (May 18, 2022).  And as confirmed by the SBA's Inspector General in May 2022, those policy choices "weakened SBA's ability to actively reduce and combat fraud and increased the risk of fraudulent and ineligible applicants receiving PPP loans and loan forgiveness."  SBA OIG Report No. 22-13 at 3.

The government was well-aware that its PPP would engender borrower fraud: "Everybody's acceptance of some or a lot of fraud is going to have to be high, because it's going to happen. . . . [T]he Paycheck Protection Program, will be an extraordinarily easy program to defraud, and it will be defrauded in massive ways."  166 Cong. Rec. H1907, H1911 (Apr. 23, 2020),    https://www.congress.gov/congressional-record/volume-166/issue-77/house-section/article/H1907-7 (quoting B. Seigel, *Experts Warn About Big Dollar Fraud In $2.2 Trillion Coronavirus Relief Package*, ABC NEWS (Apr. 4, 2020)).  The government made clear it would backstop this risk.  From the outset, the government proclaimed that PPP lenders would "be held harmless for borrowers' failure to comply with program criteria," 85 Fed. Reg. 20,811, 20,812

(Apr. 15, 2020), and that fraudulent borrowers would be individually prosecuted for their own wrongdoing. *Id.* at 20,814 ("If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability such as charges for fraud.").

An investigation by the House Committee on Small Business into fraud in the COVID-19 Lending Programs confirmed that, "[d]espite being aware of many of these fraud risks from the outset, the SBA made numerous decisions that decreased the likelihood that the government would successfully be able to detect and recover fraudulently obtained loans." *A Miscalculated Risk* at 4. As early as June 2020, the GAO reported that federal relief programs like the PPP were vulnerable to significant risks of fraudulent activities, and it issued a series of recommendations to the SBA to immediately address the ongoing fraud risks. *See* GAO, GAO-20-625, *COVID-19: Opportunities to Improve Federal Response and Recovery Efforts* at 36 (June 2020), https://www.gao.gov/assets/gao-20-625.pdf. And in later testimony before the House Committee on Oversight and Accountability regarding fraud and improper payments in COVID-19 pandemic relief programs, the U.S. Comptroller General reemphasized the widespread shortcomings in federal agencies' (like the SBA's) fraud risk management practices and internal controls for COVID-19 relief programs such as the PPP. GAO, GAO-23-106556, *Emergency Relief Funds: Significant Improvements Are Needed to Address Fraud and Improper Payments* at 2-3 (Feb. 1, 2023), https://www.gao.gov/assets/gao-23-106556.pdf. The GAO found that the SBA's initial approach to managing fraud risks in the PPP "had not been strategic"—noting that the SBA did not develop its fraud risk assessments for the programs until October 2021 (at which point the PPP had already stopped accepting new applications) and the SBA did not even designate a dedicated antifraud entity until February 2022. *Id.* at 15.

10

### E.    Kabbage's Support Of The SBA's Implementation Of The PPP

Frohwein and Petralia helped to found Kabbage, a non-bank financial technology company, in 2008.  Compl. ¶¶10, 57.  Initially founded to provide capital to small e-commerce businesses, Kabbage grew through the years to serve a broad range of small businesses that were underserved or overlooked by traditional banking institutions.  Kabbage was able to underwrite underserved small businesses in part through its ability to integrate with platforms containing alternative data sources, such as eCommerce platforms or payment providers, to evaluate loan applications.  *See id*. ¶57.  As is common for growth-stage, venture capital-backed startups, Kabbage did not turn a profit during this period.  Instead, it focused on growth, raising hundreds of millions of dollars in funding and expanding its customer base exponentially.  *See id*. ¶58.

In March 2020, as the COVID-19 pandemic exploded and much of the U.S. economy shut down, Kabbage's customer base faced financial devastation.  *See id*. ¶61.  Anticipating the economic shocks that COVID-19 would bring, including potential mass loan defaults among Kabbage's customers, Kabbage stopped initiating new loans, furloughed its staff, and reduced executive compensation.  *Id*. ¶¶9, 61-62.

In April 2020, shortly after the PPP was implemented, Kabbage quickly began to retool its platform to process PPP applications.  Kabbage developed an automated system to process applications in compliance with SBA guidance, including extracting data from tax documents, which Kabbage had never previously used in its underwriting process.  *See id*. ¶¶86, 90.  The automated systems collected the requisite information from borrowers and the documents they submitted, conducted identity verification and other compliance checks using third party software, determined borrower eligibility, and calculated the loan amount available.  Initially, Kabbage entered into an agreement with two bank partners to process PPP loan applications through

11

Kabbage's website for loans that would be funded by bank partners.  *Id.* ¶¶52-53.  On April 13, the SBA approved Kabbage's application to become a direct PPP lender.  *Id.* ¶54.

Prior to its participation in PPP, Kabbage had written Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") procedures to comply with regulatory requirements and to detect and prevent money laundering.  *Id.* ¶¶188-189.  As it built out its PPP platform, and consistent with its historical approach, Kabbage developed a largely automated process to conduct compliance review of loan applications.  *Id.* ¶¶198-199.  The automated process had a manual second level review process to review issues that arose during automated loan processing.  *Id.* ¶199.

Underserved small businesses—which Kabbage specialized in serving—faced additional barriers in receiving PPP loans, especially from large banks with which they lacked pre-existing relationships.  *See Message from SBA Administrator Jovita Carranza* (June 15, 2020), https://www.sba.gov/document/policy-guidance-sba-administrator-message-lenders-re-underserved-communities.  Kabbage recognized this need and set out to process PPP applications both from its existing customers and from underserved small businesses and sole proprietorships that had no prior relationship with the company.  It was able to do so quickly.  Ultimately, between April and August 2020, Kabbage facilitated over $7 billion of PPP loans as both a bank partner and direct lender.  Compl. ¶55.

## F.    Procedural History

Relator filed this action on February 5, 2021.  ECF No. 1.  The action remained under seal for several years pending a decision from the United States on whether to intervene in this matter. On August 26, 2024, the United States elected to intervene, *id.* at 34, filing the operative Complaint on December 20, 2024, *id.* at 40.

## LEGAL STANDARDS

### A.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 12(b)(6) requires a plaintiff to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### B.    Rule 9(b)

"[A] complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b)," which requires a party to "state with particularity the circumstances constituting fraud." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009); Fed. R. Civ. P. 9(b). In other words, Rule 9(b) requires a plaintiff pleading fraud to "set forth the who, what, when, and where before access to the discovery process is granted." *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (cleaned up); *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015). The Fifth Circuit applies Rule 9(b)'s heightened pleading standard "with bite and without apology." *Grubbs*, 565 F.3d at 185 (quotation omitted).

## ARGUMENT

### I.    THE COMPLAINT FAILS TO STATE AN FCA CLAIM AGAINST ANY DEFENDANT

The Complaint fails to allege facts sufficient to sustain the FCA claims in Counts I, II, and III. The elements of a FCA violation under the provisions underlying Counts I and II are: "(1) [a] false statement or fraudulent course of conduct; (2) [that was] made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit

13

moneys due (i.e., that involved a claim)." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012). As an initial matter, as set forth in greater detail in each of the Defendants' individual briefs, the Complaint fails to allege how each *individual Defendant* caused the submission of false claims to the government based on *Kabbage's* purported misconduct. Even putting that aside, the government has failed to carry its pleading burden on the first, second, and third elements—falsity, scienter, and materiality—which requires dismissal of Counts I and II as to all Defendants.[3] Count III (Conspiracy) fails under the intra-corporate conspiracy doctrine and because the government has not, in any event, pleaded an agreement among the Defendants. Taken together, these defects require dismissal of the government's FCA case against all Defendants.

### A.    The Complaint Fails To Allege Any Individual Defendant Knew Of Any Falsity Related To Alleged Calculation Errors Or Noncompliant BSA/AML Procedures

Counts I and II should be dismissed as to all Defendants because the Complaint does not adequately plead falsity or scienter under the FCA. Two essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's subjective knowledge of the claim's falsity. *U.S. ex rel. Schutte v. SuperValu Inc*., 598 U.S. 739, 747 (2023); *see also U.S. ex rel. Jameson v. WBI Energy Transmission, Inc.*, 2024 WL 3512126, at *6 (S.D. Tex. July 22, 2024). The FCA defines "knowingly" to mean "that a person, with respect to [false] information," "(i) has actual knowledge of the information," "(ii) acts in deliberate ignorance of the truth or falsity of the information," or "(iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1). "Deliberate ignorance" encompasses defendants "who are aware of a substantial risk that their statements are false, but who intentionally avoid taking steps to confirm

---

[3] The briefs filed by each individual Defendant will address other elements of the FCA claims as to a given Defendant.

the statements' truth or falsity," while "reckless disregard" captures defendants "who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *SuperValu*, 598 U.S. at 750-51. Mere "negligence" and "innocent mistakes" do not suffice to meet the FCA's "knowledge" prong. *U.S. v. Southland Mgmt. Corp.*, 326 F.3d 669, 680-81 (5th Cir. 2003); *see also U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 (5th Cir. 2008) (negligence and gross negligence are insufficient to establish the FCA's mens rea requirement).

The Complaint fails to adequately allege both falsity and scienter as to any individual Defendant. Instead, it makes sweeping conclusory allegations about how the Defendants caused the submission of false claims and made false statements to the SBA based on "thousands" of allegedly inflated and fraudulent PPP loans that Kabbage processed. Compl. ¶¶2-4. Specifically, the Complaint alleges that Defendants are responsible for (1) inflating PPP loan amounts as a result of systematically double-counting employees' state and local taxes ("SALT error") and including annual per-employee compensation over $100,000 in calculating their average monthly payroll ("100k error") (*see id.* ¶¶105-185), (2) failing to comply with PPP lender loan review requirements (*see id.* ¶¶186-285), and (3) approving false loan forgiveness claims affected by the SALT and $100k errors (*see id.* ¶¶296-299, 308-313).[4]

---

[4] For the loans purportedly affected by the alleged SALT and 100k error, the government does not allege with particularity whether or how each of the affected loans were inflated, forgoing any loan-by-loan accounting, and instead pleading only that it is "likely" allegedly impacted loans were inflated. *See, e.g.*, Compl. ¶153 ("non-wage payroll costs [such as retirement and health insurance] could cause an applicant's loan amount to exceed $20,833.33 per employee"); ¶¶315-320 ("borrower *likely* was not eligible for the loan in the amount approved by Kabbage")(emphasis added); ¶¶302-315 (failing to include any particulars as to how SALT withholdings inflated borrower loan amounts); *see also* Mr. Robinson's Individual Motion to Dismiss, filed concurrently herewith.

At base, each of Kabbage's alleged errors is contingent on the assertion that its automated system with manual second-level review was inconsistent with the SBA regulations with which Kabbage certified compliance. *See* Compl. ¶¶26-27; *see also* 85 Fed. Reg. 20,811, 20,815 (Apr. 15, 2020). But "general statement[s] of adherence to all regulations or statutes governing participation in a program through which federal funds are received is an insufficient basis on which to premise FCA liability." *U.S. ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 947 (S.D. Tex. 2007), *aff'd sub nom., U.S. ex rel. Gudur v. Deloitte & Touche*, 2008 WL 3244000 (5th Cir. Aug. 7, 2008).

And critically, the Complaint does not adequately allege that Kabbage's review system did not adhere to the relevant PPP guidance that informed the certification. As relevant here, that guidance stated:

> Providing an accurate calculation of payroll costs is the responsibility of the borrower, and the borrower must attest to the accuracy of those calculations. *Lenders are expected to perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll cost.* The level of diligence by a lender should be informed by the quality of supporting documents supplied by the borrower. Minimal review of calculations based on a payroll report by a recognized third-party payroll processor, for example, would be reasonable. If lenders identify errors in the borrower's calculation or material lack of substantiation in the borrower's supporting documents, the lender should work with the borrower to remedy the error.

*Paycheck Protection Program Loans Frequently Asked Questions*, at Answer to No. 1 (Apr. 6, 2020) (emphasis added), https://www.sba.gov/sites/default/files/2023-03/Final%20PPP%20FAQs.pdf ("Apr. 6, 2020 PPP FAQ"); *see* Compl. ¶40. The SBA guidance, therefore, required lenders perform a "good faith review" in a "reasonable time" and instructed lenders to rely on borrower certifications and supporting documentation, confirming that they did not need to rigorously scrutinize or replicate an applicant's loan calculations. *See also* Apr. 6, 2020 PPP FAQ at Answer to No. 4 (directing "[l]enders are permitted to rely on borrowers' certifications"); *Paycheck Protection Program Loans Frequently Asked Questions*, at Answer to No. 31 (Apr. 23,

2020),                   https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2023%2020.pdf (noting that "[l]enders may rely on a borrower's certification regarding the necessity of the loan request").

Failure to comply with vague and imprecise PPP lender requirements cannot serve as the basis for FCA liability. *See U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (holding that "imprecise statements or differences in interpretation growing out of a disputed legal question are [ ] not false under the FCA"). This is especially true here because the SBA's guidance was not binding authority. *See Lucius v. Fort Taco, LLC*, 2022 WL 335491, at *6 n.1 (S.D. Fla. Jan. 5, 2022) (noting that "informal FAQ sheet from the SBA is not binding authority"); Apr. 6, 2020 PPP FAQ at 1 n.1 (cautioning that SBA's FAQs "do[] not carry the force and effect of law independent of the statute and regulations on which it is based"); *see also supra* at Background §§B-C.

Even if the guidance had been clear, the Complaint does not allege how Kabbage's automated review with manual second-level review failed to comply with the scope of that guidance. And, importantly, the Complaint does not allege any Defendant individually believed Kabbage's review system did not adhere to the SBA's guidance. In fact, the Complaint demonstrates the opposite—that Kabbage's automated reviews with manual second-level review met the SBA's minimal standards. Kabbage confirmed receipt of borrower certifications, relied on them, and performed automated and manual reviews of supporting documentation. *See* Compl. ¶90 ("Kabbage then used an automated program to scan the tax documents, extract data, and compare them against the borrowers' entries. At times, Kabbage employees manually reviewed the supporting documentation."). Moreover, and critically, the SBA knew from a review of

17

Kabbage's PPP lender application that it used an automated loan application, underwriting, and servicing platform, and nonetheless approved Kabbage as a direct lender.  *See id.* ¶54.

The Complaint further fails to allege any particulars about Kabbage's processing of forgiveness applications, offering only the barest of generalizations that Defendants had "caused the submission of . . . false certifications related to applications for forgiveness" related to loans effected by the SALT and $100,000 errors.  Compl. ¶¶299, 313.  But the Complaint provides little else to meet the pleading requirements of Rule 9(b)—no particulars about when Kabbage started processing forgiveness applications, what Kabbage's process was for receiving and processing forgiveness applications, who at Kabbage created the web process to receive and approve forgiveness applications, or any individual Defendant's role in creating or supervising that process. The Complaint even recognizes that Defendants left Kabbage in October 2020, *see id.* ¶¶10-12, 59, and acknowledges that "some" forgiveness applications were approved or issued "after the AmEx transaction and after Defendants had left Kabbage," *id.* ¶293, without any specifics as to *when* those applications were actually submitted, by whom, or any further details about the forgiveness applications at all.

The Complaint, therefore, does not establish falsity or scienter under the stringent pleading requirements of Rule 9(b).  Accordingly, Counts I and II should be dismissed.

### B.    The Complaint Fails To Allege Materiality

Counts I and II should also be dismissed as to all Defendants because the Complaint does not adequately plead materiality under the FCA.  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4).  "[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,

579 U.S. 176, 193 (2016).  The FCA's materiality standard is "rigorous" and "demanding."  *Id*. at 192-94; *see also Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387-88 (5th Cir. 2017) (quoting *Escobar*, 579 U.S. at 194); *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 669-70 (5th Cir. 2017) (reversing jury verdict for relator for lack of materiality).  While the materiality inquiry is fact-intensive, it is not "too fact intensive" to decide on a motion to dismiss, and FCA plaintiffs "must also plead their claims with plausibility and particularity under [FRCP] 8 and 9(b), for instance, by pleading facts to support allegations of materiality."  *Escobar*, 579 U.S. at 195 n.6.

To plead materiality, the Complaint must allege facts indicating "the government would [not] pay the claim . . . if it knew of the claimant's violation."  *U.S. ex rel. Patel v. Cath. Health Initiatives*, 792 F. App'x 296, 301 (5th Cir. 2019); *U.S. ex. rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 242 (5th Cir. 2020) (affirming dismissal of complaint that made "no specific allegations regarding the materiality of [defendant's] alleged fraud").  "[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."  *Escobar*, 579 U.S. at 195; *see also U.S. v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016).  And "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the [FCA plaintiff] in establishing materiality."  *Harman*, 872 F.3d at 663.

The Complaint fails to satisfy the materiality analysis.  Specifically, it does not allege that the government would not have paid the claims if it had known of purported infirmities in Kabbage's loan processing.  As noted above, the Complaint alleges that Kabbage inflated PPP loan amounts for certain borrowers due to the SALT error and the 100k error.  *See* Compl. ¶¶105-185.  But the allegations regarding the government's decision to pay Kabbage for its loan services

in the PPP are wholly conclusory and lack specificity.  The Complaint merely alleges, for instance, "[h]ad the SBA known these facts, the United States would not have paid these claims."  *Id*. ¶335; *see also id.* 343 (same), *id.* ¶352 (same), *id.* ¶357 (same).  The Court must ignore these conclusory allegations when assessing the Complaint under *Twombly* and *Escobar*, which requires the government to plead "facts to support allegations of materiality."  *Escobar*, 579 U.S. at 195 n.6; *see Twombly*, 550 U.S. at 555.

Rigorous enforcement of the FCA's demanding pleading requirements is especially relevant here in light of the public record regarding the SBA's priorities during the April to October 2020 period at issue.  As described *supra*, the SBA was well aware of risks of fraud in the program but nonetheless relaxed underwriting criteria and urged lenders to rely on borrower attestations and to distribute billions of dollars to small businesses as quickly as possible on a first-come, first-served basis.  *See supra* at Background §D.  Most tellingly, from the outset, the SBA proclaimed that PPP lenders would "be held harmless for borrowers' failure to comply with program criteria." 85 Fed. Reg. 20,811, 20,812 (Apr. 15, 2020).  That proclamation made clear that the SBA understood that lenders would be reluctant to process PPP loans quickly enough if they were potentially liable for fraudulent loans that got through their reviews.  The SBA knew there would be fraud and announced that *fraudulent borrowers* would be individually prosecuted for their own wrongdoing.  The SBA's contemporaneous awareness that many PPP borrowers would commit fraud belies the Complaint's conclusory allegation that Kabbage's submission of allegedly fraudulent claims influenced the SBA's decision to pay those claims.  *See Escobar*, 579 U.S. at 195.

Furthermore, the SBA's consistent payment of claims submitted by Kabbage (and other PPP lenders) is strong evidence that identifying and detecting fraud was in fact *not* material to the

government's decision to issue loans during the early months of the pandemic.  *See id.*  The SBA simply (and understandably) had other priorities—namely, providing a lifeline to small businesses to avert an economic collapse, but it came at a price.  As the SBA OIG explained:

> SBA's initial response to implement the PPP quickly made billions of dollars of capital available to millions of borrowers affected by the COVID-19 pandemic. . . .  However, SBA's efforts to hurry capital were at the expense of controls that could have reduced the likelihood of ineligible or fraudulent businesses obtaining a PPP loan.

SBA OIG Report No. 21-07, Executive Summary, 19.

Moreover, the government was on notice of the SALT error at least as early as November 25, 2020 when Relator David Berteletti filed an FCA complaint against Kabbage in the U.S. District Court for the District of Massachusetts, alleging that Kabbage had improperly included SALT withholdings in its loan calculations.  *See U.S. ex rel. Berteletti v. Kabbage Inc.*, ECF No. 1, 1:20-cv-12114-GAO (D. Mass. Nov. 25, 2020).  But as the Complaint acknowledges, the SBA did not stop processing forgiveness applications for Kabbage customers until sometime after January 2021, after the Department of Justice issued its Civil Investigative Demand to Kabbage concerning the SALT error.  *See* Compl. ¶¶143-144.  This vagueness about timing and the Complaint's failure to allege particulars about the forgiveness or guaranty applications submitted and processed by the SBA, means the government fails to meet the FCA's rigorous materiality standard.  And because the Complaint fails to allege the requisite materiality, Counts I and II should be dismissed as to all Defendants.

## II.   THE GOVERNMENT CANNOT CARRY ITS PLEADING BURDEN UNDER RULE 9(B) BY RELYING ON DEFENDANTS' EXERCISING THEIR CONSTITUTIONAL RIGHTS IN INVESTIGATIVE DEPOSITIONS.

"[W]hile adverse inferences may be drawn in civil cases from a party's invocation of the Fifth Amendment, the rule applies *only* where the party "refuse[s] to testify in response to probative evidence offered against them."  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)

21

(emphasis added). The government may not rely on a defendant's Fifth Amendment assertion as a shortcut to meet its pleading obligations under Rule 9(b). *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 825 (S.D. Tex. 2007) (noting that "invocation of the Fifth Amendment does not excuse Plaintiffs from pleading with specificity" under Rule 9(b)); *see also In re Curtis*, 177 B.R. 717, 720 (Bankr. S.D. Ala. 1995) ("A plaintiff seeking to rely on a Fifth Amendment inference must first offer evidence which at least tends to prove each part of the plaintiff's case.").

At the motion to dismiss stage, the Court cannot draw an adverse inference from a defendant's lawful invocation of the Fifth Amendment. *See In re Enron Corp. Sec.*, 490 F. Supp. 2d at 825. The court may deny a motion to dismiss only if a complaint alleges facts, not silence. *See, e.g.*, *In re Cross*, 653 B.R. 362, 376 (Bankr. E.D. Tex. 2023) ("Any adverse inference drawn [] may not be the sole evidentiary basis for granting Plaintiff's Motion."). Even at trial, an adverse inference is only permissible if independent evidence supports the proposition. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977) (holding that the Fifth Amendment is violated when "refusal to waive the Fifth Amendment privilege leads automatically and without more to imposition of sanctions"); *Baxter*, 425 U.S. at 318 ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify *in response to probative evidence offered against them*. . . .") (emphasis added); *see also SEC v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998) ("*Lefkowitz* and *Baxter* require that there be evidence in addition to the adverse inference to support a court's ruling."). The same is true at summary judgment:  "[A] party . . . cannot rely solely on the other party's exercise of her fifth amendment rights." *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 n.3 (5th Cir. 1990) (citation omitted).

Indeed, "one of the basic functions of the [Fifth Amendment] privilege is to protect

innocent [persons]." *Grunewald v. U.S.*, 353 U.S. 391, 421 (1957). In *Ohio v. Reiner*, the Supreme Court unanimously confirmed that the Fifth Amendment protects innocent people. 532 U.S. 17, 18 (2001). The witness who declined to testify in *Reiner* was innocent, but the Supreme Court nonetheless held that it was reasonable for the witness to refrain from answering questions about knowledge of and proximity to conduct the government deemed criminal because "truthful responses of an innocent witness . . . may provide the government with incriminating evidence." *Id.* at 21. Accordingly, courts rule against plaintiffs who seek to rely on defendants' invocations of the Fifth Amendment without independent evidence. *See, e.g.*, *Curtis*, 177 B.R. at 719-20 (dismissing complaint because "[a] plaintiff seeking to rely on a Fifth Amendment inference must first offer evidence which at least tends to prove each part of the plaintiff's case.").

Despite that well-settled principle, the Complaint includes 46 allegations that the Defendants invoked their Fifth Amendment rights during investigative depositions by federal prosecutors whose coworkers in the District of Massachusetts were conducting a parallel criminal investigation. *See, e.g.*, Compl. ¶91 (Robinson); *id.* ¶92 (Petralia); *id.* ¶93 (Frohwein). The government cannot rely on these invocations to meet Rule 9(b)'s heightened pleading standard.[5] Otherwise, it would set a precedent that civil FCA actions could always proceed simply as a result of the government opening a concurrent criminal investigation. The Court should bring its common sense to bear and not bite at the government's bait to draw an adverse inference from

---

[5] Defendants do not intend to invoke their Fifth Amendment privilege in this litigation, and, for this additional reason, the Court should not consider allegations relating to prior invocations of the Fifth Amendment privilege. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 762 F. Supp. 2d 942, 962 (S.D. Tex. 2010) ("a district court may exclude evidence of invocation of the Fifth Amendment privilege, even though it generally allows adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence, e.g., when that party subsequently testifies or cooperates with an investigation").

Defendants' invocation of constitutional rights.  It is equally plausible, particularly given the lack of inculpatory non-party evidence here, that Defendants invoked their Fifth Amendment rights to avoid providing exculpatory testimony.  Indeed, there are many reasons why Defendants choose to invoke their Fifth Amendment rights that have nothing to do with their unwillingness to provide inculpatory testimony, including that providing exculpatory testimony when there is an open criminal investigation can lead to threats of charges for false statements pursuant to 18 U.S.C. §1001.

In deciding Defendants' motion to dismiss, the Court should therefore ignore the 46 paragraphs in which the government attempts to draw adverse inferences from Defendants' Fifth Amendment invocations.  When doing so, the meager allegations that remain are insufficient to carry the government's heightened burden under Rule 9(b).

## III.    THE COMPLAINT FAILS TO ALLEGE A CONSPIRACY UNDER THE FCA

Count III should be dismissed as to all Defendants because the Complaint does not allege a conspiracy under the FCA.[6]  To state a conspiracy claim under the FCA, the government must allege facts sufficient to establish "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid . . . and (2) at least one act performed in furtherance of that agreement."  *Grubbs*, 565 F.3d at 193 n.38 (quoting *Farmer*, 523 F.3d at 343).  The government must also plead a shared "specific intent to defraud the government" by the alleged conspirators.  *U.S. ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*, 2019 WL 5970283, at *12 (W.D. Tex. Nov. 13, 2019) (internal citations omitted).  The government

---

[6] The Complaint cites 31 U.S.C. § 3729(a)(3), which does not exist.  Even if the Complaint cited the correct provision of the FCA as to conspiracy, 31 U.S.C. § 3729(a)(1)(C), which provides for FCA liability when a "person . . . conspires to commit a violation" of the other sub-paragraphs of the FCA, the Complaint fails to allege the necessary elements of a conspiracy claim.

has failed to do so here.

As a threshold matter, the conspiracy claim fails as a matter of law under the intra-corporate conspiracy doctrine.  Under that doctrine, "employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 201 (D.D.C. 2011) (internal citation omitted); *see also Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (noting that the intra-corporate conspiracy doctrine is a "long-standing rule"); *see also Marceaux v. Lafayette City-Par. Consol. Gov't*, 921 F. Supp. 2d 605, 643 (W.D. La. 2013).  Frohwein, Petralia, and Robinson were all Kabbage employees at the time of the alleged conspiracy, and the Complaint does not allege any of them acted outside the scope of their employment.  *See Dickerson v. Alachua Cnty. Comm'n.,* 200 F.3d 761, 770 (11th Cir. 2000) (explaining that corporate agent must have an "independent personal stake" to be acting outside the scope of their employment).  The Complaint alleges only "*internal* fraudulent conduct, barring an FCA conspiracy charge under the intracorporate conspiracy doctrine."  *U.S. ex rel. Abrams v. Procarent, Inc*., 499 F. Supp. 3d 605, 617 (S.D. Ind. 2020). The conspiracy claim should thus be dismissed.

The Complaint also fails to allege the necessary elements of a conspiracy claim under Rule 9(b), providing an independent basis for dismissal.  With respect to the first element—the existence of an unlawful agreement—the Complaint merely alleges that a conspiracy existed because the Defendants "knowingly entered into an unlawful agreement."  Compl. ¶346.  But this allegation is wholly conclusory and must be ignored.  *See Twombly*, 550 U.S. at 555.  Because the Complaint does not otherwise allege the existence of an unlawful agreement, let alone any allegations regarding when, how, or between whom any alleged conspiratorial agreement was entered, Count III fails to meet Rule 9(b)'s heightened pleading standard and must be dismissed.  *See Grubbs*, 565

F.3d at 185, 193-94 (dismissing conspiracy charge against certain defendants, finding that the "*possibility* of an agreement" between defendants is insufficient to meet Rule 9(b)'s standard, and reviving charge as to two defendants who were alleged to have had a meeting during which they "described how they . . . perpetrate[d] the alleged fraud[.]").

## CONCLUSION

The Court should dismiss the government's FCA claims with prejudice in their entirety.

Dated: March 11, 2025

Respectfully submitted,

_/s/ Melissa R. Smith_
Melissa R. Smith
Gillam & Smith LLP
303 South Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Fax: (903) 934-9257
melissa@gillamsmithlaw.com

Anjan Sahni (_pro hac vice_)
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center, 250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
anjan.sahni@wilmerhale.com

Christopher E. Babbitt (_pro hac vice_)
Michaela S. Wilkes Klein (_pro hac vice_)
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
Fax: (202) 663-6363
christopher.babbitt@wilmerhale.com
michaela.wilkesklein@wilmerhale.com

George P. Varghese (_pro hac vice_)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000
george.varghese@wilmerhale.com
**Counsel for Kathryn Petralia**

_/s/ Nicholas M. Mathews_
Nicholas M. Mathews
Alexander J. Chern
McKool Smith, PC - Dallas
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4258
Fax: (214) 978-4044
Nmathews@mckoolsmith.com
Achern@mckoolsmith.com

Miranda Hooker (_pro hac vice_)
Kate E. MacLeman (_pro hac vice_)
Kara N. Czekai (_pro hac vice_)
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Telephone: (617) 570-1000
Fax: (617) 523-1231
MHooker@goodwinlaw.com
KMacLeman@goodwinlaw.com
KCzekai@goodwinlaw.com
**Counsel for Robert Frohwein**

_/s/ Henry W. Asbill_
Henry W. Asbill (_pro hac vice_)
Christopher B. Mead (_pro hac vice_)
Lisa H. Schertler (_pro hac vice_)
Paola Pinto (_pro hac vice_)
Schertler Onorato Mead & Sears
555 13th Street NW Suite 500W
Washington DC 20004
Telephone: 202-628-4199
Facsimile: 202-628-4177
hasbill@schertlerlaw.com
cmead@schertlerlaw.com
lschertler@schertlerlaw.com
ppinto@schertlerlaw.com
**Counsel for Spencer Robinson**

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2025, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

Dated: March 11, 2025

Respectfully Submitted,

*/s/ Melissa R. Smith*
Melissa R. Smith
Gillam & Smith LLP
303 South Washington Ave.
Marshall, TX 75670
Telephone: (903) 934-8450
Fax: (903) 934-9257
melissa@gillamsmithlaw.com

**Appendix A – PPP IFRs as of June 30, 2020**

| IFR No. | Subject / Title | Date Posted | Date Published |
|---|---|---|---|
| 1 | Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 | April 2, 2020 | April 15, 2020 |
|  | Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program | April 3, 2020 | April 15, 2020 |
| 2 | Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20817 | April 3, 2020 | April 15, 2020 |
| 3 | Business Loan Program Temporary Changes; Paycheck Protection Program-Additional Eligibility Criteria and Requirements for Certain Pledges of Loans, 85 Fed. Reg. 21747 | April 14, 2020 | April 20, 2020 |
| 4 | Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23450 | April 24, 2020 | April 28, 2020 |
| 5 | Small Business Administration Business Loan Program Temporary Changes; Paycheck Protection Program-Additional Criterion for Seasonal Employers, 85 Fed. Reg. 23917 | April 27, 2020 | April 30, 2020 |
| 6 | Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Disbursements, 85 Fed. Reg. 26321 | April 28, 2020 | May 4, 2020 |
| 7 | Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders, 85 Fed. Reg. 26324 | April 30, 2020 | May 4, 2020 |
| 8 | Business Loan Program Temporary Changes; Paycheck Protection Program-Nondiscrimination and Additional Eligibility Criteria, 85 Fed. Reg. 27287 | May 5, 2020 | May 8, 2020 |
| 9 | Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Extension of Limited Safe Harbor With Respect to Certification Concerning Need for PPP Loan Request, 85 Fed. Reg. 29845 | May 8, 2020 | May 19, 2020 |
| 10 | Requirements for Loan Increases for Partnerships or Seasonal Employers, 85 Fed. Reg. 29842 | May 13, 2020 | May 19, 2020 |
| 11 | Eligibility of Certain Electric Cooperatives, 85 Fed. Reg. 29847 | May 14, 2020 | May 19, 2020 |

| IFR No. | Subject / Title | Date Posted | Date Published |
|---|---|---|---|
| 12 | Treatment of Entities with Foreign Affiliates, 85 Fed. Reg. 30835 | May 18, 2020 | May 21, 2020 |
| 13 | Second Extension of Limited Safe Harbor with Respect to Certification Concerning Need for PPP Loan and Lender Reporting, 85 Fed. Reg. 31357 | May 20, 2020 | May 26, 2020 |
| 14 | Requirements – Loan Forgiveness, 85 Fed. Reg. 33004 | May 22, 2020 | May 28, 2020 |
| 15 | SBA Loan Review Procedures and Related Borrower and Lender Responsibilities, 85 Fed. Reg. 33010 | May 22, 2020 | May 28, 2020 |
| 16 | Eligibility of Certain Telephone Cooperatives, 85 Fed. Reg. 35550 | June 5, 2020 | June 8, 2020 |
| 17 | Interim Final Rule on Revisions to the First PPP Interim Final Rule, 85 Fed. Reg. 36308 | June 11, 2020 | June 12, 2020 |
| 18 | Additional Revisions to First PPP Interim Final Rule, 85 Fed. Reg. 36717 | June 12, 2020 | June 16, 2020 |
| 19 | Interim Final Rule on Revisions to the Third and Sixth Interim Final Rules, 85 Fed. Reg. 36997 | June 17, 2020 | June 16, 2020 |
| 20 | Revisions to Loan Forgiveness Interim Final Rule and SBA Loan Review Procedures Interim Final Rule, 85 Fed. Reg. 38304 | June 22, 2020 | June 24, 2020 |
| 21 | Additional Eligibility Revisions to First PPP Interim Final Rule, 85 Fed. Reg. 38301 | June 24, 2020 | June 24, 2020 |
| 22 | Certain Eligible Payroll Costs (Fishing Boat Owners), 85 Fed. Reg. 39066 | June 25, 2020 | June 30, 2020 |

**Appendix B – PPP FAQs as of June 30, 2020**

| FAQ No. | Question | Date |
|---|---|---|
| 1 | Paragraph 3.b.iii of the first PPP Interim Final Rule, subsection C.3.c. of the consolidated interim final rule implementing updates to PPP, and subsection (h)(2)(i)(C) of the interim final rule for Second Draw PPP Loans state that lenders must "[c]onfirm the dollar amount of average monthly payroll costs . . . for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application." Does that require the lender to replicate each of the borrower's calculations? | Published April 3, 2020 Revised March 3, 2021 Revised March 12, 2021 |
| 2 | Are small business concerns (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) required to have 500 or fewer employees to be eligible borrowers for First Draw PPP Loans? | Published April 6, 2020 Revised March 3, 2021 |
| 3 | Does my business have to qualify as a small business concern (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) in order to receive a First Draw PPP Loan? | Published April 6, 2020 Revised March 3, 2021 |
| 4 | Are lenders required to make an independent determination regarding applicability of affiliation rules under 13 C.F.R. 121.301(f) to borrowers? | Published April 6, 2020. |
| 5 | Are borrowers required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)? | Published April 6, 2020 Revised March 3, 2021 |
| 6 | The affiliation rule based on ownership (13 C.F.R. 121.301(f)(1)) states that SBA will deem a minority shareholder in a business to control the business if the shareholder has the right to prevent a quorum or otherwise block action by the board of directors or shareholders.  If a minority shareholder irrevocably gives up those rights, is it still considered to be an affiliate of the business? | Published April 6, 2020 |
| 7 | Section 7(a)(36)(A)(viii)(II) of the Small Business Act excludes from the definition of payroll costs any employee compensation in excess of $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred.  Does that exclusion apply to all employee benefits of monetary value? | Published April 6, 2020 Revised March 3, 2021 |
| 8 | Do PPP loans cover paid sick leave? | Published April 6, 2020 |
| 9 | My small business is a seasonal business whose activity increases from April to June.  Considering activity from that period would be a more accurate reflection of my business's operations.  However, my small business was not fully ramped up on February 15, 2020.  Am I still eligible? | Published April 6, 2020 Revised March 3, 2021 |

| FAQ No. | Question | Date |
|---|---|---|
| 10 | What if an eligible borrower contracts with a third-party payer such as a payroll provider or a Professional Employer Organization (PEO) to process payroll and report payroll taxes? | Published April 6, 2020 |
| 11 | May lenders accept signatures from a single individual who is authorized to sign on behalf of the borrower? | Published April 6, 2020 Revised March 3, 2021 |
| 12 | I need to request a loan to support my small business operations in light of current economic uncertainty.  However, I pleaded guilty to a felony crime a very long time ago.  Am I still eligible for the PPP? | Published April 6, 2020 Revised June 25, 2020 Revised March 12, 2021 |
| 13 | Are lenders permitted to use their own online portals and an electronic form that they create to collect the same information and certifications as in the Borrower Application Forms, in order to complete implementation of their online portals? | Published April 6, 2020 Revised March 3, 2021 |
| 14 | What time period should borrowers use to determine their number of employees? | Published April 6, 2020 Revised March 3, 2021 |
| 15 | Should payments that an eligible borrower made to an independent contractor or sole proprietor be included in calculations of the eligible borrower's payroll costs? | Published April 6, 2020 Revised March 3, 2021 |
| 16 | How should a borrower account for federal taxes when determining its payroll costs for purposes of the maximum loan amount, allowable uses of a PPP loan, and the amount of a loan that may be forgiven? | Published April 6, 2020 Revised March 3, 2021 |
| 17 | I filed or approved a loan application based on the version of the PPP Interim Final Rules published at the time of the application.  Do I need to take any action based on the updated guidance in these FAQs? | Published April 6, 2020 Revised March 3, 2021 |
| 18 | Are PPP loans for existing customers considered new accounts for FinCEN Rule CDD purposes?  Are lenders required to collect, certify, or verify beneficial ownership information in accordance with the rule requirements for existing customers? | Published April 6, 2020 |
| 19 | Do lenders have to use a promissory note provided by SBA or may they use their own? | Published April 8, 2020 |
| 20 | The amount of forgiveness of a PPP loan depends on the borrower's payroll costs over the applicable forgiveness covered period. When does the applicable forgiveness covered period begin? | Published April 6, 2020 Revised June 25, 2020 Revised March 3, 2021 |
| 21 | Do lenders need a separate SBA Authorization document to issue PPP loans? | Published April 13, 2020 Revised March 3, 2021 |

| FAQ No. | Question | Date |
|---|---|---|
| 22 | I am a non-bank lender that meets all applicable criteria of the PPP Interim Final Rules.  Will I be automatically enrolled as a PPP lender?  What criteria will SBA and the Treasury Department use to assess whether to approve my application to participate as a PPP lender? | Published April 13, 2020 Revised March 3, 2021 |
| 23 | How do the $10 million cap (or $2 million cap for a Second Draw PPP Loan) and affiliation rules work for franchises? | Published April 13, 2020 Revised March 3, 2021 |
| 24 | How do the $10 million cap (or $2 million cap for a Second Draw PPP Loan) and affiliation rules work for hotels and restaurants (and any business assigned a North American Industry Classification System (NAICS) code beginning with 72)? | Published April 13, 2020 Revised March 3, 2021 |
| 25 | Does the information lenders are required to collect from PPP applicants regarding every owner who has a 20% or greater ownership stake in the applicant business (i.e., owner name, title, ownership %, TIN, and address) satisfy a lender's obligation to collect beneficial ownership information (which has a 25% ownership threshold) under the Bank Secrecy Act? | Published April 13, 2020 |
| 26 | SBA regulations require approval by SBA's Standards of Conduct Committee (SCC) for SBA Assistance, other than disaster assistance, to an entity, if its sole proprietor, partner, officer, director, or stockholder with a 10 percent or more interest is: a current SBA employee; a Member of Congress; an appointed official or employee of the legislative or judicial branch; a member or employee of an SBA Advisory Council or SCORE volunteer; or a household member of any of the preceding individuals.  Do these entities need the approval of the SCC in order to be eligible for a PPP loan? | Published April 14, 2020 Revised March 3, 2021 |
| 27 | SBA regulations require a written statement of no objection by the pertinent Department or military service before it provides any SBA Assistance, other than disaster loans, to an entity, if its sole proprietor, partner, officer, director, or stockholder with a 10 percent or more interest, or if a household member of any of the preceding individuals, is an employee of another Government Department or Agency having a grade of at least GS-13 or its equivalent.  Does this requirement apply to PPP loans? | Published April 14, 2020 Revised March 3, 2021 |
| 28 | Is a lender permitted to submit a PPP loan application to SBA through SBA's electronic loan processing system before the lender has fulfilled its responsibility to review the required borrower documentation and calculation of payroll costs, and for Second Draw PPP Loans, review the required borrower documentation regarding revenue reduction? | Published April 14, 2020 Revised March 3, 2021 Revised March 12, 2021 |

| FAQ No. | Question | Date |
|---|---|---|
| 29 | Can lenders use scanned copies of documents or E-signatures or E-consents permitted by the E-sign Act? | Published April 15, 2020 Revised March 3, 2021 |
| 30 | Can a lender sell a PPP loan into the secondary market? | Published April 17, 2020 |
| 31 | Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan? | Published April 23, 2020 Revised March 3, 2021 |
| 32 | Does the cost of a housing stipend or allowance provided to an employee as part of compensation count toward payroll costs? | Published April 24, 2020 |
| 33 | Is there existing guidance to help PPP applicants and lenders determine whether an individual employee's principal place of residence is in the United States? | Published April 24, 2020 |
| 34 | Are agricultural producers, farmers, and ranchers eligible for PPP loans? | Published April 24, 2020 Revised March 3, 2021 |
| 35 | Are agricultural and other forms of cooperatives eligible to receive PPP loans? | Published April 24, 2020 Revised March 3, 2021 |
| 36 | To determine borrower eligibility under the 500-employee or other applicable threshold for First Draw PPP Loans, or the 300-employee threshold for Second Draw PPP Loans established by the Economic Aid Act, must a borrower count all employees or only full-time equivalent employees? | Published April 26, 2020 Revised March 3, 2021 |
| 37 | Do businesses owned by private companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan? | Published April 28, 2020 |
| 38 | Section 1102 of the CARES Act provides that PPP loans are available only to applicants that were "in operation on February 15, 2020."  Is a business that was in operation on February 15, 2020 but had a change in ownership after February 15, 2020 eligible for a PPP loan? | Published April 29, 2020 |
| 39 | Will SBA review individual PPP loan files? | Published April 29, 2020 Revised March 3, 2021 Revised July 29, 2021 |
| 40 | Will a borrower's PPP loan forgiveness amount (pursuant to section 1106 of the CARES Act (codified as section 7A of the Small Business Act) and SBA's implementing rules and guidance) be reduced if the borrower laid off an employee, offered to rehire the same employee, but the employee declined the offer? | Published May 3, 2020 Revised March 3, 2021 |
| 41 | Can a seasonal employer that received a First Draw PPP Loan in 2020 and elected to use a 12-week period between May 1, 2019 and September 15, 2019 to calculate its maximum PPP loan | Published May 3, 2020 Revised March 3, 2021 |

| FAQ No. | Question | Date |
|---|---|---|
|  | amount under the interim final rule issued by Treasury on April 27, 2020, make all the required certifications on the Borrower Application Form? |  |
| 42 | Do nonprofit hospitals exempt from taxation under section 115 of the Internal Revenue Code qualify as "nonprofit organizations" under section 1102 of the CARES Act? | Published May 3, 2020 Revised March 3, 2021 |
| 43 | FAQ #31 reminded borrowers to review carefully the required certification on the Borrower Application Form that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."  SBA guidance and regulations provide that any borrower who applied for a PPP loan prior to April 24, 2020 and repaid the loan in full by May 7, 2020 will be deemed by SBA to have made the required certification in good faith.  Is it possible for a borrower to obtain an extension of the May 7, 2020 repayment date? | Published May 5, 2020 Revised March 3, 2021 |
| 44 | How do SBA's affiliation rules at 13 C.F.R. 121.301(f) apply with regard to counting the employees of foreign and U.S. affiliates? | Published May 5, 2020 Revised March 3, 2021 |
| 45 | Is an employer that repays its PPP loan by the safe harbor deadline (May 18, 2020) eligible for the Employee Retention Credit? | Published May 6, 2020 Revised May 27, 2020 |
| 46 | [RESERVED] | Published May 13, 2020 Revised March 3, 2021 Revised March 12, 2021 Deleted July 29, 2021 |
| 47 | An SBA interim final rule posted on May 8, 2020 provided that any borrower who applied for a PPP loan and repays the loan in full by May 14, 2020 will be deemed by SBA to have made the required certification concerning the necessity of the loan request in good faith.  Is it possible for a borrower to obtain an extension of the May 14, 2020 repayment date? | Published May 13, 2020 Revised March 3, 2021 |
| 48 | By when must a lender electronically submit an SBA Form 1502 indicating that PPP loan funds have been disbursed? | Published May 19, 2020 Revised March 3, 2021 |
| 49 | What is the maturity date of a PPP loan? | Published June 25, 2020 |