## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PAUL PIETSCHNER, <br><br> Plaintiff, <br><br> v. <br><br> KATHRYN PETRALIA; ROBERT FROHWEIN; and SPENCER ROBINSON, <br><br> Defendants. | Civil Action No.: 4:21-cv-110-SDJ |

## DEFENDANT SPENCER ROBINSON'S MOTION TO DISMISS THE COMPLAINT IN INTERVENTION FOR IMPROPER VENUE, <u>LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM</u>

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ....................................................................................................1

STATEMENT OF ISSUES ......................................................................................2

ARGUMENT ...........................................................................................................2

I.    THE COMPLAINT MUST BE DISMISSED FOR LACK OF PERSONAL
      JURISDICTION AND IMPROPER VENUE. ........................................................2

      A.  Legal Standards Under Federal Rules Of Civil Procedure 12(b)(2) And (3). .........3

      B.  Proper Venue Is A Prerequisite To Personal Jurisdiction Under 31 U.S.C.
          § 3732(a). ....................................................................................................3

      C.  Venue In This District Is Improper Under § 3732(a), And Personal
          Jurisdiction Therefore Is Lacking ................................................................5

II.   THE 100K ERROR AND SBA/AML ALLEGATIONS FAIL BECAUSE
      KABBAGE'S AUTOMATED REVIEWS SATISFIED 3.b(i)-(iii) AND KNOW
      YOUR CUSTOMER REQUIREMENTS.................................................................10

      A.  The Government Has Not Pled With Particularity How Kabbage's Automated
          System With Manual Backups Was Not a "Good Faith Review" Of Monthly
          Payroll Costs Or Failed To Meet Some Unarticulated Fraud Detection
          Standard In The Context Of SBA's Controlling Guidance ..................................11

      B.  The Government Has Failed To Plausibly Plead Intent With Respect To The
          100k Error Or BSA/AML Certifications ..............................................................14

      C.  The Government Has Failed To Plausibly Plead Intent With Respect To Any
          Individual PPP Application...................................................................................14

      D.  The Complaint Fails To Allege Materiality For The 100k Error And
          Inadequate Loan Review – SBA Continued To Pay Claims With Knowledge
          That The PPP Program Allowed Substantial Numbers Of Fraudulent Loan
          Applications ...........................................................................................................15

III.  BECAUSE KABBAGE DID NOT INCLUDE HEALTH INSURANCE OR
      RETIREMENT BENEFITS IN ITS LOAN CALCULATIONS, THE
      GOVERNMENT HAS NOT PLED WITH PARTICULARITY THAT THE
      SALT OR 100K ERRORS ACTUALLY OVERSTATED LOAN AMOUNTS,
      AND HAS ALSO FAILED TO PLAUSIBLY ALLEGE SCIENTER ....................16

A.  The Government Has Not Pled Any Particulars Demonstrating That Health Insurance And Retirement Benefits Would Be Less Than SALT Errors ..............18

B.  The Complaint's Examples May Demonstrate A Few Applications Where The 100k Error "Likely" Exceeded Retirement And Health Insurance, But Do Not Allege That Defendants Had Anything To Do With Those Examples..................20

C.  The Government Has Not Pled Particular Sufficient To Plausibly Allege Scienter On The SALT Error .................................................................................21

IV.  DEFENDANTS LEFT KABBAGE BEFORE IT STARTED PROCESSING FORGIVENESS APPLICATIONS, THE GOVERNMENT ADMITS THAT IT KNEW ABOUT THE SALT AND 100K ERRORS, AND BORROWERS' FALSE CERTIFICATIONS ON FORGIVENESS APPLICATIONS BROKE THE CHAIN OF PROXIMATE CAUSATION.........................................................22

CONCLUSION..................................................................................................................25

ii

TABLE OF AUTHORITIES

Cases

*Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822 (5th Cir. 1996) .............4

*Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255 (5th Cir. 1994).......................4

*Calder v. Jones*, 465 U.S. 783 (1984).................................................................................8, 9

*Caldwell v. Palmetto State Sav. Bank of S. Carolina*, 811 F.2d 916 (5th Cir. 1987) ......................7

*Daniel v. Amer. Bd. of Emerg. Med.*, 428 F.3d 408 (2d Cir. 2005)...................................................4

*Daughtry v. Silver Fern Chem., Inc.*, 2024 WL 2211005 (E.D. Tex. May 16, 2024) ....................3

*Dixie Carriers, Inc. v. Nat'l Mar. Union of Amer., AFL-CIO*, 35 F.R.D. 365
  (S.D. Tex. 1964)....................................................................................................................6

*DLR, LLC v. Montoya*, 465 F. Supp. 3d 676 (N.D. Tex. 2020).......................................................9

*ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672 (E.D. Tex. 2020) .......................... 3, 7-9

*Goodyear Dunlop Tires Oper., S.A. v. Brown*, 564 U.S. 915 (2011) ...............................................8

*GTE New Media Services, Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) ....................4

*Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285 (S.D. Tex. 2001) ....................................25

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)......................................................................3

*KM Enterprises, Inc. v. Global Traffic Tech., Inc.*, 725 F.3d 718 (7th Cir. 2013) ......................2, 3

*Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021) ....................................................25

*Langton v. Cbeyond Comm., L.L.C.*, 282 F. Supp. 2d 504 (E.D. Tex. 2003) .................................3

*Mgmt. Insights, Inc. v. CIC Enter., Inc.*, 194 F. Supp. 2d 520 (N.D. Tex. 2001)...........................4

*Paroline v. United States*, 572 U.S. 434 (2014)...........................................................................24

*Phan Son Van v. Pena*, 990 S.W.2d 751 (Tex. 1999)...................................................................25

*Savoie v. Pritchard*, 122 F.4th 185 (5th Cir. 2024) ...................................................................3, 8

*Stuart v. Spademan*, 772 F.2d 1185 (5th Cir. 1985) ............................................................7, 8, 10

*United States v. King-Vassel*, 728 F.3d 707 (7th Cir. 2013)........................................................24

*U.S. ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920 (S.D. Tex.
  2007), *aff'd sub nom., U.S. ex rel. Gudur v. Deloitte & Touche*, 2008 WL 3244000
  (5th Cir. Aug. 7, 2008)...............................................................................................10, 11

*U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645 (5th Cir. 2017).....................................16

*U.S. ex rel. Hueseman v. Prof'l Compounding Centers of Am., Inc.*, 664 F. Supp. 3d 722
  (W.D. Tex. 2023) .......................................................................................................24

*U.S. ex rel. Krohn v. Sun West Serv., Inc.*, 2000 WL 36739959
  (D.N.M. Apr. 11, 2000) ...............................................................................................5

*U.S. ex rel. Patel v. Cath. Health Initiatives*, 792 F. App'x 296 (5th Cir. 2019) ....................15, 16

*U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023) ....................................................11, 14

*U.S. ex rel. Smith v. Athena Constr. Grp, Inc.*, 2018 WL 4110743 (M.D. Pa. Aug. 29, 2018).......6

*U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*,
  110 F.3d 861 (2d Cir. 1997)...........................................................................................5

*U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*,
  976 F. Supp. 207 (S.D.N.Y. 1997)...................................................................................5

*U.S. ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641 (N.D. Miss. 2015)........................24

*Virginia Innovation Sci., Inc. v. Amazon.com, Inc.*, 2019 WL 3082314
  (E.D. Tex. July 15, 2019)................................................................................................5

*Walden v. Fiore*, 571 U.S. 277 (2014).....................................................................................7, 8

Statutes

31 U.S.C. § 3729(a)(1)................................................................................................24

31 U.S.C. § 3729(a)(2)................................................................................................24

31 U.S.C. § 3732(a) ................................................................................................ 2-6, 9

Texas Civil Practice & Remedies Code Annotated § 17.042 ....................................................9, 10

Rules

Federal Rule of Civil Procedure 4(k)(1)(C)........................................................................3

Federal Rule of Civil Procedure 9(b)..........................................1, 2, 11, 14, 15, 22, 25

Federal Rule of Civil Procedure 12(b)(2) .....................................................................2, 3

Federal Rule of Civil Procedure 12(b)(3) .....................................................................2, 3

Federal Rule of Civil Procedure 12(b)(6) ........................................................................2


Regulations

Small Business Administration Interim Final Rule, 85 Fed. Reg. 20811 (Apr. 15, 2020)............16


Other Sources

Adamczyk, Alicia, *The average employer 401(k) match is at an all-time high—see how yours compares* (June 10, 2019), https://www.cnbc.com/2019/06/10/this-is-the-average-401k-employer-match.html ........................................................................................................19

Benz, Christine, *100 Must-Know Statistics about 401(k) Plans* (Jun 10 2019), https://www.morningstar.com/retirement/100-must-know-statistics-about-401k-plans ...............19

Federal Reserve Bank of St. Louis, Median Personal Income in the United States (Updated: Sep. 10, 2024), https://fred.stlouisfed.org/series/MEPAINUSA646N ........................19

Kaiser Family Foundation, *2019 Employer Health Benefits Survey* (Sep. 25, 2019), https://www.kff.org/report-section/ehbs-2019-summary-of-findings/ .......................................18

Keisler-Starkey, Katherine & Lisa N. Bunch, *Health Insurance Coverage in the United States: 2019* (Sep. 15 2020), https://www.census.gov/library/publications/2020/demo/p60-271.html#:~:text=.%20In%202019%2C%20the%20percentage%20of%20people,2019%2C%20down%20from%2020.5%20percent%20in%202018 .................................................18

Loughead, Katherine & Emma Wei, *State Individual Income Tax Rates and Brackets 2019* (Mar. 20, 2019), https://taxfoundation.org/data/all/state/state-individual-income-tax-rates-brackets-2019/ ...............................................................................................................................19

Walczak, Jared, *Local Income Taxes in 2019* (Jul. 30, 2019), https://taxfoundation.org/research/all/state/local-income-taxes-2019/........................................19

v

**INTRODUCTION**

The Complaint in Intervention shows that Kabbage accomplished a remarkable feat during a national emergency: It collected PPP loan applications and supporting documents from over 250,000 customers, transmitted those applications to SBA, and distributed over $7 billion in PPP loan proceeds to American businesses between April and May 2020.  "Employees were routinely working sixteen hours per day, seven days a week. As [Defendant Spencer] Robinson commented on or about April 4, 2020, 'Everyday is basically Monday at the moment.'" Compl. ¶104.

Scapegoating Kabbage for the fraud or innocent mistakes of some PPP loan applicants, the Government says Kabbage did three things wrong: 1) two employees with no tax experience created application guidance telling customers to double count state and local income tax payments as payroll expenses, and Kabbage failed to correct that innocent mistake fast enough ("the SALT error"); 2) Kabbage accepted customer representations that they did not compensate any employees more than $100,000 annually without building additional software reviews to check customer math ("the $100k error"); and 3) Kabbage violated its duty to do a "good faith review" because it used an automated review system that failed to catch a sufficient, unspecified percentage of fraudulent applications, even though it triggered thousands of manual reviews.

Tellingly, the Government does not allege that any Kabbage manual reviewers ever approved a loan they knew was fraudulent. Instead, the Government quoted internal emails confirming Kabbage's policy (utterly consistent with SBA guidance) to rely on customer certifications of accuracy when employees could not confirm a loan was fraudulent. Compl. ¶217 ("Yes, we reviewed them but couldn't confirm as fraud.").

On the SALT issue, even though it did not satisfy Rule 9(b) and did not plausibly plead intent, at least the Government can point to an innocent mistake by Kabbage employees that

allegedly caused applicants to double count state and local tax payments. On the 100k error and loan review process, however, the Government fails to demonstrate any violations of SBA guidance. SBA made it clear from the jump that a lender's primary function was to confirm receipt of customer documents and maintain them for SBA reviews down the road. SBA issued controlling guidance that lenders were entitled to rely on applicant certifications and should do a minimal review with no obligation to replicate a customer's loan calculations.

In the face of that guidance, the Complaint's soundbite accusations melt into vague Government expectations that Kabbage should have detected more fraud than it did. Where would Kabbage have found clear guidelines about how much more fraud detection would have saved it from accusations of "reckless disregard?" Where would the Court find those guidelines? Certainly not in the Government's Complaint.

## STATEMENT OF ISSUES

This Court should dismiss the Complaint with prejudice under Federal Rules of Civil Procedure 12(b)(2), (3), and (6) and Rule 9(b) because:

1.      The Complaint fails to allege venue and personal jurisdiction.

2.      The Complaint violates Rule 9(b) and fails to sufficiently and plausibly allege falsity, materiality and scienter.

## ARGUMENT

### I.      THE COMPLAINT MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE.

The operative personal jurisdiction and venue statute in this False Claims Act ("FCA") suit is 31 U.S.C. § 3732(a).  Personal jurisdiction and venue are a "package deal" – *i.e.*, only a court with proper venue over the action is authorized to issue a summons on a nationwide basis to secure personal jurisdiction over a non-resident defendant.  *Cf. KM Enterprises, Inc. v. Global Traffic*

2

*Tech., Inc*., 725 F.3d 718, 730 (7th Cir. 2013) (jurisdiction and venue under Clayton Act were "a package deal;" plaintiff must satisfy venue to avail itself of nationwide service of process). Because the Eastern District of Texas is not a proper venue for any of the three defendants under § 3732(a), the Court cannot obtain personal jurisdiction over Mr. Robinson, domiciled and resident in Florida, by way of nationwide service of process.  The court should dismiss on both grounds.[1]

### A. **Legal Standards Under Federal Rules Of Civil Procedure 12(b)(2) And (3)**

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the party seeking to invoke federal court jurisdiction over the nonresident defendant has the burden of showing that the exercise of personal jurisdiction is proper."  *Daughtry v. Silver Fern Chem., Inc*., 2024 WL 2211005, at *6 (E.D. Tex. May 16, 2024).  The same is true for a motion to dismiss for improper venue under Rule 12(b)(3).  *Langton v. Cbeyond Comm., L.L.C.*, 282 F. Supp. 2d 504, 508 (E.D. Tex. 2003).  The plaintiff must present a *prima facie* case for personal jurisdiction and venue.  *Savoie v. Pritchard*, 122 F.4th 185, 190 (5th Cir. 2024); *Langton*, 282 F. Supp. 2d at 508.

### B. **Proper Venue Is A Prerequisite To Personal Jurisdiction Under 31 U.S.C. § 3732(a)**.

"Normally, federal courts establish personal jurisdiction over defendants based on their minimum contacts with the forum state."  *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 684 (E.D. Tex. 2020).  *See generally Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).  An exception arises "when cases are brought under a federal statute with a nationwide-service-of-process provision."  *ESPOT*, 492 F. Supp. 3d at 684.  *See* Fed. R. Civ. P. 4(k)(1)(C) (serving a summons establishes personal jurisdiction "when authorized by a federal statute").  Under some statutes authorizing nationwide service, the Fifth Circuit has applied a "national contacts"

---

[1]   Defendants Kathryn Petralia and Robert Frohwein are filing separate motions to dismiss for lack of personal jurisdiction and improper venue.

approach (albeit with some reluctance), which holds that "the relevant inquiry [under the Fifth Amendment due process clause] is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (addressing Securities Exchange Act and upholding national contacts approach over a dissent). *See Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 826 (5th Cir. 1996) (following *Busch* in context of ERISA but "with grave misgivings regarding the authority upon which we rely").

Not all federal statutes authorizing nationwide service are identical, however. Some condition the privilege of securing personal jurisdiction through nationwide service on satisfaction of specific venue requirements. *See, e.g.*, *Daniel v. Amer. Bd. of Emerg. Med.*, 428 F.3d 408, 423 (2d Cir. 2005) (holding that Clayton Act "indicates that its service of process provision applies (and, therefore, establishes personal jurisdiction) only in cases in which its venue provision is satisfied"); *GTE New Media Services, Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) ("A party seeking to take advantage of [Clayton Act]'s liberalized service provisions must follow the dictates of both of its clauses."); *Mgmt. Insights, Inc. v. CIC Enter., Inc.*, 194 F. Supp. 2d 520, 530-33 (N.D. Tex. 2001) (nationwide service was not available under Clayton Act where plaintiff failed to satisfy "venue prong" of statute). Where a federal statute authorizing nationwide service limits venue to districts with which one or more defendants have certain connections, the Fifth Amendment "national contacts" approach is effectively eclipsed by a more traditional Fourteenth Amendment "minimum contacts with the forum" analysis.

The FCA is such a statute. In pertinent part, 31 U.S.C. § 3732 ("False claims jurisdiction") provides:

> (a) Actions under section 3730.—Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple

4

> defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States.

The first sentence of § 3732(a) is a venue provision "concerned principally with the location in which an action under § 3730 may be commenced." *U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd*., 110 F.3d 861, 865 (2d Cir. 1997). "The second sentence limits the exercise of personal jurisdiction by providing that while a summons may be served anywhere, it may issue only from an '***appropriate***' district court." *U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd*., 976 F. Supp. 207, 210 (S.D.N.Y. 1997) (emphasis added). As the Southern District of New York explained: "The statute does not define 'appropriate,' but it appears from the context that 'appropriate' refers back to the first sentence of section 3732(a), which describes where venue is appropriate." *Id*. *Accord U.S. ex rel. Krohn v. Sun West Serv., Inc.*, 2000 WL 36739959, at *6 (D.N.M. Apr. 11, 2000). Accordingly, the Court has personal jurisdiction over Mr. Robinson only if venue in this district is proper under § 3732(a). Because this venue is improper, dismissal is required both for improper venue and lack of personal jurisdiction.

## C. Venue In This District Is Improper Under § 3732(a), And Personal Jurisdiction Therefore Is Lacking.

"[W]hen determining whether venue is proper, the Court is to look at the time the complaint is filed." *Virginia Innovation Sci., Inc. v. Amazon.com, Inc*., 2019 WL 3082314, at *8 (E.D. Tex. July 15, 2019). In addition, because three of the conditions for venue in § 3732(a) are framed in the present tense (action may be brought where defendant "can be found, resides, [or] transacts business"), those conditions must "exist at the time of filing of suit for venue to be proper." *See*

*Dixie Carriers, Inc. v. Nat'l Mar. Union of Amer., AFL-CIO*, 35 F.R.D. 365, 370 (S.D. Tex. 1964) (analyzing venue for suits involving labor organizations).[2]

The Complaint admits that Mr. Robinson "resides in the State of Florida" and does not allege that he was otherwise "found in" the Eastern District of Texas when the Complaint was filed on December 20, 2024.  Compl. ¶12.  The only basis on which the Complaint alleges that venue and personal jurisdiction are proper is that "Defendants transacted business in this district" and, more specifically, that "Defendants, *through Kabbage*, transacted business in this district" because "*Kabbage*, under the direction and control of Defendants, approved and disbursed hundreds of PPP loans in this district[.]" Compl. ¶¶6-7 (emphases added).  These allegations do not get the Government close to the finish line under § 3732(a).

For one thing, even if Kabbage's corporate activities were relevant (they are not), Kabbage could not have been transacting business in the Eastern District of Texas when the Complaint was filed – because it no longer existed.  *See U.S. ex rel. Smith v. Athena Constr. Grp, Inc.*, 2018 WL 4110743, at *3 (M.D. Pa. Aug. 29, 2018) (evaluating venue under the FCA and noting that it was not clear from complaint whether "Defendant *currently* transacts business into Pennsylvania" (emphasis in original)).  The Complaint confirms that Kabbage was liquidated long before then and, on May 7, 2024, its successor entity (KServicing Wind Down Corp.) "executed a settlement agreement with the DOJ to resolve its False Claims Act liability[.]"  Compl. ¶146.

More fundamentally, though, Kabbage is not a "*defendant*" in this action.  Section 3732(a) provides that proper venue must be established as to "*the defendant* or, in the case of multiple defendants, *any one defendant*[.]" 31 U.S.C. § 3732(a).  In *ESPOT*, this Court determined that a

---

[2]  The Complaint does not attempt to allege that venue is proper in this District under the final hook of § 3732(a), which allows an FCA action to be brought in a judicial district "in which any act proscribed by section 3729 occurred."

6

similar venue prerequisite to personal jurisdiction under RICO's nationwide service provision –

*i.e.*, that the action be brought in a district in which *at least one defendant was conducting business*

– required a traditional constitutional "minimum contacts" personal jurisdiction analysis.  *ESPOT*,

492 F. Supp. 3d at 686 (citing *Caldwell v. Palmetto State Sav. Bank of S. Carolina*, 811 F.2d 916,

918 (5th Cir. 1987)).  *See id*. ("Thus, so long as at least one defendant has engaged in sufficient

minimum contacts with Texas related to the alleged RICO claim, its nationwide service-of-process

provision will grant personal jurisdiction over all other defendants when the 'ends of justice' so

require under section 1965(b).").  The "transacts business" condition of § 3732(a) likewise asks

whether any one of the three defendants "has 'minimum contacts' with the forum state such that

exercising personal jurisdiction over the defendant would not offend 'traditional notions of fair

play and substantial justice.'"  *ESPOT*, 492 F. Supp. 3d at 687.  The answer is no.

"A minimum-contacts analysis involves more than counting the nonresident's contacts

with the forum."  *Stuart v. Spademan*, 772 F.2d 1185, 1189-90 (5th Cir. 1985).  The Court "must

look to see whether there has been some act by which the nonresident *purposefully avails itself* of

the privilege of conducting activities within the forum state, thus invoking the benefits and

protection of its laws[]" so that the nonresident "should reasonably anticipate being haled into

court in the forum state."  *Id*. at 1190 (emphasis added; internal quotations and citations omitted).

As in *ESPOT*, the only conceivable basis for personal jurisdiction over Mr. Robinson is

"specific" or "case linked" jurisdiction, under which "the defendant's *suit-related conduct* must

create a *substantial connection* with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014)

(emphasis added).[3]   Critically, "it is *the defendant's conduct* that must form the necessary

---

[3]  The alternative to "specific" jurisdiction is "general" or "all purpose" jurisdiction, which allows
a court "to hear any and all claims" against a defendant if that defendant's "affiliations with the
State are so continuous and systematic as to render [the defendant] essentially at home in the forum

connection with the forum State that is the basis for its jurisdiction over him." *Id*. at 285 (emphasis added). "Due process requires that a defendant be haled into court in a forum State based on *his own affiliation with the State*, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id*. at 286 (emphasis added; citation omitted). For example, in *Stuart*, the Fifth Circuit found that "[t]he random use of interstate commerce to negotiate and close a particular contract, the isolated shipment of goods to the forum at the instigation of the resident plaintiffs, and the mailing of payments to the forum [did] not constitute the minimum contacts necessary to constitutionally exercise jurisdiction over" an individual defendant. *Stuart*, 772 F.2d at 1194.

Moreover, an individual's contacts with the forum State "are not to be judged according to their employer's activities there." *Calder v. Jones*, 465 U.S. 783, 790 (1984). A Texas state-law corollary to this principle is the "fiduciary shield" doctrine, which "prevents the exercise of personal jurisdiction based solely on acts undertaken in a defendant's corporate capacity." *Savoie*, 122 F.4th at 191.

Applying these principles, the Complaint fails to state a *prima facie* case for personal jurisdiction over Mr. Robinson. The Complaint contains barely any references to Texas and no allegations that Mr. Robinson *purposely forged a substantial connection* with Texas, much less with the Eastern District of Texas. The Complaint does not allege that Mr. Robinson traveled to Texas, communicated with PPP borrowers in Texas, reviewed PPP loan applications for any such borrowers, or took any action in Texas related to the claims in this lawsuit. *Cf. ESPOT*, 492 F. Supp. 3d at 689 (finding specific jurisdiction over defendant who made fraudulent

---

State." *Goodyear Dunlop Tires Oper., S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted). For individuals, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Id.* at 924. Mr. Robinson's domicile is Florida, not Texas.

8

misrepresentations giving rise to the cause of action via personal "phone calls and text messages" to an individual "whom he knew to be in Texas and the co-founder of ESPOT, a Texas company"). According to the Complaint, Mr. Robinson's alleged conduct occurred, without exception, outside Texas and purely in Mr. Robinson's capacity as an officer of Atlanta-based and Delaware-incorporated Kabbage.

Those allegations fail to state a *prima facie* case for personal jurisdiction for two interrelated reasons. First, the Complaint alleges no individual conduct by Mr. Robinson – whether in his corporate capacity or not – that created a purposeful and substantial connection to Texas.[4] Second, even the minuscule connection that the Complaint alleges between the claims at issue and Texas is based solely on *Kabbage*'s alleged facilitation of certain loans to borrowers in the Eastern District of Texas.[5] And Mr. Robinson's contacts with Texas "are not to be judged according to [his] employers' activities there." *Calder*, 465 U.S. at 790. Because the Complaint fails to allege that Mr. Robinson, through his own activities, purposefully forged a substantial connection with the Eastern District of Texas, venue is improper under § 3732(a) and the Court lacks personal jurisdiction over Mr. Robinson.[6] Moreover, for the reasons stated in the individual brief filed by Mr. Frohwein, dismissal rather than transfer is appropriate.

---

[4]   Even if the Complaint had alleged actions by Mr. Robinson in his corporate capacity with a purposeful connection to Texas, they would be disregarded for purposes of assessing personal jurisdiction under the fiduciary shield doctrine. *See DLR, LLC v. Montoya*, 465 F. Supp. 3d 676, 682 (N.D. Tex. 2020) (applying fiduciary shield doctrine, court excluded from specific jurisdiction analysis defendant's "contacts with Texas that were on behalf of [his employer], such as his 63 trips to his office in Dallas").

[5]   The Complaint alleges that Kabbage facilitated PPP loans to 235,000 accounts and that the loans to borrowers in the Eastern District of Texas numbered in the "hundreds." Compl. ¶¶6, 285. Even assuming "hundreds" means 999 loans, those loans would amount to just .4 percent of the total loans allegedly facilitated by Kabbage. Curiously, neither the Relator nor his counsel appear to have any connection to the Eastern District of Texas either.

[6]   For similar reasons, Mr. Robinson lacks the "minimum contacts" with Texas necessary for personal jurisdiction and service under the Texas long-arm statute. *See* Tex. Civ. Prac. & Rem.

II.     **THE 100K ERROR AND SBA/AML ALLEGATIONS FAIL BECAUSE KABBAGE'S AUTOMATED REVIEWS SATISFIED 3.b.(i)-(iii) AND KNOW YOUR CUSTOMER REQUIREMENTS.**

The central allegation in the Complaint is that Kabbage's Form 2484 applications for loan guaranties were false claims because Kabbage did not comply with paragraphs 3.b(i)-(iii) of the April 15, 2020, Interim Final Rule ("IFR"):

> PPP lenders were also required to: (a) "confirm receipt of borrower certifications," (b) "confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020," and (c) confirm, by performing a good faith review, "the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application." 85 Fed. Reg. 20811, 20815 (Apr. 15, 2020). SBA guidance referred to these requirements as "paragraphs 3.b(i)-(iii) of the April 15 Interim Final Rule." (Compl. ¶26).

As the Government alleges,

> SBA Form 2484 required lenders to certify that they had complied with paragraphs 3.b(i)-(iii) of the April 15 Interim Final Rule and that "[t]he Lender has obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts) of the Applicant and will retain copies of such documents in the Applicant's loan file." (Compl. ¶27).[7]

The Fifth Circuit has held that "general statement[s] of adherence to all regulations or statutes governing participation in a program through which federal funds are received is an insufficient basis on which to premise FCA liability." *U.S. ex rel. Gudur v. Deloitte Consulting*

---

Code Ann. § 17.042 (authorizing jurisdiction over those "doing business" in Texas). The Texas long-arm statute extends to the limits of due process, which make its minimum-contacts inquiry identical to the constitutional test. *Stuart*, 772 F.2d at 1189.

[7] A fair reading of Form 2484 indicates its central purpose was to ensure that the lender had collected numerous specific certifications from borrowers required for loan eligibility, and that the lender would retain the "Applicant's loan file" for any SBA review in the future. *See* https://www.sba.gov/document/sba-form-2484-lender-application-form-paycheck-protection-program-loan-guaranty.

*LLP*, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007), *aff'd sub nom., U.S. ex rel. Gudur v. Deloitte & Touche*, 2008 WL 3244000 (5th Cir. Aug. 7, 2008)

> A.      **The Government Has Not Pled With Particularity How Kabbage's Automated System With Manual Backups Was Not A "Good Faith Review" Of Monthly Payroll Costs Or Failed To Meet Some Unarticulated Fraud Detection Standard In The Context Of SBA's Controlling Guidance.**

Two essential elements of an FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the claim's falsity. *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 742-43 (2023). Under Rule 9(b), the Government has not pled the "what" of Kabbage's alleged fraudulent failure to comply with 3.b(i)-(iii) in this context.

The "what" of the alleged falsity in Kabbage's Form 2484 certifications has to begin with controlling guidance from SBA at the outset of the PPP program. As the Complaint admits:

> Recognizing the time sensitive nature of businesses' financial needs, the SBA permitted PPP lenders to rely on borrower certifications for certain components of the loan application and to rely on documents borrowers provided to determine qualifying loan amounts. *See* 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020) ("SBA will allow lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness.") . . . (Compl. ¶21).

SBA issued and updated a "PAYCHECK PROTECTION PROGRAM LOANS Frequently Asked Questions (FAQs)" document as controlling guidance to the public:

> Borrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (as amended), the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Economic Aid Act), and of the Paycheck Protection Program Interim Final Rules ("PPP Interim Final Rules")(link). The U.S. government will not challenge lender PPP actions that conform to this guidance, and to the PPP Interim Final Rules and any subsequent rulemaking in effect at the time the lender's action is taken.

FAQ Question 1 confirmed that lenders could rely on borrower certifications and supporting documentation, and did not need to replicate an applicant's loan calculations:

11

> Providing an accurate calculation of payroll costs is the responsibility of the borrower, and the borrower attests to the accuracy of those calculations on the Borrower Application Form . . .. Lenders are expected to perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll cost. For example, minimal review of calculations based on a payroll report by a recognized third-party payroll processor would be reasonable. In addition, as the PPP Interim Final Rules indicate, lenders may rely on borrower representations, including with respect to amounts required to be excluded from payroll costs.[8]

SBA's FAQs allowed lenders to rely on borrower certifications for other compliance issues as well. *See* FAQ 4 ("It is the responsibility of the borrower to determine which entities (if any) are its affiliates and determine the employee headcount of the borrower and its affiliates. Lenders are permitted to rely on borrowers' certifications."); FAQ 31 ("Lenders may rely on a borrower's certification regarding the necessity of the loan request.").

The Complaint demonstrates that Kabbage's automated reviews with manual backups met these standards. Kabbage confirmed receipt of borrower certifications, relied on them, and did automated reviews of supporting documentation. In the words of 3.b.(iii), Kabbage "[c]onfirm[ed] the dollar amount of average monthly payroll costs . . . by reviewing the payroll documentation submitted with the borrower's application." Paragraph 90 of the Complaint admits: "Kabbage then used an automated program to scan the tax documents, extract data, and compare them against the borrowers' entries. At times, Kabbage employees manually reviewed the supporting documentation."

For 3.b.(ii), all successful borrowers certified under penalty of perjury that they were in operation on around February 15, 2020. Kabbage relied on those certifications and supporting payroll information without specifically searching for a pre-February date. Compl. ¶204. And the

---

[8]   PPP FAQ #1, revised Mar. 12, 2021, referenced, but not quoted in full, at Compl. ¶40; https://www.sba.gov/document/support-faq-ppp-borrowers-lenders.

Government does not attempt to deny that Kabbage "[c]onfirm[ed] receipt of borrower certifications" as required by 3.b.(i).

With respect to the 100k error, again, the Government concedes that Kabbage had a review process and relied on borrower certifications:

> In the loan calculation methodology designed by S.A. and N.G., which Robinson approved, Kabbage asked borrowers whether they had any employees who made more than $100,000 annually. If the borrower answered yes, they were required to upload IRS Forms W-2 of those employees to Kabbage's website. Manual reviewers then reviewed any such self-reported applications. (Compl. ¶149).

> If applicants responded that they did not have any employees with compensation exceeding $100,000 (whether that was true or not), Kabbage took no further steps to verify applicants' representations and the borrower's loan calculation. (Compl. ¶150).

The Government also concedes that Kabbage had an automated fraud review process to comply with "Know Your Customer" ("KYC") requirements:

> Kabbage also used a primarily automated process to "review" PPP loan applications to confirm the borrower's eligibility and in an attempt to comply with KYB/KYC requirements, as required under PPP regulations. At a high level, Kabbage processed the information submitted by the borrower through several software programs designed to verify borrowers' identities and business information and evaluate their documents for fraud concerns. If a borrower's information was flagged in Kabbage's automated process, the application was sent for manual review by a Kabbage employee or contractor, who then reviewed the submitted materials, requested additional documentation, and decided whether to decline or approve the application. (Compl. ¶94).

The Government generally alleges that these automated review procedures failed to prevent some unspecified, unacceptable percentage of fraudulent applications. But SBA did not require Kabbage to certify that its review procedures stopped enough fraud to satisfy Government lawyers. Kabbage certified accurately that it gathered customer certifications and reviewed their applications and supporting documents. The borrowers caused false claims, not Kabbage. The

13

Government has failed to sufficiently allege that Kabbage's certifications of compliance were actually false.

To plead the "what" of Kabbage's fraud under Rule 9(b), the Government would have to specify authority to establish that automated reviews did not meet paragraphs 3.b.(i)-(iii), specify what review processes would have been sufficient, and specify how Kabbage failed to satisfy those standards. The Government has not met that pleading standard. This Court should dismiss the 100k error and SBA/AML allegations for failure to plausibly establish or plead actual falsity.

### B. The Government Has Failed To Plausibly Plead Intent With Respect To The 100k Error Or BSA/AML Certifications.

When laws, regulations, or contracts are ambiguous, the Government may still establish scienter under the FCA if the Defendant had a subjective understanding that he was acting in reckless disregard of a potential interpretation. *SuperValu*, 598 U.S. at 753-54. But here, the Government has failed to plausibly allege that Defendants knew that Kabbage's automated processes failed to meet SBA's requirements.

As discussed in the next section, the Government alleges that Defendants learned about specific instances of fraudulent applications *after the fact*. But it does not allege that they received notice, or admitted, that Kabbage's automated processes failed to meet SBA's definitions for "review" or "confirmation." *See* Defendants' Joint Motion to Dismiss ("Joint Motion") at 16-18.

### C. The Government Has Failed To Plausibly Plead Intent With Respect To Any Individual PPP Application.

For the 100k error and BSA/AML claims, the Government alleges that Defendants "knew" that Kabbage's automated processes failed to prevent *some* fraudulent or incorrect applications. The Government also alleges generally that Kabbage learned about some fraudulent applications

14

*after the fact.* But the Government does not allege that Defendants knew that any particular PPP loan application was false before Kabbage submitted it.

The Government's "examples" of false claims under the 100k error and BSA/AML issues[9] demonstrate the Government's failure to plausibly plead wrongful intent. None of the examples meet Rule 9(b) pleading standards because they do not allege that there were manual reviews of the applications, or whether anyone at Kabbage knew the loans were fraudulent *before they were submitted*.[10] The examples do not allege the *who*—they do not allege that any Defendant had personal knowledge of the applications.

At most, the Government alleges that Defendants knew that some fraudulent applications were getting through Kabbage's reviews. As discussed below, if the falsity alleged here is that Kabbage's systems for reviewing and confirming applications (and relying on borrower certifications) were somehow deficient because they failed to catch some unspecified percentage of loan applications, that falsity was not material—*because SBA knew that for all lenders*, and continued to pay claims with that knowledge throughout the PPP program.

> **D. The Complaint Fails To Allege Materiality For The 100k Error And Inadequate Loan Review—SBA Continued To Pay Claims With Knowledge That The PPP Program Allowed Substantial Numbers Of Fraudulent Loan Applications.**

To plead materiality, an FCA plaintiff must allege facts indicating "'the government would [not] pay the claim … if it knew of the claimant's violation.'" *U.S. ex rel. Patel v. Cath. Health*

---

[9]  Compl. ¶¶315-20, 325-29.

[10] The Complaint vaguely suggests that Kabbage failed to take unspecified corrective actions when it learned about some inaccurate applications after the fact. *See* Compl. ¶183 ("(What actions were taken is unclear, but subsequent reviews of Kabbage's loan data revealed numerous loans affected by the $100k Error, which Kabbage had not fixed.") But the Complaint's substantive counts do not allege failures to correct after the fact. And to the extent the Government alleges that some Kabbage forgiveness applications restated errors, those allegations utterly fail to meet 9(b) standards.  *See* section III below.

*Initiatives*, 792 F. App'x 296, 301 (5th Cir. 2019). And "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the [FCA plaintiff] in establishing materiality." *U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017). *See* Joint Motion at 18-19.

Here, the Government has not, and cannot, plead with particularity that SBA would not have paid claims if it knew that some unspecified percentage of a lender's applications contained fraud. That was true for all lenders, and SBA knew it. Most tellingly, from the outset, SBA proclaimed that PPP lenders would "***be held harmless for borrowers' failure to comply with program criteria***[.]"[11] That proclamation made clear that SBA understood that lenders would be reluctant to process PPP loans quickly enough if they were potentially liable for fraudulent loans that got through their reviews. SBA knew there would be fraud, and announced that ***fraudulent borrowers*** would be individually prosecuted for their own wrongdoing.[12]

The Complaint's materiality allegations are entirely conclusory and ignore the context of SBA's conscious decisions to trade speed for minimal reviews and reliance on borrower certifications. *See* Joint Motion at 19-21. Because the Complaint fails to allege the requisite materiality as to all Defendants for the 100k error and alleged inadequate loan review, those allegations should be dismissed.

### III. BECAUSE KABBAGE DID NOT INCLUDE HEALTH INSURANCE OR RETIREMENT BENEFITS IN ITS LOAN CALCULATIONS, THE GOVERNMENT HAS NOT PLED WITH PARTICULARITY THAT THE SALT OR 100K ERRORS ACTUALLY OVERSTATED LOAN AMOUNTS, AND HAS ALSO FAILED TO PLAUSIBLY ALLEGE SCIENTER.

---

[11] IFR, 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020) (emphasis added).
[12] *Id*. at 20814 ("If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability such as charges for fraud.").

SBA Form 2483, the Paycheck Protection Program Borrower Application Form, required applicants to state their "Average Monthly Payroll."  The form did not require applicants to itemize the components of those monthly payroll costs. Under the PPP program, average monthly payroll included not just wages, "but some eligible non-wage payroll costs, such as healthcare and retirement payments."[13] However, "Kabbage's automated PPP loan calculation methodology relied on documents that could be easily scanned, which required them to be uniform." Compl. ¶105. Because Kabbage could not readily scan non-standard retirement and health benefit documentation, it told applicants: "To verify your information as quickly as possible, we're not currently including employee-paid group health benefits or retirement contributions in loan calculations."[14]

As the Government concedes, this means that it is only "likely" that a 100k error overstated an applicant's actual loan eligibility. *See* Compl. ¶153 ("non-wage payroll costs [such as retirement and health insurance] could cause an applicant's loan amount to exceed $20,833.33 per employee"), ¶¶315-20 (each "borrower *likely* was not eligible for the loan in the amount" approved by Kabbage) (emphasis added). The same logic applies to the SALT error. If an applicant's retirement and health insurance benefits were higher than her SALT withholdings, the loan amount was not actually overstated. Tellingly, however, the Government does not even allege that the SALT error was "likely" to exceed health insurance and retirement benefits.

---

[13] Compl. ¶153. *See* https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Application-3-30-2020-v3.pdf.

[14] *See How We Calculate Your Potential Loan Amount*, KABBAGE.COM (June 22, 2020, 7:31 PM) [https://web.archive.org/web/20200622193136/https://www.kabbage.com/paycheck-protection-program-loans/]. The Complaint referred to Kabbage's website and its web portal for receiving applications and supporting documentation, ¶¶82-83, so this Court may consider the site's full contents on a motion to dismiss.

**A.    The Government Has Not Pled Any Particulars Demonstrating That Health Insurance And Retirement Benefits Would Be Less Than SALT Errors.**

The Complaint's "examples" of SALT errors do not include particulars demonstrating that those applicants' SALT withholdings were less than their retirement and health insurance expenses. Compl. ¶¶302-05. The Complaint does not allege any particulars indicating that SALT withholdings generally exceed retirement and health insurance expenses for all customers, some customers, or zero customers. The Complaint does not allege any particulars for loan applications where the SALT error exceeded a particular applicant's retirement and health insurance benefits. The Government has thus failed to allege with particularity that Kabbage approved and submitted loan amounts that were overstated as a result of the SALT error.

This is not just an arcane pleading failure; it is actually likely that SALT withholdings exceeded health insurance and retirement benefits. In 2019, average annual premiums for employer-sponsored health insurance were $7,188 for single coverage and $20,576 for family coverage.[15] On average, covered workers contributed $1,242 for single coverage and $6,015 for family coverage.[16] Therefore, on average, employers paid $5,946 in premiums for single coverage plans and $14,561 in premiums for family coverage.

Of course, some employers do not offer health insurance, others offer health insurance only to some workers, and some offer limited benefits. In 2019, roughly 55.4% percent of workers had health care coverage from their employers.[17]

---

[15] Kaiser Family Foundation, *2019 Employer Health Benefits Survey* (Sep. 25, 2019), https://www.kff.org/report-section/ehbs-2019-summary-of-findings/.

[16] *Id.*

[17] Katherine Keisler-Starkey & Lisa N. Bunch, *Health Insurance Coverage in the United States: 2019* (Sep. 15 2020), https://www.census.gov/library/publications/2020/demo/p60-271.html#:~:text=.%20In%202019%2C%20the%20percentage%20of%20people,2019%2C%20down%20from%2020.5%20percent%20in%202018.

In 2019, 56% of workers participated in some form of workplace retirement programs.[18] According to a Fidelity survey, employers who matched 401(k) benefits averaged matching up to 4.7% of income in 2019.[19] Of course, some employers did not offer retirement benefits, and some employees did not take advantage of matching retirement benefits.

In 2019, median personal income in the U.S. was $35,980.[20] That year, 4,964 taxing jurisdictions across 17 states imposed local income taxes.[21] As just three examples, in 2019 a median-wage worker in Philadelphia would have paid approximately $2,500.93 in SALT; a median-wage employee in Detroit would have paid approximately $2,392.67 in SALT; and a median-wage worker in Baltimore would have paid approximately $2,807.91 in SALT.[22]

Thus, an employer paying average single coverage premiums for median wage earners in Philadelphia, Detroit or Baltimore would have paid almost twice as much in health care benefits as it would have withheld in SALT. Of course, state and local income tax rates vary, and some states and localities impose increasingly progressive tax rates as income increases. Many workers claim deductions that would reduce their SALT withholdings below standard state and local tax rates. SALT withholdings go up for higher wage-earners, while health insurance premiums stay

---

[18] Christine Benz, *100 Must-Know Statistics about 401(k) Plans* (Jun 10 2019), https://www.morningstar.com/retirement/100-must-know-statistics-about-401k-plans.

[19] Alicia Adamczyk, *The average employer 401(k) match is at an all-time high—see how yours compares* (June 10, 2019), https://www.cnbc.com/2019/06/10/this-is-the-average-401k-employer-match.html.

[20] Federal Reserve Bank of St. Louis, Median Personal Income in the United States (Updated: Sep. 10, 2024), https://fred.stlouisfed.org/series/MEPAINUSA646N.

[21] Jared Walczak, *Local Income Taxes in 2019* (Jul. 30, 2019), https://taxfoundation.org/research/all/state/local-income-taxes-2019/.

[22] *Id.*; Katherine Loughead & Emma Wei, *State Individual Income Tax Rates and Brackets 2019* (Mar. 20, 2019), https://taxfoundation.org/data/all/state/state-individual-income-tax-rates-brackets-2019/.

19

constant across all income levels. On the other hand, higher earners are more likely to receive health care benefits.

In the face of these annual statistics[23] and common sense, it matters that the Government could not allege that it was "likely" that health insurance and retirement benefits exceeded SALT withholdings. The Government has not, and cannot, plausibly allege that Defendants should have known that SALT withholdings exceeded retirement and health insurance for any particular borrower, and thus could not have known that any particular loan application was "likely" inflated by the SALT error at the time of submission.

### B.    The Complaint's Examples May Demonstrate A Few Applications Where The 100k Error "Likely" Exceeded Retirement And Health Insurance, But Do Not Allege That Defendants Had Anything To Do With Those Examples.

The Complaint alleges six examples of 100k errors. Compl. ¶¶315-20. The math on those examples may support the allegations that each "borrower likely was not eligible for the loan in the amount approved by Kabbage." However, the Complaint does not allege that Defendants knew about, or had anything to do with, those six examples.

And as with the SALT issue, the rest of the Complaint does not allege any particulars indicating that 100k errors generally exceeded retirement and health insurance expenses for all customers, some customers, or zero customers. The Complaint does not allege any particulars for loan applications where the 100k error exceeded a particular applicant's retirement and health insurance benefits. The Government has thus failed to allege with particularity that Defendants caused Kabbage to approve and submit loan amounts that were overstated as a result of the 100k error, and has failed to plausibly allege that Defendants acted in reckless disregard of the truth.

---

[23] We do not ask the Court to take judicial notice of these statistics or rely on them as undisputed facts.  They just illustrate the significance of the Government's failure of pleading at the motion to dismiss stage.

20

**C.    The Government Has Not Pled Particulars Sufficient To Plausibly Allege Scienter On The SALT Error.**

Kabbage's exclusion of retirement and health insurance benefits from its loan calculations severely undercuts the Government's allegations of scienter in two ways. First, the Government alleges that Defendants greedily approved loan applications with the intent to inflate their loan processing fees, in reckless disregard of whether Kabbage's review processes were sufficient. If Defendants intended Kabbage's reviews to be fig leaves, why care that Kabbage couldn't do an automated review of retirement and health insurance documents? Why not just accept customer certifications about those expenses, and inflate your processing fees that way? Defendants did just the opposite.

Second, the Government concedes that the SALT error began as an innocent mistake. Compl. ¶¶102, 114, 117 (employees with no tax background "misapprehended these tax documents" and mistakenly included SALT withholdings in loan calculations). The Government's allegations of intent focus on Defendants receiving notice about the SALT error, and their alleged failures to correct it. Compl. ¶¶127, 129, 132.

However, the Complaint does not allege that Defendants received notice that the SALT errors exceeded applicants' retirement and health care expenses. To the contrary, the Government alleges an email exchange suggesting that Defendants did not believe the SALT error was significant in the context of Kabbage's overall loan application calculations. When told that a CPA had called Kabbage to say that the SALT error was a "HUGE mistake" that could get Kabbage "in serious trouble," Mr. Robinson responded: "We've heard it all before . . . What we were tasked to

21

do by SBA is not possible and our calc gets as close as possible. It's not perfect but its what we can do at a semblance of scale." Compl. ¶¶137-38.[24]

The Complaint fails to allege facts to plausibly contradict Mr. Robinson's statement that Defendants believed that the SALT error did not materially overstate loan calculations.

## IV. DEFENDANTS LEFT KABBAGE BEFORE IT STARTED PROCESSING FORGIVENESS APPLICATIONS, THE GOVERNMENT ADMITS THAT IT KNEW ABOUT THE SALT AND 100K ERRORS, AND BORROWERS' FALSE CERTIFICATIONS ON FORGIVENESS APPLICATIONS BROKE THE CHAIN OF PROXIMATE CAUSATION.

The Complaint alleges that Defendants are responsible for false loan forgiveness claims affected by the SALT and 100k errors. Compl. ¶¶296, 298-99 (SALT error); 308, 310-13 (100k error). The Government apparently does not assert claims related to forgiveness applications based on alleged violations of lender loan review requirements. Compl. ¶¶321-28.

As the Joint Motion details, the Complaint admits that the Government was on notice of Kabbage's alleged processing errors at least as early as November 2020, and the Government failed under Rule 9(b) to plead *when* it stopped processing Kabbage's forgiveness applications. The Complaint's vagueness about timing is even worse because the Government admits that Defendants left Kabbage in October 2020. Compl. ¶¶10-12, 59. The Complaint also failed under Rule 9(b) to plead the particulars of Mr. Robinson's participation in the forgiveness application process. Joint Motion at 18, 21.

The Government's failure under Rule 9(b) to describe PPP Loan Forgiveness Form Application Form 3508 is understandable—it contradicts the Government's case. SBA first offered

---

[24] As discussed more fully in Defendant Frohwein and Petralia's individual briefs, the full email chain indicates that Defendants also believed that Kabbage had consulted counsel on this issue.

22

Form 3508 with attached instructions and worksheets on May 15, 2020.[25] That form required

numerous certifications from *borrowers* subject to criminal prosecution for false statements.

Borrowers had to check boxes certifying:

> The dollar amount for which forgiveness is requested:
> • was used to pay costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; or business utility payments);
> • includes all applicable reductions due to decreases in the number of full-time equivalent employees and salary/hourly wage reductions;
> • does not include nonpayroll costs in excess of 25% of the amount requested; and
> • does not exceed eight weeks' worth of 2019 compensation for any owner-employee or self-employed individual/general partner, capped at $15,385 per individual.
> I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.
> The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness.
> I have submitted to the Lender the required documentation verifying payroll costs, the existence of obligations and service (as applicable) prior to February 15, 2020, and eligible business mortgage interest payments, business rent or lease payments, and business utility payments.
> The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects.  I understand that knowingly making a false statement to obtain forgiveness of an SBA-guaranteed loan is punishable under the law, including 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

The form instructions required borrowers to fill out a Schedule A worksheet Table 2 listing

all employees paid more than $100,000 a year and provided instructions about not calculating

forgiveness payments on compensation paid to any employee above a $100,000 annual rate. SBA

---

[25]    See    https://www.sba.gov/document/sba-form-3508-ppp-loan-forgiveness-application-instructions.

issued five versions of Form 3508 with instructions between May 15 and October 31, 2020 reflecting minor changes in forgiveness rules, but all versions retained the same borrower certifications.

Beginning October 8, 2020, SBA offered a simplified PPP Loan Forgiveness Application Form 3508S for loans less than $150,000.[26] That form required the same certifications from borrowers, but added the underlined phrase to the certification that "The Borrower has accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness, and has accurately calculated the forgiveness amount requested."

The FCA carefully defines proscribed conduct: (1) knowingly presenting or "*caus[ing] to be presented*" a false claim for payment; and (2) knowingly making, using, or "*caus[ing] to be made or used*" a false record or statement. *See* 31 U.S.C. § 3729(a)(1)-(2) (emphasis added). "The [FCA] causation standard employs traditional notions of proximate causation 'to determine whether there is a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim[.]'" *U.S. ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 681 (N.D. Miss. 2015). An action that breaks the chain of causation would relieve a defendant of liability. *United States v. King-Vassel*, 728 F.3d 707, 714 (7th Cir. 2013).

"Causation under the FCA requires proximate cause, not merely 'but for' cause." *U.S. ex rel. Hueseman v. Prof'l Compounding Centers of Am., Inc.*, 664 F. Supp. 3d 722, 752 (W.D. Tex. 2023) (citation omitted). Proximate cause is a common-law concept focused on the scope of risk and foreseeability. *See Paroline v. United States*, 572 U.S. 434, 445 (2014).

---

[26] *See* https://www.sba.gov/document/sba-form-3508s-ppp-3508s-loan-forgiveness-application-instructions.

"Generally, a person's criminal conduct is a superseding cause extinguishing liability of a negligent actor unless the criminal conduct was a foreseeable result of that negligence." *Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021) (internal quotations omitted). The intervening criminal acts of a third party are a superseding cause of harm to another, unless that harm is a normal consequence of a situation created by the actor's conduct. *See id.; Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999). In addition, causation must be pled with particularity under Rule 9(b). *See Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 292 (S.D. Tex. 2001).

As discussed above, the Complaint lacks specific allegations that Defendants participated in the submission of false loan forgiveness applications. Loan forgiveness applications required extensive certifications from borrowers, whose false statements broke the chain of proximate causation. To the extent that the Government alleges Defendants failed to catch fraudsters, the law of proximate causation has a common sense answer—go after the liars. To the extent the Government alleges that Defendants acted in reckless disregard and failed to prevent foreseeable criminal conduct, Rule 9(b) has a common sense requirement—plead it with particularity.[27]

## CONCLUSION

The Government's FCA and common law claims, and Relator's superseded Complaint, all rely on the same inadequate factual allegations and unfounded legal claims. The Court should dismiss all claims with prejudice.

---

[27] Mr. Robinson incorporates by reference the legal arguments made in co-Defendants' individual motions, to the extent they relate to him, particularly with respect to the common law claims that depend on the same inadequate pleading foundations as the FCA claims.

25

Dated March 11, 2025

Respectfully Submitted,

By: /s/ Henry W. Asbill

Henry W. Asbill (admitted *Pro Hac Vice*)
DC Bar #938811
hasbill@schertlerlaw.com
Christopher B. Mead (admitted *Pro Hac Vice*)
MD Bar #8512010419
cmead@schertlerlaw.com
Lisa H. Schertler (admitted *Pro Hac Vice*)
DC Bar #430754
lschertler@schertlerlaw.com
Paola Pinto (admitted *Pro Hac Vice*)
FL Bar #1013933
ppinto@schertlerlaw.com
SCHERTLER ONORATO MEAD & SEARS
555 13th Street NW Suite 500W
Washington DC 20004
Telephone: 202-628-4199
Facsimile: 202-628-4177

*Attorneys for Defendant Spencer Robinson*

26

**CERTIFICATE OF SERVICE**

I certify that on March 11, 2025, this document was served on counsel of record via the Court's CM/ECF Document Filing System.


Dated March 11, 2025                     Respectfully Submitted,

                                         By: /s/ Henry W. Asbill

                                         Henry W. Asbill (admitted *Pro Hac Vice*)
                                         DC Bar # 938811
                                         hasbill@schertlerlaw.com
                                         SCHERTLER ONORATO MEAD & SEARS
                                         555 13th Street NW Suite 500W
                                         Washington DC 20004
                                         Telephone: 202-628-4199
                                         Facsimile: 202-628-4177

27