**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* PAUL PIETSCHNER | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Civil No. 4:12-cv-110-SDJ |
| | ) | |
| KATHRYN PETRALIA; ROBERT | ) | |
| FROHWEIN; and SPENCER ROBINSON | ) | |
| SPENCER ROBINSON | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

**UNITED STATES' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS THE UNITED STATES' COMPLAINT IN INTERVENTION**

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

ISSUES PRESENTED ............................................................................................. 3

DEFENDANTS' RULE 12(b)(2) AND (b)(3) MOTIONS FAIL................................ 3

I.     FACTS AND ALLEGATIONS RELEVANT TO VENUE AND
       PERSONAL JURISDICTION ........................................................................ 5

       A.     Procedural History of This *Qui Tam* Action. .......................................... 5

       B.     Defendants' Nationwide Fraud.................................................. 6

II.    LEGAL STANDARD....................................................................................... 8

III.   ARGUMENT ................................................................................................... 9

       A.     Under the FCA, Personal Jurisdiction Is Coterminous with Venue.......... 9

       B.     In an FCA *Qui Tam* Lawsuit, Venue Is Determined at the Time the
              Relator Filed the *Qui Tam* Complaint, Based on the Parties Named
              in the *Qui Tam* Complaint. .................................................................. 12

       C.     The Requirements of 31 U.S.C. § 3732(a) Are Satisfied in This
              Case. ............................................................................................ 15

              1.     Venue Is Proper Because Original *Qui Tam* Defendant
                     Kabbage Was Transacting Business in This District When
                     This *Qui Tam* Case Was Filed in 2021 ...................................... 15

              2.     Venue Lies in EDTX Because FCA Violations Occurred
                     Here.............................................................................. 16

              3.     Not One of the Defendants Has Meaningfully Disputed
                     That He or She Transacts Business in EDTX. ............................. 17

              4.     Transfer, Not Dismissal, Is Appropriate if This Court Finds
                     Venue Lacking. ............................................................... 18

       D.     The Exercise of Personal Jurisdiction over Defendants Comports
              with Due Process. .............................................................................. 19

              1.     The Fifth Amendment Due Process "National Contacts"
                     Analysis Applies. ............................................................ 20

              2.     A Defendant's U.S. Residency, Without More, Is Sufficient
                     to Satisfy the Due Process Clause of the Fifth Amendment
                     in FCA Cases. ................................................................ 23

              3.     Defendants Offer No Other Plausible Reason Why a State-
                     Centric "Minimum Contacts" Analysis Should Limit This
                     Court's Personal Jurisdiction in This Case................................. 25

4.       Fifth Amendment Due Process Is Satisfied Because
Defendants Live in the U.S. ............................................. 29

DEFENDANTS' RULE 12(b)(6) AND 9(b) MOTIONS FAIL ................................ 30

I.       FACTUAL BACKGROUND ............................................................. 32

A.       Defendants' Participation in the Paycheck Protection Program. ............. 32

B.       The False Claims. ........................................................... 34

1.       Kabbage Fraudulently Inflated Thousands of PPP Loans
through the SALT Error and the $100k Error............................ 34

2.       Kabbage Failed to Review Loans According to PPP
Requirements and Approved Loans for Patently Fraudulent
and Ineligible Borrowers............................................. 36

C.       Defendants Knew Kabbage Was Submitting False Claims to the
SBA to Receive Processing Fees for Loans Approved or Serviced
by Kabbage. ................................................................ 37

1.       Petralia Knew Kabbage Was Submitting False Claims to
the SBA. .......................................................... 38

2.       Frohwein Knew Kabbage Was Submitting False Claims to
the SBA. .......................................................... 39

3.       Robinson Knew Kabbage Was Submitting False Claims to
the SBA. .......................................................... 40

D.       Defendants Personally Profited from the PPP....................................... 42

II.      LEGAL STANDARD ................................................................. 44

III.     ARGUMENT ...................................................................... 46

A.       The False Claims Act Is Designed to Prevent Fraud on the
Government, Whatever the Form............................................ 46

B.       The Government Adequately Pleaded Violations of the False
Claims Act. ............................................................... 46

C.       The Government Adequately Pleaded Falsity as to All Defendants........ 47

1.       The Government's Complaint Adequately Alleges False
Claims and False Statements...................................... 48

2.       Kabbage's Procedures for Processing PPP Loans,
Designed, Implemented, and Approved by Defendants,
Violated PPP Requirements. ...................................... 50

3.       Defendants' Remaining Arguments Regarding Falsity Do
Not Warrant Dismissal of this Case............................... 52

D.       The Government Adequately Pleaded Scienter....................................... 54

1.      The Government's Complaint Adequately Alleges
        Defendants' Scienter.................................................................55

2.      Scienter May Be Pleaded Generally Under Rule 9(b)................57

3.      The Government Knowledge Defense Is Not Properly
        Resolved on a Motion to Dismiss.............................................58

4.      Petralia's Arguments Regarding Scienter Are Unpersuasive
        and Fail....................................................................................60

5.      The Government Has Alleged Facts from Which This
        Court May Infer Frohwein Had the Requisite FCA
        Scienter....................................................................................63

E.   Defendants' Arguments Erroneously Conflate Falsity and Scienter........65

1.      PPP Requirements Were Not So Vague As to Preclude
        FCA Liability............................................................................65

2.      The Government's Complaint Plausibly Alleges Falsity and
        Scienter Relating to the SALT and $100k Errors......................69

F.   The Government Adequately Pleaded Materiality. ...............................73

1.      The Government's Complaint Satisfies the Materiality
        Standard....................................................................................74

2.      Defendants' Counterarguments Regarding Materiality Are
        Incorrect or Unavailing.............................................................79

G.   The Government Adequately Pleaded Causation...................................82

1.      The Government's Complaint Alleges Frohwein and
        Petralia's Personal Conduct Was a Substantial Factor in
        Causing the Submission of Claims for PPP Processing
        Fees..........................................................................................83

2.      Robinson's Arguments Regarding Causation Similarly Do
        Not Warrant Dismissal..............................................................87

H.   The Government Has Adequately Alleged an FCA Conspiracy. ............90

1.      The Government Has Adequately Alleged the Existence of
        a Civil Conspiracy Between These Three Defendants and
        Their Agreement to Violate the FCA.........................................90

2.      The FCA Does Not Require Allegations That Defendants
        Have a Shared Specific Intent to Defraud the Government.........95

3.      The Intra-corporate Conspiracy Doctrine Does Not Bar the
        Government's FCA Conspiracy Claim Against These Three
        Defendants.................................................................................96

I.   The Government Adequately Pleaded Common Law Claims................98

1.      The Government Adequately Pleaded Unjust Enrichment. .........98

2.      The Government Adequately Pleaded Payment by Mistake......101

iii

J.    The Court Can and Should Consider Defendants' Fifth Amendment Invocations in Evaluating the Sufficiency of the Government's Complaint. ................................................................... 103

IV.    REQUEST FOR OPPORTUNITY TO REPLEAD ......................................... 105

CONCLUSION ...................................................................................................................... 106

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Ademiluyi v. Nat'l Bar Ass'n,*
    No.: 15-02947, 2016 WL 4705536 (D. Md. Sept. 8, 2016)............................................ 18

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.,*
    219 F.3d 519 (6th Cir. 2000)........................................................................................ 89

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................................... 44

*Banque Libanaise Pour Le Com. v. Khreich,*
    915 F.2d 1000 (5th Cir. 1990)..................................................................................... 21

*Baxter v. Palmigiano,*
    425 U.S. 308 (1976)................................................................................................... 104

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................................... 44

*Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.,*
    97 F.3d 822 (5th Cir. 1996)......................................................................................... 22

*Benningfield v. City of Houston,*
    157 F.3d 369 (5th Cir. 1998)....................................................................................... 97

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.,*
    582 U.S. 255 (2017)............................................................................................. 20, 22

*Busch v. Buchman, Buchman & O'Brien,*
    11 F.3d 1255 (5th Cir. 1994)................................................................................ passim

*Bustos v. Lennon,*
    538 F. App'x 565 (5th Cir. 2013)....................................................................21, 22, 24

*Cedric Kushner Promotions, Ltd. v. King,*
    533 U.S. 158 (2001)..................................................................................................... 96

*Century Indem. Co. v. URS Corp.,*
    No. 08-5006, 2009 WL 2446990 (E.D. Pa. Aug. 7, 2009) ........................................ 101

*Conn Appliances, Inc. v. Williams,*
    936 F.3d 345 (5th Cir. 2019)......................................................................................... 9

*Cunnigham v. Assured Auto Grp., Inc.,*
    No. 4:20-CV-41, 2021 WL 1139744 (E.D. Tex. Mar. 2, 2021).................................... 24

*Cunningham v. CBC Conglomerate, LLC,*
    359 F. Supp. 3d 471 (E.D. Tex. 2019)......................................................................... 22

*D.H. Griffin Wrecking Co. v. 1031 Canal Dev., LLC*,
    463 F. Supp. 3d 713 (E.D. La. 2020)........................................................... 61

*Daughtry v. Silver Fern Chem., Inc.*,
    No. 1:23-cv-343, 2024 WL 2211005 (E.D. Tex. May 16, 2024).................................... 8

*Disabled Patriots of Am., Inc. v. Carolina Mall, LLC*,
    No. 3:08CV550-RJC-DSC, 2009 WL 928688 (W.D.N.C. Apr. 3, 2009)...................... 18

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
    232 F.3d 1258 (9th Cir. 2000).................................................................... 103, 104

*Donovan v. Grim Hotel Co.*,
    747 F.2d 966 (5th Cir. 1984)........................................................................... 29

*Double Eagle Energy Servs., LLC v. MarkWest Utica EMG, LLC*,
    936 F.3d 260 (5th Cir. 2019)..................................................................... passim

*Dussouy v. Gulf Coast Inv. Corp.*,
    660 F. 2d 594 (5th Cir. 1981)...................................................................... 96, 97

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938)................................................................................... 21, 24

*ESAB Group, Inc. v. Centricut, Inc.*,
    126 F.3d 617 (4th Cir. 1997)........................................................................... 25

*ESPOT, Inc. v. MyVue Media, LLC*,
    492 F. Supp. 3d 672 (E.D. Tex. 2020)........................................... 11, 12, 21, 26

*Est. of Abtan v. Blackwater Lodge & Training Ctr.*,
    611 F. Supp. 2d 1 (D.D.C. 2009).................................................................. 9, 16

*Gearhart v. Express Scripts, Inc.*,
    422 F. Supp. 3d 1217 (E.D. Ky. 2019)............................................................ 101

*Gilmour v. Blue Cross & Blue Shield of Ala.*,
    No. 4:19-CV-160, 2021 WL 1196272 (E.D. Tex. Mar. 30, 2021)............................. 45

*Gines v. D.R. Horton, Inc.*,
    699 F.3d 812 (5th Cir. 2012).................................................... 45, 64, 71, 82

*Goldlawr, Inc. v. Heiman*,
    369 U.S. 463 (1962)....................................................................................... 18

*Gomez v. Toledo*,
    446 U.S. 635 (1980)....................................................................................... 70

*Great-West Life & Annuity Insurance Co. v. Knudson*,
    534 U.S. 204 (2002)..................................................................................... 100

*Greene v. DeMoss*,
    No. 21-30044, 2022 WL 3716201 (5th Cir. Aug. 29, 2022)............................... 56, 84

vi

*Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*,
   85 F.3d 201 (5th Cir. 1996) ..................................................................... 22

*H & B Equip. Co. v. Int'l Harvester Co.*,
   577 F.2d 239 (5th Cir. 1978) ..................................................................... 97

*Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*,
   921 F.3d 522 (5th Cir. 2019) ....................................................................... 9

*Hericks v. Lincare Inc.*,
   No. 07-387, 2014 WL 1225660 (E.D. Pa. Mar. 25, 2014) ......................... 23

*Hernandez v. Vanderbilt Mortg. & Fin., Inc.*,
   No. C-10-67, 2010 WL 1875796 (S.D. Tex. May 6, 2010) ............... 11, 22, 23

*Hess v. Bumbo Int'l Tr.*,
   954 F. Supp. 2d 590 (S.D. Tex. 2013) .......................................................... 9

*Hilliard v. Ferguson*,
   30 F.3d 649 (5th Cir. 1994) ....................................................................... 96

*Horihan v. Hartford Ins. Co. of the Midwest*,
   979 F. Supp. 1073 (E.D. Tex. 1997) ............................................... 13, 14, 15

*Hyde v. United States*,
   225 U.S. 347 (1912) ................................................................................... 17

*In re Loestrin 24 Fe Antitrust Litig.*,
   261 F. Supp. 3d 307 (D.R.I. 2017) ........................................................... 101

*Intell. Ventures II LLC v. FedEx Corp.*,
   No. 2:16-CV-00980-JRG, 2017 WL 5630023 (E.D. Tex. Nov. 22, 2017) ....... 4, 9, 18, 26

*Jackson v. Wright*,
   82 F.4th 362 (5th Cir. 2023) ..................................................................... 70

*Johnston v. Multidata Sys. Int'l Corp.*,
   523 F.3d 602 (5th Cir. 2008) ....................................................................... 9

*Jones v. Bock*,
   549 U.S. 199 (2007) ................................................................................... 70

*Jones v. Petty-Ray Geophysical Geosource, Inc.*,
   954 F.2d 1061 (5th Cir. 1992) ................................................................... 22

*Jones v. Robinson Prop. Grp., L.P.*,
   427 F.3d 987 (5th Cir. 2005) ................................................................... 105

*Keeton v. Hustler Mag., Inc.*,
   465 U.S. 770 (1984) ................................................................................... 29

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*,
   725 F.3d 718 (7th Cir. 2013) ..................................................................... 11

*Knight v. Standard Chartered Bank*,
    531 F. Supp. 3d 755 (S.D.N.Y. 2021)...............................................................20, 28

*Langton v. Cbeyond Comm., LLC*,
    282 F. Supp. 2d 504 (E.D. Tex. 2003)........................................................................8

*Levin v. Miller*,
    763 F.3d 667 (7th Cir. 2014)....................................................................................70

*Lorelei Corp. v. Cnty. of Guadalupe*,
    940 F.2d 717 (1st Cir. 1991)....................................................................................24

*LTV Educ. Sys., Inc. v. Bell*,
    862 F.2d 1168 (5th Cir. 1989).................................................................98, 101, 103

*Luallen v. Higgs*,
    277 F. App'x 402 (5th Cir. 2008)............................................................................11

*Luna v. Davis*,
    59 F.4th 713 (5th Cir. 2023)....................................................................................18

*Marathon Oil Co. v. A.G. Ruhrgas*,
    182 F.3d 291 (5th Cir. 1999)...................................................................................22

*Marsteller ex rel. United States v. Tilton*,
    880 F.3d 1302 (11th Cir. 2018)...............................................................................76

*Max Daetwyler Corp. v. R. Meyer*,
    762 F.2d 290 (3rd Cir. 1985)...................................................................................24

*McFadin v. Gerber*,
    587 F.3d 753 (5th Cir. 2009)..............................................................................20, 22

*Med. Mut. of Ohio v. deSoto*,
    245 F.3d 561(6th Cir. 2001).....................................................................................24

*Moler v. Wells*,
    18 F.4th 162 (5th Cir. 2021)....................................................................................13

*Morgan v. Swanson*,
    659 F.3d 359 (5th Cir. 2011)......................................................................44, 50, 104

*Mullins v. TestAmerica, Inc.*,
    564 F.3d 386 (5th Cir. 2009)...................................................................................21

*Myers v. Am. Dental Ass'n.*,
    695 F.2d 716 (3d Cir. 1982)...........................................................................4, 8, 17

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*,
    484 U.S. 97 (1987)..................................................................................................19

*Payne v. United States*,
    247 F.2d 481 (8th Cir. 1957)...................................................................................45

*Pinker v. Roche Holdings, Inc.*,
    292 F.3d 361 (3rd Cir. 2002) ...................................................................... 21

*Republic of Panama v. BCCI Holdings (Lux.) S.A.*,
    119 F.3d 935 (11th Cir. 1997) ..................................................................... 25

*Reyes v. JA & M Developing Corp.*,
    No. 12-61329-CIV, 2012 WL 3562024 (S.D. Fla. Aug. 17, 2012) ........... 9, 16

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457 (2007) .................................................................................... 14

*Rolls-Royce Corp. v. Heros, Inc.*,
    576 F. Supp. 2d 765 (N.D. Tex. 2008) ........................................................ 20

*Ruckh v. Salus Rehab., LLC*,
    963 F.3d 1089 (11th Cir. 2020) .............................................................. 82, 84

*Safeco Ins. Co. v. Burr*,
    551 U.S. 47 (2007) ................................................................................. 68, 69

*Saktides v. Cooper*,
    742 F. Supp. 382 (W.D. Tex. 1990) ............................................................. 29

*Savoie v. Pritchard*,
    122 F.4th 185 (5th Cir. 2024) .................................................................. 8, 28

*Scanlan v. Tex. A&M Univ.*,
    343 F.3d 533 (5th Cir. 2003) ........................................................ 45, 61, 71

*SEC v. Colello*,
    139 F.3d 674 (9th Cir. 1998) ..................................................................... 104

*SEC v. DiBella*,
    No. 3:04-CV-1342, 2007 WL 1395105 (D. Conn. May 8, 2007) .............. 105

*SEC v. Farrell*,
    No. 95-CV-6133T, 1996 WL 788367 (W.D.N.Y. Nov. 6, 2006) .............. 104

*SEC v. Kornman*,
    391 F. Supp. 2d 477 (N.D. Tex. 2005 ....................................................... 104

*SEC v. Sharp Cap., Inc.*,
    No. 3:98-CV-2792G, 1999 WL 242691 (N.D. Tex. Apr. 16, 1999) .......... 45

*Seiferth v. Helicopeteros Atuneros, Inc.*,
    472 F.3d 266 (5th Cir. 2006) ...................................................................... 20

*Shambaugh & Son, L.P. v. Steadfast Ins. Co.*,
    91 F.4th 364 (5th Cir. 2024) ....................................................................... 22

*Sidco Indus., Inc. v. Wimar Tahoe Corp.*,
    768 F. Supp. 1343 (D. Or. 1991) ................................................................ 13

*Siebert v. Gene Sec. Network, Inc.*,
　　75 F. Supp. 3d 1108 (N.D. Cal. 2014)........................................................56

*Staub v. Proctor Hosp.*,
　　562 U.S. 411 (2011)................................................................87, 88

*Stuart v. Spademan*,
　　772 F.2d 1185 (5th Cir. 1985)................................................................21

*U.S. Commodity Futures Trading Comm'n v. M25 Invs. Inc.*,
　　No. 3:09-CV-1831, 2010 WL 769367 (N.D. Tex. Mar. 6, 2010).................................45

*United States ex rel. Aldridge v. Corp. Mgmt., Inc.*,
　　78 F.4th 727 (5th Cir. 2023)................................................................81, 82, 86

*United States ex rel. Barko v. Halliburton Co.*,
　　952 F. Supp. 2d 108 (D.D.C. 2013)................................................................23

*United States ex rel. Bibby v. Mortg. Invs. Corp.*,
　　987 F.3d 1340 (11th Cir. 2021)................................................................76, 78

*United States ex rel. Borges v. Dr.'s Care Med. Ctr.*,
　　No. 01-8112 (S.D. Fla. Jan. 29, 2007)................................................................99

*United States ex rel. Butler v. Hughes Helicopters, Inc.*,
　　71 F.3d 321 (9th Cir. 1995)................................................................60

*United States ex rel. Cairns v. D.S. Med. LLC*,
　　No. 1:12CV00004, 2015 WL 590325 (E.D. Mo. Feb. 11, 2015).................................99

*United States ex rel. Campbell v. KIC Dev., LLC*,
　　No. EP-18-CV-193, 2019 WL 6884485 (W.D. Tex. Dec. 10, 2019).................................74

*United States ex rel. Campie v. Gilead Scis., Inc.*,
　　862 F.3d 890 (9th Cir. 2017)................................................................79

*United States ex rel. Cheryl Taylor v. Healthcare Assocs. of Tex., LLC*,
　　No. 3:19-CV-02486, 2025 WL 624493 (N.D. Tex. Feb. 26, 2025).................................96

*United States ex rel. Colquitt v. Abbott Lab'ys*,
　　858 F.3d 365 (5th Cir. 2017)................................................................54, 58

*United States ex rel. Drakeford v. Tuomey*,
　　792 F.3d 364 (4th Cir. 2015)................................................................56

*United States ex rel. Druding v. Care Alts.*,
　　81 F.4th 361(3d Cir. 2023)................................................................79

*United States ex rel. Ebu-Isaac v. INSYS Therapeutics, Inc.*,
　　No. 2:16-cv-07937, 2021 WL 3619958 (C.D. Cal. June 9, 2021).................................85

*United States ex rel. Escobar v. Universal Health Servs., Inc.* (*Escobar II*),
　　842 F.3d 103 (1st Cir. 2016)................................................................78, 79

*United States ex rel. Finks v. Huda*,
    205 F.R.D. 225 (S.D. Ill. 2001) .................................................................. 23

*United States ex rel. Folliard v. CDW Tech. Servs., Inc.*,
    722 F. Supp. 2d 20 (D.D.C. 2010) .............................................................. 53

*United States ex rel. Frey v. Health Mgmt. Sys., Inc.*,
    No. 3:19-CV-0920, 2021 WL 4502275 (N.D. Tex. Oct. 1, 2021) .......... 76, 77

*United States ex rel. Grand v. Northrop Corp.*,
    811 F. Supp. 330 (S.D. Ohio 1992) ............................................................ 10

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ............................................................... passim

*United States ex rel. Haight v. RRSA (Com. Div.), LLC*,
    No. 3:16-CV-1975, 2020 WL 6163139 (N.D. Tex. Oct. 20, 2020) .............. 86

*United States ex rel. Harman v. Trinity Indus. Inc.*,
    872 F.3d 645 (5th Cir. 2017) ........................................................... 73, 78, 79

*United States ex rel. Heath v. Wisc. Bell, Inc.*,
    92 F.4th 654 (7th Cir. 2023) ...................................................................... 79

*United States ex rel. Hebert v. Dizney*,
    295 F. App'x. 717 (5th Cir. 2008) .............................................................. 45

*United States ex rel. Hendow v. Univ. of Phx.*,
    461 F.3d 1166 (9th Cir. 2006) .................................................................... 48

*United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*,
    No. SA-17-CV-1249, 2019 WL 5970283 (W.D. Tex. Nov. 13, 2019) .......... 95

*United States ex rel. Johnson v. Shell Oil Co.*,
    183 F.R.D. 204 (E.D. Tex. 1998) ................................................................ 45

*United States ex rel. Krawitt v. Infosys Techs. Ltd.*,
    372 F. Supp. 3d 1078 (N.D. Cal. 2019) .................................................. 68, 69

*United States ex rel. Krohn v. Sun W. Servs., Inc.*,
    No. 97-0644, 2000 WL 36739959 (D.N.M. Apr. 11, 2000) .......... 10, 19, 23, 29

*United States ex rel. Landis v. Tailwind Sports Co.*,
    51 F. Supp. 3d 9 (D.C.C. 2014) ............................................................ 64, 83

*United States ex rel. Landsberg v. Levinson*,
    No. 2:03CV1429, 2006 WL 895044 (W.D. Pa. Mar. 29, 2006) .............. 23, 29

*United States ex rel. Lemon v. Nurses To Go, Inc.*,
    924 F.3d 155 (5th Cir. 2019) ............................................................... passim

*United States ex rel. Ligai v. ETS-Lindgren Inc.*,
    No. H–112973, 2014 WL 4649885, (S.D. Tex. Sept. 16, 2014) ................... 96

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
  575 F.3d 458 (5th Cir. 2009).............................................................................73, 75, 94

*United States ex rel. Lutz v. Berkeley Heartlab, Inc.*,
  225 F. Supp. 3d 487 (D.S.C. 2016).............................................................................97, 99

*United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*,
  540 F. Supp. 3d 103 (D. Mass. 2021).............................................................................85

*United States ex rel. McCarthy v. Straub Clinic & Hosp., Inc.*,
  140 F. Supp. 2d 1062 (D. Haw. 2001).............................................................................28

*United States ex rel. Mitchell v. CIT Bank, N.A.*,
  No. 4:14-CV-00833, 2022 WL 812364 (E.D. Tex. Mar. 16, 2022)...............................78

*United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*,
  No. 24-50176, 2025 WL 939890 (5th Cir. Mar. 28, 2025).........................48, 55, 72, 78

*United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*,
  507 F. Supp. 3d 734 (W.D. Tex. 2020).............................................................................78

*United States ex rel. Pilecki-Simko v. Chubb Inst.*,
  443 F. App'x 754 (3d Cir. 2011).............................................................................62

*United States ex rel. Pitts v. Hedges*,
  No. 5:16-cv-00127, ECF No. 196 (E.D.N.C., Mar. 31, 2022)......................................86

*United States ex rel. Porter v. Magnolia Health Plan, Inc.*,
  810 F. App'x 237 (5th Cir. 2020).............................................................................46

*United States ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015).............................................................................68, 69

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
  355 F.3d 370 (5th Cir. 2004).............................................................................82

*United States ex rel. Roberts v. Aging Care Home Health, Inc.*,
  474 F. Supp. 2d 810 (W.D. La. 2007).............................................................................99, 101

*United States ex rel. Sandager v. Dell Marketing, L.P.*,
  872 F. Supp. 2d 801 (D. Minn. 2012).............................................................................11

*United States ex rel. Schagrin v. LDR Indus., LLC*,
  No. 14-c-9125, 2018 WL 6064699 (N.D. Ill. Nov. 20, 2018)......................................85

*United States ex rel. Schmidt v. Zimmer, Inc.*,
  386 F.3d 235 (3d Cir. 2004).............................................................................89

*United States ex rel. Schutte v. SuperValu Inc.*,
  598 U.S. 739 (2023).............................................................................passim

*United States ex rel. Silingo v. WellPoint, Inc.*,
  904 F.3d 667 (9th Cir. 2018).............................................................................84

xii

*United States ex rel. Silva v. VICI Mktg., LLC,*
  361 F. Supp. 3d 1245 (M.D. Fla. 2019)............................................................99, 101

*United States ex rel. Spicer v. Westbrook,*
  751 F.3d 354 (5th Cir. 2014)................................................................................49

*United States ex rel. Steury v. Cardinal Health, Inc.,*
  735 F.3d 202 (5th Cir. 2013)................................................................................54

*United States ex rel. Sullivan v. Atrium Medical Corp.,*
  No. SA-13-CA-244-OLG, 2014 WL 12879671(W.D. Tex. Dec. 31, 2014), *adopted by*
  2015 WL 13799755 (W.D. Tex. Mar. 18, 2015)........................................................27

*United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.,*
  110 F.3d 861 (2d. Cir 1997)................................................................................10

*United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.,*
  976 F. Supp. 207 (S.D.N.Y. 1997) ....................................................................10, 19

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
  125 F.3d 899 (5th Cir. 1997)............................................................................45, 48

*United States ex rel. Tucker v. Christus Health,*
  No. 09-1819, 2012 WL 5351212 (S.D. Tex. Oct. 23, 2012)..............................5, 22, 23

*United States ex rel. Vallejo v. Investronica, Inc.,*
  2 F. Supp. 2d 330 (W.D.N.Y. 1998)..................................................................11, 23

*United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc.,*
  433 F.3d 1349 (11th Cir. 2005)............................................................................68

*United States ex rel. Wilkins v. N. Am. Constr. Corp.,*
  173 F. Supp. 2d 601 (S.D. Tex. 2001)................................................................94, 95

*United States v. Americus Mortg. Corp.,*
  No. 4:12-CV-2676, 2017 WL 4083589 (S.D. Tex. Sept. 14, 2017).........................57, 88

*United States v. Blair,*
  No. 19-00410, 2021 WL 5040334 (D. Md. Oct. 29, 2021) ..........................................58

*United States v. BNP Paribas SA,*
  884 F. Supp. 2d 589 (S.D. Tex. 2012)....................................................................98

*United States v. Bollinger Shipyards, Inc.,*
  775 F.3d 255 (5th Cir. 2014)..........................................................................passim

*United States v. Caldwell,*
  16 F. 3d 623 (5th Cir. 1994)................................................................................17

*United States v. Charles,*
  469 F.3d 402 (5th Cir. 2006)............................................................................83, 98

*United States v. Eghbal,*
  548 F.3d 1281 (9th Cir. 2008)..............................................................................88

*United States v. Hodge*,
　933 F.3d 468 (5th Cir. 2019)...................................................................... passim

*United States v. King-Vassel*,
　728 F.3d 707 (7th Cir. 2013)............................................................................ 88

*United States v. Letourneau*,
　No. 11 CR 182, 2013 WL 3834410 (N.D. Ill. July 24, 2013)........................ 58

*United States v. Luce*,
　873 F.3d 999 (7th Cir. 2017)............................................................................ 78

*United States v. Mackby*,
　261 F.3d 821 (9th Cir. 2001)............................................................................ 82

*United States v. Mayo*,
　721 F.2d 1084 (7th Cir. 1983).......................................................................... 17

*United States v. Mead*,
　426 F.2d 118 (9th Cir.1970)............................................................................. 98

*United States v. Medica-Rents Co.*,
　Nos. 03-11297, 06-10393, 07-10414, 2008 WL 3876307 (5th Cir. Aug. 19, 2008)........ 98

*United States v. Medica-Rents Co.*,
　285 F. Supp. 2d 742 (N.D. Tex. 2003)....................................................... 98, 101

*United States v. Medoc Health Servs. LLC*,
　470 F. Supp. 3d 638 (N.D. Tex. 2020)...................................................... 90, 91, 95

*United States v. Metzinger*,
　No. 94–7520, 1996 WL 412811 (E.D. Pa. July 18, 1996)............................... 23

*United States v. Neifert-White Co.*,
　390 U.S. 228 (1968)......................................................................................... 46

*United States v. Nekritin*,
　No. 10-CR-491, 2011 WL 2462744 (E.D.N.Y. June 17, 2011)...................... 58

*United States v. Palomares*,
　52 F.4th 640 (5th Cir. 2022) ........................................................................... 52

*United States v. President & Fellows of Harvard Coll.*,
　323 F. Supp. 2d 151 (D. Mass. 2004)............................................................... 85

*United States v. Priola*,
　272 F.2d 589 (5th Cir. 1959)............................................................................ 95

*United States v. Quicken Loans Inc.*,
　239 F. Supp. 3d 1014 (E.D. Mich. 2017)..................................................... 75, 87

*United States v. Romans*,
　823 F.3d 299 (5th Cir. 2016)............................................................................ 17

*United States v. Southland Mgmt. Corp.*,
    326 F.3d 669 (5th Cir. 2003)...................................................................... 60

*United States v. St. John*,
    625 F. App'x 661 (5th Cir. 2015)............................................................... 96

*United States v. St. Joseph Reg'l Health Ctr.*,
    240 F. Supp. 2d 882 (W.D. Ark. 2002)...................................................... 23

*United States v. Villaspring Health Care Ctr., Inc.*,
    No. 3:11-43, 2011 WL 6337455 (E.D. Ky. Dec. 19, 2011).......................... 86

*United States v. Wise*,
    370 U.S. 405 (1962)................................................................................... 97

*United States v. Wurts*,
    303 U.S. 414 (1938)................................................................................... 98

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016)............................................................................. passim

*Walden v. Fiore*,
    571 U.S. 277 (2014).................................................................... 20, 22, 26

*Warfield v. KR Ent., Inc. (In re Fed. Fountain, Inc.)*,
    165 F.3d 600 (8th Cir. 1999)...................................................................... 23

*Washington v. Morad*,
    No. 15-868, 2016 WL 7187932 (E.D. La. Dec. 12, 2016) ........................... 28

*Whitfield v. United States*,
    543 U.S. 209 (2005)................................................................................... 17

*Wiliams v. Tava Ventures, Inc.*,
    No. 3:23-CV-0854, 2024 WL 620366 (N.D. Tex. Feb. 14, 2024)................ 13

## STATUTES

15 U.S.C. § 22................................................................................................... 11

15 U.S.C. § 636(a)(36)(A)(vii)(II)(aa)............................................................... 66

15 U.S.C. § 636(a)(36)(F)(ii)(II) ....................................................................... 66

15 U.S.C. § 636(a)(36)(P)................................................................................... 47

15 U.S.C. §636(a).............................................................................................. 1

15 U.S.C.§ 636(a)(36)(A)(vii)(I)(GG)................................................................ 66

18 U.S.C. § 1965................................................................................. 11, 12, 27

18 U.S.C. § 1965(a)–(b)..................................................................................... 27

18 U.S.C. §§ 1961–1968 .................................................................................... 11

28 U.S.C. § 1404(a) .......................................................................................... 23

28 U.S.C. § 1406(a) ...................................................................................... 3, 18

31 U.S.C. § 3729(a)(1)(A) ....................................................................... passim

31 U.S.C. § 3729(a)(1)(B) ....................................................................... passim

31 U.S.C. § 3729(a)(1)(C) ....................................................................... passim

31 U.S.C. § 3729(b) .......................................................................................... 67

31 U.S.C. § 3729(b)(1) ..................................................................................... 60

31 U.S.C. § 3729(b)(1)(A) ............................................................................... 54

31 U.S.C. § 3729(b)(1)(B) ......................................................................... 90, 95

31 U.S.C. § 3729(b)(4) ..................................................................................... 74

31 U.S.C. § 3729(b)(4). .................................................................................... 73

31 U.S.C. § 3730(a) .......................................................................................... 14

31 U.S.C. § 3730(b) .......................................................................................... 14

31 U.S.C. § 3730(d)(1) ..................................................................................... 14

31 U.S.C. § 3731(c) .................................................................................... 13, 18

31 U.S.C. § 3732(a) ................................................................................... passim

31 U.S.C. §§ 3729–3733 .................................................................................... 1

85 Fed. Reg. 20811, 20815 (Apr. 15, 2020) ................................................... 52

S. Rep. No. 99-345,
    *reprinted in* 1986 U.S.C.C.A.N. 5266 .................................... 10, 12, 25, 95

## OTHER AUTHORITIES

14D Charles Alan Wright, Arthur R. Miller, *et al.*,
    *Federal Practice and Procedure (Jurisdiction and Related Matters)* § 3826
    (4th ed. 2013) ............................................................................. 4, 8, 16, 17

4 Charles Alan Wright, Arthur R. Miller, *et al.*,
    *Federal Practice and Procedure (Civil)* § 1068.1 (4th ed. 2015) ................................. 21

Claire M. Sylvia,
    *The False Claims Act: Fraud Against the Government* § 10:52 .................................... 12

## RULES

Fed. R. Civ P. 4(k)(1)(C) ...........................................................................................26, 29

Fed. R. Civ. P. 12(b)(6) ............................................................................................ passim

Fed. R. Civ. P. 15(a) ...........................................................................................3, 105

Fed. R. Civ. P. 4(k)(1)(A) ...................................................................................22, 24, 26

Fed. R. Civ. P. 8 ..............................................................................................................3

Fed. R. Civ. P. 9(b) ................................................................................................... passim

Fed. R. Evid. 201(b) ...................................................................................................71

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 .......................................................................................21

## INTRODUCTION

Plaintiff, the United States of America (the "United States" or the "Government") by and through undersigned counsel, hereby opposes Defendants' Joint Motion to Dismiss the United States' Complaint in Intervention (ECF No. 66, the "Joint Motion"), Defendant Kathryn Petralia's Motion to Dismiss the United States' Complaint in Intervention (ECF No. 65, "Petralia Motion"); Defendant Spencer Robinson's Motion to Dismiss the Complaint in Intervention for Improper Venue, Lack of Personal Jurisdiction, and Failure to State a Claim (ECF No. 67, "Robinson Motion"), and Defendant Robert Frohwein's Motion to Dismiss the United States' Complaint in Intervention (ECF No. 68, "Frohwein Motion").  Due to considerable overlap of issues and arguments in the Defendants' briefs, the United States submits this Omnibus Opposition in response to all four motions.

Each of the Defendants, Kathryn Petralia, Robert Frohwein, and Spencer Robinson (collectively, the "Defendants"), knowingly violated the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA"), and common law by submitting, causing the submission of, and conspiring to submit false claims and statements to the United States when they owned, operated, and controlled the now-liquidated financial technology company Kabbage, Inc. ("Kabbage").  At the beginning of the COVID-19 pandemic in March 2020, Kabbage was facing imminent financial ruin.  The Defendants, all former executives of Kabbage with significant personal financial interests in the company, seized the opportunity created by the Paycheck Protection Program ("PPP") to salvage their interests.  On March 27, 2020, Congress created the PPP under section 7(a) of the Small Business Act as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to provide expedited emergency relief to small businesses affected by the COVID-19 pandemic, and entrusted private lenders to make PPP loans to eligible borrowers in compliance with PPP requirements.  ECF No. 40 ("USG Compl." or "Government's Complaint") ¶¶ 17–18.  So long as

lenders, like Kabbage, adhered to the PPP requirements and submitted claims and certifications to the SBA for forgiveness or guaranty purchase payments, SBA would make payment of the loan principal plus outstanding interest to the lender upon the lender's request.  USG Compl. ¶ 19.

Each of the Defendants personally participated in the scheme to illegally obtain processing fees and loan forgiveness and guaranty purchase payments for loans that did not comply with program requirements, so they could line their pockets with lucrative payouts that likely would not have existed but for Kabbage's—and Defendants'—systematic loan calculation errors and compliance failures.  Each Defendant's individual contributions to, and knowledge of, this misconduct is detailed in the Government's Complaint in Intervention.  In particular, the Government's Complaint details how each Defendant directed and controlled the operations of Kabbage, knew that Kabbage systematically miscalculated PPP loans and misrepresented its deficient loan review procedures, and despite that knowledge, pushed Kabbage to pump out ever more PPP loans without correcting those deficiencies.  The description of Defendants' fraudulent conduct in the Government's Complaint exceeds every element and purpose of Rules 8(a)(2) (to plead claims plausibly) and 9(b) (to plead fraud with particularity and scienter generally).  It gives Defendants fair notice to prepare a defense and is not a pretext for discovering unknown wrongs. *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190–91 (5th Cir. 2009).

Confronted with the particularized allegations in the Government's Complaint, in four briefs, Defendants jointly move to dismiss on three overlapping grounds.  *First*, Defendants argue the Complaint does not adequately allege personal jurisdiction as to any Defendant, and venue is improper in this district (Petralia Mot. 6–10; Robinson Mot. 3–9; Frohwein Mot. 6–16). [1] *Second*,

---

[1]     Page references are to the page numbers of the cited motions, located at the bottom of the page, not to the page numbers applied by ECF.

Defendants claim that the Complaint does not plead the elements of 31 U.S.C. § 3729(a)(1)(A) (presentment); (a)(1)(B) (false statements); and (a)(1)(C) (conspiracy) under the FCA either plausibly or with particularity. *Lastly*, Defendants Petralia and Frohwein claim that the Complaint does not adequately plead common law claims (Petralia Mot. 22–25; Frohwein Mot. 24–25). Despite the voluminous briefing, Defendants' arguments fail. For the reasons set forth herein, the United States respectfully requests that this Court deny Defendants' motions to dismiss.[2]

## ISSUES PRESENTED

1) Venue is proper in this Court under 31 U.S.C. § 3732(a) because original *qui tam* defendant Kabbage was transacting business in the Eastern District of Texas when the lawsuit was filed in 2021 and because violations of the FCA occurred here.

2) All Defendants live in the United States; therefore, this Court has personal jurisdiction over all Defendants and should deny Defendants' 12(b)(3) motions for dismissal.

3) The Government's Complaint pleads with sufficient particularity claims against each Defendant under the FCA, 31 U.S.C. §§ 3729(a)(1)(A) (presentment), (a)(1)(B) (false statements), and (a)(1)(C) (conspiracy).

4) The Government's Complaint pleads with sufficient particularity common law claims for unjust enrichment and payment by mistake against all Defendants.

## DEFENDANTS' RULE 12(b)(2) AND (b)(3) MOTIONS FAIL

Defendants have individually moved to dismiss this case under Rule 12(b)(2) (personal jurisdiction) and (b)(3) (venue) based on similar—and similarly flawed—arguments. *See*

---

[2]    Should this Court conclude that venue is improper the United States respectfully requests, alternatively, that the Court transfer this action pursuant to 28 U.S.C. § 1406(a) to a district with venue, or grant the United States leave to amend pursuant to Fed. R. Civ. P. 15(a). The United States similarly requests leave to amend under Rule 15(a) should this Court conclude that any claim in the Complaint fails to satisfy the requirements of Fed. R. Civ. P. 8 or 9(b).

Robinson Mot. 9–16; Frohwein Mot. 4, 9–15; Petralia Mot. 6–10.  As a preliminary matter, all three Motions incorrectly assume that the United States was required to state explicitly in its Complaint all bases for its choice of venue, which it is not.  *See* 14D Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice and Procedure (Jurisdiction and Related Matters) § 3826 (4th ed. 2013); *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724 (3d Cir. 1982) (explaining that because improper venue is an "affirmative dilatory defense," defendants must allege facts showing the absence of venue); *Intell. Ventures II LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG, 2017 WL 5630023, at *5 (E.D. Tex. Nov. 22, 2017) (burden of establishing improper venue is on defendant).

In this FCA action, 31 U.S.C. § 3732(a) governs which federal district courts have venue and empowers those courts to exercise personal jurisdiction over all defendants, wherever located, subject to the limits of due process.  Although each Defendant complains about his or her supposed lack of "contacts" with Texas or the Eastern District of Texas, section 3732(a) plainly gives this Court authority to adjudicate FCA claims against all Defendants for at least two reasons.  First, a district court has venue and personal jurisdiction if "any one defendant" was "transact[ing] business" in the district when the lawsuit is filed.  31 U.S.C. § 3732(a).  This Court therefore has venue over the Defendants because original *qui tam* defendant Kabbage was transacting business in the Eastern District of Texas when this lawsuit was filed in 2021.  Second, section 3732(a) gives venue and personal jurisdiction to the district court where "any act proscribed by section 3729 occurred," regardless of the Defendants' contacts with the judicial district.  This Court has venue and personal jurisdiction because, as alleged in the Government's Complaint numerous acts constituting FCA violations occurred in the Eastern District of Texas because Kabbage approved and facilitated PPP loans here.  *Id.*  What is more, not one Defendant alleges sufficient facts for this Court to conclude that he or she was not personally "transact[ing] business in this district" in 2021, when this suit was filed.

Moreover, this Court's exercise of personal jurisdiction over the Defendants comports with the due process clause of the Fifth Amendment because all three live in the United States. No more is required under the "national contacts" analysis that applies in FCA cases, *see, e.g.*, *United States ex rel. Tucker v. Christus Health*, No. 09-1819, 2012 WL 5351212, at *2 (S.D. Tex. Oct. 23, 2012), or in any case where a federal court sitting in federal question jurisdiction is empowered with nationwide service of process under a federal statute, *see Double Eagle Energy Servs., LLC v. MarkWest Utica EMG, LLC*, 936 F.3d 260, 264 (5th Cir. 2019), as this Court is under 31 U.S.C. § 3732(a). Citing no authority and offering no persuasive analysis, the Defendants argue that this Court's personal jurisdiction is limited by the state-centric "minimum contacts" analysis that applies to state courts, and to federal courts sitting in diversity jurisdiction, under the due process clause of the Fourteenth Amendment. That is incorrect.

For the following reasons, Defendants' Rule 12(b)(2) and (b)(3) motions should be denied.

## I. FACTS AND ALLEGATIONS RELEVANT TO VENUE AND PERSONAL JURISDICTION

### A. Procedural History of This *Qui Tam* Action.

On February 5, 2021, Relator Paul Pietschner ("Relator") filed a *qui tam* complaint naming as Defendants Kabbage, Inc. ("Kabbage"), Kathryn Petralia ("Petralia"), Robert Frohwein ("Frohwein"), and Spencer Robinson ("Robinson"). Complaint, ECF No. 1 ("Relator Complaint"). Relator's Complaint alleged that Kabbage fraudulently approved PPP loans, and in so doing presented or caused the presentment of false claims to SBA, and made or caused false statements to SBA, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). Relator Compl. ¶¶ 233–235. Relator alleged that Petralia, Kabbage's co-founder and President, Frohwein, Kabbage's co-founder and Chief Executive Officer ("CEO") and Robinson, Kabbage's Head of Strategy, directed and controlled Kabbage's fraudulent activities—and, that each benefitted

personally from the fraud, which directly enlarged their multi-million-dollar payouts when American Express, Inc. ("Amex") purchased Kabbage's assets in late 2020.  Relator Compl. ¶¶ 13–16; *see also* USG Compl. ¶¶ 59, 70, 80.

On May 9, 2024, the United States partially intervened in Relator's *qui tam* action for purposes of settlement with Kabbage, and on June 12, 2024, this Court dismissed the claims against Kabbage pursuant to the parties' stipulation.  ECF Nos. 29 (notice of intervention), 30 (joint stipulation of partial dismissal as to Kabbage), and 31 (order of dismissal as to Kabbage). On August 26, 2024, the United States noticed intervention as to the remaining defendants, Petralia, Frohwein, and Robinson, and obtained from this Court an extension of time to file its Complaint.  ECF Nos. 34 (notice of intervention), 38 (order granting extension of time).

On December 20, 2024, the United States filed a Complaint in Intervention against the remaining Defendants, Frohwein, Petralia, and Robinson.  USG Compl.  The Government's Complaint alleges that each Defendant committed violations of three different subparts of the FCA:  presenting, or causing the presentment of, false claims for payment to SBA in violation of 31 U.S.C. § 3729(a)(1)(A) (Count I, USG Compl. ¶¶ 330–337); making or using, or causing to be made or used, false statements material to false claims to SBA in violation of 31 U.S.C. § 3729(a)(1)(B) (Count II, USG Compl. ¶¶ 338–344); and conspiracy to defraud the Government in violation of 31 U.S.C. § 3729(a)(1)(C) (Count III, USG Compl. ¶¶ 345–353).  The Government also alleges against Defendants common law claims for unjust enrichment and payment by mistake based on the same FCA-related conduct.  Counts IV and V, USG Compl. ¶¶ 354–364.

B.    **Defendants' Nationwide Fraud**

From April to October 2020, the Defendants knowingly defrauded the United States by approving ineligible PPP loans in all 50 U.S. states, including in the Eastern District of Texas.

When Relator filed his Complaint in 2021, Kabbage,[3] doing business as KServicing, was making new PPP loans, in addition to actively providing online financial services to PPP borrowers in all 50 U.S. states, including in Texas and in this judicial district.   Relator Compl. ¶¶ 11–13; USG Compl., ¶ 339.   Kabbage processed PPP loan applications from borrowers nationwide, including from borrowers in Tyler, Plano, and Beaumont, Texas, *see* USG Compl. ¶¶ 6, 317, 327,[4] and serviced these PPP loans until 2022 or 2023.   *Id.* ¶¶ 81, 339.

Each PPP loan Kabbage approved involved multiple transmissions of information to and from the borrower's location.   Kabbage marketed its services nationwide, including in Texas.   The prospective PPP borrower, wherever located, submitted responses to Kabbage's questions and uploaded supporting documents on Kabbage's online lending platform.   USG Compl. ¶ 84.   Once approved through Kabbage's fraudulent process, borrowers nationwide received PPP loan funds. Moreover, for the PPP loans that Kabbage fraudulently approved, SBA received from borrowers nationwide, including in Texas, false claims for forgiveness payments, which resulted in payments by SBA to the lenders.

As alleged in the Government's Complaint, Defendants together "directed and controlled Kabbage and its participation in the PPP" and shared responsibility for "overseeing all Kabbage employees and Kabbage's day-to-day operations."  USG Compl. ¶¶ 59, 70.   Kabbage co-founders Petralia and Frohwein lived in Georgia when Relator filed his Complaint, as did Robinson, Kabbage's Head of Strategy.   Relator Compl. ¶¶ 14–16; Frohwein Mot. 4; Petralia Mot. 7.[5]

---

[3]      As alleged in the Relator's Complaint, ¶ 11, Kabbage was a Delaware corporation with a principal place of business in Georgia.

[4]      The fraudulent loans to Plano, Texas, borrowers listed in the Government's Complaint are representative examples only.

[5]      Frohwein and Robinson subsequently moved to California and Florida, respectively.   Frohwein Mot. 4; Robinson Mot. 6; USG Compl. ¶¶ 11–12.

Regardless of their location, however, each of the Defendants personally engaged in conduct to direct, control, and oversee the fraudulent aspects of Kabbage's PPP business nationwide, including activities in the state of Texas and in this judicial district. USG Compl., ¶¶ 294–329 (examples of PPP loans in this district). And, each Defendant engaged in conduct with knowledge that his or her conduct caused the submission of false certifications to the SBA, resulting in SBA's payment of millions of dollars of processing fees, forgiveness payments, and guaranty purchase payments in connection with fraudulent PPP loans nationwide. USG Compl. ¶¶ 48–50. The end game of Defendants' fraud was to leverage Kabbage's PPP earnings to sell Kabbage's assets, and when they succeeded each Defendant personally earned millions from the sale. USG Compl. ¶¶ 79–80. Those gains resulted directly from Kabbage's nationwide PPP business, including the loans Kabbage made in this district.

## II. LEGAL STANDARD

Once a defendant has moved to dismiss under Rule 12(b)(2) or (b)(3), the plaintiff must show, respectively, that venue and the exercise of personal jurisdiction are proper. *Daughtry v. Silver Fern Chem., Inc*., No. 1:23-cv-343, 2024 WL 2211005, at *6 (E.D. Tex. May 16, 2024) (personal jurisdiction); *Langton v. Cbeyond Comm., LLC*, 282 F. Supp. 2d 504, 508 (E.D. Tex. 2003) (venue). In a pre-discovery challenge, the plaintiff may establish personal jurisdiction and venue based solely on allegations. *See Savoie v. Pritchard*, 122 F.4th 185, 190 (5th Cir. 2024) (personal jurisdiction); *Langton*, 282 F. Supp. 2d at 508 (venue).

Because improper venue is an affirmative defense, the plaintiff is not required to include allegations in its complaint showing that venue is proper. 14D Wright & Miller, Federal Practice and Procedure § 3826; *Myers*, 695 F.2d at 724 (explaining that because improper venue is an "affirmative dilatory defense," defendants must allege facts showing the absence of venue); *Reyes v. JA & M Developing Corp.*, No. 12-61329-CIV, 2012 WL 3562024, at *3 (S.D. Fla. Aug. 17,

2012) ("The Complaint itself is not required to include allegations showing venue to be proper.");
*Intell. Ventures*, 2017 WL 5630023, at *5 (burden of establishing improper venue is on defendant).
In evaluating whether venue is proper, a court is not limited to the statement of venue in the complaint, if any, but may consider allegations in the complaint and matters outside the complaint.
*Est. of Abtan v. Blackwater Lodge & Training Ctr.*, 611 F. Supp. 2d 1, 10–11 (D.D.C. 2009).

As for personal jurisdiction, "[t]he plaintiff bears the burden of establishing a district court's jurisdiction over a non-resident, but it need only make a prima facie case if the district court rules without an evidentiary hearing." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  Proof by a preponderance of the evidence is not required. *Id.*  In evaluating a challenge to personal jurisdiction, courts "accept as true the uncontroverted allegations in the complaint and resolve in favor of [plaintiff] any factual conflicts." *Conn Appliances, Inc. v. Williams*, 936 F.3d 345, 347 (5th Cir. 2019) (quoting *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 539 (5th Cir. 2019)).  If plaintiff establishes the requisite contacts with the forum, the burden shifts to the defendant to show that "asserting jurisdiction would offend traditional notions of fair play and substantial justice." *Hess v. Bumbo Int'l Tr.*, 954 F. Supp. 2d 590, 593 (S.D. Tex. 2013).

## III.  ARGUMENT

### A.  Under the FCA, Personal Jurisdiction Is Coterminous with Venue.

Section 3732(a) of the FCA governs which federal judicial districts are a proper venue for a given FCA action, as well as which federal district courts may exercise personal jurisdiction over the defendants.  That provision states:

> Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United

States.

31 U.S.C. § 3732(a).

The first sentence is a venue provision that limits the federal districts in which "an action under § 3730 may be commenced." *See United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861, 865 (2d. Cir 1997). Under its plain language, an FCA action may proceed in "any judicial district where the defendant transacts business." *United States ex rel. Grand v. Northrop Corp.*, 811 F. Supp. 330, 331–32 (S.D. Ohio 1992) (FCA venue statute does not require courts to weigh a defendant's contacts with one district as compared to another).

The second sentence addresses personal jurisdiction. Described by Courts and Congress as "basically a form of long-arm statute," *Thistlethwaite*, 110 F.3d at 868 (quoting S. Rep. No. 345, 99th Cong. 2d Sess. 32 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5297), the second sentence authorizes an "appropriate district court" to issue summons "at any place within or outside the United States." As is clear from context and case law, the phrase "appropriate district" in the second sentence refers back to "any judicial district" in which "an action may be brought" in the first sentence of section § 3732(a). *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 976 F. Supp. 207, 210 (S.D.N.Y. 1997); *United States ex rel. Krohn v. Sun W. Servs., Inc.*, No. 97-0644, 2000 WL 36739959, at *6 (D.N.M. Apr. 11, 2000).

Taken together, these two sentences make personal jurisdiction "congruent with venue" for purposes of FCA cases. *Thistlethwaite*, 110 F.3d 861 at 867 . In other words, if an FCA lawsuit is filed in a judicial district where venue lies, then the court may exercise personal jurisdiction over all defendants. [6] The FCA is not the only federal statute that makes personal jurisdiction and venue

---

[6]    Consistent with this principle, the United States does not contend that this Court should exercise personal jurisdiction over Defendants unless this Court concludes it has venue under 31 U.S.C.§ 3732(a). The Robinson Motion (at 2–5) and the Frohwein Motion (at 9–10, 15–

a "package deal."[7]

In a multi-defendant FCA case, venue lies wherever any *one* of the defendants in the action resides or transacts business, or where "any act proscribed by" the FCA "occurred," even if no defendant resides or transacts business there.  *See* 31 U.S.C. § 3732(a); *United States ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330, 336 (W.D.N.Y. 1998) (allegation that one defendant transacts business in the district sufficient to establish venue in a multi-defendant action in the district); *United States ex rel. Sandager v. Dell Marketing, L.P.*, 872 F. Supp. 2d 801, 806 (D. Minn. 2012) (just one defendant must transact business in district for venue).  This Court has interpreted RICO, 18 U.S.C. § 1965, similarly, concluding that this provision "allow[s] for nationwide service of process and personal jurisdiction over any other party" if at least one

---

16) both acknowledge the connection between venue and personal jurisdiction under the FCA but argue that venue is lacking.  The Petralia Motion (at 7) mentions the connection between venue and personal jurisdiction under the FCA but then makes arguments about personal jurisdiction that ignore FCA's nationwide service of process language (at 8).  The United States contends that venue is proper under 31 U.S.C. § 3732(a), giving this Court nationwide service of process and, by extension, personal jurisdiction over all Defendants.

[7]    The Clayton Act, 15 U.S.C. § 22, similarly specifies certain judicial districts where a lawsuit under the antitrust laws may be brought and then authorizes nationwide service of process by those judicial districts, making personal jurisdiction congruent with venue.  *See KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 730 (7th Cir. 2013) ("[W]e hold that Section 12 must be read as a package deal.  To avail oneself of the privilege of nationwide service of process, a plaintiff must satisfy the venue provisions of Section 12's first clause."); *see also Busch v. Buchman, Buchman & O'Brien*, 11 F.3d 1255, 1257–1258 (5th Cir. 1994) (venue is coextensive with personal jurisdiction in a case arising under 1934 Securities Exchange Act); *Luallen v. Higgs*, 277 F. App'x 402, 405 (5th Cir. 2008) (same); *Double Eagle Energy Servs., LLC v. MarkWest Utica EMG, LLC*, 936 F.3d 260, 264 (5th Cir. 2019) (noting that Bankruptcy Rule 7004 authorizes nationwide service of process, giving bankruptcy courts personal jurisdiction over any person with sufficient contacts with the United States); *Hernandez v. Vanderbilt Mortg. & Fin., Inc*., No. C-10-67, 2010 WL 1875796, at *4 (S.D. Tex. May 6, 2010) (Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO") authorizes nationwide service of by proper district court); *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 685 (E.D. Tex. 2020) (same).

defendant meets the requirements of that section.[8] *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 685 (E.D. Tex. 2020).

The FCA's current venue and service provision, enacted as part of the 1986 amendments to the FCA, was intended to allow for "more efficient litigation" of cases with multiple defendants involving the "same or similar conduct." Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 10:52 (quoting S. Rep. No. 99-345, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5297). The 1986 amendments recognized the reality—well-illustrated here—that many FCA suits "involve several defendants and only infrequently can all defendants be 'found' in any one judicial district." 1986 U.S.C.C.A.N. at 5297. And those amendments rejected a more restrictive view of jurisdiction and venue that would require the Government to "file multiple suits involving the same scheme or pattern of fraudulent conduct" because it would "increase the cost to the Government to pursue these cases and have a comparable impact upon the judicial resources required for a complete adjudication." *Id.*

**B.    In an FCA *Qui Tam* Lawsuit, Venue Is Determined at the Time the Relator Filed the *Qui Tam* Complaint, Based on the Parties Named in the *Qui Tam* Complaint.**

All three Defendants' motions ignore the procedural history of this case and assume—incorrectly—that venue in a FCA *qui tam* lawsuit is determined at the time the United States intervenes, based on the defendants named in the Government's Complaint. *See* Frohwein Mot. 9–11 (referencing the Government's Complaint only and asserting inaccurately that "the

---

[8]    Notably, the FCA, 31 U.S.C. § 3732(a), includes a broader grant of venue than RICO, 18 U.S.C. § 1965, because nothing in the RICO provision establishes venue based solely on the location of the violation.

Government chose to file this lawsuit in this district in 2024[9]); Petralia Mot. 9–10; Robinson Mot

6 (contending that Kabbage is not a defendant and focusing on the Government's Complaint).

Defendants do not dispute, and therefore concede, that venue in this action was proper in 2021,

when the Relator initiated this action and Kabbage was included among the defendants.

It is well-settled in the Fifth Circuit that "venue is determined at the outset of litigation and

is not affected by subsequent events." *Moler v. Wells*, 18 F.4th 162, 166 n.7 (5th Cir. 2021)

(quoting *Smilde v. Snow*, 73 F. App'x 24, 26 (5th Cir. 2003)). Moreover, the relevant parties for

purposes of venue are the parties named in the complaint filed at the outset of the suit. *See Horihan*

*v. Hartford Ins. Co. of the Midwest*, 979 F. Supp. 1073, 1076 (E.D. Tex. 1997) (proper venue "is

determined at the time the complaint is filed and is not affected by a subsequent change of parties"

(quoting *Sidco Indus., Inc. v. Wimar Tahoe Corp.*, 768 F. Supp. 1343, 1346 (D. Or. 1991)); *see*

*also Wiliams v. Tava Ventures, Inc.*, No. 3:23-CV-0854, 2024 WL 620366, at *1–2 (N.D. Tex.

Feb. 14, 2024) ("[D]istrict courts in Texas have, for the most part, agreed that the district in which

proper venue lies is not affected by a subsequent change of parties."). "Because subsequent

changes in the parties do not affect venue," the exit of an originally named defendant from the

lawsuit is "immaterial to the determination of whether this case is properly before this court."

*Horihan*, 979 F. Supp. at 1076.

A *qui tam* lawsuit like this one is initiated when the relator files a complaint—a fact that is

clear from the docket in this case, which the Court opened in 2021 when Relator filed this action

---

[9]    The Frohwein Motion (at 11 & n.10) would make hay of the common practice of the U.S. Department of Justice, Civil Division, and the U.S. Attorney's Office for the Eastern District of Texas of issuing a press release upon filing of a False Claims Act complaint or complaint-in-intervention. That motion also mischaracterizes the procedural history of this case by suggesting that the "Government chose to file this lawsuit" in December 2024; as is clear from the docket, this case was filed by Relator in 2021. The Government twice intervened in Relator's lawsuit before filing its Complaint in Intervention, which is deemed to relate back to the filing date of the Relator's original complaint under 31 U.S.C. § 3731(c).

against Kabbage, Petralia, Frohwein, and Robinson.  *See* Relator Compl.  Moreover, the text of the FCA, 31 U.S.C. § 3730(b) (Actions by Private Persons), makes clear that it is the relator who "bring[s] a civil action" under this section, and that if the Government "elect[s] to intervene" it "proceeds with the action" that the relator previously filed.  Nothing in § 3730(b) suggests that the Government's decision to intervene in a *qui tam* somehow discontinues the relator's lawsuit and initiates a new one.

In fact, an entirely separate provision—§ 3730(a)—concerns actions filed by the Attorney General in the first instance.  As recognized by the Supreme Court in *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 477 (2007), there is a "sharp distinction between actions brought by the Attorney General under § 3730(a)" in the absence of a *qui tam*, and "actions brought by a private person under § 3730(b)."  The Court explained:

> An action brought by a private person does not become one brought by the Government just because the Government intervenes and elects to "proceed with the action."  Section 3730 elsewhere refers to the Government's "proceed[ing] with an action brought by a person under subsection (b)"—which makes crystal clear the distinction between actions brought by the Government and actions brought by a relator where the Government intervenes but does not oust the relator.  § 3730(d).

*Id.* at 477–478.  Thus, contrary to what Defendants suggest in their motions, the Government's decision to intervene in a *qui tam* action filed under § 3730(b) does not transform a *qui tam* into a new lawsuit filed in the first instance by the Government under § 3730(a).  Rather, when the Government intervenes, it "proceeds with" a pre-existing "action brought by a person under subsection (b)."  31 U.S.C. § 3730(d)(1).  Accordingly, the venue for this case was determined on the date Relator filed this *qui tam* action, with Kabbage as a named defendant.  *See Horihan*, 979 F. Supp. at 1076.

### C.    The Requirements of 31 U.S.C. § 3732(a) Are Satisfied in This Case.

1.    Venue Is Proper Because Original *Qui Tam* Defendant Kabbage Was Transacting Business in This District When This *Qui Tam* Case Was Filed in 2021.

Defendants' venue challenges ignore that Kabbage was a named defendant in this action when it was filed, and that at that time Kabbage was "transacting business" in the Eastern District of Texas ("EDTX") as required by 31 U.S.C. § 3732(a).  This action began in 2021, when Kabbage was still in business making and servicing the PPP loans that it made and facilitated, including loans made in EDTX.  USG Compl. ¶ 81.  Kabbage continued to be a party to this action until 2024, when it settled its potential liability with the United States, the United States intervened in part as to Kabbage to effectuate the settlement, and this Court dismissed Kabbage from this action.  *See* ECF Nos. 29, 30, and 31.  Kabbage's 2021 business activities in EDTX are sufficient to establish venue over this entire action because 31 U.S.C. § 3732(a) is satisfied if any one defendant meets its criteria.  Kabbage's departure from this action by settlement has no effect on the venue determination.  *See Horihan*, 979 F. Supp. at 1076.

Not one of the Defendants' motions disputes, and therefore all three Defendants must be deemed to concede, that venue was proper over Kabbage when Relator brought this *qui tam* action on February 5, 2021.  *See, e.g.*, Petralia Mot. 10 (referencing Kabbage's business in the EDTX but disputing that it can be "imputed to individual executives"); Frohwein Mot. 10 (asserting that "Kabbage is not a party to this lawsuit," ignoring that Kabbage *was* a party until this Court dismissed it from this lawsuit upon settlement of the claims against it; not denying that Kabbage transacted business in the EDTX in 2021); Robinson Mot. 6 (contending that Kabbage's business operations ceased in December 2024 but not disputing that Kabbage was a going concern conducting business in EDTX in 2021).  Thus, all three Defendants' Rule 12(b)(3) motions fail.

2. <u>Venue Lies in EDTX Because FCA Violations Occurred Here.</u>

Although no more is needed, venue lies in this Court for an additional, independent reason: the FCA violations alleged in this action involve "act[s] proscribed by section 3729 [that] occurred" in EDTX. 31 U.S.C. § 3732(a); Relator Compl. ¶ 10.[10] Kabbage originated PPP loans throughout the United States, including to PPP borrowers in the EDTX. Relator Compl. ¶ 12; USG Compl. ¶¶ 6, 317, 327 (identifying fraudulent loans to borrowers in Plano, TX).

Each and every fraudulent loan transaction with a PPP borrower in the EDTX involved actions prohibited by various subparts of 31 U.S.C. § 3729. In violation of § 3729(a)(1)(A), Defendants caused those Texas borrowers to submit false claims for forgiveness and to receive false forgiveness payments from SBA. USG Compl. ¶¶ 330–337 (presentment count). In violation of § 3729(a)(1)(B), Defendants caused those Texas borrowers to make or submit false statements to SBA. *Id.* ¶¶ 338–344 (false statements and records count). Moreover, these fraudulent loan transactions occurred because Kabbage, at the direction and under the control of Defendants, marketed Kabbage's fraudulent PPP services nationwide, including in EDTX. *Cf. Busch v. Buchman, Buchman & O'Brien*, 11 F.3d 1255, 1257 (5th Cir. 1994) (rejecting defendant's argument that because defendant "drafted documents in New York for a promoter in New York, it is not responsible for [the promoter's] subsequent nationwide mailing of the prospectus" that

---

[10]    The Robinson Motion (at n.2) suggests that the United States may not rely on the FCA violations that occurred in the EDTX as a result of Defendants' scheme and identified in the Government's Complaint because the Complaint does not expressly state that these are a basis for venue. This argument fails because a plaintiff is not required to identify any basis for venue in its complaint. 14D Wright & Miller, Federal Practice and Procedure § 3826; *Reyes*, 2012 WL 3562024, at *3 ("The Complaint itself is not required to include allegations showing venue to be proper."). To evaluate Defendants' venue challenge, this Court can and should consider *all* allegations in the Complaint (not just those that happen to be expressly labeled "venue") and may properly consider evidence outside the complaint if needed. *See Est. of Abtan v. Blackwater Lodge & Training Ctr.*, 611 F. Supp. 2d 1, 11 (D.D.C. 2009). Because Defendants do not dispute, and therefore concede, the facts relevant to venue, the Court need not consider extrinsic evidence to reject Defendants' venue challenges.

reached an investor in Texas, because "this parochial view of the facts belies the realities of the business transaction"). That establishes venue in EDTX, and therefore also personal jurisdiction under 31 U.S.C. § 3732(a).

Additionally, all of Kabbage's interactions with those borrowers were overt acts in furtherance of the conspiracy under § 3729(a)(1)(C) USG Compl. ¶¶ 345–359 (conspiracy count). Venue exists wherever the conspiracy agreement was formed or wherever an act in furtherance of the conspiracy occurred. *Hyde v. United States*, 225 U.S. 347, 363–64 (1912); *United States v. Mayo*, 721 F.2d 1084, 1089 (7th Cir. 1983) (collecting cases in support of the "general conspiracy law principle which allows for venue in any district where the agreement occurred or any district where an overt act, in furtherance of the agreement, occurred."); *United States v. Romans*, 823 F.3d 299, 310 (5th Cir. 2016). This rule applies even where an overt act is not a required element of the particular conspiracy offense. *Whitfield v. United States*, 543 U.S. 209, 218 (2005). Thus, a co-conspirator can be tried in a district where he has never set foot. *Hyde*, 225 U.S. at 365–67; *United States v. Caldwell*, 16 F.3d 623, 624 (5th Cir. 1994) (in conspiracy cases, "venue is proper in any district where the agreement was formed, or an overt act occurred, . . . even where it permits trial against defendants in a district in which they never set foot").

Thus, this Court has venue and personal jurisdiction in this case under 31 U.S.C. § 3732(a).

### 3. Not One of the Defendants Has Meaningfully Disputed That He or She Transacts Business in EDTX.

Although no more is needed, Defendants' motions focus on a single potential basis for the Court's venue over this case—their business transactions with EDTX or Texas at the relevant time —but fail to meet their burden to establish that these contacts do not exist. *See* 14D Wright & Miller, Federal Practice and Procedure § 3826; *Myers*, 695 F.2d at 724 (explaining that because improper venue is an "affirmative dilatory defense," defendants must allege facts showing the

absence of venue); *Intell. Ventures II LLC*, 2017 WL 5630023, at *5.  Defendants were transacting business in EDTX in 2021, which is the date on which this case was filed and the date to which the Government's Complaint-In-Intervention relates back under 31 U.S.C. § 3731(c).  USG Compl. ¶ 7.  Neither the Robinson nor the Petralia Motions contain any facts or allegations to contradict the United States' allegation that they were doing business in EDTX as of 2021 (or, for that matter, in 2024).  USG Compl. ¶ 3.  The Frohwein Motion includes a declaration stating that he does not "presently transact business in Texas" as of March 6, 2025, and did not "when the above-captioned complaint was filed," but offering no actual facts in support of these conclusory statements.  Ex. 1 to Frohwein Mot.  Courts need not credit declarations that contain broad legal or factual assertions unsupported by specific facts, *see Luna v. Davis*, 59 F.4th 713, 716 (5th Cir. 2023), and the Court should not do so here.

## 4.  Transfer, Not Dismissal, Is Appropriate if This Court Finds Venue Lacking.

Should this Court nevertheless conclude that venue is improper, the appropriate remedy is transfer under 28 U.S.C. § 1406(a) and not dismissal.  Under that provision, a court may cure improper venue by transferring the action "to any district or division in which it could have been brought" if "the interest of justice so requires."  28 U.S.C. § 1406(a).  A federal district court does not need personal jurisdiction over the defendant to transfer under section 1406(a).  *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466 (1962).  Courts have wide discretion to transfer and often do so where transfer promotes efficiency or plaintiffs' choice of venue was in good faith and reasonable.  *See, e.g., Ademiluyi v. Nat'l Bar Ass'n*, No.: 15-02947, 2016 WL 4705536, *3 (D. Md. Sept. 8, 2016) ("Dismissal, rather than transfer, may be appropriate in limited circumstances where the plaintiff is harassing the defendants or acting in bad faith or forum shopping."); *Disabled Patriots of Am., Inc. v. Carolina Mall, LLC*, No. 3:08CV550-RJC-DSC, 2009 WL 928688, at *1 (W.D.N.C. Apr. 3, 2009) ("[P]rinciples of judicial efficiency" favor transfer if dismissal "would be followed

by the re-filing of an identical lawsuit . . . .").  Transfer here is "in the interest of justice" because the decision to file this action in EDTX is reasonable and re-filing elsewhere would be inefficient.

### D.    The Exercise of Personal Jurisdiction over Defendants Comports with Due Process.

As the Fifth Circuit has held, "[p]ersonal jurisdiction requires two things:  authorization for service of summons, and a 'constitutionally sufficient relationship' (the 'minimum contacts' test) between the defendant and the forum." *Double Eagle*, 936 F.3d at 264 (*quoting Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)).  Because, as discussed in section III.C above, this Court has venue over this FCA action under 31 U.S.C. § 3732(a), this Court is an "appropriate district" empowered by statute with nationwide service of process and to exercise personal jurisdiction over all defendants in the action.  *See Thistlethwait*e, 976 F. Supp. at 210; *Krohn*, 2000 WL 36739959, at *6 .  Thus, the first requirement for personal jurisdiction (authorization for service of summons) is satisfied here.  *See Double Eagle*, 936 F.3d at 264.  That leaves the second requirement, a "constitutionally sufficient relationship" with the relevant "forum."  *See id.*  Each Defendant asserts that due process requires he or she have "minimum contacts" with either Texas or EDTX, and that such contacts do not exist.  Frohwein Mot. 12–16 (Texas); Petralia Mot. 6–9 (Texas); Robinson Mot. 7–9 (EDTX).

Defendants' arguments are flawed in multiple ways.  Defendants are wrong about the constitutionally relevant forum; where, as here, the Court sits in federal question jurisdiction in a case arising under a federal statute authorizing nationwide service of process, "the forum is the United States."  *See Double Eagle*, 936 F.3d at 264 (further holding that "minimum contacts with the United States (Fifth Amendment due process) suffice; minimum contacts with a particular state (Fourteenth Amendment due process) are beside the point").  Defendants give no persuasive reason and cite no authority for their assertions that a Fourteenth Amendment non-resident due

process analysis (or derivative concepts of 'general jurisdiction,' 'specific jurisdiction,' and 'minimum contacts with a forum *state*') govern this *federal* Court's exercise of personal jurisdiction in this FCA case against U.S. resident defendants.[11]  The so-called 'fiduciary shield' doctrine invoked by Defendants is irrelevant.  For the following reasons, the Court may, consistent with due process, exercise personal jurisdiction over all Defendants as to all claims in this action.[12]

> 1.    The Fifth Amendment Due Process "National Contacts" Analysis Applies.

In actions arising under a federal statute—like the FCA—that authorizes nationwide service of process, the prevailing view among courts is that due process requires that the defendant

---

[11]    The Defendants' arguments to this effect vary.  The Robinson Motion (at 4) asserts that a Fourteenth Amendment due process analysis controls because the FCA limits "venue to districts with which one or more defendants have certain connections," but cites no support for this proposition.  The Petralia (at 6–9) and Frowhein (at 13–16) Motions rely, without analysis, on obviously distinguishable cases involving the exercise of personal jurisdiction by state courts, *e.g.*, *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 258, 262 (2017), federal courts sitting in diversity jurisdiction, *e.g.*, *Seiferth v. Helicopeteros Atuneros, Inc.*, 472 F.3d 266, 270–71 (5th Cir. 2006), federal courts in cases where the court's authority to asset personal jurisdiction is limited by Fed. R. Civ. P. 4(k)(1)(A), *e.g.*, *Walden v. Fiore*, 571 U.S. 277, 283 (2014), and federal courts applying a due process analysis to defendants who are not U.S. residents, *e.g.*, *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 765–69 (S.D.N.Y. 2021).  The Frohwein Motion (at 7) even selectively quotes the Fifth Circuit's opinion in *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009), a diversity case, obscuring that it is applying a Fourteenth Amendment due process analysis and not a Fifth Amendment due process analysis.  The reasons that these cases are inapplicable to FCA cases against U.S. resident defendants are discussed in more detail in section III.D.1, *infra*.

[12]    The Petralia Motion (at n.6) suggests that even if this Court concludes that it has personal jurisdiction of purposes of the FCA claims in this case, it lacks personal jurisdiction over the common law claims in this action.  A federal court may exercise pendant personal jurisdiction over claims for which it lacks independent personal jurisdiction, provided that those claims arise from the same facts.  *See Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008) (noting that "every circuit court to decide the issue has approved pendant personal jurisdiction").  Moreover, the exercise of pendant jurisdiction promotes efficiency and is not unfair to the defendant.  *Id.* ("[A] defendant who already is before the court to defend a federal claim is unlikely to be severely inconvenienced by being forced to defend a state claim whose issues are nearly identical or substantially overlap the federal claim.  Notions of fairness to the defendant simply are not offended in this circumstance.") (quoting 4A Wright & Miller, Federal Practice & Procedure § 1069.7).

have minimum contacts with the United States as a whole, not necessarily with the state or judicial district where the suit is filed.  *See* 4 Charles Alan Wright & Arthur R. Miller, *et al.*, Federal Practice and Procedure (Civil) § 1068.1 (4th ed. 2015) (discussing evolution and rationale of the "national contacts" standard noting that courts have "gravitated toward" that standard in cases where a federal statute authorized nationwide service of process); *see also ESPOT*, 492 F. Supp. 3d at 684) (Jordan, J.) (citing *Busch*, 11 F.3d 1255 at 1258 ).  The reason for this is clear: in such cases federal courts sit as a unit of the national government and apply the law of the United States as the sovereign, not the law of one of the fifty states, as in diversity cases.  *See Pinker v. Roche Holdings, Inc.*, 292 F.3d 361, 369 (3rd Cir. 2002) (collecting cases, stating "consistent with several of our sister courts of appeals, [we] hold that a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts").  State-based territorial limitations that may constitutionally limit a federal court's exercise of personal jurisdiction in diversity cases do not apply in federal question cases.  *Id.*

That is because, under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity jurisdiction must apply the substantive law of the state in where it is located, which includes any limitations on the exercise of personal jurisdiction that the due process clause of the Fourteenth Amendment would impose on a state court.  *See Stuart v. Spademan*, 772 F.2d 1185, 1189 (5th Cir. 1985) (in diversity case, personal jurisdiction is governed by the Texas long-arm statute and due process clause of the Fourteenth Amendment); *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009) (same); *Bustos v. Lennon*, 538 F. App'x 565, 567 (5th Cir. 2013) (same); *see also Banque Libanaise Pour Le Com. v. Khreich*, 915 F.2d 1000, 1003 (5th Cir. 1990) (citing *Erie*).  By contrast, in federal question cases, there is no ***constitutional*** reason why a federal court's personal jurisdiction would be limited by the due process clause of the Fourteenth Amendment, which restricts only the activities of "states."  U.S. Const. amend. XIV, § 1.  The

overwhelming majority of cases cited in Defendants' Motions to support their state-centric "minimum contacts" analyses are diversity cases and entirely inapplicable here.[13]

Instead, the "national contacts" analysis under the due process clause of the Fifth Amendment applies. Contrary to Defendants' protestations, this rule is the binding law of the Fifth Circuit in federal question cases where a federal statute authorizes nationwide service of process. As explained in *Double Eagle*, 936 F.3d at 264:

> [W]here a case arises under a statute authorizing "nationwide service, the forum is the United States. So minimum contacts with the United States (Fifth Amendment due process) suffice; minimum contacts with a particular state (Fourteenth Amendment due process) are beside the point.

*See also Busch*, 11 F.3d at 1258 (federal district court in Texas has personal jurisdiction over New York resident charged with violation of the 1934 Securities Exchange Act, which authorized nationwide service of process over defendant); *Tucker*, 2012 WL 5351212, at *2 (applying holding of *Busch* to find that national contacts analysis applies in FCA case); *Hernandez*, 2010 WL 1875796, at *3–4 (S.D. Tex. May 6, 2010) (noting that *Busch* is binding authority in the Fifth Circuit and finding personal jurisdiction over defendants in RICO case).[14]  Moreover, numerous

---

[13]    *See, e.g., Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992) (diversity case); *Gundle Lining Constr. Corp. v. Adams Cnty. Asphalt, Inc.*, 85 F.3d 201, 203–04 (5th Cir. 1996) (same); *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999) (same); *Shambaugh & Son, L.P. v. Steadfast Ins. Co.*, 91 F.4th 364, 372 (5th Cir. 2024) (same); *Bustos*, 538 F. App'x 565 at 568 (same); *McFadin*, 587 F.3d 753 at 758–59 (same); *Cunningham v. CBC Conglomerate, LLC*, 359 F. Supp. 3d 471, 478 (E.D. Tex. 2019) (same); *see also Bristol-Myers Squibb Co.*, 582 U.S. 255 at 258  (applying due process clause of Fourteenth Amendment to state court's exercise of personal jurisdiction); *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (applying personal jurisdiction analysis applicable to state courts as required by Rule 4(k)(1)(A)).

[14]    The Petralia Motion (at 8 n.4) disparages controlling Fifth Circuit precedent acknowledging the 'national contacts' rule as 'old,' noting that it was questioned but applied in *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 826 (5th Cir. 1996), but makes no mention of a 2019 Fifth Circuit decision where the Fifth Circuit recognizing the rule without equivocation. *Double Eagle*, 936 F.3d at 264.  Moreover, the Petralia Motion's assertion

courts have found that the national contacts analysis is appropriate in FCA cases because its venue provision, 31 U.S.C. § 3732(a) authorizes nationwide service of process.[15]  This Court should reach the same conclusion.

> 2. A Defendant's U.S. Residency, Without More, Is Sufficient to Satisfy the Due Process Clause of the Fifth Amendment in FCA Cases.

Where, as here, the "national contacts" test applies, a defendant's residency in the United States satisfies all "fair play and substantial justice" requirements of due process—no separate fairness analysis is required to establish personal jurisdiction.  *See Double Eagle*, 936 F.3d at 264 (where the "national contacts" standard applies, "haling [a U.S. resident] into federal court 'does not offend traditional notions of fair play and substantial justice'" (quoting *Busch*, 11 F.3d at 1258)); *see also Warfield v. KR Ent., Inc.* (*In re Fed. Fountain, Inc.*), 165 F.3d 600, 602 (8th Cir. 1999) (rejecting that due process requires a court to balance any "federal interest" in litigating in a particular court against "attendant inconveniences to the defendant," noting that convenience may be considered under 28 U.S.C. § 1404(a) but is not a matter of due process).

---

(at 8 n.4) that "due process concerns are heightened" because the "FCA is punitive" fails to explain how or why this would transform the relevant due process inquiry from a Fifth Amendment to a Fourteenth Amendment one.  The Robinson (at 4) and Frohwein (at 15) Motions similarly disparage *Bellaire* and *Busch*, 11 F.3d at 1258, and like the Petralia Motion ignore subsequent case law confirming that the "national contacts" rule is controlling.  *See e.g.*, *Double Eagle*, 936 F.3d at 264; *Tucker*, 2012 WL 5351212, at *2; *Hernandez*, 2010 WL 1875796, at *4.

[15]    *See, e.g.*, *Tucker*, 2012 WL 5351212, at *2; *United States ex rel. Landsberg v. Levinson*, No. 2:03CV1429, 2006 WL 895044, at *3 (W.D. Pa. Mar. 29, 2006) (minimum contacts established where defendants "reside and do business within the territory of the United States"); *United States ex rel. Finks v. Huda*, 205 F.R.D. 225, 228 (S.D. Ill. 2001) (finding defendant's contacts with the United States establish personal jurisdiction over FCA claim); *Investronica*, 2 F. Supp. 2d 330 at 334 (same); *Hericks v. Lincare Inc.*, No. 07-387, 2014 WL 1225660, at *1 n.2 (E.D. Pa. Mar. 25, 2014) (same); *United States v. Metzinger*, No. 94–7520, 1996 WL 412811, at *2–3 (E.D. Pa. July 18, 1996) (same); *United States v. St. Joseph Reg'l Health Ctr.*, 240 F. Supp. 2d 882, 886 n.1 (W.D. Ark. 2002) (same); *Krohn*, 2000 WL 36739959, at *6  (same); *see also United States ex rel. Barko v. Halliburton Co.*, 952 F. Supp. 2d 108, 115 (D.D.C. 2013) (personal jurisdiction over non-U.S. defendant in FCA case turns on defendant's contacts with the United States as a whole).

That makes sense because the fairness that due process requires relates to the fairness of the exercise of power by a particular sovereign over an individual based on residence or contacts with the territory of the sovereign. *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 567–68 (6th Cir. 2001) ("[W]hen a federal court exercises jurisdiction pursuant to a national service of process provision, it is exercising jurisdiction for the territory of the United States and the individual liberty concern is whether the individual over which the court is exercising jurisdiction has sufficient minimum contacts with the United States."); *Lorelei Corp. v. Cnty. of Guadalupe*, 940 F.2d 717, 719 (1st Cir. 1991) ("The physical scope of the court's constitutional power is broad.  It is clear that the Fifth Amendment permits a federal court to exercise personal jurisdiction over a defendant in a federal question case if that defendant has sufficient contacts with the United States as a whole . . . ." (quotation marks omitted)); *see also Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293–94 (3rd Cir. 1985) ("[I]t is not the territory in which a court sits that determines the extent of jurisdiction, but rather the geographical limits of the unit of government of which the court is a part." (quotation marks omitted)).

Consequently, due process fairness concerns require only that a defendant have contacts with the United States, which is the sovereign exercising power over the individual defendant.  The contrary argument in the Frohwein Motion (at 14–15), based on *Bustos*, 538 F. App'x at 567 (a diversity case) and *Cunnigham v. Assured Auto Grp., Inc.*, No. 4:20-CV-41, 2021 WL 1139744 (E.D. Tex. Mar. 2. 2021) (involving a state law claim and a federal claim under a statute with no identified nationwide service provision), is wrong.  In those cases, as required by *Erie* and Fed. R. Civ. P. 4(k)(1)(A), each federal court properly put itself in the shoes of the state court where it is located and analyzed personal jurisdiction as if the state, not the federal government, were the relevant sovereign.

Moreover, even if a further fairness analysis were warranted here, the federal interest in

the exercise of nationwide personal jurisdiction under the FCA—which allows the United States to proceed against all three Defendants in a single case before the same Court—outweighs any inconvenience to the Defendants. A "congressional policy choice that includes nationwide service of process should be afforded substantial weight." *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 627 (4th Cir. 1997) (quotation marks omitted). Further, where "Congress has provided for nationwide service of process, courts should presume that nationwide personal jurisdiction is necessary to further congressional objectives." *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 948 (11th Cir. 1997).

The FCA is the United States' primary civil tool for fighting fraud against the Government. FCA actions often involve multiple defendants residing in different federal judicial districts. In such cases, the ability to sue all defendants in the same federal court is instrumental to furthering the policy of combating fraud. This is especially true where defendants residing in different parts of the country have conspired in connection with getting false claims paid, as is alleged in this case. It is because of these very considerations that Congress added the nationwide service of process provision to the FCA as part of the 1986 amendments to the Act. *See* S. Rep. No. 99-345, at 32 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5297. Given the clear federal interest in effective enforcement of the FCA, any inconvenience the Defendants may encounter in having to litigate in EDTX does not make the exercise of personal jurisdiction unconstitutional.

3. Defendants Offer No Other Plausible Reason Why a State-Centric "Minimum Contacts" Analysis Should Limit This Court's Personal Jurisdiction in This Case.

Although, as discussed above, there is no ***constitutional*** requirement that a federal court sitting in federal question jurisdiction would analyze personal jurisdiction under the Fourteenth Amendment Due process clause, a federal court may nevertheless be required by statute to determine personal jurisdiction using a state-centric "minimum contacts" analysis. *See, e.g.*,

*Walden v. Fiore*, 571 U.S. 277, 283 (2014) (noting that in many federal question cases, "a federal district court's authority to assert personal jurisdiction" is governed by Fed. R. Civ. P. 4(k)(1)(A), which authorizes service of process on a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"). Defendants point to no such statutory requirement in this FCA case, however, because there is none. Personal jurisdiction in this case is governed by Fed. R. Civ. P. 4(k)(1)(C) (authorizing service of process "where permitted by a federal statute") and 31 U.S.C. § 3732(a) (authorizing nationwide service of process by an "appropriate district court"), neither of which requires minimum contacts with any state. Defendants' Motions make four core arguments, each of which fails.

*First*, the Petralia (at 7–8), Frohwein (at 15–16) and Robinson (at 5–6) Motions argue that this Court is not authorized to exercise nationwide service of process under 31 U.S.C. § 3732(a) and therefore lacks personal jurisdiction over the Defendants. This argument fails because, as discussed in section III.C above, this Court is an "appropriate district court" within the meaning of 31 U.S.C. § 3732(a) because named Defendant Kabbage was "transact[ing] business" here when this *qui tam* was filed in 2021 and because the Government has alleged not just one, but numerous "act[s] proscribed by section 3729" that occurred in this district, including the submission of false statements and overt acts in furtherance of conspiracy. Moreover, not one of Defendants' Motions demonstrates that he or she is not, in fact, currently "transact[ing] business" in EDTX within the meaning of 31 U.S.C. § 3732(a). *See Intell. Ventures II LLC*, 2017 WL 5630023, at *5 (burden of establishing improper venue is on defendant). As an "appropriate" district, this Court is authorized to exercise nationwide service of process under Fed. R. Civ. P. 4(k)(1)(C) and 31 U.S.C. § 3732(a).

*Second,* the Robinson (at 6–7) and Petralia (at 8) Motions point to this Court's ruling in *ESPOT*, 492 F. Supp. 3d at 685 (Jordan, J.), arguing that because a state-centric minimum contacts analysis is relevant to determining personal jurisdiction under the RICO venue and process

provision, 18 US.C. § 1965, it must also be relevant under the FCA. This ignores key differences between the two statutes. Unlike under the FCA, under RICO there are different process and service rules for the initial defendant, who must either "reside[]," be "found," have "an agent," or "transact[] his affairs," in the judicial district, and for additional defendants, who are subject to nationwide service of process if "the ends of justice require" they be included in the suit. 18 U.S.C. § 1965(a)–(b); *see also ESPOT*, 492 F. Supp. 3d at 685 (parsing 18 U.S.C. § 1965, noting differing interpretations among courts). This statutory language requires that the initial defendant have "minimum contacts" with the judicial district in which a RICO suit is filed but authorizes nationwide service of process over all other defendants regardless of whether they have minimum contacts with the judicial district. *ESPOT*, 492 F. Supp. 3d at 686–87.

In contrast to the RICO provision at issue in *ESPOT,* the FCA, 31 U.S.C. § 3732(a), grants nationwide service of process to any district court where "any act proscribed by [the FCA] occurred," regardless of whether any defendant resides in, or has minimum contacts with, that judicial district. And, as discussed in section III.C.1, above, Kabbage was a party to this *qui tam* action when it was filed, and it is undisputed that Kabbage was transacting business with the Eastern District of Texas at the relevant time, when this action was filed. Nothing in *ESPOT* suggests that a state-centric "minimum contacts" analysis is appropriate under the FCA.

*Third*, the Petralia Motion (at 7–8) points to a few inapposite cases that it contends require this Court to apply a state-centric "minimum contacts" analysis in this FCA case. The Petralia Motion ignores that the majority of federal courts to consider this issue have found just the opposite, that the "national contacts" analysis applies in FCA cases like this one.[16] In *United States ex rel. Sullivan v. Atrium Medical Corp.*, No. SA-13-CA-244-OLG, 2014 WL 12879671, at

---

[16]    See note 15, *supra*.

*10, 13 (W.D. Tex. Dec. 31, 2014), *adopted by* 2015 WL 13799755 (W.D. Tex. Mar. 18, 2015), the court held—consistent with the weight of authority—that in a FCA case "the relevant due process inquiry is whether the defendants have sufficient minimum contacts with the United States." The court nevertheless granted defendant's motion to dismiss because the plaintiff relators did not "argue[] or present[] authority to show that the exercise of personal jurisdiction over [the defendant was] consistent with due process." *Id.* at *13. The United States has done so here.

Additionally, in *Washington v. Morad*, No. 15-868, 2016 WL 7187932, at *2 (E.D. La. Dec. 12, 2016), an FCA *qui tam* suit, the court's one-sentence statement when resolving a motion for default judgment that it had personal jurisdiction over a defendant residing in the court's judicial district is not a holding that a state-centric minimum contacts analysis applies under the FCA. Similarly, in *United States ex rel. McCarthy v. Straub Clinic & Hosp., Inc.*, 140 F. Supp. 2d 1062, 1071–72 (D. Haw. 2001), and *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 760, 761 (S.D.N.Y. 2021), the courts analyzed personal jurisdiction in FCA cases using language suggestive of a Fourteenth Amendment due process analysis without acknowledging or addressing the many reasons and authorities indicating that it does not apply. None of these cases support Defendants' view that a state-centric "minimum contacts" analysis applies in a FCA case against U.S. resident defendants.

*Fourth,* and finally, all three Motions contend that the so-called "fiduciary shield" doctrine, *see, e.g.*, *Savoie v. Pritchart*, 122 F.4th 185, 192–93 (5th Cir. 2024), somehow blocks this Court from exercising personal jurisdiction over the Defendants. *See* Frohwein Mot. 15 & n.11; Petralia Mot. 9 & n.5; Robinson Mot. 9. That doctrine is irrelevant for multiple reasons. First, it is a judicial interpretation of state long-arm statutes and a "question of state law, not due process;" therefore it has no application in this federal question case where personal jurisdiction is based on federal statutes, 31 U.S.C. §§ 3732(a) and Fed. R. Civ P. 4(k)(1)(C). *See Savoie*, 122 F.4th at 191

(quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984)). Second, it is beyond dispute that Defendants have sufficient contacts with the relevant forum—the United States—because they live here; there is no need to consider Kabbage's contacts. Third, this case is about the FCA violations that Defendants committed personally, from which they personally profited, and for which they are personally liable. This is ***not*** a case based on "acts performed not for [Defendant's] own benefit but for the benefit of" Kabbage. *See Saktides v. Cooper*, 742 F. Supp. 382, 385 (W.D. Tex. 1990) (quotation marks omitted); *see also Donovan v. Grim Hotel Co.*, 747 F.2d 966, 973 (5th Cir. 1984) (fiduciary shield does not apply where individual is sued for violations of a federal statute under which he has personal liability); *Krohn*, 2000 WL 36739959 at *8 (rejecting application of corporate shield doctrine in FCA case where individual defendant was "alleged to have been an active participant" in the violation, "the alleged acts were intentional," and the potential harm to the United States was "foreseeable").

    4.  <u>Fifth Amendment Due Process Is Satisfied Because Defendants Live in the U.S.</u>

    There can be no dispute that Frohwein, Petralia, and Robinson all live in the United States. It is patently clear, therefore, that this Court's exercise of personal jurisdiction over them satisfies the requirements of Fifth Amendment due process. *See United States ex rel. Landsberg v. Levinson*, No. 2:03CV1429, 2006 WL 895044, at *3 (W.D. Pa. Mar. 29, 2006); *Double Eagle*, 936 F.3d at 264. That is the beginning and end of the inquiry.

    For the foregoing reasons, this Court's exercise of personal jurisdiction over the Defendants is authorized by 31 U.S.C. § 3732(a) and consistent with the due process.

## DEFENDANTS' RULE 12(b)(6) AND 9(b) MOTIONS FAIL

Defendants have moved individually and jointly to dismiss this case under Rule 12(b)(6) and Rule 9(b) based on overlapping arguments that the Government failed to state a claim under the FCA and under common law. *See* Joint Mot. 13–25; Robinson Mot. 10–25; Frohwein Mot. 17–25; Petralia Mot. 11–25. Their arguments are without merit and the motions should be denied.

The Government's Complaint alleges in extensive detail how each Defendant designed, directed, controlled, and orchestrated Kabbage's PPP participation, and how each Defendant knowingly submitted, caused the submission of, and conspired to submit false claims to the SBA using Kabbage's PPP participation. At Defendants' direction, Kabbage miscalculated loan amounts, approved inflated PPP loans, and failed to perform the good faith review of PPP loan documentation SBA's regulations required despite representing to SBA that it had done so. As required by Rule 9(b), the Government's Complaint particularly identifies each Defendant's role, knowledge, and acts (by commission or omission), and the circumstances of the fraud, putting Defendants on ample notice of the nature of the claims against them.

Each element of the Government's FCA presentment and false statements claims is well-pled. Defendants argue that the Government inadequately alleged falsity as it relates to Kabbage's automated system for PPP (Joint Mot. 14–18; Robinson Mot. 10–15) or as it relates to the loans with alleged loan calculation errors (Robinson Mot. 16–22), despite detailed allegations about how these systematically generated inflated PPP loans and misrepresentations to SBA. Defendants also argue that scienter is inadequately alleged as to Petralia and Frohwein (Petralia Mot. 15–22; Frohwein Mot. 19–24) and as to the SALT calculation error (Robinson Mot. 21), again, despite detailed allegations about what each Defendant knew about these issues and when. Defendants also contend that the supposed vagueness of the PPP requirements further negate both falsity and scienter (Joint Mot. 17; Frohwein Mot. 22–23) but fail to explain why any of the particular PPP

requirements at issue in this case was unclear. The improperly asserted affirmative defense brought forward by Robinson (at 16–22); Defendants' challenges to materiality (Joint Mot. 18–21; Robinson Mot. 15–16); and Defendants' arguments that their conduct did not cause fraudulent forgiveness and guaranty purchase payments for miscalculated loans (Robinson Mot. 22–25), or otherwise cause false statements and claims (Petralia Mot. 11–14; Frohwein Mot. 17–19), are all also unavailing. In support of these arguments, Defendants baselessly urge the Court to apply inapplicable standards, consider extrinsic evidence, and ignore that these Defendants repeatedly invoked the Fifth Amendment during investigative testimony taken pursuant to the FCA when evaluating the Complaint under Rules 8(a)(2) and 9(b) (Joint Mot. 21–24).

Defendants' challenges to the Government's remaining claims are no more successful. Their arguments that the Government inadequately pled an FCA conspiracy claim (Joint Mot. 24–25) and that such claim is barred by the "intra-corporate conspiracy" doctrine, are equally unavailing. That doctrine does not apply and there are myriad allegations supporting an inference of Defendants' agreement to violate the FCA, as well as allegations describing the acts they each took in furtherance of the conspiracy. Finally, Petralia and Frohwein claim that the Government's Complaint does not adequately plead common law unjust enrichment or payment by mistake (Petralia Mot. 22–25; Frohwein Mot. 24–25). This argument plainly ignores the particularized allegations supporting these claims.

This Court should decline Defendants' repeated suggestions to apply inapplicable standards, consider materials outside the Government's Complaint, and draw inferences in their favor, none of which is appropriate in evaluating the adequacy of the Government's Complaint. For the reasons set forth below, Defendants' Rule 12(b)(6) and 9(b) motions should be denied.

I.    **FACTUAL BACKGROUND**

    A.  <u>**Defendants' Participation in the Paycheck Protection Program.**</u>

        Between approximately April and October 2020, each of the Defendants, through their direction, control of, and management of Kabbage's PPP business, knowingly submitted and caused to be submitted tens of thousands of false or fraudulent claims and statements to the United States.  USG Compl. ¶¶ 51, 68–71.  These false claims resulted in the SBA's payment of millions of dollars of processing fees and loan forgiveness and guaranty purchase payments, which were ineligible for payment.  USG Compl. ¶ 73, 114, 146, 185, 289–293.

        Defendants caused Kabbage to participate in the PPP and attest to the SBA via SBA Form 3507 that it would assume all obligations and responsibilities of complying with PPP requirements.  *See* USG Compl. ¶¶ 23–24, 51–53, 57–66.  Each Defendant directed, controlled, and facilitated Kabbage's participation in the PPP and was closely involved with its day-to-day activities relating to PPP.  USG Compl. ¶¶ 51, 68–71.  Frohwein signed the Lender Partner agreements on behalf of Kabbage, where Kabbage promised those partners that it would comply with all program requirements.  USG Compl. ¶¶ 52–53.  Robinson signed and submitted Forms 2484 and 1502 to the SBA.  USG Compl.  ¶¶ 88, 291.  Petralia and Robinson approved Kabbage's defective PPP loan platform and document review processes.  USG Compl. ¶¶ 84–85, 88–89, 95, 198–200.

        Although the SBA relaxed some, but not all, lender requirements for PPP in recognition of the time-sensitive economic emergency caused by the COVID-19 pandemic, Kabbage, as a PPP lender, was still required to comply with certain baseline obligations:  (1) confirm receipt of borrower certifications; (2) confirm receipt of information demonstrating that borrowers had employees for whom it paid salaries and payroll taxes on or around February 15, 2020; (3) confirm, by performing a good faith review of payroll documentation submitted by the borrower, the dollar amount of average monthly payroll costs for the prior calendar year, or—in other words—confirm

the correct loan calculation; and (4) comply with applicable Bank Secrecy Act/Anti-Money Laundering (BSA/AML) requirements. USG Compl. ¶¶ 26, 44. Each of the Defendants knew this. *See* USG Compl. ¶¶ 68–71, 84, 103, 196, 224, 226. Though lenders were held harmless for acts of borrowers, SBA did not hold lenders harmless for their failure to comply with these minimal lender requirements. USG Compl. ¶ 22. Simply put, lenders could not shirk all responsibility.

Consistent with this, for every loan Kabbage approved, it submitted a Form 2484 certifying that it had complied with these first three requirements, confirmed the amount of the loan, and that it had obtained and reviewed the borrower's application and documents demonstrating qualifying payroll amounts. USG Compl. ¶ 27. Kabbage also submitted to the SBA Form 1502 to obtain payment of processing fees for each loan it approved and attested that the information it submitted was true and accurate so that it could get paid. USG Compl. ¶¶ 29–30, 288–289.

Each Defendant personally contributed to making these false certifications and statements to the SBA for each loan Kabbage processed and caused the submission of these certification and statements by its Lender Partners. USG Compl. ¶¶ 287–288, 291. Specifically, as Authorized Lender Official with the SBA, Robinson personally signed Forms 2484 and 1502 and attested that Kabbage had complied with the PPP requirements, which were submitted to SBA. USG Compl. ¶¶ 69, 288, 291. Through their operational control of Kabbage and supervision of Robinson, Petralia and Frohwein also caused the submission of these false statements, certifications, and claims. USG Compl. ¶¶ 70, 84, 89, 292. The Government also alleges each Defendant had reason to know that these certifications and statements to the SBA were false. Even Robinson personally acknowledged that he would be pulled in to answer for "all of the crap [Kabbage was] doing." USG Compl. ¶ 291. Frohwein texted Petralia following a July 9, 2020, company-wide Town Hall meeting whether Kabbage could escape scrutiny for Kabbage's PPP participation if "we donate[d] $10 million of our PPP fees to some cause." USG Compl. ¶ 271.

B.    **The False Claims.**

1.    Kabbage Fraudulently Inflated Thousands of PPP Loans through the SALT Error and the $100k Error.

PPP loans that Kabbage incorrectly calculated were false and all certifications, statements, and claims submitted to the SBA regarding these loans were false. Under Defendants' direction, Kabbage calculated PPP loan amounts for borrowers to increase the number of loans processed. USG Compl. ¶¶ 66, 75, 82, 86–87. Robinson oversaw the teams that designed its loan calculation and delegated that responsibility to employees with no prior experience with payroll, accounting, or tax issues. USG Compl. ¶¶ 69, 85, 115–117. Defendants approved that calculation. USG Compl. ¶¶ 88–93, 111, 115–116. The PPP loan calculation contained two errors: first, it erroneously double-counted state and local income taxes paid by employees ("SALT") in determining average monthly payroll, although SALT was not an eligible employer-paid payroll cost ("SALT Error"). Kabbage double-counted SALT by adding to borrowers' reported annual gross payroll, reported in W-3 Box 1 or Box 5, the amounts of state and local income tax reported in W-3 Box 17 and Box 19. USG Compl. ¶¶ 105–113. The SALT Error alone inflated more than 53,000 loans by more than $111 million, as Kabbage later admitted in a settlement agreement with the Government. USG Compl. ¶¶ 114, 145–146, 294. Despite numerous warnings, discussed in section I.C below, Defendants chose not to investigate or correct the issue. USG Compl. ¶¶ 124, 131–132, 142. The flawed calculation was not corrected until January 2021. USG Compl. ¶ 143.

Each loan fraudulently inflated by the SALT Error was accompanied by several false statements, certifications, and claims by Kabbage and its Lender Partners. First, on Form 2484, Kabbage or its Lender Partners falsely stated the loan amount and falsely certified that the lender had confirmed the borrower's average monthly payroll for each SALT Error loan. USG Compl. ¶ 295. The borrower also falsely stated the loan amount on its application form, a false statement

caused by Kabbage's erroneous loan calculation.  Second, Kabbage or its Lender Partners submitted false claims for payment of inflated processing fees for each SALT Error loan through Form 1502.  USG Compl. ¶ 294.  Lastly, Kabbage or its Lender Partners submitted false claims for forgiveness for thousands of SALT error loans before the SBA was informed of the error.  USG Compl. ¶¶ 296–298.  The Government's Complaint provides specific examples of loans with these false statements and claims.  USG Compl. ¶¶ 302–305.

Kabbage's calculation also failed to exclude annual per-employee compensation over $100,000 in determining average monthly payroll, contrary to the CARES Act's requirements (the "$100k Error").  USG Compl. ¶¶ 147–156.  It did so by not requiring borrowers to submit payroll information for all employees through IRS Form W-2 and by failing to implement logical or mathematical checks or caps to ensure the loan was correctly calculated despite specific suggestions by employees.  USG Compl. ¶¶ 149, 151, 153–156, 158–159.  Despite numerous warnings detailed in section I.C below, Defendants chose to do nothing to investigate or correct the $100k Error.  USG Compl. ¶¶ 170, 179, 183.  The $100k Error alone inflated more than 1,900 loans by at least $100 million, as Kabbage later admitted in a settlement agreement with the government.  USG Compl. ¶ 185.  Like the SALT Error loans, Kabbage and its Lender Partners submitted several false statements, certifications, and claims for each loan fraudulently inflated by the $100k Error, in Forms 2484, Forms 1502, and loan forgiveness and guaranty purchase requests. USG Compl. ¶¶ 306–313.  The Government's Complaint similarly provides specific examples of false statements and claims relating to the $100k Error loans.  USG Compl. ¶¶ 315–320.

When the SBA was informed of the SALT and $100k Errors, it stopped processing loans fraudulently inflated by Kabbage's loan calculation errors.  USG Compl. ¶¶ 143–144, 184.

2. <u>Kabbage Failed to Review Loans According to PPP Requirements and Approved Loans for Patently Fraudulent and Ineligible Borrowers.</u>

Defendants developed and implemented a PPP loan review process that did not comply with PPP requirements. As a result, Kabbage approved PPP loans to thousands of patently fraudulent and ineligible borrowers, resulting in false certifications material to false claims. Before PPP, Kabbage's outside auditor opined that Kabbage's lack of BSA/AML prioritization was an "important weakness," as Defendants knew. USG Compl. ¶¶ 189–191. Kabbage's Head of Fraud also warned Defendants that its pre-PPP procedures did not comply with BSA/AML requirements and that it needed increased fraud controls. USG Compl. ¶¶ 192–196. Nevertheless, Defendants plunged ahead with PPP. They directed the company to participate in PPP and submit Form 3507, which stated that Kabbage would comply with BSA/AML requirements. USG Compl. ¶ 51. They then prioritized increasing revenue while decreasing loan processing costs at the expense of fraud controls and performing good faith reviews to "pump up the volume" of PPP loans. USG Compl. ¶¶ 199–202. Robinson was a key decisionmaker about every aspect of Kabbage's PPP loan processing, including its BSA/AML procedures, and provided training to Kabbage employees on processing PPP applications. *See* USG Compl. ¶¶ 95–96, 204–205, 208–210, 215–216.

For example, Kabbage did not require many borrowers to provide proof that they were in business as of February 15, 2020. USG Compl. ¶ 204. Kabbage approved loans with insufficient identity verification and lowered identity verification thresholds. USG Compl. ¶¶ 208–209. Robinson, with Frohwein and Petralia's knowledge, eliminated Yodlee, a tool Kabbage previously used to prevent fraud, despite warnings that doing so would result in fraud. USG Compl. ¶¶ 205–206. Robinson permitted Kabbage staff to approve PPP loans even when they had not reviewed the borrower's drivers' license or conducted a background check. USG Compl. ¶ 207–208. Robinson ignored recommendations about automated review of documents based solely on cost.

USG Compl. ¶ 210. Under Defendants' direction and supervision, Kabbage did not collect enough documents to be able to confirm borrower eligibility, USG Compl. ¶¶ 217, did not staff sufficient fraud analysts to address the volume of suspicious PPP loans, USG Compl. ¶¶ 211–213, approved loans without conducting OFAC checks, USG Compl. ¶ 214, and did not promptly file Suspicious Activity Reports (SARs) with the government to identify potentially fraudulent or money laundering activity. USG Compl. ¶ 216. Put simply, Kabbage's procedures for processing PPP loans did not ensure that Kabbage could confirm the borrower was in existence as of February 15, 2020, and that the borrower had employees for whom it paid payroll, as required by the CARES Act. If changes were implemented, they were only just days before the PPP ended in 2020, though concerns were first raised to Robinson and Petralia months prior. USG Compl. ¶¶ 276–278.

Where Kabbage failed to comply with PPP lender requirements to review the loan application in good faith and approved loans for obviously ineligible and fraudulent borrowers, each loan was accompanied by several false statements, certifications, and claims by Kabbage and its Lender Partners. First, on Form 2484, Kabbage or its Lender Partners falsely certified that the lender received documentation demonstrating that the borrower had employees for whom it paid salaries on February 15, 2020, and reviewed the payroll documentation to confirm the borrower's average monthly payroll. USG Compl. ¶¶ 295. Second, Kabbage or its Lender Partners submitted false claims for payment of processing fees on Form 1502. The Government's Complaint identifies example false statements and claims relating to these loans. USG Compl. ¶¶ 325–329.

### C.   Defendants Knew Kabbage Was Submitting False Claims to the SBA to Receive Processing Fees for Loans Approved or Serviced by Kabbage.

Each of the Defendants knew that Kabbage was miscalculating PPP loan amounts through the SALT and $100k Errors in loans Kabbage approved and submitted to SBA for payment. Each Defendant also knew that Kabbage's processes were deficient such that Kabbage did not have

sufficient fraud controls and review processes to conduct a good faith review of borrower materials to detect fraud and confirm borrower eligibility.

      1.   <u>Petralia Knew Kabbage Was Submitting False Claims to the SBA.</u>

Specifically, the Government alleges Petralia controlled and directed Kabbage and its PPP participation, knew Kabbage's PPP lender obligations, approved Kabbage's PPP review procedures, was closely involved with the day-to-day activities of Kabbage's PPP participation, and attended and participated in daily or twice-daily senior management meetings discussing Kabbage's PPP lending issues, regulatory updates, and interactions with SBA. *See* USG Compl. ¶¶ 2–3, 6, 47, 59, 68–71, 84, 102, 196, 199–200, 222, 224, 226. Petralia also attended Kabbage Town Hall meetings where employees raised concerns about Kabbage's fraud processes and responsibility for miscalculated loans. USG Compl. ¶¶ 171, 219, 247, 258, 266–267.

The Government also alleges Petralia was aware of Kabbage's loan calculation issues as early as April 2020. The Government alleges Petralia received notice from a Twitter user and a CPA through other Kabbage employees of concerns that Kabbage double-counted SALT, USG Compl. ¶¶ 120–126, 128; from Lender Partner 1, USG Compl. ¶¶ 133–135; and from a CPA who left a voice message and email warning of "a huge glaring error" in the calculation, USG Compl. ¶¶ 137–141. Regarding the $100k Error, Kabbage employee N.G. discussed with Petralia in late April 2020 that he had identified loans affected by the $100k Error, and she was later given more information by text. USG Compl. ¶¶ 164–166. Approximately two months later, employee T.S. informed Petralia that Kabbage had approved loans with the $100k Error, USG Compl. ¶¶ 169, 172–173, and she knew that outside journalists had flagged that Kabbage approved and disbursed loans with apparent $100k Errors, USG Compl. ¶¶ 174–175, 177–178. She chose not to remedy either calculation error. *See, e.g.*, USG Compl. ¶¶ 142, 173.

Regarding Kabbage's deficient review process, Petralia knew at the outset of the program

that outside auditors and Kabbage's Head of Fraud had raised flags about Kabbage's inadequate BSA/AML program and fraud controls. USG Compl. ¶¶ 187–192. She stood idly by when Robinson approved the removal of Yodlee, even though it would increase fraud, and decided to develop a document reading tool (OCR) to reduce costs. USG Compl. ¶¶ 205–206, 215. Also in April 2020, Petralia fired Kabbage's Head of Fraud after she raised concerns about Kabbage's fraud rate, suggesting Petralia's knowledge of Kabbage's deficient processes in fraud detection from the beginning. USG Compl. ¶¶ 74, 103, 230–239. She fielded questions from employees at Town Halls about the volume of fraudulent loans approved by Kabbage, and she knew that outside journalists had identified fraudulent loans approved by Kabbage. USG Compl. ¶¶ 247, 258, 274, 279. When employees came to Petralia with fraud concerns and potential improvements, she "ignored" one text thread, mocked another employee who suggested improvements to the process with Robinson, and chose to do nothing in response. USG Compl. ¶¶ 242–246, 260–265. When a Kabbage employee explicitly suggested pausing PPP loan processing to improve fraud controls, Petralia declined to do so. USG Compl. ¶ 266–267.

## 2. Frohwein Knew Kabbage Was Submitting False Claims to the SBA.

As to Frohwein, the Government alleges he maintained intimate involvement with Kabbage's participation during PPP, knew of the PPP lender obligations to participate, and knew that Kabbage's PPP processes were deficient. USG Compl. ¶¶ 52–53, 68–71, 84, 89, 196–197, 222, 224, 226, 271. At the outset of PPP, Frohwein knew that Kabbage's processes were inadequate to comply with BSA/AML and that Kabbage had high fraud risks due to the warnings of the outside auditors and Kabbage's Head of Fraud. USG Compl. ¶¶ 189–190, 192. Even Frohwein himself believed that Kabbage's PPP processes were deficient and that it could come back to haunt them. *See* USG Compl. ¶¶ 197, 254–256, 271. Frohwein attended the daily senior management meetings and Town Hall meetings discussing fraud and loan miscalculations. USG

Compl. ¶¶ 71, 171, 219, 247, 258, 266–267. In April 2020, he was informed by Lender Partner 1 about the SALT Error and received the same email and voicemail from the CPA as Petralia. USG Compl. ¶¶ 133, 137. In early May, he was informed that N.G. had identified the $100k Error, USG Compl. ¶¶ 165–166, and in June he received warnings from Kabbage's Consultant 1 that Kabbage's loan calculation needed updating, USG Compl. ¶¶ 168, 171. He knew journalists had found loans with apparent $100k Errors. USG Compl. ¶¶ 177–178.

Regarding Kabbage's deficient loan review processes, Frohwein knew in April 2020, like Petralia, that Robinson had eliminated Yodlee and had decided that Kabbage would develop an OCR to reduce costs. USG Compl. ¶¶ 205, 215. Like Petralia, he heard the questions and concerns from employees at Town Halls about fraudulent loans Kabbage approved and knew that outside journalists had identified fraudulent loans Kabbage approved. USG Compl. ¶¶ 247, 258, 274, 279; *see also* USG Compl. ¶¶ 260, 262. He knew that Petralia declined to follow an employees' recommendation to pause PPP loan processing to improve fraud controls. USG Compl. ¶ 266–267. Frohwein knew that Kabbage had filed only a handful of SARs as PPP came to an end. USG Compl. ¶ 216. Yet, he chose to do nothing. When presented with the Consultant's report warning that Kabbage was—in Frohwein's words—"sending fraudulent data to the SBA," Frohwein instructed Robinson and others to "kill" it rather than remediate the concerns it identified. USG Compl. ¶¶ 254–256. He also sought to conceal discussions of fraudulent borrowers approved by Kabbage by marking conversations as attorney-client privileged when they were not. USG Compl. ¶ 279. Instead of fixing the issues, Frohwein suggested donating money "to some cause" to avoid scrutiny. USG Compl. ¶¶ 271.

3. <u>Robinson Knew Kabbage Was Submitting False Claims to the SBA.</u>

As stated above, Robinson supervised the development of Kabbage's PPP platform. *See, e.g.*, USG Compl. ¶¶ 84–85. Robinson also knew that Kabbage's processes and loan calculation

method were flawed and that Kabbage was approving and submitting PPP loans containing the SALT and $100k Errors, as well as PPP loans for which Kabbage had not conducted a good faith review.  USG Compl. ¶¶ 151–152, 158–162, 219, 221.  Like Frohwein and Petralia, he knew the PPP requirements, USG Compl. ¶ 222, 224–226, and was even warned by multiple Kabbage employees that SBA cared about fraud.  USG Compl. ¶¶ 221, 223.  Like Frohwein and Petralia, he attended the daily senior management meetings and most of the Town Hall meetings where employee concerns were raised.  USG Compl. ¶¶ 71, 171, 219, 247, 258.

Robinson was warned by several outside third parties about the SALT Error in April 2020, including a Twitter user and a CPA, USG Compl. ¶¶ 120–126, 128 and the CPA who left a voice message, USG Compl. ¶¶ 137–141.  Even as Robinson asked aloud, "maybe we should talk to [a CPA]," he chose not to do so.  USG Compl. ¶¶ 122, 124, 131–132 142.  Regarding the $100k Error, Kabbage employee N.G. told Robinson several times over three days in late April 2020 that he had found thousands of inflated loans, and even complained to a co-worker that he couldn't "get anyone to actually push to reverse / edit / etc.," even Robinson, whom he commented seemed "just drunk." USG Compl. ¶¶ 158–162.  Approximately two months later, employee K.A. notified Robinson that simple "math" showed that Kabbage had miscalculated loans with the $100k Error, as did employee T.S.  USG Compl.  ¶¶ 169, 172–173.  He also received Consultant 1's recommendation to update Kabbage's loan calculation.  USG Compl. ¶¶ 168, 171.  He knew that journalists and Lender Partner 2 identified Kabbage loans with apparent $100k Errors.  USG Compl. ¶¶ 174–175, 177–178, 180–182.

Further, the Government's Complaint alleges numerous instances starting in April 2020 where Robinson knew of Kabbage's deficient reviews and personally approved procedures and deviations therefrom while prioritizing cost-savings and speed at the expense of fraud controls, despite concerns from other Kabbage employees.  USG Compl. ¶¶ 201, 204–211, 215, 217.

Kabbage's Head of Fraud warned Robinson several times in late March and early April 2020 that Kabbage's identity verification needed improvement and that Kabbage's fraud rate was much higher than industry standard. USG Compl. ¶¶ 230–236. He reassigned that employee, who was then fired by Petralia. USG Compl. ¶¶ 237–239. Robinson failed to ensure that Kabbage promptly filed SARs, despite advice from attorneys and Consultant 1. USG Compl. ¶ 216. Robinson told employees who came to him with concerns relating to fraud in PPP loans and suggestions for improving the review procedures to ignore indicators of fraud. USG Compl. ¶¶ 242–246, 248–253, 260–265, 268–269. He carried out Frohwein's directive to "kill" Consultant 1's report warning that Kabbage was—in Frohwein's words—"sending fraudulent data to the SBA." USG Compl. ¶ 257. He was tasked with answering employee questions and concerns at Town Halls about fraudulent loans, and like Petralia and Frohwein, knew that outside journalists had identified fraudulent loans approved by Kabbage. Robinson also knew of concerns from Kabbage's correspondent bank and Relator. USG Compl. ¶¶ 273–275. Robinson even said, in a Slack message to another Kabbage employee on May 1, 2020, that "treasury, sba, private industry, and now the Fed…all of them are going to be able to pull me in to answer for all the crap we're doing." USG Compl. ¶ 291. Rather than remedy Kabbage's processes, Robinson hoped loans would be "auto-forgiven" without more review. USG Compl. ¶¶ 282, 284.

### D. Defendants Personally Profited from the PPP.

Each Defendant had skin in the game, through their ownership interests in Kabbage. USG Compl. ¶ 80. From their positions as executives and leaders of Kabbage, Defendants used PPP to increase Kabbage's value and make it attractive for sale. As Kabbage suspended its lending products, furloughed employees, and planned for PPP, USG Compl. ¶ 61, 63–66, Petralia and Frohwein closely tracked how many PPP loans were approved by Kabbage and submitted to the SBA. *See* USG Compl. ¶ 72, 75. Frohwein pressured employees to process PPP loans as quickly

as possible and reminded them that Kabbage could not be paid processing fees until after it had disbursed funds to the borrower. USG Compl. ¶¶ 72, 75, 199. Robinson told another employee that Kabbage should "take as much" revenue as they could get, since "we could definitely use a few hundred million." USG Compl. ¶ 64. Defendants passed this pressure to push PPP loans out Kabbage's door to all employees. USG Compl. ¶ 72. Defendants attended a company-wide Town Hall meeting in early April 2020 where another senior executive framed the PPP as "a great business to be in" because "Kabbage could raise the equivalent of an equity [financing] round in the next 3 months." USG Compl. ¶ 65. Petralia celebrated Kabbage's approval of PPP loans with a meme of a person making a snow angel in cash. USG Compl. ¶ 75. The Government also alleges that at this time, Frohwein and Petralia entered into discussions with Amex to sell the company, and Petralia told senior management including Robinson and Frohwein that Kabbage should maximize the number of PPP loans approved because of the value to Kabbage "from an enterprise perspective" of deploying more money faster to more businesses. USG Compl. ¶¶ 61, 66, 75. PPP was their ticket out of financial ruin, and to a big payout.

Selling substantially all Kabbage's assets benefited each Defendant personally.[17] Each Defendant had her or his own stake in Kabbage: their respective Kabbage stock and options, in addition to, and independent of, reinstatement of their executive compensation at Kabbage. USG Compl. ¶ 80. Each Defendant stood to receive large payouts should they increase Kabbage's value by approving PPP loans and PPP dollars at volume. Thus, they rushed to profit from PPP and employed Kabbage's erroneous loan calculations and deficient review processes, in violation of the FCA, for their own personal benefit. *See* USG Compl. ¶ 80. Defendants' scheme earned Kabbage PPP processing fees to which it was not entitled. USG Compl. ¶¶ 75, 78. With these

---

[17]    Notably, the sale excluded Kabbage's PPP loan portfolio. *See* USG Compl. ¶ 79.

schemes in hand and despite earlier projections that Kabbage would run out of cash by fall 2020, Kabbage recovered financially, reinstated executive compensation, and paid Defendants bonuses. USG Compl. ¶¶ 62, 79.  In October 2020, Defendants sold the company's assets (except for Kabbage's PPP portfolio) and received lucrative payouts: at least $17 million to Frohwein, $10 million to Petralia, and $1 million to Robinson.  USG Compl. ¶¶ 79–80.

## II.    LEGAL STANDARD

In reviewing a Rule 12(b)(6) motion, a court must accept the complaint's allegations as true and view them in the light most favorable to the plaintiff. *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 257, 261 (5th Cir. 2014).  "The complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff." *Morgan v. Swanson*, 659 F.3d 359, 370 n.17 (5th Cir. 2011) (quotation marks omitted).  To survive a Rule 12(b)(6) motion, the complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court should not "look behind a complaint's allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial." *Bollinger*, 775 F.3d at 260 (quotation marks omitted).  The allegations need only "be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citation omitted). Plausibility is not "probability" and does not require detailed factual allegations. *Id*. at 556.

FCA claims must also comply with Rule 9(b)'s particularity requirements. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009).  The Government must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) "requires only simple, concise, and direct allegations of the circumstances constituting fraud."

*Grubbs*, 565 F.3d at 186 (quotation marks omitted).  An FCA complaint is sufficient if it alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id*. at 190.  "[C]onditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b); *Bollinger*, 775 F.3d at 260.

Rule 9(b)'s heightened pleading requirements are less stringent in FCA cases and government enforcement actions involving complex facts.  *See Gilmour v. Blue Cross & Blue Shield of Ala.*, No. 4:19-CV-160, 2021 WL 1196272, at *7 (E.D. Tex. Mar. 30, 2021) (Jordan, J.).[18]  Sufficiency of pleadings depends on various factors, including "the nature of the case, the complexity or simplicity of the transaction or occurrence," and the amount of the "circumstantial detail" needed to give the defendants notice of the allegations.  *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957) (quotation marks omitted).

"[I]n deciding whether to grant a motion to dismiss, a district court may not 'go outside the complaint'" with one recognized exception: "a district court may consider documents attached to the motion to dismiss if they are referred to in the plaintiff's complaint *and* are central to the plaintiff's claim." *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 (5th Cir. 2012) (emphasis added) (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)).  In evaluating whether to consider materials outside a complaint on a motion to dismiss, the objection of the plaintiff is an important factor.  *See Scanlan*, 343 F.3d at 536.

---

[18]      *See also, e.g.*, *United States ex rel. Hebert v. Dizney*, 295 F. App'x. 717 (5th Cir. 2008); *U.S. Commodity Futures Trading Comm'n v. M25 Invs. Inc.*, No. 3:09-CV-1831, 2010 WL 769367, at *2 (N.D. Tex. Mar. 6, 2010); *SEC v. Sharp Cap., Inc.*, No. 3:98-CV-2792G, 1999 WL 242691, at *2 (N.D. Tex. Apr. 16, 1999); *United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206 (E.D. Tex. 1998); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998).

## III.    ARGUMENT

### A.    The False Claims Act Is Designed to Prevent Fraud on the Government, Whatever the Form.

The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). The FCA imposes liability on any person (1) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or (2) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B).  The government must plausibly allege four elements to establish an FCA claim: "(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (quotations omitted).  Under 31 U.S.C. § 3729(a)(1)(C), FCA liability attaches to "any person . . . who conspires to commit a violation" of the enumerated FCA provisions.  Here, the United States alleges that Defendants violated 31 U.S.C. § 3729(a)(1)(A) (Count I), (a)(1)(B) (Count II), and (a)(1)(C) (Count III).

### B.    The Government Adequately Pleaded Violations of the False Claims Act.

The Government's detailed 364 paragraph Complaint clearly satisfies the pleading standard to provide Defendants notice of the allegations underlying the United States' FCA claims with the requisite particularity.  Indeed, it states the particulars of Defendants' scheme, including:

- The "who"—Defendants, as CEO, President, and Head of Strategy of Kabbage, who directed, designed, and implemented Kabbage's PPP participation, including its faulty loan calculation methodology and its deficient processes for reviewing and approving loans, in conspiracy with other Kabbage employees;

- The "what"—PPP loans approved by Kabbage, which acted at the direction and under the control of Defendants Frohwein, Petralia, and Robinson, with material loan calculation errors and for borrowers who were patently ineligible or

46

fraudulent;

- The "where"—at Kabbage, which solicited, processed, and approved PPP applications from borrowers in all 50 states;

- The "when"—between April and October 2020; and

- The "how"—by approving and implementing a loan calculation methodology that flew in the face of CARES Act requirements and SBA regulations to systematically miscalculate thousands of PPP loans due to the SALT Error, USG Compl. ¶¶ 105–114, 145, and the $100k Error, USG Compl. ¶¶ 147–156, 185, and by approving and implementing loan review processes that failed to adequately confirm borrower identity and the borrower's eligibility as required by SBA regulations, USG Compl. ¶¶ 198–219, Defendants failed to satisfy the lender obligations under the PPP and confirm that PPP loans were approved with eligible loan amounts and to borrowers who submitted sufficient documentation to support their loan.

USG Compl. ¶¶ 1–330.  No more is required to state a claim for fraud under Rules 8(a) and 9(b).

## C.    **The Government Adequately Pleaded Falsity as to All Defendants.**

All three of the Government's FCA theories in this case—presentment under § 3729(a)(1)(A), false statements under § 3729(a)(1)(B), and conspiracy under § 37329(a)(1)(C)—require the identification of a false "claim."  Under the FCA, a "claim" includes "any request or demand . . . for money or property" made to a recipient if the Government provides or reimburses the recipient any portion of the money requested.  31 U.S.C. § 3729(b)(2).  In this case, the relevant "claims" are (1) the request for PPP processing fees submitted by Kabbage and its Lender Partners for processing PPP loans, *see* 15 U.S.C. § 636(a)(36)(P), and (2) the request for forgiveness and guaranty purchase payments submitted by Kabbage and its Lender Partners to the SBA where the lender approved the borrower's forgiveness application, or where the lender requested that SBA purchase the guaranty on the loan after the borrower defaulted or its forgiveness request was denied.  *See* USG Compl. ¶ 19.

A claim can be false under several theories, including when it is a factually false claim (*i.e.*, a claim that facially contains inaccurate facts or overcharges), *see, e.g.*, *United States ex rel.*

*Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1170 (9th Cir. 2006); and when it is legally false because it contains a false express or implied certification of compliance with requirements, *see, e.g.*, *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 186–190 (2016). "[W]here the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). Where liability is based on § 3729(a)(1)(B), the Government must allege a "false record or statement material to a false or fraudulent claim." *See also United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009).

    1.  <u>The Government's Complaint Adequately Alleges False Claims and False Statements.</u>

The Government's Complaint adequately alleges that Defendants made and caused two basic types of factually false claims and statements that resulted from Defendants' misconduct. *First*, as described in the Factual Background, Defendants fraudulently inflated borrowers' loan amounts due to the SALT Error and the $100k Error, resulting in factually false statements of the loan amount by the borrower on the application form, and by Kabbage and its Lender Partners on Forms 2484 (guaranty) and 1502 (processing fees). Compl. ¶¶ 27–28, 30, 40, 287–288. On Forms 1502, Kabbage and its Lender Partners also submitted factually false claims for inflated processing fees based on the fraudulently inflated loan amounts. USG Compl. ¶¶ 40, 302, 315. *See United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, No. 24-50176, 2025 WL 939890, at *5 (5th Cir. Mar. 28, 2025) ("The False Claims Act penalizes claims that are factually false . . . .").

*Second*, the Government's Complaint adequately alleges that Defendants repeatedly caused Kabbage and its Lender Partners to falsely certify compliance with material conditions of

payment. On Form 3507, Kabbage certified that it would maintain compliance with applicable PPP requirements. USG Compl. ¶¶ 23, 286. On Forms 2484, Kabbage and its Lender Partners falsely certified for each loan that they had complied with the lender obligations enumerated in paragraphs 3.b(i)–(iii) of the April 15, 2020, Interim Final Rule, when, in fact, they had not. USG Compl. ¶¶ 26, 287. Also in those Forms 2484, Kabbage and its Lender Partners falsely stated that they had "obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts)" when they had not. USG Compl. ¶¶ 27, 287. Similarly, Kabbage and its Lender Partners falsely stated and certified on forgiveness and guaranty purchase payment requests for loans fraudulently inflated by the SALT and $100k Errors that they confirmed the borrower's forgiveness calculation and issued the loan consistent with lender requirements. USG Compl. ¶¶ 31–32, 43, 290. These certifications were expressly false. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016) ("'[F]alse or fraudulent claims' include . . . claims containing express falsehoods.").

Moreover, SBA's processing fee, forgiveness, and guaranty payments were conditioned on these certifications of compliance. Kabbage and its Lender Partners, as PPP lenders, could not issue a PPP loan without first making these certifications, and SBA did not provide payment of processing fees until it had approved the guaranty, the lenders had made these certifications, and Kabbage or its Lender Partners issued the funds to the borrower. *See* USG Compl. ¶¶ 28–30. Furthermore, Kabbage and its Lender Partners certified compliance with these requirements to obtain guaranty purchase payments. *See* USG Compl. ¶ 32.

Accordingly, the Government's Complaint has alleged false statements and claims on both theories. *See United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365–66 (5th Cir. 2014).

2. Kabbage's Procedures for Processing PPP Loans, Designed, Implemented, and Approved by Defendants, Violated PPP Requirements.

Defendants argue that the Government's claims are "contingent on the assertion that [Kabbage's] automated system with manual second level review was inconsistent with SBA regulations," Joint Mot. 16, and that the Government's Complaint "demonstrates that Kabbage's automated reviews with manual backups met these standards," Robinson Mot. 12. Defendants dispute the sufficiency of the allegations and ask the Court to resolve a factual dispute by drawing inferences in their favor, which is inappropriate on a motion to dismiss. *See Morgan*, 659 F.3d at 370 n.17. Even so, as is clear from the allegations in the Government's Complaint, this is not a case just about the sufficiency of such a system. Rather, it is a case about Defendants' scheme to enrich themselves by using a shoddy loan approval process that they knew to be miscalculating loan amounts and approving ineligible PPP loans. Defendants ignore allegations that Kabbage's process—developed, implemented, and approved by Defendants—failed to comply with PPP requirements. These allegations satisfy Rules 8(a) and 9(b).

As explained in the Factual Background relating to the SALT and $100k Errors, the Government's Complaint alleges with particularity that the reason Kabbage decided to calculate loans for borrowers was to increase the number of loans processed and its profits (USG Compl. ¶¶ 86–87), that Defendants designed and approved that calculation (*id.* ¶¶ 88–93, 115–116), and that for thousands of borrowers, the calculation erroneously double-counted SALT, (*id.* ¶¶ 105–114) and failed to exclude annual per-employee compensation over $100,000 (*id.* ¶¶ 147–156). Where Kabbage, on Defendants' directive, required borrowers to use its calculation and incorrectly calculated loan amounts, the certifications that it had "confirmed the dollar amount of average monthly payroll costs . . . by reviewing the payroll documentation" were false. These allegations establish the falsity of the statements and certifications Defendants made and caused Kabbage and

its Lender Partners to submit to the SBA.

Relating to Kabbage's failure to review loans in compliance with PPP requirements, the Government's Complaint alleges with particularity that Kabbage's PPP loan review process, which was developed, implemented, and approved by Defendants, did not comply with PPP requirements, resulting in false certifications material to false claims.  For example, the Government's Complaint alleges that Kabbage's procedures did not require many borrowers to provide proof that they were in business as of February 15, 2020, as required by the CARES Act and as Robinson knew.  USG Compl. ¶ 204.  Robinson, with Frohwein and Petralia's knowledge, eliminated Yodlee, a fraud control, despite warnings that doing so would result in fraud.  USG Compl. ¶¶ 205–206.  Kabbage approved loans without reviewing borrowers' identification (USG Compl. ¶¶ 208–209); without conducting a background check of borrowers (*id.* ¶ 207); and without conducting OFAC checks, (*id.* ¶ 214).  Kabbage did not collect documents sufficient to confirm borrower eligibility (*id.* ¶¶ 217), as Robinson acknowledged and as all three Defendants knew because they approved the PPP platform (*id.* ¶¶ 83–84, 217).  Kabbage did not have enough fraud analysts to address the volume of suspicious PPP loans; Robinson was told this firsthand, and Frohwein was warned by Kabbage's Consultant 1 about this risk.  *See* USG Compl. ¶¶ 104, 168, 211–213, 216.  Robinson ignored recommendations to improve Kabbage's automated review of documents solely based on cost.  USG Compl. ¶ 210.  Where Kabbage, on Defendants' directive, eliminated safeguards against fraud such that it approved obviously ineligible and fraudulent borrowers, certifications that it had "confirmed the dollar amount of average monthly payroll costs . . . by reviewing the payroll documentation" and "confirm[ed] receipt of information demonstrating that borrowers had employees . . . on or around February 15, 2020" were false. These allegations suffice to establish the falsity of the statements and certifications Defendants made and caused Kabbage and its Lender Partners to submit to SBA.

Robinson argues that because PPP regulations permitted lenders to rely on borrower certifications, Kabbage and Defendants need only have "a review process" to comply with PPP requirements, such that Kabbage did not need to substantively review documents to confirm the borrower was in business as of February 15, 2020. *See* Robinson Mot. 11–12. But this contention belies the plain text of the statute and regulations, which laid out four requirements for lenders, only one of which specified that lenders "confirm receipt of borrower certifications." 85 Fed. Reg. 20811, 20815 (Apr. 15, 2020). The practical effect of Robinson's reading would be to eliminate the other three requirements listed in the regulation and the those laid out in statute, an outcome which must be disfavored.[19] *Cf. United States v. Palomares*, 52 F.4th 640, 644 (5th Cir. 2022) ("[W]e must give effect, if possible, to every clause and word of a statute." (quotation marks omitted)). Furthermore, the Government's Complaint alleges with particularity that Kabbage's review process, as it was, failed to confirm that borrowers were in fact in business as of February 15, 2020, as required by law. *See* USG Compl. ¶¶ 204, 326–328. The Robinson Motion mischaracterizes the plain language of the PPP lender requirements and ignores that the Government has adequately pleaded falsity under Rules 9(b) and 8(a)(2).

3. Defendants' Remaining Arguments Regarding Falsity Do Not Warrant Dismissal of this Case.

Defendants make several additional arguments regarding falsity that misconstrue the requirements of Rule 9(b) or mischaracterize the allegations to wrongfully conflate falsity and knowledge. *First*, the Joint Motion argues that the Government's Complaint fails to plausibly

---

[19]    Robinson rhetorically asks, in relation to his affirmative defense relating to Kabbage's choice to exclude eligible healthcare and retirement costs in the loan calculation, discussed in section III.E.2, why Defendants would not just accept borrower certifications about those costs to justify including them. *See* Robinson Mot. 21. The answer lies in the PPP regulations—which also required lenders to review the borrower's documents—and demonstrates that Defendants recognized that they needed to do so.

allege damages due to inflated forgiveness payments to borrowers with miscalculated loans because it does not particularly describe Kabbage's process for "receiving and processing forgiveness applications" or which Kabbage employees created that process. Joint Mot. 18; *see* Robinson Mot. 22. But "[t]his argument conflates the FCA's requirement that a false claim exist with Rule 9(b)'s requirement that the misrepresentations underlying the false claim be pled with particularity. A defendant can make a misrepresentation to the government separately from a claim for payment, even though the misrepresentation relates to the claim." *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 32 (D.D.C. 2010). As discussed above, the relevant misrepresentations reside in the statement of the loan amount and in the lender certifications on Forms 2484 and 1502 and requests for forgiveness and guaranty purchase payments, which are identified and described in the Government's Complaint. USG Compl. ¶¶ 27, 29–32, 303, 316. And the Government's Complaint plausibly alleges damages by identifying the total damage to the SBA along with examples of loans with calculation errors for which Kabbage and its Lender Partners submitted forgiveness applications for loans. USG Compl. ¶¶ 298-300, 303 (SALT); USG Compl. ¶¶ 311–313, 316. Rule 9(b) does not require identification of actual employees within a corporate entity who submitted false claims and details of dates when it has alleged with particularity the "particular circumstances constituting fraud." *Grubbs*, 565 F.3d 180 at 190 . "To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Id.*

*Second*, Robinson argues that, in order to survive a motion to dismiss, the Government must plead what review processes would have been sufficient. *See* Robinson Mot. 14. But nothing in Rule 9(b) requires the Government to plead as much. As described in the Factual Background, The Government's Complaint alleges with particularity the review that SBA's regulations required

of PPP lenders.  As set forth above, the Government's Complaint alleges how Kabbage's processes failed to comply with those requirements.  That is enough.  *See United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 371 (5th Cir. 2017) ("The general rule is that a plaintiff must plead details such as the time and place of the false representations."); *United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 206 (5th Cir. 2013) (holding that Rule 9(b) requires a complaint to "state the substance of the fraud that has been committed").

*Lastly*, Defendants argue that the Government has failed to allege falsity where the Government's Complaint pleads that the loan amounts for the example loans affected by the SALT and $100k Errors were "only . . . 'likely' allegedly impacted."  Joint Mot. 15 n.4 (citing USG Compl. ¶ 315–320); Robinson Mot. 17, 20 (citing USG Compl. ¶¶ 315–320).  However, this argument both misconstrues the Government's Complaint and conflates the elements of falsity and knowledge.  A fair reading of the Government's Complaint shows that (1) the Government identified the specific example claims of the $100k Error as ones that are false; (2) the Government alleged these claims are false—not "likely" false; and (3) for purposes of alleging scienter, not falsity, the Government's Complaint states that Kabbage knew at the time of the loan that it was likely false based purely on the documents submitted with the loan application.  Notably, the example claims relating to loans affected by the SALT Error do not contain the word "likely" at all.  The Government's Complaint, therefore, does not allege that the SALT and $100k Errors only "likely" affected the loan amount and does not concede falsity.

### D.    The Government Adequately Pleaded Scienter.

The FCA defines "knowingly" to mean that the defendant acted with "actual knowledge" that a statement or record was false, or in either "deliberate indifference" or "reckless disregard" of the statement's truth or falsity.  31 U.S.C. § 3729(b)(1)(A).  Specific intent to defraud is not

required.  *Id.* § 3729(b)(1)(B).[20]  As the Supreme Court clarified, "the term 'actual knowledge' refers to whether a person is 'aware of' information."  *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023) (quotation marks omitted).  "[T]he term 'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity."  *Id.*  Lastly, "the term 'reckless disregard' similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway."  *Id.*  Where an FCA complaint alleges "outright falsehoods" including express certifications, rather than "misrepresentations by omission," the scienter requirement does not extend to the materiality element.  *Peripheral Vascular*, 2025 WL 939890, at *9 .

      1.  <u>The Government's Complaint Adequately Alleges Defendants' Scienter.</u>

As described in detail in the Factual Background, section I.C, the Government's Complaint plausibly alleges the scienter of each Defendant and, contrary to Defendants' argument, does not make "sweeping conclusory allegations" of their deliberate ignorance and reckless disregard to Kabbage's loan calculation errors and failures in reviewing PPP loans according to PPP requirements.  Joint Mot. 15; *see also* Petralia Mot. 17.  The Government's Complaint alleges that each Defendant was repeatedly warned that Kabbage's calculation did not comply with statutory PPP requirements because it double-counted SALT, USG Compl. ¶¶ 120–141, and failed to exclude compensation over $100,000, USG Compl. ¶¶ 157–183, and yet they chose not to remedy the errors.  USG Compl. ¶¶ 142, 170.  Further, the Government's Complaint has alleged that Defendants were well aware of the defects in Kabbage's review of PPP loans and that it resulted in the approval of patently fraudulent and ineligible borrowers, through the numerous complaints

---

[20]     To the extent Robinson argue that dismissal is warranted because the Government's Complaint fails to allege "intent," *see* Robinson Mot. 14–15, the argument clearly fails.

and concerns raised to them by Kabbage employees, Consultant 1, journalists, and others.  USG Compl. ¶¶ 220–285.  These warnings came as early as April 2020, USG Compl. ¶¶ 120–122, 133, 137 (to Defendants re SALT Error); *id.* ¶¶ 158–160, 162–164 (to Petralia and Robinson re $100k Error); *id.* ¶¶ 205–207, 210, 230–233, 235–136, 242 (to Defendants re deficient reviews), before and as Kabbage began approving loans, *see* USG Compl. ¶¶ 52–54, and continued through August 2020, USG Compl. ¶¶ 165, 168–169, 171–174, 177–178, 180–181 (to Defendants re $100k Error); *id.* ¶¶ 248–255, 258–264, 266–268, 273, 275 (to Defendants re deficient reviews), all while Defendants pressed their employees to process loans quickly and declined to pause processing. USG Compl. ¶ 65–66, 72, 75, 235, 266–267.  Accordingly, the Government's Complaint sufficiently alleges Defendants acted at least with reckless disregard.  *See SuperValu Inc.*, 598 U.S. at 751; *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 380–81 (4th Cir. 2015) (holding that scienter was established by defendant's "seeming inaction in the face of . . . warnings"); *Siebert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1119, 1125 (N.D. Cal. 2014) (collecting cases and holding that relator had established reckless disregard as a matter of law where after an audit key employees "became aware that their accounting procedures *might not* comply with the NIH accounting regulations" (emphasis added)).  Allegations that Defendants engaged in the same conduct does not render the allegations conclusory.  *See Greene v. DeMoss*, No. 21-30044, 2022 WL 3716201, at *3 (5th Cir. Aug. 29, 2022) ("[I]dentical allegations do not necessarily defeat an otherwise sufficient pleading.").

Contrary to Defendants' argument, the Government need not allege that "any Defendant individually believed Kabbage's review system did not adhere to the SBA's guidance."  Joint Mot. 17; *see also* Petralia Mot. 21.  Rather, the Government must allege that the Defendants acted "knowingly" as defined by the FCA, and may do so generally.  *See United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014).  While the "FCA's scienter element refers to

respondents' knowledge and subjective beliefs," *SuperValu Inc.*, 598 U.S. at 749, that admonition does not require the Government to allege Defendants' actual knowledge when reckless disregard or deliberate ignorance has been plausibly alleged, *see id.* at 750 ("[E]ither actual knowledge, deliberate ignorance, or recklessness will suffice.").

      2.  <u>Scienter May Be Pleaded Generally Under Rule 9(b).</u>

Defendants argue that scienter must be pleaded with particularity pursuant to Rule 9(b) and that the Government's Complaint has failed to do so by not "alleg[ing] that any Defendant had personal knowledge" of the example claims in the Government's Complaint. Joint Mot. 18; Robinson Mot. 15, 20. However, as the Fifth Circuit has recognized, "[k]nowledge need not be pled with particularity under Rule 9(b); it need only be pled plausibly pursuant to Rule 8." *Bollinger*, 775 F.3d 255 at 260. Accordingly, the Government need not have alleged whether particular loans went through manual review to plead the *who* of Rule 9(b); the Government properly alleges the *who* when "[t]he Government identifies [Defendants] by name and explains [their] roles in [the] company[y] and in the fraudulent scheme as a whole." *United States v. Americus Mortg. Corp.*, No. 4:12-CV-02676, 2013 WL 4829269, at *8 (S.D. Tex. Sept. 10, 2013).[21] As set forth above, the Government's Complaint plausibly pleads scienter as to all three Defendants as it has identified Defendants by name, explained their roles, and the fraud scheme.

---

[21]     To the extent Defendants' argument here sounds in causation, rather than scienter, an FCA defendant may knowingly cause the submission of false claims without knowing the specific loans that would result in false claims, as discussed in further detail in section III.G.1. *See . Hodge*, 933 F.3d 468 at 475.

3. <u>The Government Knowledge Defense Is Not Properly Resolved on a Motion to Dismiss.</u>

Defendants argue that SBA's knowledge of Kabbage's automated business model and recognition that there would be fraud by borrowers preclude FCA scienter.[22] *See* Joint Mot. 17–18; Frohwein Mot. 23–24. This argument invokes the so-called government knowledge defense, which provides "that there is no scienter when the defendant knows—not just that the statements are false—but that the government knows that the statements are false." *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 380 (5th Cir. 2017). "If the government knows and approves of the *particulars of a claim* for payment before that claim is presented," the defendant's conduct cannot be said to be knowing under the FCA. *Id.* (emphasis added) (quotation marks omitted). However, "[t]he government knowledge defense is not appropriate at the motion to dismiss stage," *Bollinger*, 775 F.3d 255 at 264, and therefore is not proper grounds for dismissal. Consideration of this defense is premature on a motion to dismiss when all inferences must be drawn in favor of the Government. *Id.*

Defendants argue that because SBA knew that Kabbage used an automated loan application and yet approved Kabbage as a direct lender, the Government's Complaint has not properly alleged scienter. Joint Mot. 17–18. Nothing in the Government's Complaint supports their contention that "the SBA knew from a review of Kabbage's PPP lender application that it used an automated loan application, underwriting, and servicing platform." *Id.* (citing USG Compl. ¶ 54).

---

[22]    The Court should not entertain Defendants' insinuations that SBA is responsible for their fraud. *See* Joint Mot. 7–10; Frohwein Mot. 22–23. Courts have repeatedly held that a defendant may not blame the victim or contend that the victim acted negligently as a defense to fraud. *See United States v. Blair*, No. 19-00410, 2021 WL 5040334, at *36 (D. Md. Oct. 29, 2021); *United States v. Nekritin*, No. 10-CR-491, 2011 WL 2462744, at *7 (E.D.N.Y. June 17, 2011); *United States v. Letourneau*, No. 11 CR 182, 2013 WL 3834410, at *3 (N.D. Ill. July 24, 2013). The Court should reject Defendants' attempts to blame SBA for Defendants' own misconduct.

Defendants purport to rely on paragraph 54, but that simply states that SBA approved Kabbage's lender application without detailing the contents of that application. Defendants also point to no facts in the Government's Complaint to support that SBA knew that Kabbage systematically overstated PPP loan amounts due to the SALT and $100k Errors or failed to review PPP applications in good faith, that particular claims were false before submission, or that Defendants knew of SBA's knowledge at the time. Thus, Defendants' argument fails as procedurally improper and because the allegations of the Government's Complaint do not rebut Defendants' scienter.

Similarly, Frohwein argues that the Government cannot establish scienter when the SBA knowingly accepted a risk of fraud in the program, urged lenders to relax their underwriting guidelines and rely on borrower attestations, and publicly proclaimed it would pursue fraudulent borrowers. Frohwein Mot. 23–24. But Frohwein has not referenced any facts in the Government's Complaint to support his contention and instead asks this Court to make inferences in his favor. Rather, Frohwein improperly refers to materials outside the Government's Complaint. *Id.* at 23 (citing Joint Mot. § D). Moreover, Frohwein does not explain how those materials—publications that post-date the relevant time period—could possibly establish either SBA's knowledge of fraud by Kabbage before it submitted claims or Frohwein's knowledge of SBA's awareness. *See* section III.F.2 below. Even so, government acknowledgment that there may be fraud by PPP borrowers does not absolve PPP lenders, like Kabbage, and their executives from their obligation to comply with the PPP requirements for which they certified compliance. USG Compl. ¶ 22. In fact, the Government alleges that SBA Form 3507 specifically warned that any false statements made to the SBA and the Department of Treasury by a PPP lender could result in prosecution and imposition of civil money penalties under 31 U.S.C. § 3729—the FCA. USG Compl. ¶ 24.

Frohwein's reliance on a non-binding concurring opinion in *Southland Management* is not helpful here. *Southland* analyzed falsity under the FCA, not scienter, on review of post-trial

motions.  In *Southland*, the government filed an FCA action against apartment complex owners who received assistance payments from HUD for failing to maintain the complex in a decent, safe, and sanitary conditions in violation of the owners' agreement with HUD.  *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 671–72 (5th Cir. 2003).  However, given the owners' continued exchanges with HUD to correct the habitability of the complex, the Fifth Circuit held that the complex owners were entitled to receive the housing assistance payments and thus, their claims for payment were not false under the FCA as a matter of law.  *Southland Mgmt. Corp.*, 326 F.3d at 677.  Unlike the complaint in *Southland*, the Government's Complaint here does not allege a situation where the SBA knew of, worked with, or endorsed Kabbage's deficient processes and PPP loan calculations and had communicated with Kabbage or Defendants about them before Kabbage submitted Form 1502 for payment of processing fees.  *See generally* USG Compl.  For the same reasons, *United States ex rel. Butler v. Hughes Helicopters, Inc.* does not help Frohwein. 71 F.3d 321, 328 (9th Cir. 1995) (holding, on post-trial motions, that relator had not shown falsity where government knew of false statements, discussed them with defendant, and approved them before payment).

### 4.  Petralia's Arguments Regarding Scienter Are Unpersuasive and Fail.

Petralia attacks the Government's Complaint not because it lacks sufficient factual allegations of Petralia's scienter as defined by the FCA, which includes knowledge, deliberate ignorance, *or* reckless disregard, 31 U.S.C. § 3729(b)(1), but rather because Petralia disagrees with the facts alleged.  *See* Petralia Mot. 17–21.  The only "logical leap," Petralia Mot. 17, here is that Petralia ask this Court to evaluate sufficiency of the Government's Complaint as if it were a motion for summary judgment.  Hence, the Petralia Motion improperly attaches its own exhibits (text and instant messages), disputes the Government's allegations, argues for inferences in Petralia's favor, and attempts to shift blame to Robinson.  *See* Petralia Mot. 17–21, 18, 19–20.  The Court should

not consider the exhibits attached or the selected facts in her Motion relating to her purported subjective beliefs as they are neither part of the Government's Complaint nor are the exhibits central to the Government's FCA claims. Text and Slack messages, unlike a contract upon which a party has filed a breach of contract action, are not themselves central to the Government's FCA claims. *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537 (5th Cir. 2003) (holding that district court erroneously considered report cited in defendants' motion to dismiss because even though "the plaintiffs rely on" the report in their pleadings, they also "rely on substantial, other evidence to support their claims"). Under these circumstances, it would be inappropriate to consider content outside the pleadings to resolve disputed facts in a Rule 9(b) challenge. Fed. R. Civ. P. 12(b)(6).[23]

Petralia also asserts the Government's Complaint failed to allege her FCA scienter because it lacks certain allegations she believes should be included. *See* Petralia Mot. 17–20. Pointing out the absence of such allegations is misleading. The focus here is the inferences that the pleaded facts support—not what was not pleaded. *Bollinger*, 775 F.3d at 262–63. Additionally, these arguments mischaracterize the Government's Complaint, as discussed in section I.C.1 above.

Here, the Government alleges several facts from which this Court may infer Petralia knew (at the relevant times) of Kabbage's loan calculation errors and its deficient document review process resulting in Kabbage's approval and transmission to SBA of fraudulent and ineligible loans. USG Compl. ¶¶ 120–141 (SALT Error), ¶¶ 157–183 ($100k Error), ¶¶ 187–192, 220–285

---

[23]    Petralia cites to *D.H. Griffin Wrecking Co. v. 1031 Canal Dev., LLC*, 463 F. Supp. 3d 713, 721–22 (E.D. La. 2020), to argue that the "rule of completeness" requires consideration of Exhibit 1, attached to her motion. However, this assertion is misleading and asks the court to resolve a factual dispute without presentation of all the evidence that the Government or Petralia may have to establish whether she was a member of this Slack exchange. Therefore, Petralia "has not adequately demonstrated how failing to consider [the full Slack exchange] would be misleading." *Id.* at 722. Furthermore, *Griffin* is inapposite, as the court there held that consideration of the email was inappropriate in part where "the email appears relevant only to the factual development of [the party's] defense," *id.*, which is certainly the case here.

(defects in review process).  As laid out in the Factual Background, the Government alleges Petralia controlled and directed Kabbage and its PPP participation.  *See* USG Compl. ¶¶ 2–3, 6, 47, 59, 68–70, 84, 102.  She attended and participated in daily or twice-daily senior management meetings and approved Kabbage's PPP review procedures.  USG Compl, ¶¶ 59, 68, 70, 71, 199–200.  She attended Town Hall meetings where employee concerns of Kabbage's fraud processes and its responsibility for miscalculating loans were discussed.  USG Compl. ¶¶ 171, 219, 247, 258, 266–267.  Petralia even sent a text message to another Kabbage employee in late April 2020, saying she was "avoiding" a thread regarding improving Kabbage's evaluation of fraudulent loans.  USG Compl. ¶¶ 245–246.  In mid and late April 2020, Petralia ignored concerns raised that Kabbage was approving miscalculated and fraudulent loans, which were submitted to the SBA.  USG Compl. ¶¶ 100, 120, 125, 135–140 (SALT Error); ¶¶ 163–165 ($100k Error); ¶¶ 172, 242–246, 259–261, 263–264, 266 (ignoring suggestions and acknowledging Kabbage's deficient processes); ¶¶ 205–206 (removal of Yodlee which would likely increase fraud).

These allegations do not improperly lump the Defendants' knowledge together nor do they impute Kabbage's generalized corporate knowledge to Petralia as she argues, *see* Petralia Mot. 18, but, instead, relate to her specifically.  From these facts, it is more than reasonable to infer Petralia either actually knew that Kabbage was submitting false statements and claims—that is, miscalculated or fraudulent PPP loans—to the SBA, or was aware of the substantial risk that Kabbage was or most likely was approving such loans and submitting them to SBA contrary to PPP regulations, for which Kabbage would receive processing fees, but she consciously chose to keep her head in the sand.  *See SuperValu Inc.*, 598 U.S. 739 at 751 (reckless disregard sufficient to establish FCA scienter).  Although Petralia attempts to draw a comparison between the Government's Complaint and *United States ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754 (3d Cir. 2011), such comparison is inapposite.  Petralia Mot. 21–22.  Unlike *Chubb Institute*, a

declined case where the relator's complaint made the circular argument that the defendant knew it had submitted false claims because it had violated a program requirement, 443 F. App'x at 760–61, the Government's Complaint alleges numerous facts from which one could infer Petralia's knowledge under the FCA that Kabbage was submitting false claims for payment. *See Bollinger*, 775 F.3d at 260 (no particularity required for knowledge); *see also* USG Compl. ¶¶ 100, 120, 125, 135–140, 163–165, 171–172, 205–206, 219, 242–247, 258–261, 263–264, 266–267.

Finally, Petralia argues that the Government's Complaint shows she did not have the requisite knowledge because the Government did not allege that the numerous concerns and warnings were re-raised with her after she forwarded and delegated them to Defendant Robinson for handling. Petralia Mot. 19–20. Again, this is misdirection and asks the Court to evaluate the sufficiency of the Government's Complaint by looking to what is not alleged versus what is. *See Bollinger*, 775 F.3d at 262–63. Petralia's argument also seeks to have inferences drawn in *her* favor. If Petralia wants to blame her co-defendant, that is her prerogative, though it has no bearing on the sufficiency of the Government's Complaint at the pleading stage.

   5. <u>The Government Has Alleged Facts from Which This Court May Infer Frohwein Had the Requisite FCA Scienter.</u>

Frohwein argues that the Government relies only upon the facts that Frohwein was copied on certain communications about the SALT and $100k Errors and he received a consultant report on Kabbage's BSA/AML program to allege scienter. Frohwein Mot. 20–22, 24. He then improperly attaches text messages and the consultant's report to request this Court make inferences in his favor regarding disputed facts. *Id.* This incorrectly summarizes the Government's claims and is improper on a motion to dismiss, where a court must accept the well pleaded allegations and draw all inferences in favor of the plaintiff. First, as laid out in the previous section, these materials are outside the complaint and not central to the Government's claims, and they must not

be considered on a motion to dismiss. *See Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 (5th Cir. 2012).    Second, the Government's Complaint against Frohwein is based on his intimate involvement with Kabbage's participation during PPP and knowledge of the PPP requirements, USG Compl. ¶¶ 68–71, 84, 89, 222, 224, his knowledge of Kabbage's required compliance with the PPP requirements, *see* USG Compl. ¶¶ 52–53, his actual belief that Kabbage's PPP processes were deficient, USG Compl. ¶ 197, and that it could come back to haunt them, USG Compl. ¶ 271. The Government also alleges facts supporting inferences that Frohwein knew about the $100k and SALT Errors, Kabbage's problem with fraud, and Kabbage's deficient processes, not only about borrower fraud. USG Compl. ¶ 133 (4/20/20 email to Frohwein from Lender Partner 1 re: SALT Error); ¶ 137 (contact on 4/24/20 to Frohwein re: SALT error); ¶¶ 162–166 (4/29/20 knowledge of $100k Error); ¶¶ 168, 171 (6/16/20 report giving notice of $100k Error); ¶¶ 177–178 (7/13/20 and 7/16/20 reporters re: $100k Error); ¶¶ 219, 260, 262, 266-267, 271, 279 (notice of defects in review process).    The Government also alleges that despite that knowledge, Frohwein pressured Kabbage employees to pump up the volume of PPP loans, which he knew would be submitted to the SBA, which would result in Kabbage's receipt of processing fees.    USG Compl. ¶¶ 72, 75, 199.    These facts are more than sufficient to generally plead scienter pursuant to Rule 8(a).

Third, Frohwein argues that the Government's FCA claim against him rests solely on the fact that he held a high-ranking position at Kabbage, relying on *United States ex rel. Landis v. Tailwind Sports Co.*, 51 F. Supp. 3d 9 (D.C.C. 2014).    Frohwein Mot. 19–20.    There, the relator did not allege facts other than the defendant's "high-ranking position" and his failure to test members of the cycling team for doping, in the absence of allegations that he was otherwise informed about the doping.    51 F. Supp. 3d at 52.    The court held that those were insufficient to support an inference of scienter.    *Id.*    As laid out above and in section I.C.2, the Government's extensive and detailed allegations as to Frohwein are starkly different than the allegations in

*Landis*.  Here, the Government has detailed multiple instances where Frohwein was informed of concerns of the SALT Error, the $100k Error, and Kabbage's deficient processes, yet chose not to address the concerns and instead pressed his employees to submit affected claims to the SBA.

### E. Defendants' Arguments Erroneously Conflate Falsity and Scienter.

In their Motions, Defendants make two arguments that assert that falsity is lacking, and, therefore, that the Government cannot allege scienter.  Specifically, the Joint Motion argues that because PPP regulations were vague, the Government has not alleged falsity.  *See* Joint Mot. 17.  Defendants go on to argue that there therefore can be no scienter.  *See* Joint Mot. 14; Frohwein Mot. 23.  Defendants also contend that because the Government's Complaint did not plead around their affirmative defense relating to Kabbage's PPP loan calculation, the Government has inadequately pleaded falsity and scienter.  Robinson Mot. 16–20; *see also* Joint Mot. 15 n.4 (joining this argument).  These arguments are inaccurate and inconsistent with pleading requirements.

### 1. PPP Requirements Were Not So Vague As to Preclude FCA Liability.

Defendants argue that there can be no FCA liability because the PPP requirements for lenders were "vague and imprecise."  Joint Mot. 17.  Defendants argue that as a result, the Government's Complaint cannot adequately plead either falsity or scienter.  Joint Mot. 14; Frohwein Mot. 23.  Ironically, Defendants' vagueness argument is unpersuasive because their briefing does not identify which PPP requirements they contend are "vague and imprecise," nor does it explain why any of the particular requirements at issue has a disputed meaning.  By contrast, the Government's Complaint enumerates specific PPP requirements that the Defendants knowingly violated through their fraudulent scheme, each one of which is clear, set out in statute and regulation, and did not change throughout the program.

### a.   The PPP Requirements for Lenders Were Clear.

*First*, the CARES Act provides that for purposes of the PPP, "payroll costs" included "payment of State or local tax assessed on compensation of employees."  USG Compl. ¶ 35; 15 U.S.C. § 636(a)(36)(A)(vii)(I)(GG) (Mar. 27, 2020).   As the Government's Complaint alleges, Kabbage's inclusion of the SALT Error in its calculation of the borrower's loan, under the direction and operational control of Defendants, violated this requirement.  USG Compl. ¶¶ 105–114, 302–305.  *Second*, "payroll costs" excluded "compensation of an individual employee in excess of an annual salary of $100,000, as prorated for the covered period."  USG Compl. ¶ 35; 15 U.S.C. § 636(a)(36)(A)(vii)(II)(aa).  The Government alleges that Kabbage's inclusion of per-employee annual compensation over $100,000 in calculating borrower loan amounts, under the direction and operational control of Defendants, violated this requirement.  USG Compl. ¶¶ 147–156, 315–320.  *Third*, for each loan, Kabbage and its Lender Partners certified that they had "obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts)" and "confirm[ed] the dollar amount of average monthly payroll . . . by reviewing the payroll documentation."  USG Compl. ¶¶ 26–27, 287.  Contrary to Defendants' argument, this is not a general statement of compliance with "all regulations or statutes."  Joint Mot. 10; Robinson Mot. 10.  Rather, it is a specific certification that Kabbage complied with specific regulatory requirements.  Under Defendants' direction and operational control, Kabbage failed to do this with respect to loans with the SALT and $100k Errors and where Kabbage failed to conduct a good faith review. USG Compl. ¶¶ 302–305, 315–320, 325–329.

*Fourth*, the CARES Act required Kabbage to consider whether a borrower was in operation as of February 15, 2020, and had employees for whom it paid salaries and payroll taxes.  USG Compl. ¶ 25; 15 U.S.C. § 636(a)(36)(F)(ii)(II).  As the Government's Complaint alleges with particularity, Kabbage, under Defendants' direction and operational control, did not do this.  USG

Compl. ¶¶ 204, 326–328. *Fifth*, Kabbage was required to implement an anti-money laundering compliance program equivalent to that of a comparable federally regulated institution before making PPP loans. USG Compl. ¶ 44–46. As the Government's Complaint alleges, Kabbage, under Defendants' direction and control, failed to do so when they eliminated borrower identity verification (USG Compl. ¶¶ 205–206), approved loans with insufficient identity verification and lowered identity verification thresholds (*id.* ¶¶ 208–209), approved loans without OFAC checks (*id.* ¶ 214), and belatedly filed SARs contrary to attorney advice (*id.* ¶ 216). The Government's Complaint particularly alleges the requirements that Defendants are said to have violated, and they are not so vague and imprecise as to foreclose FCA liability.

Defendants appear to argue that the SBA did not require lenders to conduct a "good faith review" because that language derives from SBA's Frequently Asked Questions, which "was not binding authority." Joint Mot. 16–17. However, as alleged in the Government's Complaint, pursuant to SBA's April 15, 2020 Interim Final Rule, Kabbage was required to, and certified that it did, "review[]" borrower's applications and supporting payroll documentation. USG Compl. ¶¶ 26–27. As SBA recognized in its 2020 Frequently Asked Questions and in a 2021 Interim Final Rule, this incorporated an expectation that the lender would "act in good faith in loan origination." USG Compl. ¶¶ 21, 40. To call such review a "good faith" review imposes no new obligations on the lender but rather describes what SBA required of lenders who facilitated the emergency economic relief program in a time of national emergency. *See* USG Compl. ¶ 22. It is patently absurd to argue that a PPP lender could satisfy its obligations by 'reviewing' and approving a loan application despite knowing, as defined by 31 U.S.C. § 3729(b), that the borrower was ineligible or fraudulent or received a loan amount that did not comply with program criteria and therefore was not supported by the documentation submitted.

### b.  *Defendants' Arguments Regarding Statutory Vagueness and Scienter Are Unsupported.*

Defendants argue that the Government cannot allege the requisite FCA scienter because the PPP lender requirements were vague, such that no one could have knowingly failed to comply with them.  Frohwein Mot. 23; *see* Joint Mot. 14.  In support of this argument, Frohwein cites to *Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007), *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015), and *United States ex rel. Krawitt v. Infosys Techs. Ltd.*, 372 F. Supp. 3d 1078 (N.D. Cal. 2019).  These arguments fail.

As an initial matter, the Government's Complaint sufficiently alleges each Defendant was aware of the program rules for lenders, including the rules regarding sufficiency of loan review.  USG Compl. ¶¶ 70, 71, 222, 224, 226.  Robinson, in particular, was warned that SBA was concerned about fraud at the outset of the program, and that Kabbage needed to comply with BSA/AML requirements.  USG Compl. ¶¶ 221, 223, ¶ 225.  Defendants' argument that their scienter is inadequately alleged because the program rules were vague and imprecise is unavailing where the Government pleads the specific requirements at issue and their knowledge of them.

Furthermore, *Safeco* and *Purcell* do not support dismissal of the Government's FCA claim against Frohwein.  "[F]acial ambiguity" in a law or regulation "does not by itself preclude a finding of scienter under the FCA."  *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 754 (2023).  This is because "ambiguity does not preclude [FCA defendants] from having learned the[] correct meaning—or, at least, becoming aware of a substantial likelihood of the terms' correct meaning."  *Id.* at 753; *cf. United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1357–58 (11th Cir. 2005) (relying on case law that "question of fact" may exist "as to the defendants' understanding of the meaning of the regulatory language," despite regulatory ambiguity).  Accordingly, the proper inquiry is "on what the defendant knew" and not "on *post*

*hoc* interpretations" of the law or the facts "that may have rendered their claims accurate." *SuperValu Inc.*, 598 U.S. at 752; *see also United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015) (rejecting the argument that "a defendant cannot be held liable under the FCA so long as it has an objectively reasonable interpretation of an ambiguous provision" and holding that "[p]roving knowledge is in part an evidentiary question," even in cases of regulatory ambiguity).

As a result, *Safeco* and its progeny are inapposite. *SuperValu* expressly rejected the application of *Safeco* to the FCA, because *Safeco* "interpreted a different statute, the FCRA, which had a different *mens rea* standard, 'willfully.'" *SuperValu Inc.*, 598 U.S. 739 at 754 (quoting *Safeco*, 551 U.S. at 52). And pre-*SuperValu* cases like *Krawitt* which hold that that a defendant's "subjective intentions . . . are irrelevant" and look instead to the "*objective*[]" view of the regulations to resolve scienter as a matter of law on a motion to dismiss are not good law. *Krawitt*, 372 F. Supp. 3d at 1089.

Because the requirements for PPP lenders as alleged in the Government's Complaint were clear and not vague, this Court should decline to dismiss for lack of falsity. And because the Government's Complaint alleges that Defendants were subjectively aware of the requirements for PPP lenders, and because the proper inquiry is on what Defendants knew, which is best resolved after discovery, this Court should decline to grant the motions to dismiss for failure to allege scienter.

### 2.  The Government's Complaint Plausibly Alleges Falsity and Scienter Relating to the SALT and $100k Errors.

Citing to numerous materials outside the Government's Complaint, Robinson raises an affirmative defense and argues that the Government fails to plead falsity with respect to the SALT and $100k Errors because it does not allege that the inflation attributable to the SALT and $100k

Errors exceeded other eligible payroll costs that Kabbage chose not to include. Robinson Mot. 16–20; *see also* Joint Mot. 15 n.4. Therefore, Robinson says, the Government has failed to plead FCA scienter as to the SALT Error. Because this argument is improperly considered on a motion to dismiss and relies on materials outside the pleadings, it should be rejected.

### a. The Government Is Not Required to Rebut Robinson's Affirmative Defense.

"[P]laintiffs are not required to anticipate or plead around affirmative defenses," *Jackson v. Wright*, 82 F.4th 362, 368 (5th Cir. 2023), and "neither *Iqbal* nor *Twombly* suggests otherwise," *Levin v. Miller*, 763 F.3d 667, 671 (7th Cir. 2014). *See also Jones v. Bock*, 549 U.S. 199, 216 (2007); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). With this argument, Robinson raises an affirmative defense that, at most, would go to damages, not liability. The Government is still entitled to per-claim penalties for each false statement and claim. *Grubbs*, 565 F.3d 180 at 188 ("[S]tating a claim under § 3729(a)(1) does not require actual or specific damages, as the statute imposes a liquidated civil penalty on violators."). As laid out above, and as Robinson concedes, the Government's Complaint alleges that Kabbage, under Defendants' direction and operational control, undertook to calculate the loan amount and informed borrowers which costs it would and would not include. USG Compl. ¶ 86. It then did so incorrectly. USG Compl. ¶¶ 110, 111, 150. Whether Kabbage intentionally excluded other eligible payroll costs—with the consent of the borrower—would go only to damages, not to liability. Accordingly, the fact that the borrower application form did not ask a borrower to itemize average monthly payroll costs is of little consequence. *See* Robinson Mot. 17.

### b. The Court Should Not Rely on or Consider Materials Outside the Government's Complaint.

Robinson cites to two types of materials: an archived Kabbage website, and various news and other publications regarding employer-paid healthcare and retirement benefits and state

income tax rates. *See* Robinson Mot. 17–19 nn.14–22. The Court should disregard both, as they are "outside of the complaint" and do not meet the *Gines* exception. 699 F.3d 812, 820.

*First*, because Robinson did not attach the archived Kabbage website to his motion, his request for consideration must fail. *See Gines*, 699 F.3d at 820. Nevertheless, the website, though it may be "insightful," is not central to the Government's claims. *Scanlan*, 343 F.3d at 537. While the Government's Complaint refers to Kabbage's "online PPP lending platform," USG Compl. ¶¶ 82, 108, 109, the website cited in Robinson's Motion is neither the PPP application portal nor the application form used by Kabbage applicants. Rather, the website cited explains Kabbage's calculation at a high level and is not itself referenced in the Government's Complaint. To contend that "the full contents" of Kabbage's website are central to the Government's claims is inaccurate. Robinson Mot. 17 n.4. If anything, "it is much more central to the [Defendants'] defenses." *Scanlan*, 343 F.3d at 537. Furthermore, judicial notice of this website is not appropriate because a web-archived website of a now-liquidated company "cannot be characterized as generally known within the [district] or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Scanlan*, 343 F.3d at 537 (citing Fed. R. Evid. 201(b)).

*Second*, the Court should also disregard the materials relating to employer-paid healthcare and retirement benefits and state income tax rates cited in footnotes 15–22. Like the Kabbage website, these materials are not subject to the exception recognized in *Gines* because they are not attached to Robinson's motion. *See Gines*, 699 F.3d at 820. They are not "central" to the Government's claims, as Robinson appears to recognize. *See id.* Notably, Robinson does not ask the Court to take judicial notice of these facts, Robinson Mot. 20 n.23, which would not be appropriate in any event. *See Scanlan*, 343 F.3d at 537. As Robinson's argument shows, his contention is fact intensive and would require examination on a loan-by-loan basis whether a borrower whose loan was impacted by the SALT and $100k Errors made eligible healthcare and

71

retirement payments for employees and whether those payments, when taken into account in the loan amount, exceeded the inflation caused by the SALT and/or $100k Errors. Thus, it is premature to evaluate this argument on a motion to dismiss, where all inferences should be drawn in favor of the Government. The court should not "look behind a complaint's allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial." *Bollinger*, 775 F.3d at 260 (quotation marks omitted); *see id.* at 262–63 (reversing the grant of a motion to dismiss where district court erred "by focusing on facts the United States did not plead rather than the inferences that the pleaded facts supported").

### c. *Robinson's Affirmative Defense Is Not Grounds for Dismissal for Lack of Scienter.*

For the same reasons, Robinson's argument that Kabbage's choice to exclude healthcare and retirement costs from the payroll calculation undercuts the well-pleaded allegations of scienter fails. As stated above, the Government is not required to plead around affirmative defenses, and certainly not those that rely on materials outside the complaint. Nevertheless, Robinson attempts to create a dispute of fact regarding his and the other Defendants' scienter by pointing to materials outside the Government's Complaint. He then draws inferences in his favor to argue that scienter is not properly pleaded. *See* Robinson Mot. 21–22. However, that is not appropriate on a motion to dismiss, where the court must accept a complaint's allegations as true, view them in the light most favorable to the plaintiff, and draw all inferences in the plaintiff's favor. *See Bollinger*, 775 F.3d 255 at 260–61. Furthermore, since the Government's Complaint alleges that Defendants' conduct resulted in factually false statements and express false certifications regarding the borrower's loan amount, it need not allege Defendants' scienter as to materiality. *See Peripheral Vascular*, 2025 WL 939890, at *9.

### F.    The Government Adequately Pleaded Materiality.

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).  A matter is material if: (1) a reasonable person would attach importance to it "in determining a choice of action," or (2) "the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action," whether or not a reasonable person would do so. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016) (quotation marks omitted); *accord United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017) (requiring proof "only that the defendant's false statements . . . had the 'potential' to influence the government's decision, not that the false statements actually did so" (quoting *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 469 (5th Cir. 2009))).

*Escobar* identified several non-dispositive factors relevant to the materiality inquiry: whether the Government has designated compliance with a particular "requirement as a condition of payment"; whether the violation of that requirement goes to the "essence of the bargain" or is "minor or insubstantial"; and whether the Government acted when it had actual knowledge of similar violations.  579 U.S. at 193–95 & n.5  (quotation marks omitted).  "No one factor is dispositive, and our inquiry is holistic."  *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019); *Harman*, 872 F.3d at 665.  Because the inquiry is holistic, it is often a matter for the jury.  *E.g.*, *United States v. Hodge*, 933 F.3d 468, 474 (5th Cir. 2019) (affirming denial of motion for judgment).

1.   The Government's Complaint Satisfies the Materiality Standard.

   a.   Defendants' Fraudulent Conduct Is Material Under the FCA's Definition.

The Government alleges that Defendants, through their operational control of Kabbage, (1) fraudulently inflated the loan amounts of PPP loans by double-counting SALT and failing to exclude per-employee annual compensation greater than $100,000 in the loan calculation, and (2) failed to review PPP loans as required by SBA requirements, resulting in the approval of obviously ineligible and fraudulent borrowers. *First*, the alleged loan calculation errors inflated the loan amounts for thousands of borrowers. The fraudulently inflated loan amounts impacted SBA's payment of PPP processing fees, which was a percentage of the loan amount, USG Compl. ¶¶ 29, 294, 306. The loan calculation errors also impacted SBA's payment of loan forgiveness and guaranty purchase payments to Kabbage and its Lender partners. USG Compl. ¶¶ 298, 312. The loan calculation errors had a "natural tendency to influence . . . the payment or receipt of money" from SBA and were, therefore, material. *See* 31 U.S.C. § 3729(b)(4) (defining materiality under the FCA). Furthermore, a reasonable person would attach importance to the amount of a loan in the context of the PPP, where the loans were designed to cover actual gross payroll expenses and the statute carefully defined the maximum loan amount. USG Compl. ¶¶ 17, 34–39. And as Defendants note, demand for PPP funds among borrowers spiked, Joint Mot. 5–6, such that Congress authorized additional funding for the program only a month after the CARES Act was passed. *See* Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, § 101(a), 134 Stat. 620, 620 (Apr. 24, 2020). By inflating PPP loans, Kabbage both enriched itself through inflated processing fees and reduced the funds available to other eligible borrowers. *Cf. United States ex rel. Campbell v. KIC Dev., LLC*, No. EP-18-CV-193, 2019 WL 6884485, at *12 (W.D. Tex. Dec. 10, 2019) ("Because a reasonable person would attach importance to the price of a contract that he or she enters, the Government has adequately alleged

materiality." (quotation marks omitted)); *Longhi*, 575 F.3d 458 at 473 (commenting in determining damages that the purpose of the SBA grant program was "to award money to eligible deserving small businesses").

*Second*, SBA paid lenders processing fees to process PPP loans and modified the requirements laid out for the PPP lenders due to the time sensitive nature of the program. USG Compl. ¶¶ 21–23, 29–30. Therefore, where Kabbage—under Defendants' direction and control— failed comply with those requirements by miscalculating PPP loan amounts and by failing to review loan applications such that obviously ineligible borrowers were approved by Kabbage, that failure would have a "natural tendency to influence . . . the payment or receipt of money" from SBA and be material. *Cf. United States v. Quicken Loans Inc.*, 239 F. Supp. 3d 1014, 1040 (E.D. Mich. 2017) (concluding that the government adequately alleged materiality where "the existence of a lender's certification to FHA requirements is a prerequisite to the endorsement of FHA insurance"). The Government therefore has adequately alleged materiality under the FCA.

### b. *Defendants' Fraudulent Conduct Is Material Under Escobar.*

In *Lemon*, the Fifth Circuit reversed the district court's dismissal because relators sufficiently alleged materiality under the *Escobar* factors. 924 F.3d at 164. Specifically, the relators alleged that defendants fraudulently certified compliance with statutory and regulatory requirements, which were conditions of payment. *Id.* at 161. The alleged violations were "not minor" because they may have led "the government to make a payment which it would not otherwise have made." *Id.* at 163 (quotation marks omitted). And the government had taken criminal and civil enforcement actions in similar circumstances. *Id.* at 162. As in *Lemon*, the Government sufficiently pleaded materiality under each *Escobar* factor.

*i.    Conditions of Payment.*

"[I]f a requirement is labelled a condition of payment and it is violated, that alone does not conclusively establish materiality. But it is certainly probative evidence of materiality." *Lemon*, 924 F.3d at 161 (quotation marks and footnote omitted); *see also United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021) (factor weighed in favor of materiality where "a lender's truthful certification that it charged only permissible fees was a condition of" payment on loan guaranties); *cf. Marsteller ex rel. United States v. Tilton*, 880 F.3d 1302, 1313 (11th Cir. 2018) (explaining that "express condition of payment" is not required "for liability to attach"). As explained in section III.C.1 above, the false certifications submitted by Kabbage and its Lender Partners relating to each loan were a condition of payment of PPP processing fees and of PPP loan forgiveness and guaranty purchase payments by the SBA to the PPP lender. USG Compl. ¶¶ 28–29, 31–32, 43, 290. This *Escobar* factor weighs in favor of materiality.

*ii.    Essence of the Bargain and Neither Minor nor Insubstantial.*

Courts "consider the extent to which the requirement that was violated is central to, or goes to the very essence of, the bargain." *Mortg. Invs.*, 987 F.3d 1340 at 1347 (quotations marks omitted); *see United States ex rel. Frey v. Health Mgmt. Sys., Inc.*, No. 3:19-CV-0920, 2021 WL 4502275, at *12 (N.D. Tex. Oct. 1, 2021) (commenting regarding alleged loss of "millions or billions of dollars": "Undoubtedly, the Government would attach importance to such a large sum of money"). Conversely, "[i]f the noncompliance was merely minor or insubstantial, then the noncompliance would be unimportant to the Government." *Frey*, 2021 WL 4502275, at *12.

The alleged calculation errors are neither minor nor insubstantial. They fraudulently inflated the amount of each borrower's loan, which was carefully defined by statute. USG Compl. ¶¶ 33–36. Inflating the loan amount ran counter to the purpose of the PPP, to support small businesses by providing loans in the amount of their actual gross payroll costs. USG Compl. ¶ 17.

A loan exceeding a borrower's actual gross payroll costs is thus neither a minor nor insubstantial departure from the PPP's aims. And the alleged calculation errors resulted in hundreds of millions of dollars in overstated loans. USG Compl. ¶¶ 114, 145, 294, 298, 306, 312. As a result of these alleged errors, the Government made payments to Kabbage and its Lender Partners it would not have otherwise, in the form of inflated forgiveness and guaranty purchase payments, and inflated processing fees. *See Lemon*, 924 F.3d at 163; *Frey*, 2021 WL 4502275, at *12.

Moreover, the Government's Complaint alleges that Kabbage facilitated or made approximately $7 billion dollars in PPP loans and received more than $217 million in processing fees. USG Compl. ¶¶ 55, 202–203. It further alleges that Kabbage systematically failed to review loans in accordance with PPP requirements, resulting in the approval of obviously ineligible and fraudulent borrowers. The volume of Kabbage's PPP lending, coupled with Defendants' recklessness in implementing the PPP, renders the alleged noncompliance neither minor nor insubstantial. Furthermore, and as discussed in section I.A above, SBA paid lenders processing fees to process PPP loans and relaxed certain lender requirements to facilitate the timely distribution of economic relief. USG Compl. ¶¶ 21–23, 29–30. Therefore, the alleged failure of Kabbage, at Defendants' direction, to comply with and certify to those requirements goes to the essence of the bargain between the lender and the SBA. *Cf. Lemon*, 924 F.3d at 163 ("Defendants cannot provide and charge for services without certifying that the patients are first eligible for those services under the terms of eligibility established by Congress and Medicare . . . ."). This *Escobar* factor weighs in favor of materiality.

### iii. Government Action.

"[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."

*Escobar*, 579 U.S. at 194–95. "Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated," or "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position," that is "very strong evidence that those requirements are not material." *Id.* at 195.

For this factor to be probative of immateriality, the Government must have "actual knowledge that certain requirements were violated." *Id.* Actual knowledge of violations is not the same as awareness of allegations of violations. *See United States ex rel. Escobar v. Universal Health Servs., Inc*. (*Escobar II*), 842 F.3d 103, 112 (1st Cir. 2016); *Harman,* 872 F.3d 645 at 661 (clarifying that the proper inquiry is whether "the relevant government agency had actual knowledge of any violations when it decided to pay the claims"); *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A*., 507 F. Supp. 3d 734, 766 (W.D. Tex. 2020) ("It is not enough that the agency is aware of allegations of fraud, it must be aware of the fraud itself."), *aff'd, rev'd, & vacated in part*, No. 24-50176, 2025 WL 939890 (5th Cir. Mar. 28, 2025). Government action in response to fraud weighs in favor of materiality. *See United States v. Luce*, 873 F.3d 999, 1008–09 (7th Cir. 2017) (material as a matter of law where government debarred defendant for noncompliance); *Mortg. Invs.*, 987 F.3d at 1351–52 (fact issue where government knew of noncompliance and took actions); *United States ex rel. Mitchell v. CIT Bank, N.A.*, No. 4:14-CV-00833, 2022 WL 812364, at *13 (E.D. Tex. Mar. 16, 2022) (same where government knew of similar violations and refused to pay claims).

The Government's Complaint alleges that when informed of Kabbage's calculation errors, SBA stopped processing loans for forgiveness and guaranty purchase payment requests. USG Compl. ¶¶ 143–144 (SALT Error); USG Compl. ¶ 184 ($100k Error). Kabbage later settled its liability with the Government and admitted to the SALT Error and $100k Error. USG Compl.

¶¶ 146, 185.  These allegations weigh in favor of materiality as it relates to those theories.  That the Government has not made a similar allegation relating to Kabbage's failure to review PPP loan applications in accordance with lender requirements does not justify dismissal, however.  The Government is not required to "plead allegations about past government action in order to survive a motion to dismiss when such allegations are relevant, but not dispositive."  *Lemon*, 924 F.3d at 162 (quotation marks omitted).  Thus, this factor is neutral as to this theory.

    2.  <u>Defendants' Counterarguments Regarding Materiality Are Incorrect or Unavailing</u>

Defendants argue that materiality is insufficiently pleaded as to the loans affected by the SALT Error because the Government was on notice of the SALT error as of November 2020, but the Government's Complaint alleges that SBA did not stop processing these loans until sometime after January 2021.  Joint Mot. 21; *see also* Robinson Mot. 22.  But, this "vagueness about timing," Joint Mot. 21, does not defeat materiality.  The federal Courts of Appeal have consistently held that governmental awareness of a relator's allegations is not the same as actual knowledge of violations for purposes of establishing materiality.  *See, e.g.*, *Escobar II*, 842 F.3d at 112 (holding that "mere awareness of allegations concerning noncompliance" does not show "knowledge of actual noncompliance"); *accord United States ex rel. Heath v. Wisc. Bell, Inc.*, 92 F.4th 654, 665 (7th Cir. 2023) ("The government's knowledge of a pending lawsuit making allegations simply does not indicate actual knowledge of actual violations."); *United States ex rel. Druding v. Care Alts.*, 81 F.4th 361, 375 (3d Cir. 2023) ("Like our sister circuits, we will not equate the government's awareness of allegations of fraud with 'actual knowledge' that fraud occurred."); *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906–07 (9th Cir. 2017) (holding that continued payment of claims by the government cannot be dispositive where the "parties dispute exactly what the government knew and when, calling into question its 'actual knowledge'"); *cf. Escobar*, 579 U.S. at 195; *Harman*, 872 F.3d 645 at 661.  In any event, the

Government's Complaint alleges that when the SBA was informed that Kabbage had double counted SALT—after Kabbage changed its loan calculation methodology—SBA stopped processing forgiveness and guaranty purchase requests for affected loans. USG Compl. ¶¶ 143–144. Timing of receipt of relator's allegations is not dispositive where the Government's Complaint clearly alleges that after learning of the SALT double counting and Kabbage's decision to change the loan calculation, SBA stopped processing loans for forgiveness and guaranty purchase payment requests.

Defendants next contend that the Government's Complaint has failed to allege materiality in light of SBA's knowledge of the risks of fraud within the PPP and its continued payment of claims to Kabbage and other lenders throughout the program, citing to materials outside of the Government's Complaint in the Introduction of the Joint Motion. Joint Mot. 9–10, 20–21; Robinson Mot. 16. This argument is unavailing. Under *Escobar*, continued payment by the Government is relevant to the materiality inquiry if it can be shown that the Government knew of actual violations of certain requirements at the time of payment. *Escobar*, 579 U.S. at 195. Therefore, whether SBA continued payment to lenders for processing PPP loans despite knowledge of general fraud by borrowers is not the relevant inquiry, Joint Mot. 20–21;[24] neither is whether SBA continued payment despite knowledge that "some unspecified percentage of a lender's applications contained fraud," Robinson Mot. 15, 16.

In fact, Defendants point to no facts alleged in the Government's Complaint—or in their extrinsic materials—that show that when SBA paid claims for processing fees or forgiveness and guaranty purchase payments, it simultaneously possessed actual knowledge of Kabbage's

---

[24]    Similarly, that lenders were held harmless for acts of borrowers is irrelevant where SBA did *not* hold lenders harmless for their failure to comply with lender requirements. USG Compl. ¶ 22.

misconduct, either its failure to review loans or its systemic loan calculation errors. Nor do Defendants point to facts alleged in the Government's Complaint—or in their extrinsic materials—that SBA had actual knowledge of misconduct by lenders, rather than by borrowers. *See* Joint Mot. 9 (citing to 2020 ABC news article read into the Congressional Record, which discusses fraud by borrowers and applicants); *id.* at 10 (citing to June 2020 GAO report, which refers to program's susceptibility to "fraudulent applications"; primary recommendations were regarding SBA's failure to provide information regarding oversight to GAO during its review). But even if the Government's allegations supported Defendants' contention that SBA continued to make payments to Kabbage and its Lender Partners with full knowledge of Kabbage's fraudulent schemes at the time of payment, that fact alone does not undermine materiality, especially considering the exigencies at the start of the COVID-19 pandemic. *See* USG Compl. ¶¶ 17, 21. "While *Escobar* articulated that continued payment despite knowledge of fraud often indicates lack of materiality, 'often' does not mean 'always.'" *United States ex rel. Aldridge v. Corp. Mgmt., Inc.*, 78 F.4th 727, 738 (5th Cir. 2023) ("[V]arious circuits have recognized valid reasons why an agency may continue to pay claims despite allegations of fraud without defeating materiality—for example, public health and safety." *Id.* at 737.).

Besides, the Court should not consider the materials cited in the introduction of the Joint Motion. As an initial matter, a majority of those publications post-date the relevant time period alleged in the Government's Complaint, the first round of PPP between April and October 2020. Defendants do not explain how statements by government agencies other than the SBA in 2022, 2023, and 2024 are relevant to any element of this case. *See* Joint Mot. 1–2 (citing 2023 Government Accountability Office (GAO) report, SBA Office of Inspector General (OIG) reports from 2021 and 2022, and 2024 Congressional report); *id.* at 7 (citing 2024 Congressional report); *id.* at 8 (citing Congressional reports from September 2020 and 2024, 2024 Treasury Department

paper, and 2022 SBA OIG report); *id.* at 9 (citing 2024 Congressional report, 2024 Treasury Department paper, 2022 Congressional testimony, and 2022 SBA OIG report); *id.* at 10 (citing 2023 GAO report). Second, these documents are outside the pleadings, not attached to their motion, and not central to Government's claims, but rather Defendants' defenses. *See Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 (5th Cir. 2012).

### G.    The Government Adequately Pleaded Causation.

The FCA reaches "anyone who knowingly assists in causing the government to pay claims grounded in fraud, without regard to whether that person has direct contractual relations with the government." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (quotation marks omitted). "[A] person need not be the one who actually submitted the claim forms in order to be liable." *Id.* (quoting *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001)). The Fifth Circuit "employs traditional notions of proximate causation to determine whether there is a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim." *Aldridge,* 78 F.4th 727 at 741 (quotation marks omitted); *see Hodge*, 933 F.3d 468 at 475 . "[A] defendant's conduct may be found to have caused the submission of a claim . . . if the conduct was (1) a substantial factor in inducing [others] to submit claims . . . , and (2) if the submission of claims . . . was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020) (quotation marks omitted). The proximate causation standard "merely demands more than mere passive acquiescence in the presentation of the claim and some sort of affirmative act that causes or assists the presentation of a false claim." *Aldridge,* 78 F.4th at 741 (quotation marks omitted). "[C]onstructive knowledge, or what has become known as the ostrich type situation where an individual has buried [their] head in the sand and failed to make simple inquiries which would alert [them] that false claims are being submitted is sufficient." *Id.* (quotation marks omitted).

Defendants make two arguments regarding causation. First, Frohwein and Petralia argue that the Government's Complaint does not adequately allege that their personal conduct caused the submission of false claims to the government. Petralia Mot. 11–14; Frohwein Mot. 17–19. Second, Robinson contends that the Government fails to particularly plead his participation in the forgiveness process, and that with respect to false loan forgiveness claims resulting from the SALT and $100k Errors, borrowers' certifications on their loan applications are a superseding cause that break the chain of proximate causation. Robinson Mot. 22–25. These arguments fail.

1.  <u>The Government's Complaint Alleges Frohwein and Petralia's Personal Conduct Was a Substantial Factor in Causing the Submission of Claims for PPP Processing Fees.</u>[25]

The Government's Complaint describes in detail Petralia and Frohwein's personal involvement in Kabbage's operations, implementation of the PPP, and systemic failures in processing PPP loans, including their personal failure to correct wrongdoing, notwithstanding Petralia and Frohwein's arguments that the Government's Complaint conflates the conduct of the Defendants and attributes actions of other employees to them. Petralia Mot. 11; Frohwein Mot. 17–18. As described in detail in the Factual Background, the Government's Complaint plausibly alleges that Petralia and Frohwein were (1) a substantial factor in causing Kabbage and its Lender Partners to submit false and inflated claims for processing fees and inflated claims for loan forgiveness to SBA; and (2) the submission of claims to SBA was reasonably foreseeable or

---

[25]  Robinson has not joined this argument, although he claims to "incorporate[] by reference the *legal* arguments made in co-Defendants' individual motions, to the extent they relate to him." Robinson Mot. 25 n.27 (emphasis added). This perfunctory argument regarding the sufficiency of the Government's Complaint should be deemed waived with respect to the causation element, because he has not explained *how* the USG Complaint's factual pleading regarding causation is insufficient as to him. *See United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006) ("Inadequately briefed issues are deemed abandoned. A single conclusory sentence in a footnote is insufficient to raise an issue for review." (citation omitted)); *Landis*, 51 F. Supp. 3d 9 at 53. Nonetheless, the USG Complaint alleges that Robinson directly submitted claims, in addition to causing their submission. *E.g.*, USG Compl. ¶¶ 291, 304–305, 317–320, 326–328.

anticipated as the natural consequence of Petralia and Frohwein's actions. *See Ruckh*, 963 F.3d 1089 at 1107.

Specifically, the Government's Complaint alleges that Petralia and Frohwein, as Kabbage's co-founders and executives, directed the company to participate in PPP to raise capital and to increase the value of the company as they sought to sell it. USG Compl. ¶¶ 57, 59, 64, 66. They were involved in Kabbage's daily management: they attended and participated in daily senior management meetings regarding PPP and led weekly company-wide Town Halls throughout the relevant time. USG Compl. ¶¶ 70–71, 65, 171, 199, 219, 247, 258, 266–267, 274, 284. Frohwein, as CEO, signed agreements with Kabbage's Lender Partners to process PPP loans in accordance with program requirements. USG Compl. ¶¶ 52–53. Petralia directly oversaw Robinson. USG Compl. ¶ 70. Both Petralia and Frohwein knew that Kabbage was submitting claims and statements to the SBA relating to PPP loans. They closely tracked how many PPP loans were approved by Kabbage and submitted to the SBA, aware that processing fees wouldn't be paid until after loan disbursement. USG Compl. ¶¶ 75, 199. Frohwein personally pressured employees to process and submit as many PPP applications to the SBA as possible, USG Compl. ¶¶ 72, 75, as did Petralia, who also told senior management to prioritize lending "more $ faster to more businesses," USG Compl. ¶¶ 66, 75. The Government's Complaint further alleges that Petralia and Frohwein were repeatedly put on notice of the systemic errors in Kabbage's loan processing even as they knew that Kabbage was submitting claims to SBA, both regarding the calculation errors and the volume of fraudulent loans approved by Kabbage and Kabbage's approval processes. *See* sections I.C.1, I.C.2, and III.D above. That both Petralia and Frohwein are "alleged to have committed the same wrongful acts" does not render the Government's Complaint conclusory or inadequately alleged. *Greene*, 2022 WL 3716201, at *3 (quoting *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018)).

As alleged in the Government's Complaint, Petralia and Frohwein, Kabbage's President and CEO respectively, caused the submission of false claims where they had "the unfettered power, not simply to report, but to affirmatively stop fraudulent conduct, and instead affirmatively decide[d] to allow the fraud to continue, and furthermore, then enjoy[ed] the resulting corporate profits" when they successfully sold the company on the heels of their apparent PPP success. *United States ex rel. Schagrin v. LDR Indus., LLC*, No. 14-c-9125, 2018 WL 6064699, at *6 (N.D. Ill. Nov. 20, 2018) ("A corporate owner and manager's knowledge of fraudulent conduct by his company is not akin to that of a subordinate employee with no responsibility for the company's actions. Such an employee possesses only the power to report fraudulent conduct to supervisors or legal authorities."); *see also United States ex rel. Martino-Fleming v. S. Bay Mental Health Ctrs.*, 540 F. Supp. 3d 103, 131 (D. Mass. 2021) ("The causation element may be satisfied where a defendant with the power, authority, and duty to stop the submission of false claims does not intervene after learning about the existence of false claims." (quotation marks omitted)).

Indeed, that's precisely what the Government has alleged here: Petralia brushed off an explicit employee suggestion that Kabbage stop processing loans to improve fraud controls, as Frohwein knew. USG Compl. ¶ 266–267. By pushing employees to submit loans and turning a blind eye to the concerns about the adequacy of their processes, Petralia and Frohwein thus "operate[d]" Kabbage "under a policy that causes others to present false claims to the government." *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 187 (D. Mass. 2004); *see also United States ex rel. Ebu-Isaac v. INSYS Therapeutics, Inc.*, No. 2:16-cv-07937, 2021 WL 3619958, at *6–7 (C.D. Cal. June 9, 2021) (holding complaint sufficiently alleged that private equity firm, by providing "management, oversight, and strategic guidance" to portfolio company, caused the submission of false claims by portfolio company by "work[ing] with or through other entities"). These cases are consistent with the Fifth Circuit's decision in

*Aldridge*, which recognized that allegations of "constructive knowledge" are sufficient. 78 F.4th at 741 (quotation marks omitted).

Frohwein's argument that the Government's Complaint premises Frohwein's liability simply on his role as CEO misses the mark. *See* Frohwein Mot. 18. The Government's Complaint alleges with particularity his knowledge of the shortcomings and errors in Kabbage's PPP loan processing, his duty and ability to resolve those errors, and his decisions to take no action. *See United States ex rel. Pitts v. Hedges*, No. 5:16-cv-00127, ECF No. 196, slip op. at 17–18 (E.D.N.C., Mar. 31, 2022) (holding that evidence was sufficient to establish that defendants caused false claims, where the individual defendants had been repeatedly made aware of the fraud, "had the duty and power to stop the fraudulent . . . billing and . . . failed to do so"). Unlike the cases cited by Frohwein, the Government's Complaint contains allegations specific to him and does not simply recite his title, *see United States ex rel. Haight v. RRSA (Com. Div.), LLC*, No. 3:16-CV-1975, 2020 WL 6163139, at *5 (N.D. Tex. Oct. 20, 2020) (dismissing where complaint alleged only that defendant was "owner and officer" of some companies and "a manager and CFO" and "indemnitor" of another), or "barely mention[ him] by name." *United States v. Villaspring Health Care Ctr., Inc.*, No. 3:11-43, 2011 WL 6337455, at *9 (E.D. Ky. Dec. 19, 2011).

Petralia argues that the Government's Complaint insufficiently alleges that she caused the submission of claims because the Government's Complaint does not allege her specific role regarding the submission of the example claims. Petralia Mot. 12–13. However, the Government need not allege specific representative examples of false claims caused by each defendant to withstand a motion to dismiss. *Cf. Hodge*, 933 F.3d 468 at 475 (holding, on review of a motion for judgment, that "[e]ven if the defendants did not know which specific loans would eventually

default, it was foreseeable that a higher percentage of them would result in claims").[26]  Petralia's contention that the acts of her subordinate Kabbage employees who carried out the scheme are intervening causes that break causation is similarly unavailing.  Petralia Mot. 14, ECF No. 65.  "A cause can be thought superseding only if it is a cause of independent origin that was not foreseeable."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (quotation marks omitted).  Far from being a superseding cause, it was foreseeable that Kabbage employees would carry out the instructions of their President and CEO to process PPP loans.

These allegations support the plausible inference that Petralia and Frohwein's conduct foreseeably resulted in the approval of loans affected by the SALT and $100k Errors and of loans that were obviously ineligible and fraudulent due to Kabbage's insufficient review of loans.

> 2.  Robinson's Arguments Regarding Causation Similarly Do Not Warrant Dismissal.

Echoing Petralia, Robinson argues that the Government's Complaint inadequately alleges that Defendants caused the false loan forgiveness claims affected by the SALT and $100k Errors because the Government's Complaint "lacks specific allegations that Defendants participated in the submission of false loan forgiveness applications."  Robinson Mot. 25; *see id.* at 22.  However, as laid out above, for purposes of a motion on the pleadings, a complaint must include "allegations [that] are sufficient to support a plausible inference" that the damages to the Government were "a reasonably foreseeable outcome of [the defendant's] actions."  *Quicken Loans,* 239 F. Supp. 3d 1014 at 1043 (denying motion to dismiss on causation).  The Government's Complaint does so here, by alleging that as Defendants engaged in discussions with Amex to sell Kabbage's assets, they were planning for the PPP loan forgiveness process and thus were aware that Kabbage would

---

[26]    Despite claiming that it is a "bedrock principle" that an FCA complaint must allege specific instances where a defendant caused others to submit false claims or statements, Petralia provides no citation in support of this contention.  Petralia Mot. 12.

accept loan forgiveness requests from borrowers and would submit forgiveness applications even after their departure. USG Compl. ¶¶ 66, 280–285. Further, the PPP explicitly provided for borrower loan forgiveness, which was approved in the first instance by the PPP lender and resulted in payment to the lender by the SBA. USG Compl. ¶ 19. It was foreseeable, and indeed expressly contemplated by the structure of the program, that Kabbage would process and submit loan forgiveness requests for the loans that it had already miscalculated and approved. Accordingly, the Government's Complaint supports the plausible inference that Defendants' conduct was a substantial factor in the submission of the loan forgiveness requests.

Robinson further argues that the certifications by PPP borrowers to the accuracy of the request for loan forgiveness "broke the chain of proximate causation," characterizing the borrower's certification as criminal conduct. Robinson Mot. 22–25. However, Robinson's effort to deflect blame onto PPP borrowers, whose loans Kabbage miscalculated, does not break the direct chain of causation. As an initial matter, courts, including the Fifth Circuit, have recognized that false statements by lenders in government loan programs in applications for loan guarantees have a "causal connection" to a subsequent request for payment, even if the payment request is not made by the lender, as it is in the PPP. *United States v. Eghbal*, 548 F.3d 1281, 1284 (9th Cir. 2008); *Hodge*, 933 F.3d 468 at 475; *cf. United States v. Miller*, 645 F.2d 473, 476 (5th Cir. 1981); *Americus Mortg. Corp.*, 2017 WL 4083589, at *3 . Further, as noted by the Supreme Court in an analogous context, "it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action . . . from being the proximate cause of the harm." *Staub*, 562 U.S. 411 at 419. "A cause can be thought superseding only if it is a cause of independent origin that was not foreseeable." *Id.* (quotation marks omitted); *see also United States v. King-Vassel*, 728 F.3d 707, 714 (7th Cir. 2013) ("Generally, however, reasonably foreseeable intervening forces will not break the chain of proximate causation."). Put another way,

an intervening tortious act may be a superseding cause that breaks the chain of causation "*unless* the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 n.11 (3d Cir. 2004) (emphasis omitted) ("The fact that Mercy's alleged false certification was an unlawful act does not render it a superseding cause that absolves Zimmer from responsibility.").

Due to the PPP's structure, the borrower's forgiveness request and certification of the loan amount calculated (or miscalculated) and approved by Kabbage was reasonably foreseeable. USG Compl. ¶ 19, 31. Defendants expected borrowers to submit forgiveness applications; indeed Robinson expressed hope that he and others at Kabbage would not have to review those applications in the event Kabbage miscalculated loans, as Frohwein and Petralia knew. USG Compl. ¶¶ 282–285. Because Kabbage—not the borrower—calculated the loan according to the methodology approved by Robinson, it was reasonably foreseeable that the borrower would apply for forgiveness in that amount, which Kabbage had already blessed. USG Compl. ¶¶ 86–88, 90, 293. Importantly, the borrower's certification is not the only certification relevant to forgiveness: on Form 2484, Kabbage certified that it had confirmed the borrower's average monthly payroll, reviewed payroll documentation, and confirmed that the borrower had provided information supporting its payroll. This lender guaranty application was required for loan approval and disbursement, forgiveness payments, and guaranty purchase payments. USG Compl ¶¶ 27–28, 287. Because there is no other factual record to analyze, these issues are premature for a motion on the pleadings and should not be a basis for dismissal. *See Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 543 (6th Cir. 2000) ("In any case where there is a question upon which reasonable minds might differ as to the foreseeability of a particular risk or the character of an intervening cause, the question is one for submission to the jury under proper instructions as to

proximate cause." (quotation marks omitted)).

### H.    The Government Has Adequately Alleged an FCA Conspiracy.

1.  The Government Has Adequately Alleged the Existence of a Civil Conspiracy Between These Three Defendants and Their Agreement to Violate the FCA.

Any person who conspires to commit a violation under the FCA, 31 U.S.C. § 3729(a)(1)(A)–(B), (D)–(G), is liable to the United States for treble damages and civil penalties. *See* 31 U.S.C. § 3729(a)(1)(C). To allege an FCA Conspiracy, the Government must allege facts, from which the factfinder could reasonably infer, "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the Government and (2) at least one act performed in furtherance of that agreement." *Grubbs*, 565 F.3d 180 at 193 (quotation marks omitted). "[A]n express, explicit agreement is not required; a tacit agreement is enough. A conspiracy may be proven with only circumstantial evidence or inferred from a concert of action." *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 658 (N.D. Tex. 2020) (quoting *United States v. Shoemaker,* 746 F.3d 614, 623 (5th Cir. 2014)); *see Kanneganti*, 565 F.3d at 193– 94. The FCA does not require that the Government prove that these Defendants had a specific intent to defraud the Government. 31 U.S.C. § 3729(b)(1)(B) ("For purposes of this section—(1) the terms "knowing" and "knowingly"—(B) require no proof of specific intent to defraud."); *see, e.g.*, *Kanneganti*, 565 F.3d at 193 (not including intent to defraud as an element of an FCA conspiracy claim).

### a.  *Defendants Agreed to Violate the FCA.*

Defendants argue that the Government's Complaint contains only a bare allegation that Defendants entered into an unlawful agreement to support its conspiracy claim. Joint Mot. 25 (citing USG Compl. ¶ 346). But this argument ignores the many facts pleaded in the Government's Complaint which are sufficient to infer the existence of Defendants' agreement to use Kabbage to

submit to the SBA false claims and statements relating to PPP loan applications that were fraudulently inflated by the $100k and SALT Errors and which Kabbage failed to review in good faith. As described in detail in the Factual Background, the Government alleges that at the outset of PPP in March 2020, each of these Defendants saw the PPP as Kabbage's lifeline, knew that by maximizing the amount of PPP loans Kabbage approved they would, in turn, increase Kabbage's immediate revenue stream and its perceived value, which they could then use as leverage for the company's sale, and could then receive their payouts on their Kabbage stock and options. *See* USG Compl. ¶¶ 60–66

Thereafter, Defendants caused Kabbage to participate in the PPP and worked together, in concert, to maximize the amount of PPP loans Kabbage approved. *See* USG Compl. ¶¶ 51–54, 59, 68–71. For example, the Government alleges that Frohwein, Petralia, and Robinson discussed by text the CPA's email and voice message about the SALT Error. USG Compl. ¶¶ 137–139. They also texted about the $100k Error identified by a Kabbage employee. USG Compl. ¶ 165. Petralia asked Robinson to respond to employee concerns regarding Kabbage's miscalculation of loans in a company-wide Town Hall that Frohwein also attended. *E.g.*, USG Compl. ¶ 171. All three Defendants discussed loan review standards by text message and email on several occasions, *e.g.*, USG Compl. ¶¶ 222, 226, 229, as did Petralia and Robinson separately, *e.g.*, USG Compl. ¶ 227. Petralia and Robinson together reassigned and then fired Kabbage's Head of Fraud when she raised concerns about Kabbage's fraud controls. USG Compl. ¶ 237. Frohwein instructed Robinson to "kill" Consultant 1's report with its unfavorable language, an instruction that Robinson carried out. USG Compl. ¶¶ 256–257. *See Medoc Health Servs.*, 470 F. Supp. 3d 638 at 659 (finding "no serious question that the Complaint adequately allege[d] that the Defendants had an agreement," because it was "replete with examples of the Defendants working together to achieve their ends," including documenting kickbacks in spreadsheets and engaging in conference

calls and exchanging emails about the scheme).

The Government's Complaint goes on to allege that even though Defendants knew of the PPP requirements and had reason to know that Kabbage's loan calculation contained errors and that its PPP review process was grossly deficient, they chose to do nothing to correct these deficient processes and rather continued to pressure Kabbage employees to submit PPP loan applications to SBA for payment. *See* USG Compl. ¶¶ 111, 115–142 (SALT Error); ¶¶ 151–182 ($100k Error); ¶¶ 188–190, 192–193, 196–198, 205–275, 277–279 (deficient review process); ¶¶ 66, 72, 75, 104, 218, 235 (pressure). Defendants accomplished this objective by using their respective positions of authority within Kabbage to pressure Kabbage employees to increase PPP volume as they maintained close oversight and involvement with every step of Kabbage's development and deployment of Kabbage's PPP platform and its lending process. USG Compl. ¶¶ 59, 68–72. By their acts of omission and commission relating to Kabbage's flawed loan calculation methodology and deficient review processes, Defendants served their own ends and received lucrative bonuses and payouts when they successfully negotiated the sale of Kabbage's assets. *See* USG Compl. ¶¶ 69–70, 72, 84–85, 200, 205–210 (roles and approvals); ¶¶ 56, 80–81 (payouts).

### b. *Acts in Furtherance of the Conspiracy to Violate the FCA.*[27]

To withstand a motion to dismiss, the Government need allege only one act in furtherance of a conspiracy, and the alleged act may be committed by any member of the conspiracy. *See Grubbs*, 565 F.3d at 193–94 (holding that relator had particularly alleged overt acts in furtherance of conspiracy by nurses not named as defendants). The United States in its Complaint alleges many acts by Defendants to further their conspiracy to cause the submission of these false claims,

---

[27]    Defendants do not argue that the Government's Complaint has failed to allege facts relating to the acts in furtherance of the conspiracy. The Court should deem this point to be conceded.

in violation of the FCA. Specifically, as described in the Factual Background, Frohwein negotiated and entered into agreements with Kabbage's Lender Partners so that Kabbage could get a foot in the PPP door. USG Compl. ¶¶ 52–53. He attempted to conceal Kabbage's PPP inadequacies when he directed Kabbage employees "to kill the out of scope crap in [the draft report prepared by Consultant 1 on Kabbage's PPP processes]" and to "punch them in the fucking face to update that report and pull it back." USG Compl. ¶¶ 254–256. He also attempted to conceal internal Kabbage discussions about fraudulent Kabbage PPP loans by instructing employees to label those communications as "attorney-client" privileged. USG Compl., ¶ 279.

The Government further alleges that Petralia fired Kabbage's Head of Fraud in April 2020 after the Head of Fraud raised concerns about Kabbage's fraud controls, to remove a potential barrier to submitting as many PPP loan applications to the SBA as possible. *See* USG Compl. ¶ 103. Petralia expressly chose not to pause Kabbage's acceptance of PPP applications in July 2020 to improve processes and fraud controls, though she had the authority to do so, because she did not think they could "afford a few weeks. Or a week." USG Compl. ¶ 266. Lastly, Robinson was the Authorized Lender Official who submitted to the SBA all PPP loans that Kabbage directly issued to borrowers—including those suffering from the SALT and $100k Errors, and which Kabbage failed to review in good faith—directly oversaw and approved the PPP review process and loan calculation, and assigned inexperienced individuals to design Kabbage's PPP loan calculation methodology and oversee Kabbage's fraud and BSA/AML review. *See* USG Compl. ¶¶ 69, 85, 87–88, 95, 101, 103, 111, 115–118, 149–151, 215. He also took part in the firing of Kabbage's Head of Fraud. *See* USG Compl. ¶¶ 103, 210.

Defendants also chose to remain idle in the midst of concerns over Kabbage's PPP processes, in furtherance of their cash-grab objective to submit as many PPP loan applications to SBA as possible, to earn processing fees, increase the company's value for future sale, and catapult

the value of their Kabbage stock and options. *See, e.g.*, USG Compl. ¶¶ 142, 173, 254. They were ultimately successful, as Kabbage facilitated over $7 billion in PPP loans between April and August of 2020, earning hundreds of millions of dollars in processing fees. USG Compl. ¶¶ 55–56. This skyrocketed Kabbage's perceived value and profits, which allowed them to restore their executive compensation, receive bonuses, and create leverage for the sale of Kabbage's assets, resulting in Frohwein's receipt of over $17 million, Petralia's receipt of over $10 million, and Robinson's receipt of over $1 million in Kabbage stock and options they would not have received had Kabbage not participated in PPP. USG Compl. ¶¶ 60–61, 79.

Accordingly, when accepting the well-pleaded allegations of the Complaint as true and making all inferences in favor of the Government as is required, it is reasonable to infer existence of an agreement between Defendants to violate the FCA so they could line their own pockets. *See United States ex rel. Wilkins v. N. Am. Constr. Corp.*, 173 F. Supp. 2d 601, 640–41 (S.D. Tex. 2001) (allegations that defendants attended meetings and exchanged drafts and of omissions and false statements in various drilling logs led to a reasonable inference of an agreement between defendants to violate the FCA), *overruled on other grounds by United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458 (5th Cir. 2009). To add, the Government's allegations demonstrate the complexities of this fraud scheme such that the Rule 9(b) pleading requirements to give Defendants notice of the FCA conspiracy claim have been met, given the nature of this case, the fraud at hand, the uniqueness of Defendants' respective roles and their all-hands-on-deck approach, and how they used their roles to further their personal ends. Thus, Defendants' Joint Motion to dismiss the Government's FCA conspiracy claim should be denied.

2.  The FCA Does Not Require Allegations That Defendants Have a Shared Specific Intent to Defraud the Government.

Defendants argue that the Government must plead a "shared 'specific intent to defraud the government' by the alleged conspirators."  Joint Mot. 24.  Although there is an abundance of allegations from which this Court may reasonably infer existence of the Defendants' shared intent to defraud the SBA through their use of Kabbage's participation in PPP, Defendants are wrong that the Government must plead "shared specific intent" to defraud to properly allege an FCA conspiracy claim.  Prior to 1986, various courts, including the Fifth Circuit, construed the FCA as incorporating common-law elements for fraud—specifically the element of specific intent to defraud.  *See, e.g.*, *United States v. Priola*, 272 F.2d 589, 594 (5th Cir. 1959).  However, incorporation of the element of the "specific intent to defraud" into the FCA was expressly rejected by Congress, when it stated that it "believe[d] this standard [was] inappropriate in a civil remedy." S. Rep. No. 99-345, reprinted in 1986 U.S.C.C.A.N. 5266, 5272.  The scienter provision added by Congress, 31 U.S.C. § 3729(b), states that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1)(B).  In light of the 1986 amendments to the FCA, it would be error for the court to require that the Government allege facts that these Defendants shared a specific intent to defraud the Government.

The Fifth Circuit and other district courts have since course corrected.  *See Kanneganti*, 565 F.3d at 193 (intent to defraud not included in FCA conspiracy elements); *Medoc Health Servs.*, 470 F. Supp. 3d 638 at 658–59 (same); *Wilkins*, 173 F. Supp. 2d 601 at 639–40 (same). Accordingly, because it is contrary to Congressional intent, the FCA's plain language, and post-1986 Fifth Circuit precedent, this Court should decline to follow the non-binding district court opinion in *United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*, No. SA-17-CV-1249, 2019 WL 5970283, at *12 (W.D. Tex. Nov. 13, 2019), which erroneously

required an allegation of "intent to defraud" for an FCA conspiracy claim.

### 3. The Intra-corporate Conspiracy Doctrine Does Not Bar the Government's FCA Conspiracy Claim Against These Three Defendants.

Defendants assert that the intra-corporate conspiracy doctrine bars the Government's FCA conspiracy claim against Defendants as a matter of law. Joint Mot. 25. Defendants are wrong. The intra-corporate conspiracy doctrine "provides 'that the acts of the agent are the acts of the corporation' and that a 'corporation cannot conspire with itself.'" *United States v. St. John*, 625 F. App'x 661, 664–65 (5th Cir. 2015) (quoting *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994)). The Fifth Circuit has applied the intra-corporate conspiracy doctrine in antitrust and civil rights cases but has expressly declined to apply this doctrine in criminal conspiracy cases[28] because "the action by an incorporated collection of individuals creates the 'group danger' at which conspiracy liability is aimed." *St. John*, 625 F. App'x at 665 (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F. 2d 594, 603 (5th Cir. 1981)). Similarly, the purposes of the FCA, like the RICO and unlike antitrust laws, are not furthered by immunizing conspiracies within a corporation as opposed to those that involve outsiders. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 166 (2001) (holding that a corporation and its employee are distinct entities under RICO, declining to apply the intra-corporate conspiracy doctrine, and making clear that the intra-corporate conspiracy doctrine was an antitrust doctrine based upon antitrust objectives). The antitrust laws are intended to reach conspiracies among two or more separate business enterprises,

---

[28]    Although no circuit has held that the intra-corporate conspiracy doctrine applies to FCA conspiracies, district courts in the Fifth Circuit have applied the doctrine to FCA cases. *See, e.g.*, *United States ex rel. Cheryl Taylor v. Healthcare Assocs. of Tex., LLC*, No. 3:19-CV-02486, 2025 WL 624493, at *2 (N.D. Tex. Feb. 26, 2025) (applying the doctrine to FCA conspiracy between two defendant entities with the same agents); *United States ex rel. Ligai v. ETS-Lindgren Inc.*, No. H–112973, 2014 WL 4649885, at *15 (S.D. Tex. Sept. 16, 2014) (applying doctrine to FCA conspiracy between parent company and its subsidiary), *aff'd per curiam on other grounds*, 611 F. App'x 219 (5th Cir. 2015). These cases are not controlling, do not carry out the purpose of the FCA, and should not be followed.

not among two or more employees within a single enterprise. *See Dussouy*, 660 F. 2d 594 at 603. No similar objective is apparent in the FCA, which is intended to reach conduct occurring within a single business enterprise. Thus, it is fully consistent with the objectives of the FCA to attach liability to conspiracies among employees of a single corporation. *Cf. St. John*, 625 F. App'x at 665 ("The fiction of corporate entity, *operative to protect officers from contract liability*, had never been applied as a shield against criminal prosecutions." (emphasis added) (quoting *United States v. Wise*, 370 U.S. 405, 417 (1962) (Harlan, J., concurring))). Accordingly, the Court should decline to import this antitrust doctrine into the FCA, which is designed to reach all fraud schemes that result in financial loss to the Government. *See Kanneganti*, 565 F.3d at 193–94 (relator plausibly alleged an FCA conspiracy between two doctors and nurses who were employed by the same hospital).

However, even if the intra-corporate conspiracy doctrine applies, an exception exists "where corporate employees act for their own personal purposes," or, in other words, when they have an independent stake in achieving the object of the conspiracy. *Benningfield v. City of Houston*, 157 F.3d 369, 379 (5th Cir. 1998); *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 244 (5th Cir. 1978); *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 502 (D.S.C. 2016) (finding that even if defendants were considered to be part of the same corporation, doctrine did not apply because their receipt of millions in commissions were independent personal stakes); *see* Joint Mot. 25. Here, the Government alleges each Defendant had an independent personal stake—their respective payouts of their stock and options, in addition to, and independent of, their executive compensation at Kabbage—and that each used Kabbage to participate in PPP to profit from Kabbage's erroneous loan calculations and deficient document review processes, in violation of the FCA, and for their own personal benefit. *See* USG Compl. ¶ 80. Furthermore, their actions in ignoring red flags, which they knew could create liability for

Kabbage, cannot reasonably be said to be in Kabbage's best interest and therefore falls outside the scope of their employment. *See* USG Compl. ¶¶ 171, 247, 258, 266–267, 271, 284. For these reasons, this Court should reject Defendants' arguments.

## I.    The Government Adequately Pleaded Common Law Claims.[29]

The United States has the ability, independent of any statute, to recover monies its agents have wrongfully, erroneously, or illegally paid out. *United States v. Wurts*, 303 U.S. 414, 415–16 (1938); *LTV Educ. Sys., Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir. 1989). This entitles the United States to recover funds wrongly paid pursuant to the federal common law doctrines of payment by mistake and unjust enrichment. *See United States v. BNP Paribas SA*, 884 F. Supp. 2d 589, 616 (S.D. Tex. 2012) (unjust enrichment); *United States v. Mead*, 426 F.2d 118, 124 (9th Cir.1970) (payment by mistake). As with its FCA claims, the Government has adequately pleaded its common law claims, and the Court should deny the motions to dismiss these claims.

### 1.    The Government Adequately Pleaded Unjust Enrichment.

Unjust enrichment applies "where the person sought to be charged is in possession of funds which in good conscience and justice should not be retained, but should be delivered to the rightful owner." *United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 777 (N.D. Tex. 2003) (quotation marks omitted). "Recovery under unjust enrichment is justified when one person obtains a benefit from another by fraud, duress, or the taking of an undue advantage." *United States v. Medica-Rents Co.*, Nos. 03-11297, 06-10393, 07-10414, 2008 WL 3876307, at *3 (5th Cir. Aug. 19, 2008) (quotation marks omitted). A plaintiff must allege "(1) a benefit was conferred, (2) the recipient was aware that a benefit was received[,] and[] (3) under the circumstances, it would be unjust to

---

[29]    Robinson did not properly raise this argument in his personal Motion, and rather joined in Petralia and Frohwein's discussion in a footnote. Robinson Mot. 25 n.27. As stated above, this cursory argument fails to identify how the Government's pleading is insufficient and should be deemed waived. *See United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006).

allow retention of the benefit without requiring the recipient to pay for it." *United States ex rel. Silva v. VICI Mktg., LLC*, 361 F. Supp. 3d 1245, 1257 (M.D. Fla. 2019) (quotation marks omitted).

The benefit need not flow directly from the government to the defendant for the government to allege an unjust enrichment claim. *E.g VICI Mktg*, 361 F. Supp. 3d 1245 at 1257. Rather, it is sufficient that the defendant received and retained a benefit through an ownership structure, contract, or other arrangement. District courts have recognized that under federal common law, unjust enrichment may be alleged as to owners of companies who received federal funds or other entities to whom federal funds have flowed. *See, e.g.*, *VICI Mktg.*, 361 F. Supp. 3d at 1257–58 (holding that government alleged unjust enrichment claim against president of pharmacy); *Berkeley Heartlab*, 225 F. Supp. 3d 487 at 503 (holding that government alleged unjust enrichment as to CEO of testing company whose "salary and bonuses were directly tied" to company's profits); *United States ex rel. Cairns v. D.S. Med. LLC*, No. 1:12CV00004, 2015 WL 590325, at *6 (E.D. Mo. Feb. 11, 2015) (holding that government alleged unjust enrichment against physician practice and its sole owner and member as "[i]t is immaterial which of these two Defendants received the funds directly from the Government"); *United States ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 820 (W.D. La. 2007) (holding that government alleged unjust enrichment against home health organization and its principal, who received a "generous salary" and shareholder distributions); *United States ex rel. Borges v. Dr.'s Care Med. Ctr.*, No. 01-8112, slip op. at 39 (S.D. Fla. Jan. 29, 2007) (government may recover in unjust enrichment against part owner of business, "federal common law" does not require a direct benefit or veil-piercing).

The United States has alleged facts in support of unjust enrichment as to all three Defendants. Due to Defendants' fraudulent conduct, the United States conferred a benefit on Kabbage, which at all relevant times was operated and controlled by Defendants, in the form of

PPP processing fees for loans affected by the SALT and 100k errors and for loans where Kabbage failed to conduct review with program requirements. USG Compl. ¶ 51, 59, 76. The Government further alleges that the benefit of the processing fees was conferred on Defendants. PPP gave Kabbage a financial lifeline in March and April 2020. USG Compl. ¶¶ 63–65, 215. Enriched by the PPP processing fees to which Kabbage was not entitled due to Defendants' fraudulent schemes, Kabbage's value increased, resulting in the successful sale of its assets. USG Compl. ¶¶ 66, 75, 78–79. Thus, Defendants' compensation between April and October 2020, the bonuses they received in October 2020, and the payouts that they received from the sale of Kabbage's assets in October 2020, were all due to, and contingent on, Kabbage's participation in PPP. USG Compl. ¶¶ 78–80. Defendants never returned the benefit to the Government, because, after the sale of Kabbage's assets, Defendants received lucrative payouts, departed Kabbage, and left the entity so cash poor that it liquidated. USG Compl. ¶¶ 80–81. As alleged in the Government's Complaint, equity, good conscience, justice, and fairness require that Defendants return their ill-gotten gains to the Government. *See Berkeley Heartlab*, 225 F. Supp. 3d at 503.

The cases to which Petralia and Frohwein cite to argue that the Government must show a direct benefit to allege an unjust enrichment claim are inapposite and distinguishable. *See* Petralia Mot. 22–23; Frohwein Mot. 25. In *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 209 (2002), the Supreme Court considered whether the injunction sought to require payment to an ERISA plan by a beneficiary was "equitable relief" under ERISA's enforcement provision. The Court considered whether the nature of the relief sought was "*typically* available in equity." *Id.* at 210 (quotation marks omitted). It contrasted the right to restitution at law with restitution in equity to conclude that the petitioners sought legal, not equitable, restitution because equitable restitution requires that "money or property identified as belonging . . . to the plaintiff . . . clearly be traced to particular funds or property in the defendant's possession," an element not

present in that case.  *Id.* at 213–14.  The Court did not opine on the elements of unjust enrichment under federal common law.  Further, Petralia and Frohwein cite cases that apply state, rather than federal, common law.  *See In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 361 (D.R.I. 2017) (declining to address various state unjust enrichment claims in a class action until class certification stage); *Gearhart v. Express Scripts, Inc.*, 422 F. Supp. 3d 1217, 1226 (E.D. Ky. 2019) (Kentucky law); *Century Indem. Co. v. URS Corp.*, No. 08-5006, 2009 WL 2446990 at *5 (E.D. Pa. Aug. 7, 2009) (Pennsylvania law).  Lastly, in *VICI Mktg.*, 361 F. Supp. 3d 1245 at 1257–58, the court dismissed an unjust enrichment claim where the complaint made no allegation of benefit conferred on one defendant, either directly or indirectly, while declining to dismiss as to two other defendants where there was such an allegation.  Because the Government adequately alleges the benefit conveyed upon the Defendants, the court should decline to dismiss the unjust enrichment claim.

### 2.  The Government Adequately Pleaded Payment by Mistake.

Under the federal common law doctrine of payment by mistake, the Government must show that it made payments "under an erroneous belief, which was material to the payment decision."  *Aging Care Home Health,*, 474 F. Supp. 2d 810 at 819 (quotation marks omitted); *see also United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 776 (N.D. Tex. 2003).  Importantly, the Government "is entitled to obtain repayment from a third party into whose hands the mistaken payments flowed where that party participated in and benefitted from the tainted transaction."  *LTV*, 862 F.2d 1168 at 1175.  "The order in which the funds flowed is immaterial."  *Id.*

The Government alleged that SBA paid claims to Kabbage for fraudulently inflated processing fees for loans affected by the SALT and 100k Errors and for loans where Kabbage, under Defendants' direction and operational control, failed to review the loan application as required.  USG Compl. ¶ 76.  The SBA did so under the erroneous beliefs that the loan amounts

complied with the CARES Act and Kabbage complied with PPP lender requirements when it had not, due to false certifications that Defendants submitted and caused to be submitted. USG Compl. ¶¶ 77, 289. The USG Complaint further alleges that Defendants both participated in and benefitted from the payments to Kabbage. As laid out in section III.I.1 above, payments flowed through to Defendants, resulting in a benefit to them. USG Compl. ¶¶ 51–53, 59, 61–66, 75–76, 78–81.

Defendants do not contest that the Government's Complaint adequately alleges Defendants' participation in the scheme. *See* Petralia Mot. 25; Frohwein Mot. 25. Still, the Government has satisfied pleading requirements. The USG Complaint alleges that Defendants had operational control over Kabbage's PPP participation. USG Compl. ¶¶ 68, 71. From there, the USG Complaint details the participation of each Defendant with particularity, as discussed in depth in the Factual Background. *See* section III.G.1 above. Petralia and Frohwein were jointly responsible for operations. USG Compl. ¶ 70. Robinson, meanwhile, reported directly to Petralia and oversaw the teams that designed and implemented Kabbage's loan calculation, signed off on Kabbage's loan calculation, and even attempted to make a calculation himself. USG Compl. ¶¶ 69–70, 111, 115, 116. As discussed above, each Defendant was informed of concerns regarding the SALT Error on many occasions yet took no corrective action. USG Compl. ¶¶ 120, 122, 130–131, 137–138 (Robinson); ¶¶ 125, 137, 140 (Petralia); ¶¶ 133, 137, 141 (Frohwein); ¶¶ 139, 142 (no action). Each Defendant was also warned of concerns of the $100k Error and yet took no corrective action. USG Compl. ¶¶ 158–162, 169, 172–174, 177, 181–182 (Robinson); ¶¶ 164, 165, 172, 174, 177–178 (Petralia); ¶¶ 165, 168, 177–178 (Frohwein).

Similarly, each Defendant was aware of the lender requirements regarding loan review and had the power to approve and change them. USG Compl. ¶¶ 84, 200–201; 205–08, 215, 226. Robinson and Petralia declined to introduce controls suggested by Kabbage employees, USG Compl. ¶¶ 210, 260–265, with Petralia choosing to continue processing PPP applications rather

than improving fraud controls, USG Compl. ¶¶ 266–267. Frohwein knew of the decision to continue processing PPP applications in the face of employee concerns, USG Compl. ¶¶ 266–267, and instead, throughout the program, pressured employees to process PPP loans as quickly as possible, USG Compl. ¶ 72. As a result, the USG Complaint alleges, for purposes of Rules 9(b) and 8(a)(2), that payment of PPP processing fees for loans affected by the SALT and $100k Errors and where Kabbage failed to conduct loan review "depended heavily on [Defendant's] actions and directly benefitted [Defendants]." *LTV*, 862 F.2d at 1175 (government alleged educational institution's participation in mistaken student loan payments where institution received tuition payments and jointly applied for student loan with bank).

### J.  The Court Can and Should Consider Defendants' Fifth Amendment Invocations in Evaluating the Sufficiency of the Government's Complaint.

As mentioned in the Defendants' Joint Motion (at 21–24), in 2024 the United States took testimony from each Defendant pursuant Civil Investigative Demands. *See* USG Compl. ¶¶ 85 nn.2–3, 89 n.4. During that testimony, each Defendant repeatedly invoked his or her Fifth Amendment rights against self-incrimination when asked about the Government's specific allegations in this case—or, about virtually any topic relating to their roles and responsibilities at Kabbage. USG Compl. ¶¶ 85 nn.2–3, 89 n.4. The Government's Complaint notes those invocations where relevant, but it does not rely on them as a "shortcut to meet its pleading obligations," *see* Joint Mot. 22, because none of the Government's particularized allegations is based *solely* on an invocation. There is no reason why the Court may not consider those invocations for purposes in evaluating the Government's Complaint under Rules 8 and 9(b).

The United States is not at this time asking this Court to rule that any of the Defendants' Fifth Amendment invocations warrant an adverse inference, as that determination requires an evidentiary ruling. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000).

Adverse inferences are available in the civil context against parties who have invoked their Fifth Amendment right against self-incrimination. *See SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998). Because "[s]ilence is often evidence of the most persuasive character," an adverse inference is "merely a realistic reflection of evidentiary significance of the choice to remain silent." *Baxter v. Palmigiano*, 425 U.S. 308, 318–19 (1976) (quotation marks omitted). Invocations made during investigative testimony are no less deserving of an adverse inference than invocations made during a deposition in litigation. *SEC v. Kornman*, 391 F. Supp. 2d 477, 494–95 (N.D. Tex. 2005) (adverse inference may be drawn from invocation in SEC investigation); *SEC v. Farrell*, No. 95-CV-6133T, 1996 WL 788367, at *7 (W.D.N.Y. Nov. 6, 2006) (same).

Defendants are wrong, however, that the *fact* that they invoked their Fifth Amendment rights during the Government's investigation is irrelevant at this pleading stage of this litigation. "[S]ilence in the face of accusation is a relevant *fact*," *Baxter*, 425 U.S. at 319 (emphasis added), and the enumeration of relevant facts is precisely the plaintiff's task under Rule 9(b). The fact of a defendant's invocation may support multiple inferences, but one of them is certainly that a defendant who "fail[s] to contest an assertion" acquiesces in that assertion "if it would have been natural under the circumstances to object to the assertion in question." *Baxter*, 425 U.S. at 318–19 (quotation marks omitted). Nothing prevents this Court from considering this potential inference to evaluate the sufficiency of the Government's Complaint, which it must do "with all reasonable inferences drawn in the light most favorable to the plaintiff." *Morgan*, 659 F.3d at 370 n.17.

There are also common-sense reasons for this Court to consider Defendants' invocations at this time. An invocation in a civil case "poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for truth." *Glanzer*, 232 F.3d at 1264 (quotation marks omitted); *see also SEC v. DiBella*, No. 3:04-CV-1342,

2007 WL 1395105 (D. Conn. May 8, 2007) (noting that defendant's invocations "severely hampered the Plaintiff's ability to conduct meaningful discovery and proceed with its case"). As is apparent from the USG Complaint, Defendants' sweeping invocations of their Fifth Amendment rights hampered the Government's ability to gather relevant facts, including about their roles and responsibilities at Kabbage. It is appropriate, therefore, for the Court to consider those invocations in evaluating the Complaint under the deferential dismissal standard. If, as Defendants suggest (Joint Mot. 23 n.5), they do not continue to assert their Fifth Amendment rights as this litigation proceeds, the Court will have an opportunity to consider their changed position as an evidentiary matter at summary judgment or trial. In the meantime, the Defendant's Fifth Amendment invocations in response to questions relating to specific communications and documents make the alleged FCA violations more plausible and particularized, even if those invocations are withdrawn or otherwise deemed inadmissible at a later procedural stage.

## IV.    REQUEST FOR OPPORTUNITY TO REPLEAD

In the event that any of its claims are deemed deficient, the Government respectfully requests an opportunity to amend the Complaint to cure any deficiency identified. Rule 15(a)(2) provides that courts should freely give leave to amend when "justice so requires." This Rule "evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005). Rule 15 "evinces a bias in favor of granting leave to amend" which should be given absent a "substantial reason." *Id.* at 994. The United States has not previously requested leave to amend.

## CONCLUSION

For these reasons, we respectfully request that this Court deny in full Defendants' Motions to Dismiss under Rules 12(b)(2), (b)(3), (b)(6) and 9(b).

Dated: April 17, 2025                              Respectfully submitted,

                                                   MICHAEL D. GRANSTON
                                                   Deputy Assistant Attorney General

                                                   ABE MCGLOTHIN, Jr.
                                                   Acting United States Attorney
                                                   Eastern District of Texas

                                                   */s/ Betty Young*
                                                   JAMES G. GILLINGHAM, Texas Bar
                                                   #24065295
                                                   BETTY S. YOUNG, Texas Bar #24102498
                                                   Assistant U.S. Attorneys
                                                   Eastern District of Texas
                                                   110 N. College Street, Suite 700
                                                   Tyler, Texas 75702
                                                   E-mail: James.Gillingham@usdoj.gov
                                                   E-mail: Betty.Young@usdoj.gov
                                                   (903) 590-1400
                                                   (903) 590-1436 (facsimile)


                                                   JAMIE ANN YAVELBERG
                                                   COLIN M. HUNTLEY
                                                   SARAH E. LOUCKS
                                                   KELLY E. PHIPPS
                                                   Attorneys, Civil Division
                                                   United States Department of Justice
                                                   P.O. Box 261
                                                   Ben Franklin Station
                                                   Washington, D.C. 20044
                                                   E-mail: Sarah.E.Loucks@usdoj.gov
                                                   E-mail: Kelly.E.Phipps@usdoj.gov
                                                   (202) 616-4203
                                                   (202) 514-0280 (facsimile)
                                                   **ATTORNEYS FOR THE**
                                                   **UNITED STATES OF AMERICA**

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2025, I caused a true and correct copy of the foregoing document to be transmitted through the Court's electronic mailing service (CM/ECF) to all counsel of record who have consented to electronic service by the Court's electronic mailing service (CM/ECF).

*/s/ Betty Young*
BETTY S. YOUNG

107