# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PAUL PIETSCHNER, <br><br> Plaintiff, <br><br> v. <br><br> KATHRYN PETRALIA; ROBERT FROHWEIN; and SPENCER ROBINSON, <br><br> Defendants. | Civil Action No.: 4:21-CV-110-SDJ |

## DEFENDANT SPENCER ROBINSON'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT IN INTERVENTION FOR IMPROPER VENUE, LACK OF PERSONAL JURISDICTION, AND FAILURE TO STATE A CLAIM

TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................... ii

ARGUMENT ........................................................................................................................1

    I.    THE GOVERNMENT FAILED TO ALLEGE FALSITY, SCIENTER, AND MATERIALITY FOR ITS SBA/AML AND 3.b.(i)-(iii) CLAIMS...............................1

    II.    THE GOVERNMENT FAILED TO ALLEGE FALSITY, SCIENTER, AND MATERIALITY FOR ITS 100K ERROR CLAIMS ......................................................5

    III.    FOR THE 100K AND SALT ERRORS, THE GOVERNMENT HAS NOT PLAUSIBLY ALLEGED THAT KABBAGE SUBMITTED FALSELY INFLATED LOAN AMOUNTS ..............................................................................8

    IV.    THE EXTENSIVE BORROWER CERTIFICATIONS REQUIRED FOR LOAN FORGIVENESS, AND SBA'S FINAL VOLUNTARY AGREEMENT, BROKE THE PROXIMATE CAUSATION CHAIN BETWEEN DEFENDANTS' CONDUCT AND KABBAGE'S LATER FORGIVENESS APPLICATIONS ...........11

CONCLUSION ...................................................................................................................11

i

TABLE OF AUTHORITIES

Regulations

Small Business Administration Interim Final Rule, 85 Fed. Reg. 20811
(Apr. 15, 2020)..................................................................................................................1, 2, 4

Other Sources

Paycheck Protection Program Loans Frequently Asked Questions, (Apr. 6, 2020),
https://www.sba.gov/sites/default/files/2023-03/Final%20PPP%20FAQs.pdf...............................1

Paycheck Protection Program Borrower Application Form (Mar. 30, 2020),
https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Application-3-30-
2020-v3.pdf...................................................................................................................................2

*See How We Calculate Your Potential Loan Amount*, KABBAGE.COM (June 22, 2020, 7:31
PM) [https://web.archive.org/web/20200618201819/https://www.kabbage.com/paycheck-
protection-program-loans/?utm_medium=email&utm_source=govdelivery] ...................................9

Defendant Spencer Robinson writes separately to rebut the details of the Government's Opposition (Opp.) to his Motion to Dismiss (SR MTD).

**I      THE GOVERNMENT FAILED TO ALLEGE FALSITY, SCIENTER, AND MATERIALITY FOR ITS SBA/AML AND 3.b.(i)-(iii) CLAIMS.**

Citing controlling SBA guidance that lenders could rely on borrower representations,[1] Robinson argued that the Complaint's descriptions of Kabbage's loan review process demonstrated that Kabbage complied with 3.b.(i)-(iii). SR MTD (Dkt. 67) 11-13 (quoting Comp. ¶90). In opposition, the Government responds that Robinson was somehow asking the Court to override the specific requirements of SBA's April 15, 2020 Interim Final Rule (IFR). Opp. (Dkt. 72) 51-52. Not so. The SBA guidance about relying on borrower certifications and not replicating borrower calculations is entirely consistent with, and informs, the regulatory language.

There was no legal falsity because Kabbage met the requirements of 3.b.(i)-(iii). Neither the Government's Complaint nor its Opposition denies that Kabbage complied with 3.b.(i) by "Confirm[ing] receipt of borrower certifications." 85 Fed. Reg. 20811, 20815 (Apr. 15, 2020). Section (ii) required Kabbage to "Confirm receipt of *information* demonstrating that a borrower . . . paid salaries and payroll taxes on or around February 15, 2020." *Id*. (emphasis added). The Government contends that Kabbage did not require "many" borrowers to "provide proof" that they were in business as of February 15, 2020 and asked manual reviewers just to confirm that borrowers had uploaded tax documents without independently reading them. Opp. 51 (citing Compl. ¶204). That argument is factually misleading. PPP loan eligibility was calculated based on average monthly payroll costs for the preceding year, or for a seasonal quarter in 2019. The PPP application form instructed:

---

[1] Paycheck Protection Program Loans Frequently Asked Questions, at Answer to No. 1 (Apr. 6, 2020), https://www.sba.gov/sites/default/files/2023-03/Final%20PPP%20FAQs.pdf.

1

> For purposes of calculating "Average Monthly Payroll," most Applicants will use the average monthly payroll for 2019, excluding costs over $100,000 on an annualized basis for each employee. For seasonal businesses, the Applicant may elect to instead use average monthly payroll for the time period between February 15, 2019 and June 30, 2019, excluding costs over $100,000 on an annualized basis for each employee. For new businesses, average monthly payroll may be calculated using the time period from January 1, 2020 to February 29, 2020, excluding costs over $100,000 on an annualized basis for each employee.[2]

Confirming that borrowers had uploaded requested documents was enough, because all those documents likely contained payroll information for periods before February 15, 2020.

Far worse, the Government's argument ignores that all successful borrowers certified under penalty of perjury: "The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC."[3]  In other words, SBA told Defendants in binding guidance that they could rely on borrower certifications; but the Department of Justice is telling them the opposite—arguing that Defendants had to demand documentary proof and manually review it. These contentions are literally frivolous.

Section (iii) required Kabbage to "Confirm the dollar amount of average monthly payroll costs for the preceding calendar year *by reviewing the payroll documentation submitted* with the borrower's application." 85 Fed. Reg. at 20815 (emphasis added). Robinson's MTD pointed out that Kabbage did just that. Paragraph 90 of the Complaint admits that Kabbage had an automated process to "review[] the payroll documentation submitted with the borrower's application" — "Kabbage then used an automated program to scan the tax documents, extract data, and compare them against the borrowers' entries. At times, Kabbage employees manually reviewed the

---

[2]    https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Application-3-30-2020-v3.pdf.
[3]    *Id*.; *see* SR MTD 12.

2

supporting documentation." SR MTD 12-13. The Government's Opposition did not address these allegations in its own Complaint.

The Government's Opposition relies on the 100k and SALT errors to support its legal falsity claims. Opp. 50. We will address those two very different "errors" in separate sections below. For 3.b.(iii) purposes, the Government's arguments about the 100k error directly contradict SBA's binding guidance that "lenders may rely on borrower representations, including with respect to amounts required to be excluded from payroll costs." SR MTD 12. Payments to employees in excess of 100k a year were "amounts required to be excluded from payroll costs." As Robinson argued, paragraphs 149-50 of the Complaint acknowledge that Kabbage relied on borrower representations that the borrowers did not have employees making more than 100k. *Id*. at 13.  When borrowers denied that they paid employees more than 100k and did not upload W-2s for such employees, there were no documents to review or confirm.  The Government's contention that this process violated 3.b.(iii) is also frivolous. Again, the Government's Opposition did not address paragraphs 149-50 in its own Complaint.

With respect to the SALT error, which the Government failed to allege actually overstated eligible loan amounts, it is enough to state the obvious: the SALT error had nothing to do with BSA/AML, or 3.b.(iii), or Kabbage's "review" of borrower applications. It was an innocent, uniform calculation error. SR MTD 21, citing Compl. ¶¶102, 114, 117 (employees with no tax background "misapprehended these tax documents" and mistakenly included SALT withholdings in loan calculations).

Tellingly, the Government disclaims any obligation to plead *what* review processes would have been sufficient to meet 3.b.(iii). Opp. 53-54. The Government's Opposition does not suggest that SBA ever defined what a good faith review meant, or that lenders could not rely on automated

processes. In the absence of any clear guidance, the Government's Opposition lists a hodgepodge

of "examples" supposedly adding up to an overall failure to meet PPP "requirements," whatever

those were. Opp. 50-51.

The Government then describes various issues related to verifying customer identity,

including the elimination of Yodlee software to access customer banking activity, not reviewing

driver's licenses, and supposedly not running OFAC checks. Opp. 50-51. The Government cites

no regulations or guidance requiring any of those things. Section 3.b.(iv) of the IFR required only

that lenders "[f]ollow *applicable* BSA requirements," and said that "such a program *may* include

a customer identification program (CIP), which includes identifying and verifying their PPP

borrowers' identities (including *e.g.*, date of birth, address, and taxpayer identification number)[.]"

85 Fed. Reg. at 20815 (emphases added).

Again, the Government's Complaint admits that Kabbage had an automated CIP program

that flagged issues for manual review:

> Kabbage also used a primarily automated process to "review" PPP loan
> applications to confirm the borrower's eligibility and in an attempt to comply
> with KYB/KYC requirements, as required under PPP regulations. At a high
> level, Kabbage processed the information submitted by the borrower through
> several software programs designed to verify borrowers' identities and business
> information and evaluate their documents for fraud concerns. If a borrower's
> information was flagged in Kabbage's automated process, the application was
> sent for manual review by a Kabbage employee or contractor, who then reviewed
> the submitted materials, requested additional documentation, and decided
> whether to decline or approve the application. (Compl. ¶94).

At a "high level," what's wrong with that? DOJ lawyers may believe Kabbage could have

done *more*. They allege no guidance actually requiring *more*, they allege no scienter evidence

that Defendants received notice that SBA required *more*, and they allege no materiality evidence

that SBA would not have paid out loans if it knew the details of Kabbage's CIP program. The

Government's desire for *more* is not material because PPP loans did not implicate typical

4

criminal anti-money-laundering program concerns. The "applicable," material, BSA requirements involved CIP procedures—Kabbage indisputably had those.

The Government's list of grievances concludes with allegations that Kabbage did not hire enough manual reviewers (without an allegation that the short-staffing led Kabbage to skip manual reviews required in its process) and that "Robinson ignored recommendations to improve Kabbage's automated review of documents solely based on cost." Opp. 51. Jury bait does not create unwritten legal obligations to spend money on every suggestion for improvement.

All this necessary detail rebuts the Government's lengthy response to Robinson's argument that the Government failed to allege legal falsity. Consistent with Robinson's MTD, the Joint Reply correctly counters the Government's materiality arguments by noting that SBA and Defendants were in the same boat—they knew that the program's need for speed and reliance on borrower certifications would allow a substantial number of fraudulent applications to get through the system. Joint Reply 10-11. That's why the Complaint fails to plead scienter and materiality with respect to certifications about BSA/AML or 3.b.(i)-(iii) compliance. SR MTD 14-16.

## II.   THE GOVERNMENT FAILED TO ALLEGE FALSITY, SCIENTER, AND MATERIALITY FOR ITS 100K ERROR CLAIMS.

Robinson argued that Kabbage's process with respect to the 100k error complied with SBA guidance, and the Government thus had failed to allege falsity, scienter, and materiality. SR MTD 11-16. The Government's Opposition seems to suggest that regardless of whether Kabbage's automated process complied with SBA guidance, Defendants were not doing a "good faith review" because they received notice that Kabbage's process sometimes "'failed to exclude compensation over $100,000,' USG Compl. ¶¶ 157–183, and yet they chose not to remedy the errors. USG Compl. ¶¶ 142, 170." Opp. 55. Robinson argued the Complaint's allegations about a failure to take corrective action were hopelessly vague. SR MTD 15 & n.10, quoting Compl. ¶183 ("What actions

5

were taken is unclear, but subsequent reviews of Kabbage's loan data revealed numerous loans affected by the $100k Error, which Kabbage had not fixed."). The Government's Opposition cites Compl. ¶183 without mentioning its concession that "What actions were taken is unclear."

The Government's Complaint and Opposition attempt to impose an unstated requirement that Kabbage should have disregarded borrower certifications, and failed "to implement logical or mathematical checks or caps" comparing the number of employees to the loan amount requested to catch 100k errors. Opp. 35. The Complaint's examples of 100k errors allege that "Kabbage knew based only on the loan amount and stated number of employees that the borrower was likely not eligible for the loan in the amount" received. Compl. ¶¶315-18, 320.

The Joint Reply has the right answer to those arguments: "To the extent a calculation comparing the number of employees to the requested loan amount would have indicated $100K errors, such a comparison was not required under the SBA's rules or guidance, and could not have been material, because SBA received the same figures (i.e., payroll and headcount) *and could have done the simple arithmetic itself.*" Joint Reply 11.

We write separately to address the Government's additional materiality responses. The Government misleadingly asserts that the Complaint alleges "Government action" in response to the 100k error: "[the] Complaint alleges that when informed of Kabbage's calculation errors, SBA stopped processing loans for forgiveness and guaranty purchase payment requests. USG Compl. ¶¶ 143–144 (SALT Error); USG Compl. ¶ 184 ($100k Error)." Opp. 78. The Government's Opposition also relies on a 2021 voluntary agreement between Kabbage and SBA ("2021 Agreement") to resolve the suspension of Kabbage's forgiveness applications. Opp. 34-35. The Complaint explicitly relied on that 2021 Agreement. Compl. ¶¶145–146, 185.

6

Because the Government referenced the 2021 Agreement in its Complaint and relies on it to support its claims and materiality arguments, this Court may consider it. We have attached it as Exhibit 1. It actually tells a story of Government *action* on the SALT error, and a story of Government *inaction* on the 100k error. The 2021 Agreement said that Kabbage had provided SBA a list of 53,000 PPP loans that "*may* have been originated with excess loan amounts." Ex. 1 at 1. The 2021 Agreement explicitly defined "Excess Loan Amounts" as "involving duplication of state and local income taxes ('SALT')." *Id*. In other words, despite SBA being on notice about the alleged 100k error (Compl. ¶184), the 2021 Agreement did not address the 100k error at all.

Consistent with Robinson's arguments in Section III below, the 2021 Agreement said that Kabbage had hired Kroll to review its methodology for estimating health and retirement benefits in comparison to the SALT error amounts. Ex. 1 at 2 (Recital H). Kroll shared a report with SBA that concluded "with few immaterial exceptions, that health insurance and retirement costs are significantly greater that SALT across the Number of Employees, the Loan Size Amount, and the Borrower Types categories." *Id*. at 3 (Recital L). Kroll reviewed Kabbage's conclusion that only approximately 4,000 loans had SALT withholdings higher than estimated health and retirement benefits, and the difference totaled only $13.5 million. *Id*. at 3-4 (Recital M). Kroll found that Kabbage's methodology was "not unreasonable." *Id*. SBA accepted a $30 million "Voluntary Payment," and agreed that the $30 million "constitutes full compensation to SBA for the Excess Loan Amounts related to the Affected PPP Loans and resolves all issues solely related to the Excess Loan Amounts." *Id*. at 4.

Critically, without ever mentioning the 100k error, SBA agreed to accept Kabbage's forgiveness applications going forward. Ex. 1 at 5. Contrary to the Government's materiality arguments, the Complaint's allegations and the 2021 Agreement demonstrate that the 100k error

7

was not material to SBA's willingness to process Kabbage's loan applications. The individual Defendants had left Kabbage more than a year earlier. The 2021 Agreement also demonstrates that SBA's knowledge of the 100k errors, combined with the extensive borrower representations required for forgiveness applications, broke the chain of causation between Defendants' alleged conduct a year earlier and SBA's forgiveness payments.

In a last resort, the Government claims that DOJ's claims against Kabbage when it was in bankruptcy were "Government action" demonstrating materiality. Opp. 78-79. In other words, we have to prove materiality to sue you, and the fact that we're suing your company for the same stuff demonstrates materiality. DOJ's decisions to pursue this mistaken case four years later have nothing to do with what was material to SBA in 2020-21. This argument is entirely circular.

The Government is also using the wrong falsity predicate to support materiality. SBA announced from the jump that borrowers were responsible for calculating their own loan amounts. The borrower's falsity was the inflated loan *amount*. Kabbage's alleged falsity was a *review* failure. The Government has not plausibly alleged that it stopped processing loan applications for Kabbage (or any other lender) based solely on the lender's reliance on borrowers' representations that they did not pay any employees more than 100k. The 2021 Agreement refutes that theory.

### III.    FOR THE 100K AND SALT ERRORS, THE GOVERNMENT HAS NOT PLAUSIBLY ALLEGED THAT KABBAGE SUBMITTED FALSELY INFLATED LOAN AMOUNTS.

Robinson's MTD demonstrated that the Kabbage application process at the heart of the Government's Complaint actually *understated* loan amounts by failing to include allowable health and retirement benefits. Robinson argued that the Government therefore had failed to plead with particularity that the 100k and SALT errors led to knowingly false claims for overstated loan amounts. SR MTD 16-22. The 2021 Agreement provides further support that "with few immaterial

exceptions, [] health insurance and retirement costs are significantly greater that SALT[.]" Ex. 1 at 3 (Recital L).

The Government's Opposition did not dispute that Kabbage's process understated loan amounts by failing to include health and retirement benefits. Instead, the Opposition made procedural attacks on Robinson's reference to an archived Kabbage webpage informing PPP loan applicants that because Kabbage could not readily scan non-standard retirement and health benefit documentation, "we're not currently including employee-paid group health benefits or retirement contributions in loan calculations."[4]

The Government contends that the archived webpage that was part of Kabbage's web platform and described Kabbage's loan application process to applicants was not "referred to in the Complaint" and was not "central" to the Government's claims. Opp. 71. That's strange, because elsewhere the Government's Opposition said that it was suing Defendants because they "directed, designed, and implemented Kabbage's PPP participation, including its *faulty loan calculation methodology*." Opp. 46 (emphasis added). The Complaint described Kabbage's web portal and automated application and review process at length. *See, e.g.,* Compl. ¶¶82-90. To be clear, the Government contends that it can cherry pick parts of that loan calculation methodology in pleading its claims and opposing a motion to dismiss, and simultaneously prohibit the Court from considering the *entire* loan calculation methodology. Of course the entire loan calculation is

---

[4] SR MTD 17 & n.14, citing *See How We Calculate Your Potential Loan Amount*, KABBAGE.COM    (June    22,    2020,    7:31    PM) [https://web.archive.org/web/20200618201819/https://www.kabbage.com/paycheck-protection-program-loans/?utm_medium=email&utm_source=govdelivery]. The Government investigated Kabbage for more than three years. Its procedural attacks on what it knows to be true are beneath its obligation to seek justice. Its first procedural attack is that we failed to attach a copy of the physical webpage to our motion. Opp. 71. The Government does not claim it could not find the webpage on the internet. We apologize for that oversight and have attached it here as Exhibit 2. We ask the Court not to hold the failures of counsel against our client.

"central" to the Government's claims—either the full calculation created inflated loan amounts, *or it did not.*

Finally, the Government argues that the Court should not take "judicial notice" of the archived webpage, because it is not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Opp. 71 (citation omitted). There is no dispute about authenticity – as a simple browser search demonstrates this. We do not ask the Court to take judicial notice of hearsay statements of fact on the webpage for their truth. The Court need only notice that the webpage said what it said, and that it was part of Kabbage's website and web portal. The Government explicitly relied on that website and web portal to support its claims.

Robinson's MTD referenced websites with statistics about SALT rates compared to health and retirement benefits solely to illustrate that the Court's common sense "plausibility" analysis should require the Government to plead that the SALT and 100k errors actually created inflated claims. Even though we expressly said that the Court should not take judicial notice of those "damned statistics" (SR MTD 20 & n. 23), the Government's Opposition said the Court should ignore the plausibility analysis. It claims that "Robinson's . . . contention is fact intensive and would require examination on a loan-by-loan basis whether a borrower whose loan was impacted by the SALT and $100k Errors made eligible healthcare and retirement payments for employees and whether those payments, when taken into account in the loan amount, exceeded the inflation caused by the SALT and/or $100k Errors." Opp. 71-72. *Precisely.* That is the calculation Defendants would have had to make in order to "know" that any individual loan application was inflated. And that is the calculation the Government must make to plead and prove its claims.

IV.    **THE EXTENSIVE BORROWER CERTIFICATIONS REQUIRED FOR LOAN FORGIVENESS, AND SBA'S FINAL VOLUNTARY AGREEMENT, BROKE THE PROXIMATE CAUSATION CHAIN BETWEEN DEFENDANTS' CONDUCT AND KABBAGE'S LATER FORGIVENESS APPLICATIONS.**

Defendants left Kabbage in October 2020. Robinson argued that the Complaint failed to allege proximate causation between Defendants' alleged conduct and Kabbage's later forgiveness applications. SR MTD 22-25. The Government's Opposition responded that it was foreseeable that a borrower who had obtained an inflated PPP loan would apply for forgiveness using the same calculations. Opp. 88-90. That is too simple and preliminary. To obtain forgiveness, borrowers had to make extensive certifications and fill out a worksheet recalculating forgiveness loan amounts, with specific references to deducting employee compensation in excess of $100,000 annually. SR MTD 23-24.

Further, the Government alleges that Kabbage was on notice of the 100k and SALT errors after Defendants left. It was not reasonably foreseeable before October 2020 that Kabbage would process erroneous forgiveness applications after entering the 2021 Agreement. The borrower certifications and the 2021 Agreement broke any chain of proximate causation.

## CONCLUSION

The Court should separately consider, and dismiss, the Government's BSA/AML 3.b.(i)-(iii) claims, the 100k error claims, and the SALT error claims, and dismiss the entire Complaint with prejudice.

11

Dated: May 9, 2025

Respectfully submitted,

/s/ *Henry W. Asbill*
Henry W. Asbill (admitted *Pro Hac Vice*)
Christopher B. Mead (admitted *Pro Hac Vice*)
Lisa H. Schertler (admitted *Pro Hac Vice*)
Paola Pinto (admitted *Pro Hac Vice*)
Schertler Onorato Mead & Sears, LLP
555 13th Street, N.W. | Suite 500 West
Washington, DC 20004
hasbill@schertlerlaw.com
cmead@schertlerlaw.com
lschertler@schertlerlaw.com
ppinto@schertlerlaw.com
Phone: (202) 628-4199
Fax: (202) 628-4177

*Counsel for Defendant Spencer Robinson*

12

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 9, 2025, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

Dated: May 9, 2025                          Respectfully Submitted,


                                            /s/ *Henry W. Asbill*
                                            Henry W. Asbill (admitted *Pro Hac Vice*)
                                            Schertler Onorato Mead & Sears, LLP
                                            555 13th Street, N.W. | Suite 500 West
                                            Washington, DC 20004
                                            hasbill@schertlerlaw.com
                                            Phone: (202) 628-4199
                                            Fax: (202) 628-4177

                                            *Counsel for Defendant Spencer Robinson*

13