IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* PAUL PIETSCHNER,<br><br>Plaintiff,<br><br>v.<br><br>KATHRYN PETRALIA;<br>ROBERT FROHWEIN; and<br>SPENCER ROBINSON,<br><br>Defendants. | Civil Action No.: 4:21-cv-110-SDJ |

**UNITED STATES' OMNIBUS SUR-REPLY IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE UNITED STATES' COMPLAINT-IN-INTERVENTION**

Plaintiff, the United States of America (the "United States" or the "Government") by and through undersigned counsel, hereby submits this sur-reply in opposition to Defendants' Motions to Dismiss (ECF No. 66, the "Joint Motion"; ECF No. 65, the "Petralia Motion"; ECF No. 67, the "Robinson Motion"; ECF No. 68, the "Frohwein Motion"). This sur-reply contains three parts: **Part I** responds to arguments in Defendants' Reply in Support of their Joint Motion to Dismiss (ECF No. 91, the "Joint Reply"); **Part II** responds to arguments in Defendant Robert Frohwein's Reply Brief in Support of His Motion to Dismiss (ECF No. 93, the "Frohwein Reply"); and **Part III** responds to arguments in Defendant Spencer Robinson's Reply in Support of His Motion to Dismiss (ECF No. 90, the "Robinson Reply"). The United States has not included a sur-reply to Defendant Kathryn Petralia's Reply in Support of Her Motion to Dismiss (ECF No. 92, the "Petralia Reply") because the arguments therein are sufficiently addressed in the United States' Opposition (ECF No. 72, the "Opposition" or "Opp'n").

1

I.    **GOVERNMENT'S RESPONSE TO THE JOINT REPLY**

In this sur-reply, the United States responds to certain arguments in the Joint Reply relating to venue and personal jurisdiction (at 1, 3–5) and materiality (at 9–12). This sur-reply does not address other arguments relating to venue (at 2–3, 6–7), falsity (at 7–9), conspiracy (at 12–13), Defendants' Fifth Amendment invocations (at 13–14), or amendment of the United States' Complaint-in-Intervention (ECF No. 40, the "Complaint") (at 14–15) because these points are sufficiently addressed in the United States' Opposition.

A.   **In Requesting Transfer as an Alternative to Dismissal, the United States Has Not Proposed NDGA As An "Alternate Venue."**

Preliminarily, Defendants misconstrue in the introduction to the Joint Reply (at 1) the Government's request that the Court consider transfer under 28 U.S.C. § 1406(a) as an alternative to dismissal as seeking transfer of this case to the U.S. District Court for the Northern District of Georgia ("NDGA").[1] That provision authorizes a Court, "in the interest of justice" to transfer an action to "**any** district or division in which it could have been brought." *Id.* (emphasis added). Consistent with the arguments in the Government's Opposition, there are numerous judicial districts where venue would be proper under 31 U.S.C. § 3732(a) (in a multi-defendant case, venue exists in any district where "any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred").

For example, other judicial districts with venue over this entire action include those in which Robinson and Frohwein reside (on information and belief, the Middle District of Florida and the Northern District of California, respectively). Moreover, venue is proper in any judicial

---

[1] The United States has not identified NDGA as its "second-choice" venue among these various options. Further, no Defendant has proposed to meet and confer with the Government to determine whether there is a single, alternative venue for this action that would be satisfactory to all parties.

2

district where the Complaint alleges that a False Claims Act ("FCA") violation caused by Defendants occurred, or any overt act in furtherance of Defendants' alleged conspiracy occurred (Opp'n 16–17), a list that includes the District of New Jersey (Compl. ¶ 302), the Northern District of Illinois (Compl. ¶ 326), the Southern District of Texas (Compl. ¶ 328), the District of Columbia, where each one of the alleged false claims and statements in this action was presented to the U.S. Small Business Administration ("SBA"), and the Eastern District of Virginia, where SBA maintained servers that accepted PPP applications and processing fee requests from lenders and transmitted processing fees to lenders. Were the United States to amend its Complaint to allege the specific location of any other thousands of violations of the FCA caused by Defendants' conduct referenced in the Complaint, venue for this entire action would be proper in those myriad judicial districts as well.

Nonetheless, for the reasons set forth in the United States' Opposition and in this sur-reply, the Court need not consider transfer or the numerous venue alternatives because venue is proper in this District.

### B. All Allegations in the Complaint Are Relevant to Venue.

Defendants' continued reliance (Joint Reply 4) on the venue allegation stated in the Complaint (¶ 7) is misplaced. As the very case law on which Defendants rely makes clear, if a court decides venue on the papers, it does so based on all facts alleged in the Complaint taken as true. *See, e.g.*, *Tobien v. Nationwide Gen. Ins. Co.*, 133 F. 4th 613, 621 (6th Cir. 2025) (where district court "decided a 12(b)(3) motion on the papers alone," plaintiff was required to "show that his pleadings and affidavits, if accepted as true, would establish that venue was proper"). Alternatively, a plaintiff may be entitled to present evidence or obtain venue discovery to create a factual record in support of its theory of venue. *Id.* at 621–22. In fact, a plaintiff need not allege venue in its Complaint at all. *Id.* at 621.

3

### C. Venue is Proper Wherever Any Single "Act Proscribed by Section 3729" Occurred.

Causing another to make a false statement or to submit false claims is an FCA violation. 31 U.S.C. § 3729. It follows then, that the acts constituting an FCA violation occurred where actions were taken to cause false statement and claims, as well as where false statements were made or false claims were submitted by another. Here, Defendants took actions that caused others located in the Eastern District of Texas to submit false claims or to make false statements. Thus, the Government alleges that Defendants not only presented false claims and made false statements, but also *caused* and *conspired to cause* the submission of false claims and false statements in violation of the FCA. *See, e.g.*, Compl. ¶¶ 332–334; 339, 346. Thus, § 3732 creates venue in the Eastern District of Texas because the false claims and statements made in that location are "act[s] proscribed by section 3729."

Defendants similarly miss the point (at Joint Reply 5) of the conspiracy case law cited in the Opposition (at 17), which is persuasive authority about how courts determine where the acts constituting a conspiracy occurred. Just like the conspiracy provision of the FCA, 31 U.S.C. § 3729(a)(1)(C), the elements of criminal conspiracy offenses include an agreement and overt acts in furtherance of the conspiracy. *Compare United States v. Romans*, 823 F.3d 299, 309–10 (5th Cir. 2016) (criminal conspiracy elements), *with United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (FCA conspiracy elements). As explained in *Romans*, a criminal conspiracy occurs where the agreement is formed and where the overt acts take place, and that is why venue exists in any of those locations. 823 F.3d at 309–10. Defendants offer no rationale or analysis as to why, in the FCA context, the location of the conspiracy should be approached differently. To the contrary, all elements of an FCA conspiracy offense, including the agreement

4

and the overt acts, are "act[s] proscribed by section 3729." Therefore § 3732 creates venue wherever any one of those acts occurred.

Further, Defendants are wrong that the Government's theory of venue would "overrun § 3732(a), leading to nationwide venue . . . wherever an individual works for a company with customers nationwide." Joint Reply 5. Where, as here, the Government alleges that individuals, through their direction and control over a company, caused the submission, or conspired to cause the submission, of false claims in multiple locations throughout the United States, the plain language of 31 U.S.C. § 3732(a) establishes venue in any one of those locations. The touchstone of § 3732(a) is where FCA violations occurred. If a defendant's fraud is truly nationwide in scope, then nationwide venue is entirely consistent with § 3732(a).

### D. Defendants' Mischaracterization of FCA Materiality Would Render FCA Enforcement Meaningless.

The Defendants' arguments about materiality are flawed and should be rejected. It is ostensibly Defendants' position that because the SBA acknowledged from the outset that there was some risk of fraud in the PPP, Defendants' and Kabbage's knowing approval of fraudulent PPP loans could not have been material to SBA's payment decision. Joint Reply 10–11. First and foremost, courts have acknowledged that "[t]he potential for fraud exists in any government program and, certainly, in [a] situation . . . where mass amounts of federal funds were expended in emergency and less-controlled conditions." *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 380 (5th Cir. 2009). There is no exception to FCA liability for those who defraud the government during a national emergency, nor should the Government be foreclosed from pursuing those who commit fraud on a government program where the government was required to take immediate action to provide emergency assistance. Second, Defendants mischaracterize both the allegations of the Government's Complaint and the arguments in its

Opposition. *See* Compl. ¶¶ 297, 310, 322, 343; Opp'n 73–82. The Government's FCA action has never been premised on Kabbage's failure to stop 100 percent of borrower fraud. Instead, the Government asserts that Kabbage, under Defendants' direction and control, falsely certified that it would and did comply with PPP lender requirements; that Kabbage failed to do so; and that this very failure was material to SBA's decision to pay Kabbage processing fees, to forgive loans, and make guaranty purchase payments. Compl. ¶¶ 297, 310, 322, 343. SBA's recognition that there would be a risk of fraud by borrowers in the PPP is not acceptance of Kabbage's, and Defendants', knowing failure to comply with lender requirements.

Equally as troubling is Defendants' claim that Kabbage was not required to certify the accuracy of the loan amount. Joint Reply 12. This is incorrect. The April 15, 2020, Interim Final Rule specifically requires that the lender "[c]onfirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application." 85 Fed. Reg. 20811, 20815 (Apr. 15, 2020); Compl. ¶ 40. Kabbage was further required to certify that it had done so by executing SBA Form 2484. *See* Compl. ¶ 41. Under Defendants' logic, a PPP lender, such as Kabbage, would serve as merely a repository for borrower documentation and certifications without any further responsibility or accountability. But the PPP required lenders to do more than merely *collect* borrower documentation and certifications. SBA and Congress delegated to lenders the responsibility for making PPP loans, imposed requirements for how it expected lenders to perform that function, and paid lenders a processing fee in exchange for their performance of the required functions. *See* 15 U.S.C. § 636(a)(36)(F)(ii), (a)(36)(P); 85 Fed. Reg. 20811, 20815 (Apr. 15, 2020). If there were no such requirements as Defendants claim, SBA need not have delegated any responsibility to PPP lenders, and borrowers would have directly submitted their PPP loan applications to SBA. The

Government alleges that Defendants caused the certifications Kabbage and its lender partners made on SBA Form 2824 to be false, and thus, Defendants violated the FCA.

## II.  GOVERNMENT'S RESPONSE TO THE FROHWEIN REPLY

Frohwein's reply raises for the first time the argument that the Government's common law claims should be dismissed "because any recovery under them would be duplicative." Frohwein Reply 9–10 (citing *United States ex rel. Drummond v. BestCare Lab'y Servs., LLC*, 950 F.3d 277, 284 (5th Cir. 2020) and *United States ex rel. Chang v. Child.'s Advocacy Ctr. of Del.*, No. 15-442, 2017 WL 4161975, at *3 (D. Del. Sept. 20, 2017)). This argument fails because it is both untimely and legally incorrect.[2]

First, arguments raised in a reply brief for the first time are not properly before the Court and are waived. *Dugger v. Stephen F. Austin State Univ.*, 232 F. Supp. 3d 938, 957 (E.D. Tex. 2017). Frohwein failed to raise this argument in his motion and thus, it is waived and need not be considered.

Second, even if it is considered, neither case cited by Frohwein supports dismissal of the government's common law claims. As an initial matter, "it is common for FCA plaintiffs to pursue related common law claims . . . based on the same set of facts." *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 659 (N.D. Tex. 2020). Frohwein's own parenthetical describing *Drummond* shows that *Drummond* speaks to the ultimate recovery of damages and its calculation. *See* Frohwein Reply 9–10 (describing *Drummond* as holding that "a damages award for unjust enrichment and payment by mistake was subsumed within a judgment under the FCA"). And *Drummond* does not stand for the proposition that the government is precluded from pursuing alternative theories of recoveries at the pleadings stage. *See* 950 F.3d at 284. Indeed, it recognizes

---

[2] This sur-reply does not address other arguments in the Frohwein Reply because they are sufficiently addressed in the Government's Opposition.

7

the contrary. *See id.* at 279. *Chang* is also inapposite because it involves the cursory dismissal of a Delaware state law claim of unjust enrichment asserted by a *qui tam* relator along with the relator's FCA claim. *See* 2017 WL 4161975, at *3. Among other issues, the court in *Chang* held that the relator had failed to plead "the absence of a remedy provided by law," which is one of the required elements of a Delaware unjust enrichment claim. *Id.* By contrast, here the Government's unjust enrichment claim arises under federal common law, which does not require that element. *See* Opp'n 98–99 (listing elements of federal common law unjust enrichment claim, citing *United States ex rel. Silva v. VICI Mktg., LLC*, 361 F. Supp. 3d 1245, 1257 (M.D. Fla. 2019)).

### III. GOVERNMENT'S RESPONSE TO THE ROBINSON REPLY

This sur-reply responds to various factual arguments and assertions in the Robinson Reply (at 1–3, 4–5, and 7–10), including new arguments about materiality based on SBA's parallel administrative settlement with Kabbage, attached to the Robinson Reply as Exhibit 1, ECF No. 90-1. This sur-reply does not respond specifically to the remaining arguments in the Robinson Reply because they are adequately addressed in the Government's Opposition.

#### A. PPP Lenders Were Required to Comply with Lender Requirements Notwithstanding Borrower Certifications.

In his Reply, Robinson suggests that because Kabbage received borrower certifications in their PPP loan applications, Kabbage's loan review process, as described in the Government's Complaint, complied with the requirements of the SBA regulations, *see* 85 Fed. Reg. 20811, 20815 (Apr. 15, 2020). *See* Robinson Reply 1–3. In essence, Robinson argues that borrower certifications preclude liability for PPP lenders and Defendants. This is inaccurate. As described above in Part I.D, the borrowers' certifications did not relieve Defendants from their obligations to comply with all PPP lender requirements. *See* Compl. ¶ 22. Those obligations included "[c]onfirm[ing] receipt of information demonstrating that a borrower had employees for whom the

8

borrower paid salary and payroll taxes on or around February 15, 2020," "[c]onfirm[ing] the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application," and "[f]ollow[ing] applicable BSA requirements," in addition to "[c]onfirm[ing] receipt of borrower certifications."  85 Fed. Reg. 20811, 20815 (Apr. 15, 2020).  As explained in the Opposition (at 34–35), Kabbage, under Defendants' control and direction, knowingly failed to follow those requirements, resulting in loans where Kabbage double-counted state and local income taxes (the "SALT Error") and failed to exclude annual per-employee compensation over $100,000 (the "$100K Error") when calculating borrowers' eligible payroll costs, resulting in the fraudulent inflation of PPP loan amounts.

### B. The Government Has Alleged That Defendants Caused Kabbage to Breach Its Obligations as a Lender.

Robinson argues that the Government is wrongly requiring "more" of Kabbage than was legally required and dismissively refers to the Government's allegations as "jury bait."  Robinson Reply 4–5.  This is inaccurate.  For every loan processed and approved by Kabbage, Kabbage and its lender partners certified that Kabbage had "[c]onfirm[ed] receipt of borrower certifications," "[c]onfirm[ed] receipt of information demonstrating that a borrower had employees for whom the borrower paid salary and payroll taxes on or around February 15, 2020," "[c]onfirm[ed] the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application," and "obtained and reviewed the required application (including documents demonstrating qualifying payroll amounts)."  85 Fed. Reg. 20811, 20815 (Apr. 15, 2020); SBA Form 2484; *see* Compl. ¶¶ 26–27.  PPP regulations also required Kabbage to "[f]ollow applicable BSA requirements."  85 Fed. Reg. 20811, 20815 (Apr. 15, 2020); *see* Compl. ¶ 44.  Notwithstanding Robinson's contentions, which invite the Court to

draw inferences in his favor, the Government seeks to hold Defendants accountable for their failure to comply with these requirements.

### C. The Court Should Not Consider Exhibit 1 Attached to Robinson's Reply, and Exhibit 1 Does Not Support Robinson's Arguments Regarding Materiality, Falsity, or Scienter.

Robinson attaches to his reply brief a 2021 agreement between Kabbage and the SBA ("2021 agreement") to support his arguments that the Government has not plausibly alleged materiality as to the $100k Error, Robinson Reply 7–8, and that the Government has not alleged falsity as to either the SALT or $100k Errors, Robinson Reply 8–10. Consideration of the attachment is procedurally improper and the attachment itself does not support Robinson's arguments.

First, Robinson offers no legal authority to support this Court's consideration of an attachment to a reply brief in support of a motion to dismiss. *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (holding that a court may only consider "documents attached to the *motion to dismiss*" if they are "referred to in the plaintiff's complaint *and* are central to the plaintiff's claim" (emphasis added)).

Second, the 2021 agreement is not "central" to the Government's claims as defined by *Scanlan* such that it should be considered here, even if it had been attached it to one of the Defendants' motions to dismiss. Generally, courts consider documents attached to a motion to dismiss that are referred to in the complaint to be "central" to the claims when they form the basis of the dispute at issue. *See PHI Grp., Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 841 (5th Cir. 2023) (considering insurance policy attached to motion to dismiss in resolving dispute over losses covered by policy); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (finding in insurance dispute that insurance contracts not attached to the complaints should be considered because they were (1) "attached . . . to their motions to dismiss," (2) "referred to in the complaints,"

and (3) "central to the plaintiffs' claims"); *Russell v. Allianz Life Ins. Co. of N. Am.*, No. 3:13-CV-00030, 2014 WL 4545807, at *2 n.2 (N.D. Miss. Sept. 12, 2014) (considering rules and regulations of insurance company that were referenced in complaint and at issue in breach of contract action between insurance company and agent).

The single reference to the 2021 agreement in the Government's 364-paragraph Complaint (at ¶ 145) and the references to that Complaint paragraph in the Government's Opposition (at 34, 47, 77) do not make the 2021 agreement "central" to the Government's claim. *See Scanlan*, 343 F.3d at 536–37 (holding that district court erroneously considered a report that defendants attached to their motion to dismiss because the plaintiffs referred to the report in their complaints). And, unlike in *PHI Grp.*, *In re Katrina Canal Beaches Litig.*, and *Russell*, this action does not seek to enforce or adjudicate the terms of the 2021 agreement. Rather, the reference to the 2021 agreement in the Complaint is just one of many facts supporting the United States' allegations of materiality and falsity as to the SALT Error.

Third, the 2021 agreement, which resolves administrative claims relating to the SALT Error, does not support Robinson's arguments about materiality. It does not tell "a story of Government *inaction* on the 100k error," as Robinson claims. Robinson Reply 7. The agreement states it is "a resolution of the Excess Loan Amounts on the Affected PPP Loans," Robinson Reply Ex. 1, Recital N, which are defined as loans "involving duplication of state and local income taxes," *id.* at Recital C. It specifically reserves claims for liability under the FCA and for "any conduct other than that relating to the Excess Loan Amounts." *Id.* ¶¶ 3, 7–8, 14. The terms of the 2021 agreement therefore make clear that it resolves certain administrative claims regarding excess loan amounts relating to SALT only. It does not address the $100k Error and does not support Robinson's contention that SBA agreed to accept Kabbage's forgiveness applications in full knowledge of the $100k Error. In fact, the agreement provides that "Kabbage represented and

11

warranted . . . that the Non-Affected PPP Loans . . . were processed, made, and originated in accordance with all PPP Loan Program Requirements." *Id.* at Recital E. Given this express representation, it is reasonably inferable that the 2021 agreement preceded any awareness on the part of the SBA relating to the $100k Error, consistent with the allegations of the Government's Complaint that SBA stopped processing guaranty and forgiveness payments for affected loans when informed of the $100k Error. Compl. ¶ 184.

Fourth, Robinson argues that the 2021 agreement supports his contention that the Government has not plausibly alleged falsity with respect to the SALT Error and the $100k Error because other calculation errors by Kabbage understated the loan amount, such that the loan amount was not falsely stated when the several errors are offset. Robinson Reply 8–9. He further contends that the Government did not dispute that Kabbage's calculation as a whole understated the loan amounts, though the Government did dispute this in its Opposition. *See* Opp'n 70. By including ineligible payroll costs in the loan calculation, Kabbage, through Defendants' actions, falsely stated the loan amount and falsely certified that it had "confirm[ed] the dollar amount of average monthly payroll . . . by reviewing the payroll documentation." USG Compl. ¶¶ 26–27, 287; *see* Opp'n 66. Furthermore, the 2021 agreement that Robinson relies on now does not support his argument that the loan amounts were not falsely inflated due to his 'offset' theory. Rather, the 2021 agreement states that "on a loan-by-loan basis, the Payroll Cost Methodology [developed by Kabbage] *does not* fully offset the Excess Loan Amounts [resulting from duplication of SALT] because for approximately 4,000 Affected PPP Loans, the estimated payroll costs as a percentage of total compensation are less than the Excess Loan Amounts as a percentage of the PPP loan amount." Robinson Reply Ex. 1, Recital M (emphasis added). The parties to the agreement estimated the amount "not offset by the Payroll Cost Methodology is approximately $13.5

12

million." *Id.* Even accepting Robinson's argument, that one of Kabbage's calculation errors was offset by another, the Government has plausibly alleged falsity.

Moreover, Robinson argues that he and the other Defendants could not have known that any individual loan was inflated despite the offset because it is a loan-by-loan inquiry. Robinson Reply 10. This argument fails because it asks for inferences to be drawn in his favor, contrary to the well-settled review standard for a motion to dismiss. Opp'n 44. As alleged in the Complaint, Defendants, and Kabbage, decided to calculate the loan amount for borrowers. Compl. ¶¶ 86–87. They knowingly included amounts that were not eligible payroll costs and that fraudulently inflated PPP loan amounts. Compl. ¶¶ 110–111, 150, 152. They also knowingly chose not to include some costs because it did not suit their purposes of processing as many loans as quickly as possible to increase their processing fees. Compl. ¶¶ 82, 86, 153, 203. Now, Robinson argues that Defendants could not have known that the loan amount was inflated due to their numerous, knowing errors. Rather than weighing in favor of dismissal, this argument shows that the Government has plausibly alleged that Robinson and Defendants were at the very least deliberately ignorant or reckless as to the truth of the loan amount when they approved the PPP loan calculation. *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023).

### D. The Government Alleged That Defendants Caused Kabbage to Miscalculate the Borrower's Loan Amount.

Lastly, Robinson argues that the Government uses "the wrong falsity predicate to support materiality," because the "inflated loan amount" is the "borrower's falsity," while a "review failure" is "Kabbage's alleged falsity." Robinson Reply 8. This mischaracterizes the Government's Complaint. As described in the Complaint, the Government has alleged that through Defendants' knowing direction and control, Kabbage calculated the loan amount and informed borrowers which costs it would and would not include. Compl. ¶¶ 86–87. Kabbage did

13

so incorrectly, and Defendants knew it. Compl. ¶¶ 110–112, 150, 152; *see also* Opp'n 70. Kabbage, as a result of Defendants' knowing conduct, both falsely stated the loan amount, and caused the borrower to do so.

This Court should decline Robinson's procedurally improper arguments, which ask that this Court adjudicate facts without proper context and make inferences in his favor. *See United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014).

\* \* \*

## **CONCLUSION**

For these reasons, and for the reasons set forth in the United States' Opposition, we respectfully request that this Court deny in full Defendants' Motions to Dismiss under Rules 12(b)(2), (b)(3), (b)(6) and 9(b).

Dated: May 30, 2025

Respectfully submitted,

BRENNA E. JENNY
Deputy Assistant Attorney General

JAY R. COMBS
Acting United States Attorney
Eastern District of Texas

*/s/ Betty Young*
JAMES G. GILLINGHAM, Texas Bar #24065295
BETTY S. YOUNG, Texas Bar #24102498
Assistant U.S. Attorneys
Eastern District of Texas
110 N. College Street, Suite 700
Tyler, Texas 75702
E-mail: James.Gillingham@usdoj.gov
E-mail: Betty.Young@usdoj.gov
(903) 590-1400
(903) 590-1436 (facsimile)


JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
SARAH E. LOUCKS
KELLY E. PHIPPS
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
E-mail: Sarah.E.Loucks@usdoj.gov
E-mail: Kelly.E.Phipps@usdoj.gov
(202) 616-4203
(202) 514-0280 (facsimile)
**ATTORNEYS FOR THE UNITED STATES OF AMERICA**

15

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2025, I caused a true and correct copy of the foregoing document to be transmitted through the Court's electronic mailing service (CM/ECF) to all counsel of record who have consented to electronic service by the Court's electronic mailing service (CM/ECF).

*/s/ Betty Young*
BETTY S. YOUNG